IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK L. BUNCE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| vs. | : | No. 2:23-cv-01740 |
| | : | |
| VISUAL TECHNOLOGY INNOVATIONS, INC. | : | District Judge Scott |
| | : | |
| | : | Magistrate Judge Hey |
| and | : | |
| | : | |
| MATHU G. RAJAN, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO ENFORCE SETTLEMENT

Plaintiff Mark Bunce respectfully responds in opposition to Defendants' Motion to Enforce Settlement. *See* Doc 71; Doc. 71-1. The motion is frivolous, brought in bad faith, and regrettably forces the Court and Bunce to expend more time and resources on unnecessary motion practice. The Court should deny the motion and award Bunce, under 28 U.S.C. § 1927, his reasonable attorneys' fees incurred in responding. All exhibits to this brief are authentic copies of the documents referenced.

The brief narrates the parties' course of conduct relating to settlement and points out the deficiencies in Defendants' arguments. But the Court could deny the motion based simply on admissions that the Defendants make in the parties' Join Status Report filed on July 2, 2024. Doc. 72. In that filing, Defendants ask the Court to order a settlement conference so that the parties can agree on terms of a settlement, thus admitting that no settlement has in fact been reached:

> A settlement was already reached but judicial economy considerations require a balancing of the time consumption of a short settlement conference (***when parties are very close to resolution anyway***) versus the time it would take for an evidentiary hearing on settlement enforcement [docket 71] and potentially resolve

> many pending motions (dismiss some claims, protective order, compel discovery, etc.) and future ones and eventually a full jury trial. ***Both parties already agree that $100,000 would be the upfront initial payment for settlement and mainly dispute the amount of the monthly installments thereafter. It is the opinion of Defense Counsel, that the formality of a settlement conference would be beneficial in resolving any remaining disputes for settlement.*** Counsel advocates participation of the parties in such a settlement conference virtually so that it may be immediate and account for Plaintiff living internationally.

Doc. 72 at 4 (emphasis added). This filing conclusively demonstrates that Defendants know their motion to enforce settlement has no legitimate factual or legal basis and has been filed in bad faith for improper purposes.

I. **Factual Background**

   A. ***Rajan's Fraudulent Scheme and Lack of Candor***

Bunce alleges that Defendant Mathu Rajan fraudulently induced Bunce to loan $1,050,000 to Rajan's company, Defendant Visual Technology Innovations, Inc. Doc. 1. Rajan did so by representing VTI had employees and assets and sold video products that could project three dimensions from flat screens. *Id*. at 4-8. Unknown to Bunce, this story was untrue. It was plausible because Rajan in fact owned and was CEO of Stream TV, a company which had actually raised hundreds of millions of dollars and had developed valuable patents. But due to Rajan's mismanagement, it still had no product to sell. When Stream TV became unable to pay its bills, its creditors sought to foreclose on its assets. Rajan had the company file bankruptcy in Delaware and later in Pennsylvania. Doc. 1 at 3-5 ¶¶ 9-18; *In re Stream TV Networks, Inc.*, BR 23-10763, 2024 WL 87639, at *2-4 (Bankr. E.D. Pa. Jan. 5, 2024); *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022).

The bankruptcy courts have already recognized that Rajan is willing to engage in improper litigation conduct and to lie under oath. The Delaware bankruptcy court dismissed Stream TV's first bankruptcy because it was filed in bad faith. *In re Stream TV*, 2024 WL 87639, at *3; Doc.

65-1 (*In re Stream TV Networks, Inc.*, BR 23-10763, Doc. 200 (genuine copy of transcript of May 17, 2021 oral rulings)). After Rajan later caused Stream TV to refile bankruptcy in Pennsylvania, the Pennsylvania bankruptcy court described his testimony as "difficult to believe," "evasive," "convoluted," "lack[ing] candor," "untrustworthy," "not believable," "self-serving," "not credible," "flippant," "unintelligible, or alternatively, intentionally deceptive," unsupported by corroborating facts, and contradicted by documents. *In re Stream TV*, 2024 WL 87639, at *17–18, 22, 24–25, 27–28, 31.

The Pennsylvania bankruptcy court found that Rajan, trying to convince the court to allow him to stay in control of his bankrupt company, had even fabricated a story about a non-existent transaction in which a supposed Chinese company called "Zhongsheng" was going to invest $300 million in Stream TV:

> The Court finds the entire picture that Mr. Rajan painted of the Zhongsheng transaction to be not credible. The Court finds the almost complete lack of documentation and communications related to a purported $300 million transaction to be most damning and suggests that the transaction was not real… the Court finds Mr. Rajan's testimony was not believable and was instead suggestive that the transaction was never real to begin with.

*Id*. at *16–18. Ultimately, the bankruptcy court found that Rajan "has administered these estates with an eye towards what he personally wants to accomplish and disclose, rather than acting consistent with his obligations to the Court and the estates' creditors," and the court removed him from control of his own company. *Id*. at *22, 36.

As further explained below, this kind of litigation misconduct has carried over to *this* case.

### B. *History of Settlement Negotiations*

Defendants' narrative in their brief is inconsistent with the factual record. To provide an accurate narrative, Bunce provides the following correspondence for the Court's review. The June

2024 communications—which Defendants incorrectly claim show a settlement—are set out below.

1. By letter dated February 7, 2023, before this lawsuit was filed, counsel for Bunce gave Defendants an opportunity to avoid litigation by simply repaying the outstanding loan balance of $1,050,000. *See* **Ex. A** (Feb. 7, 2023 M. Rajan Ltr.).

2. Not disputing that he owed $1,050,000, via email dated February 23, 2023, Rajan proposed a potential repayment schedule, without firm dates. *See* **Ex. B** (M. Rajan Email Feb. 23, 2023). No payment having been made, this lawsuit was subsequently filed on May 5, 2023.

3. On April 17, 2024, Defendants made a first settlement offer to Bunce. *See* **Ex. C** (Apr. 17, 2024 R. Rajan Ltr.). In this letter, Raja Rajan, Defendant Rajan's brother and attorney, boasted about making Bunce have to spend a lot of money prosecuting his claims: "Since I pay with arrangements with the VTI lawyer on a fixed flat fee, I know the legal cost being expended by him. Its no where [sic] the cost of the lawyers in the Stream TV bankruptcy. It may be expensive to collect your money back unless you lawyers are dirt cheap. I request you consider this proposal before depositions commence."

4. On April 22, 2024, in response to Defendants' April 17 letter, Bunce made a first counteroffer to Defendants. *See* **Ex. D** (Apr. 22, 2024 M. Kohler Ltr.).

5. On April 25, 2024, Defendants rejected Bunce's April 22 counteroffer, suggesting they negotiate different, additional terms. *See* **Ex. E** (Apr. 25, 2024 R. Rajan Ltr.). This was Defendants' second attempt a making a settlement proposal, though its terms are indefinite.

6. On May 22, 2024, Defendants made a third settlement offer to Bunce. *See* **Ex. F** (May 22, 2024 R. Rajan Ltr.). Defendant's counsel reiterated his boast about making Bunce spend a lot of money prosecuting his claims: "Since I have payment arrangements with the VTI lawyer on a fixed flat fee, I know the legal cost being expended by him. It's nowhere near the cost of the lawyers in the Stream TV bankruptcy. It may be expensive to collect your money back unless your lawyers are dirt cheap. I request you consider this proposal before depositions commence." Plaintiff did not respond to this offer because the terms remained unacceptable.

7. On June 23, 2024, Defendants made a fourth settlement proposal to Bunce. This is the subject of Defendants' motion. The communication states:

    > VTI and are confident that Mr. McCarthy will contribute to the proposed settlement. Accordingly, in the settlement agreement, we will need a full release for Mr. McCarthy also.
    >
    > - $50k upfront payment with the settlement documents.
    > - $25k per month until $1,050,000 is reached.

4

- The documents will have customary terms including non-disparagement and confidentiality.
- No prepayment penalty (we will try to pay off early). A five (5%) discount if paid in full in 2025.

**Ex. G** (June 23, 2024 R. Rajan Ltr.) (bullet points in original).[1]

8. On June 24, 2024 at 11:39 a.m., counsel for Bunce responded via email to Defendants' fourth proposal. Defendants incorrectly characterize this email as a "counteroffer." Bunce rejected Defendants' fourth proposal and invited further negotiations. Counsel for Bunce explained:

    > As for the settlement offer, it is not a serious offer. Any settlement would require the upfront payment of at least $100,000 by defendants. If Mr. McCarthy is going to contribute funds toward a settlement, then we need to communicate with him directly to confirm his position.

    **Ex. H** at 6, (June 24-26, 2024 M. Kohler – R. Rajan Emails).

9. On June 24, 2024 at 1:51 p.m., Defendants responded via email to this invitation to further negotiate by doing so, offering to pay a higher upfront payment, though still less than $100,000:

    > My client wants to increase the lump sum to $75k…Let me know by COB tomorrow if the new settlement offer is accepted or rejected.

    *Id*. at 5-6. Even if Bunce's 11:39 a.m. email had been an offer, it was rejected by this response, which proposed something different.

10. Via an email dated June 24, 2024 at 1:57 p.m., counsel for Bunce rejected a settlement that would include only a $75,000 upfront payment:

    > Your settlement offer is rejected.

    *Id*. at 5.

11. On June 24, 2024 at 3:44 p.m., Defendants responded via email with further negotiation:

    > It is obvious your [sic] using your threats to get another $25k up front. Defendants are seeing if your demand of $100k is possible. They will know by COB 6/25/24 Wednesday.

---

[1] Timothy McCarthy is not represented by Defendants' counsel, Raja Rajan. Mr. McCarthy has not participated in any settlement negotiations. He has not offered to pay any part of a settlement.

5

*Id*. at 2-3.

12. On June 25, 2024 at 3:43 p.m., Defendants emailed what they now improperly characterize as an "acceptance" of a supposed offer from Bunce:

    > Defendants have found $100k you insist as the upfront payment. They will tell McCarthy that he needs to communicate with you if he wants a release of claims also. In case he asks, will email communication be sufficient or it has to be a phone call?
    >
    > Based on that, the deposition of Mr. Bunce is cancelled. Do want us to draft first pass of a settlement agreement or will you do that?

    *Id*. at 2.

13. Via an email and letter dated June 26, 2024, counsel for Bunce made a final settlement demand, which would require an upfront payment of $100,000 no later than close of business on June 27. **Ex. L**. Defendants never accepted this demand.

    C. ***Defendants and Their Counsel Intentionally Caused Bunce to Travel to Philadelphia for No Good Reason.***

Defendants falsely claim there was a settlement, despite the unambiguous record otherwise. Why? Two reasons come to mind. They wish to delay this litigation by injecting motion practice over whether a settlement was reached, using the supposed settlement as a reason to cancel Bunce's deposition on the eve of the close of fact discovery. And Defendants wish to cause Bunce to incur attorneys' fees and costs unnecessarily, hoping he will "cry uncle," give up, and accept their last, rejected proposal.

Despite earlier discussions with the Court about taking depositions remotely to avoid overseas travel, Defendants demanded to depose Bunce in person in the United States. Since Bunce is the plaintiff and filed his lawsuit in this district, he agreed to come to Philadelphia to be deposed on July 1, one week before the end of fact discovery (and a date requested by Defendants' counsel). But Defendants used the false claim of a settlement as a reason to cancel Bunce's deposition at the 11th hour, even though Bunce already had paid for his travel arrangements. Defendants' statements

6

that "Plaintiff desired not to appear for his deposition" and "negotiated fervently to settle the case to avoid his deposition" are false. Doc. 71-1 at 3.

Here's what really happened, as evidenced by email communications and other documents:

1. On April 23, 2024, Defendants' counsel requested available dates in early July for Plaintiff's in-person deposition. **Ex. I** (Apr. 23, 2024 R. Rajan Ltr.).

2. On April 26, 2024, Bunce offered to give his deposition on July 1, 2, or 3. **Ex. J** (Apr. 26-30, 2024 B. Parsley – R. Rajan Emails).

3. On April 30, 2024, Defendants agreed to depose Bunce on July 1. They promised to send a deposition notice (but did not do so). *See id.*

4. On June 21, 2024, counsel for Bunce asked to move the deposition from July 1 to July 2 to accommodate travel from Atlanta, Georgia to Philadelphia by Bunce's counsel. **Ex. H** at 7.

5. Defendants' counsel refused to move the deposition to July 2. *Id.* at 6-7.

6. On June 24, 2024, Bunce's counsel proposed two alternative arrangements for the deposition: July 2 beginning at 9:00 a.m. or July 1 beginning at 1:00 p.m. *Id.* at 6.

7. Defendants' counsel refused to agree to either option. *Id.* at 5. Despite not having sent a deposition notice for Mr. Bunce, Defendants' counsel made it clear that Defendants' counsel expected to go forward with the deposition in person in Philadelphia beginning at 9:00 a.m. on July 1 at the law offices of Bunce's local counsel. *Id.*

8. Bunce's counsel then agreed to conduct Bunce's deposition beginning at 9:00 a.m. on July 1, 2024. *Id.* at 3-4. Bunce's counsel arranged to have local counsel attend the deposition in person and Atlanta counsel would participate remotely.

9. The following day, on June 25, 2024, Defendants communicated that they purported to "accept" Plaintiff's "counteroffer" of an "upfront payment of at least $100,000" and unilaterally stated that Mr. Bunce's deposition was cancelled. *Id.* at 2.

10. On June 24 and 25, 2024, Bunce's counsel explained to Defendants' counsel that no such settlement existed, that Bunce would appear for his July 1 deposition as agreed, that he had arranged to travel to the United States to attend the deposition, and that Defendants had yet to send a deposition notice or information about a court reporter. *Id.* at 1-5. Discovery was set to close on July 8.

11. On June 26, 2024, the same day Bunce traveled to the United States in advance of his deposition, counsel for Bunce emailed Defendants a letter making a final settlement demand, which required Defendants to wire transfer $100,000 to Bunce

7

by close of business on June 27. **Ex. L**. No payment was made and the offer was not otherwise accepted.

12. On June 28, 2024, Defendants filed their baseless motion to enforce a purported "settlement."

13. On July 1, 2024, Bunce appeared for his deposition. Neither Defendants' counsel nor any court reporter appeared for Plaintiff's deposition. **Ex. K** (July 1, 2024 M. Kohler Email). Bunce appeared for his deposition because the parties had agreed for it to occur on July 1, because Bunce believed Defense counsel's contention that a settlement had been reached was made in bad faith and to cause discovery to continue past the July 8 deadline while the motion to enforce settlement was litigated. Defendants could have deposed Bunce on July 1 notwithstanding the purported settlement but did not do so for invalid reasons.

14. On July 2, Defendants admitted in a filing with this Court that the parties were (supposedly) "very close to resolution" and had not, in fact, resolved all disputes between them. Doc. 72 at 4. In other words, there really was no settlement agreement. Defendants wanted a settlement conference so they could further delay this case.

## II.     Law and Argument

### A.     *Legal Standard*

To prevail on their motion to enforce the purported settlement, Defendants must "essentially meet the summary judgment standard." *Newlan v. Norfolk S. Ry. Co.*, No. 3:18-CV-22, 2019 WL 13211877, at *2 (W.D. Pa. Dec. 19, 2019) (citing *Tiernan v. Devoe*, 923 F.2d 1024, 1032 (3d Cir. 1991)). The motion is governed by Pennsylvania law. *See Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009). Defendants must prove there are "no disputed issues of material fact as to the validity of the settlement agreement and that the agreement is valid as a matter of law." *Id.* Ultimately, settlement agreements are simply contracts. To be enforceable, they must meet the same requirements as any contract:

> The validity and enforceability of settlement agreements is governed by state contract law. A settlement agreement is enforceable only if: (1) the parties have manifested an intention to be bound by its terms, and (2) those terms are sufficiently definite to be specifically enforced.

*Newlan*, 2019 WL 13211877, at *2 (internal citations omitted); *see Riviello v. First Nat. Cmty. Bank*, No. CIV.A. 3:10-2347, 2013 WL 1348259, at *1-2 (M.D. Pa. Apr. 3, 2013). A party's intent is an objective analysis concerning whether a reasonable person would think there was an intent to have a binding agreement. *Park v. Evanston Ins. Co.*, No. 19-4384, 2021 WL 5399908, at *3 (E.D. Pa. Nov. 18, 2021). And any settlement agreement cannot be ambiguous or poorly defined. *Id.* When the parties fail to agree on essential terms of the bargain, there is no agreement. *Id.*

Pennsylvania, whose law governs the motion to enforce settlement, has long recognized the "mirror image rule": that "a valid acceptance to an offer must identically mirror the terms of the offer." *In re Whatever, LLC*, 478 B.R. 700, 709 (Bank. W.D. Pa. 2012); *see Am. Eagle Outfitters*, 584 F.3d at 582. Indeed, "nothing is better settled" than the need for a mirror-image acceptance of an offer (which never happened here): "Under the common law mirror image rule, a valid acceptance to an offer must identically mirror the terms of the offer." *In re Whatever, LLC*, 478 B.R. 700, 709 (Bankr. W.D. Pa. 2012) (citing *Flender Corp. v. Tippins Int'l, Inc.*, 2003 Pa. Super. 300, 830 A.2d 1279, 1284 (Pa. Super. Ct. 2003)). The Pennsylvania Supreme Court has explained:

> [I]n order to constitute a contract there must be an offer on one side and an unconditional acceptance on the other. So long as any condition is not acceded to by both parties to the contract, the dealings are mere negotiations and may be terminated at any time by either party while they are pending. There must be a meeting of minds in order to constitute a contract. This doctrine is very familiar and has been recognized many times in our Courts… To constitute a contract the acceptance of the offer must be absolute and identical with the terms of the offer.

*Cohn v. Penn Beverage Co.*, 169 A. 768, 768-69 (Penn. 1934). When the parties are still negotiating and have not come to an agreement on all essential terms of the contract, "there is nothing for the court to enforce." *Lazer & Lazer Corp. v. Agronomed Pharms. LLC*, 618 F. Supp. 3d 186, 199 (E.D. Pa. 2022).

9

### B.  *Bunce and Defendants Never Had a Meeting of the Minds on Essential Terms.*

The communications described show that Bunce and Defendants never reached a meeting of the minds on all material terms of a settlement. There is no mirror-image acceptance of an offer. And the parties have not mutually expressed their intent to be bound. Just the opposite.

First, Defendants erroneously characterize Defendants' fourth "offer" on June 23 as sufficiently definite to achieve a meeting of the minds on all material terms. *See Lazer & Lazer*, 618 F. Supp. 3d at 199. This was not an offer definitely covering all essential terms:

> VTI and are confident that Mr. McCarthy will contribute to the proposed settlement. Accordingly, in the settlement agreement, we will need a full release for Mr. McCarthy also.
>
> - $50k upfront payment with the settlement documents.
>
> - $25k per month until $1,050,000 is reached.
>
> - The documents will have customary terms including non-disparagement and confidentiality.
>
> - No prepayment penalty (we will try to pay off early). A five (5%) discount if paid in full in 2025.

**Ex. G**. This says nothing about how Defendants' counterclaims will be resolved. *See* Doc. 52; Doc. 62. It says a full release from Mr. McCarthy will be required, but there are no communications with Mr. McCarthy concerning his intent to enter into a settlement or the terms of it. McCarthy is not represented by Raja Rajan; he has not been served with the third-party complaint; and he has not communicated with Bunce's counsel concerning any settlement of this case. We thus do not know whether, how, or to what extent he would participate in the purported agreement, to which he is an essential party.

The "offer" also leaves out any discussion of the other, "customary terms." **Ex. G**. The offer omits any discussion of: *Who* will contribute to the upfront payment? *How much will* each contributor pay? and *When* and *how* will the upfront payment be paid? "Even when there is

evidence of mutual assent, a settlement agreement does not constitute an enforceable contract if," as here, "there are ambiguities and undetermined matters which render [the] settlement agreement impossible to understand and enforce." *Derrick Jacobs v. City of Philadelphia,* No. CV 19-4615, 2024 WL 3202549, at *5. (E.D. Pa. June 26, 2024).

Second, Defendants erroneously characterize Bunce's email on June 24 at 11:39 a.m. as a counteroffer: "As for the settlement offer, it is not a serious offer. Any settlement would require the upfront payment of at least $100,000 by defendants. If Mr. McCarthy is going to contribute funds toward a settlement, then we need to communicate with him directly to confirm his position." **Ex. H** at 6. This was a rejection of Defendants' fourth proposal and an invitation to further negotiations, as it did not "mirror" the Defendants' fourth proposal. *See In re Whatever, LLC*, 478 B.R. at 709; *Flender Corp.*, 830 A.2d at 1284. The statement that "this is not a serious offer" plainly shows that, viewed in context, the communication was rejecting an offer and providing information for further discussion. Bunce was *negotiating* the terms of a possible future settlement, not making a firm offer with definite terms on all material issues. *See Lazer & Lazer Corp.*, 618 F. Supp. 3d at 199 (without an intent to be bound, "negotiations concerning the terms of a possible future contract do not result in an enforceable agreement") (citations omitted). This email also was not a counteroffer because it did not provide all material terms needed for a settlement. In fact, the ***only*** term it proposed was an up-front payment of "at least" $100,000 instead of the proposed $50,000. **Ex. H**. Thus, even if this were an attempted counteroffer, it was far too indefinite to be capable of being accepted via a mirror-image acceptance. *See Park*, 2021 WL 5399908, at *3.

Further, the email does not unequivocally agree to anything. Its uses conditional language when it says that any settlement "***would*** require the upfront payment of at least $100,000." **Ex. H** (emphasis added). "Would" contemplates that other things must be defined and agreed to first— i.e., the parties must also definitively agree on all other material terms as well. *See Would*, Oxford

11

English Dictionary (2024) (defining "would" in relevant part as "[e]xpressing prediction of a *contingent* future event, or a result to be expected, in a *supposed case or under particular conditions* (with the condition expressed by a conditional, temporal, or imperative clause, or implied) (emphasis added)). Further, the use of "at least" means that Bunce might *not* agree to $100,000 but might require more as an up-front payment.

The reference to McCarthy also precludes the email from being a definite offer. Viewed in context of the chain of communications, it communicates that any participation by McCarthy in potential settlement, as Defendants had indicated would need to happen, would have to be addressed. This left open for further negotiation part of the material terms of any potential settlement. A condition of further negotiation (much less an "offer") was direct communications between Bunce's counsel and McCarthy, which has never occurred. A reasonable person could not conclude that Bunce had made a firm offer. *See Park*, 2021 WL 5399908, at *3.

Third, Defendants minimize the importance of communications occurring after Bunce's counsel sent his June 24 email at 11:39 a.m. **Ex. H**. Even if this email were a definite offer, Defendants rejected it by not accepting it in a mirror-image way but instead proposing different terms for a settlement. On June 24, 2024 at 1:51 p.m., Defendants by email rejected an up-front payment of $100,000, proposing instead a lower up-front payment: "My client wants to increase the lump sum to $75k…Let me know by COB tomorrow if the new settlement offer is accepted or rejected." *Id*. at 5-6. Tellingly, Defendants themselves characterize this response as a "*new settlement offer*." *Id*. (emphasis added). This negates any reasonable characterization of Defendants' later "acceptance" email as an acceptance of Bunce counsel's June 24 email at 11:39 a.m. It is objectively obvious the parties had no intent to settle based on this June 24 email sent as 11:39 a.m. *See Park*, 2021 WL 5399908, at *3. This intent *not* to settle is reinforced by Bunce

counsel's unambiguous email response dated June 24, 2024 at 1:57 p.m. to Defendants' proposal to settle based on a $75,000 downpayment: "Your settlement offer is rejected." **Ex. H** at 5.

Fourth, viewed in context, it is frivolous and bad faith for Defendants to contend that their email on June 25 constituted the "acceptance" of a settlement offer: "Defendants have found $100k you insist as the upfront payment. They will tell McCarthy that he needs to communicate with you if he wants a release of claims also. In case he asks, will email communication be sufficient or it has to be a phone call? Based on that, the deposition of Mr. Bunce is cancelled. Do want us to draft first pass of a settlement agreement or will you do that?" **Ex. H** at 2. Even if Bunce had made an offer on June 24 at 11:39 a.m., this response does not rise to the level of a mirror-image acceptance. *See In re Whatever, LLC*, 478 B.R. at 709. The Defendants' counterclaims remain unaddressed. Participation by McCarthy is left unresolved. And, as explained above, material terms of a settlement are left unresolved. Bunce never agreed, for example, that paying "25k per month until $1,050,000 is reached," **Ex. G**, was acceptable. (It wasn't.)

Other communications further prove that Bunce had no intent to enter into a settlement on the terms Defendants rely on. *See Jacobs*, 2024 WL 3202549, at *4-5. Counsel for Bunce repeatedly told Defendants' counsel, on multiple occasions that they had ***not*** settled:

- "As for the settlement offer, it is not a serious offer." **Ex. H** at 6.

- "Your settlement offer is rejected." *Id.* at 5.

- "There's no settlement. Mr Bunce hasn't accepted anything. If you want to put a best and final offer in writing signed by everyone who wants a release, then Mr. Bunce will respond at that time." *Id.* at 1.

- "We are in receipt of Defendants' fourth settlement offer dated June 23, 2024. This offer, as well as all prior offers by Defendants, to settle this dispute have been rejected and remain rejected by Plaintiffs Mark Bunce. There can be no legitimate dispute over this. Your contention that the parties have already in fact reached a mutual settlement agreement is incorrect. Mr. Bunce's statement that any settlement would require a $100,000 up-front payment constituted negotiations. You know this. The parties have never reached a binding meeting

13

of the minds on definite terms for settlement." **Ex. L** (June 26, 2024 M. Kohler Ltr.).

In sum, Bunce has never indicated an intent to be bound. *See Newlan*, 2019 WL 13211877, at *2. The entirety of the communications constitutes nothing but "evidence of preliminary negotiations," which "does not alone constitute a contract." *See Am. Eagle Outfitters*, 584 F.3d at 582 (citation omitted).

Indeed, as evidenced by Defendants' portion of the parties' joint status report filed on July 2, 2024, *Defendants themselves do not dispute that material terms of any settlement are left indefinite. See* Doc. 72 at 4. This admission should be conclusive of the fact no settlement has been reached and that Defendants have brought this motion in bad faith.

Defendants' arguments are not legitimate, but merely evidence a strategy of delaying trial (using the purported settlement to unilaterally cancel Bunce's agreed deposition—Defendants will undoubtedly contend they should have the right to take it later) and causing Bunce to needlessly expend attorneys' fees.

### C. *The Court Should Award Bunce His Attorneys' Fees.*

"[S]anctions may not be imposed under [28 U.S.C.] § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal. As such, under § 1927, an attorney's conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 142 (3d Cir. 2009) (citations omitted). This standard is met here. Defendants have already admitted that no settlement exists. Yet they filed the motion to enforce a "settlement" anyway, requiring Plaintiff to respond to it and so incur yet more attorneys' fees. This is bad faith and shows an intent to "multipl[y] the[se] proceedings … unreasonably and vexatiously." *See* 28 U.S.C. § 1927.

Tellingly, Defendants' counsel cannot help but taunt Bunce concerning how defense counsel's tactics are causing him to incur significant legal fees, while Defendants are using a family member to litigate on a "fixed flat fee":

> [I]n the spirit of trying to get some monies to Mark Bunce so that he can cut off how much he is spending (in legal fees) to collect reimbursement for his investment, VTI and Mathu Rajan make the following Settlement Proposal as mentioned below…. Since I pay with arrangements with the VTI lawyer on a fixed flat fee, I know the legal cost being expended by him. ***Its no where [sic] the cost of the lawyers in the Stream TV bankruptcy. It may be expensive to collect your money back unless you [sic] lawyers are dirt cheap.*** I request you consider this proposal before depositions commence.

*See* **Ex. C** (emphasis added); **Ex. F**.

Defendants have also relied on a purported settlement as a bad-faith tactic to cause fact discovery to continue beyond the July 8, 2024 deadline imposed by the scheduling order, which Bunce intended to adhere to. Doc. 47. When Defendants unilaterally purported to cancel the deposition on June 25, 2024 (**Ex. H** at 2), they did so on the ground that a settlement had been reached and therefore further discovery was unnecessary. Bunce reasonably believed that Defense counsel's contention that a settlement had been reached was made in bad faith and to cause discovery to continue past the July 8 deadline, while the motion to enforce settlement was litigated. Bunce thus appeared for his deposition on July 1, because the parties had long agreed for it to occur on that date and because the assertion that a settlement had been reached was frivolous. Had Bunce not appeared for his deposition, Defense counsel would have tried to make an issue of that. Moreover, nothing prevented the Defendants from going forward with Bunce's deposition on July 1 notwithstanding the purported settlement. Defendants knew the motion to enforce settlement would be opposed. It should be obvious that Defense counsel, Raja Rajan, Defendant Mathu Rajan's brother, has engaged in improper and bad-faith litigation conduct.

15

This is further supported by Defense counsel Rajan's admission to the Court at the mandatory status conference held on July 9, 2024. Having learned that Bunce had traveled to the United States for his deposition, the Court expressed surprise and reminded the parties that, at their previous status conference, Doc. 40, the Court had indicated (and the parties had appeared to agree) that remote depositions should be taken whenever possible, given that there are overseas witnesses and an overseas party (Bunce resides in Europe). Counsel for Defendants Rajan stated that he had demanded that Bunce come to the United States as a punitive measure because Defendant Rajan was upset that Bunce had addressed his health in court filings. This admission shows bad faith and a malicious intent to engage in improper litigation conduct (as was characteristic of Defendant Rajan's conduct in the bankruptcy cases, as the record in those cases plainly shows).

Bunce appropriately addressed the validity of Rajan's health because Rajan had contended he was too ill to give his deposition or testify in court in this case within the discovery period. Bunce thus asked the Court for a HIPAA order so he could verify Rajan's health. *See* Doc. 25; Doc. 25-1; Doc. 25-2; Doc. 59; Doc. 59-1; Doc. 59-2. This was spurred by the fact that Rajan had previously used his health as a basis for delaying proceedings in the Pennsylvania bankruptcy of Stream TV. *See id*. Rajan's history of being untruthful to courts and engaging in improper litigation conduct provided a valid basis to question his representations. *See* Doc. 65 at 1-3.

In the Delaware bankruptcy, the bankruptcy court explained why it was dismissing the bankruptcy petition filed by Rajan as having been filed in bad faith. See Doc. 65-1. The bankruptcy court explained that Defendant Rajan had engaged in obstructive conduct in that matter:

> Mr. Rajan's primary purpose for filing this petition was to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the omnibus agreement [by which Stream TV Network's creditors could be paid], vitiate the purpose and effect of the Chancery Court's order [enforcing the omnibus agreement], and to maintain ownership and control over the assets of the debtor [Stream TV] for his own benefit."

*Id*. at 13–14. This misconduct included actions by Defense counsel here, Raja Rajan: "Mr. Rajan and his brother"—Raja Rajan—"took improper actions to neutralize the omnibus agreement after it was approved on behalf of Stream by the resolution committee." *Id*. at 14.

The Pennsylvania bankruptcy court's findings about Defendant Mathu Rajan's litigation-related misconduct help explain his course of abusive conduct in this lawsuit (consistent with his underlying fraud against Bunce). *See generally In re Stream TV*, 2024 WL 87639.

All this goes to show why the Court should award Bunce his reasonable attorneys' fees under 28 U.S.C. § 1927 incurred in preparing this response. Defendants and their counsel have acted in bad faith throughout this ligation, as the docket's unnecessary and frivolous filings reveals.

## III. Conclusion

The Court should deny the motion. The Court should award Bunce his reasonable attorneys' fees and costs due to the regrettable misconduct of Defendants and their counsel, which likely will continue unless the Court imposes sanctions.

As Bunce's counsel stated at the July 9, 2024 status conference, Bunce is amenable to participating remotely in a settlement conference if the Court believes it would be productive, so long as it does not affect the deadlines set forth in the operative scheduling order (Doc. 47).

Dated: July 12, 2024

                                      Respectfully submitted,

By:   <u>*s/ Michael D. Homans*</u>
       Michael D. Homans
       ID No. 76624
       HOMANSPECK, LLC
       230 Sugartown Road
       Suite 218
       Wayne, PA 19087
       (215) 419-7463
       mhomans@homanspeck.com

*Attorneys for Plaintiff Mark L. Bunce*

Michael P. Kohler, *admitted pro hac vice*
MILLER & MARTIN PLLC
Regions Plaza Suite 2100
1180 West Peachtree Street, NW
Atlanta, Georgia 30309-3407
(404) 962-6100
Michael.Kohler@millermartin.com

*Attorneys for Plaintiff Mark L. Bunce*