## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK L. BUNCE,<br><br>Plaintiff, | : : : | |
| vs. | : | |
| VISUAL TECHNOLOGY INNOVATIONS, INC.<br>and<br>MATHU G. RAJAN,<br><br>Defendants/Counterclaim and Third-Party Plaintiffs | : : : : : : : : | Civil Action Case No.<br>C.A. No. 2:23-cv 01740 |
| vs. | : | |
| Mark Bunce ,<br>Counterclaim Defendant<br>and | : : : | |
| Timothy McCarthy<br>Third -Party Defendant | : : | |

## OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT

This Memorandum is in opposition to Plaintiff Mark Bunce's motion for summary

judgment.

## Table of Contents

I.   RELEVANT PROCEDURAL HISTORY ................................................................ - 3 -

II.  RELEVANT SUMMARY OF FACTS ................................................................... - 3 -

III. ARGUMENT .......................................................................................................... - 7 -

    A.   Introduction ................................................................................................. - 7 -

    B.   The Standard for Summary Judgment ...................................................... - 8 -

    C.   Summary Judgment should be granted against Plaintiff on his claim for Fraudulent Inducement. ............................................................................... - 9 -

    D.   Summary Judgment should be granted against Plaintiff on his claim for Unjust Enrichment. ...................................................................................... - 12 -

    E.   Summary Judgment should be granted against Plaintiff on his claim for Breach of Contract. ...................................................................................... - 14 -

IV. CONCLUSION ..................................................................................................... - 17 -

**Table of Authorities**

**Citation**                                                                                               **Page(s)**

*Alter v. Resort Props. of Am*., No. 59583, at *4-5 (Nev. May 30, 2014) *citing Jones v. SunTrust Mortg., Inc.*, 274 P.3d 762, 764 (Nevada Supreme Court 2012)…..................... 16

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)......................................................... 9

*Cnty. of Clark v. Bonanza No, 1,* 96 Nev. 643, 650-51, 615 P.2d 939, 944 (1980)............. 16

*Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)....... 9

*Jett v. Mikelis*, No. 84032-COA, at *11 (Nev. App. Jan. 30, 2024) citing  *J.A. Jones Constr.,* 120 Nev. at 290, 89 P.3d at 1018 *accord Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872, 891 (Del.Ch. 2009)......................................................................................... 12, FN4

*Mobius Connections Grp. Inc. v. Techskills, LLC*, Case No.: 2:10-cv-01678-GMN-RJJ, at *10-11 (D. Nev. Jan. 20, 2012) *See Leasepartners Corp., Inc. v. Robert L. Brooks Trust*, 942 P.2d 182, 187 (Nev. 1997) (citing 66 Am.Jur.2d Restitution § 6 (1973))…........ 13

*Nenzel v. Rochester Silver Corporation*, 48 Nev. 41, 43 (Nev. 1924)................................. 16

*Oehler v. Humana, Inc.,* 105 Nev. 348, 350 (Nev. 1989)..................................................... 7

*Official Committee of Unsecured Creditors ex rel. Estate of Woodside Group, LLC v. Nilson (In re Woodside Group, LLC),* 427 B.R. 817, 838 (Bankr. C.D. Cal. 2010) citing *Unionamerica Mortgage,*626 P.2d at 1273.......................................................................... 13

*Rhodes v. Designer Distribution Servs., LLC,* 381 P.3d 655 (Nev. 2012)  citing *Lipshie v. Tracy Investment Co*.,39 Nev. 370, 379, 566 P.2d 819, 824 (1977).................................... 13

*Schlotfeldt v. Charter Hosp. of Las Vegas,* 112 Nev. 42, 47 n.3 (Nev. 1996)..................... 11, 12

*Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017)…........................................... 9

*Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441-42 (9th Cir. 2017) quoting *Anderson* , 477 U.S. at 248, 106 S.Ct. 2505 ; *Animal Legal Def. Fund* , 836 F.3d at 989…......................... 9

## I.    RELEVANT PROCEDURAL HISTORY

Discovery closed on July 7, 2024.  The Court dismissed the third-party Defendant (Timothy McCarthy), because it concluded service of process was taking too long (6 months) even under the international Hague convention treaty rules.  The Court refused to reinstate the third-party complaint against Timothy McCarthy or order alternative service of process. The Court also dismissed the counterclaims against Plaintiff Bunce without a memorandum explaining the rationale.

The new deadlines set by the Court were/are:

- Motions For Summary Judgment are due by 10/17/2024.
- Plaintiffs Pretrial Memo is due by 2/25/2025.
- Defendants Pretrial Memo is due by 2/25/2025.
- Trial Pool is Set for 3/11/2025.

Defendants filed for summary judgment against all of Plaintiff's claim on October 17, 2024 [docket 107] This document is in opposition to Plaintiff's Motion for Summary Judgment as two of three of Plaintiff's claims are without merit and one claim is premature.

## II.    RELEVANT SUMMARY OF FACTS

Plaintiff Mark Bunce ("**Bunce**") invested three times in a Nevada company called Visual Technology Innovations, Inc. ("**VTI**") in 2021.  Bunce invested: February 25, 2021 ("**1st Investment**") that matured on when VTI raised a $1,000,000 and also when another company called Stream TV Networks, Inc. filed for Bankruptcy protection.  Exhibit 3 to Complaint. He invested a second time on March 8, 2021 ("**2nd Investment**"). Exhibit 5 to Complaint. Plaintiff Bunce changed that loan by Amendment to only mature when VTI raised $10,000,000. Exhibit 7 to Complaint.  He invested for a third time in May 4, 2021 ("**3rd Investment**") and again made maturity only when VTI raised $10,000,000.  Exhibit 7 to Complaint.  VTI is a Defendant/Counterclaim and Third-Party Plaintiff in this action.

Bunce was approached with the investment opportunity only days after Timothy McCarthy ("**McCarthy**"), had signed investment paperwork with VTI.  McCarthy had signed investment paperwork with VTI for the sum of thirty million dollars (USD $30,000,000) but he indicated his money would come into VTI only thirty (30) days later.  See attached as Exhibit A hereto (investment paperwork of McCarthy). Plaintiff Bunce was introduced to VTI by Mr. Glen Davis (an agent for VTI).

McCarthy's investment paperwork says in pertinent part:

The funds would be made available in thirty (30) calendar days from Effective Date ("**Initial Closing**"). (emphasis added)

Section 3, page 1 of Exhibit A hereto.

Plaintiff Bunce was to be a precursor investor to McCarthy, but Plaintiff had questions about McCarthy's investment promises, specifically if there were "***Any pre conditions or break clauses?" (emphasis added)*** Exhibit B hereto *(*an email from an Agent of VTI relaying the questions of Plaintiff to VTI.)  Plaintiff Bunce demanded to see the McCarthy investment paperwork himself.  Id.

Bunce also asked many questions about VTI, including:

- Copies of latest statutory accounts and management accounts of VTI;
- Details of bank debt and charges of VTI;
- Copy of the agreement to fund the USD $30M inflow (McCarthy). Any preconditions or break clauses?
- Notes and/or details on reverse target and any letters of comfort from brokers/lawyers to VTI;
- Details of financial investment undertaken by the directors of VTI; and
- Whether this cash injection would be to finance working capital for delivery of product that has firm orders of VTI.

Id.

Plaintiff Bunce was satisfied with his due diligence, so he made his first investment about seven (7) days later. Exhibit 3 to Complaint. Plaintiff knew from the finances that VTI would struggle financially to repay him without the thirty million dollars (USD $30,000,000) promised by

- 4 -

McCarthy. Plaintiffs Bunce asked for VTI's finances. Exhibit B hereto. Plaintiff Bunce proceeded anyway because he was confident of the monies from McCarthy to repay his investment loan(s). Exhibit 3 to Complaint (Plaintiff 1st Investment).

Though McCarthy signed investment paperwork with VTI, he never provided investment monies.  McCarthy defrauded Bunce and VTI[1].  It is clear that Plaintiff based his entire investment loans on the McCarthy investment loans being able to repay his loans.

It is unclear why the Court dismissed McCarthy from this suit since the Plaintiff's investments in VTI were entirely based on the investment commitment McCarthy already made to VTI.  In November of 2021, more than nine (9) months after his first investment, Plaintiff tired of waiting for the money from McCarthy to repay him.  He demanded that VTI execute a repayment of his monies that previously was contingent on VTI raising more monies. But as argued below, there was no legal consideration for that loan "modification."

When Plaintiff filed this lawsuit in 2023, he sued VTI for alleged breach of investment loan contracts. He asserted a breach of contract claim against the company VTI but also claims against VTI's founder and leader Mathu Rajan ("**MR**") for alleged "fraudulent inducement" and "unjust enrichment" for added leverage in the lawsuit.  As shown below, Plaintiff Bunce has no evidence to support those personal claims against MR.

Plaintiff openly admits the importance of McCarthy in his investment in VTI.  Plaintiff attached a document called a "drawdown" of the McCarthy investment funds to his Complaint. Exhibit 4 to Complaint.  The document provided in pertinent part:

---

[1] Though the Court dismissed McCarthy from this suit, he is being sued in Nevada Federal District Court by VTI for at least thirty million dollars (USD $30,000,000). (*VTI v Timothy Mcarthy*, et. al., No 2:24-cv-00728 in the Federal District of Nevada). Any recovery from McCarthy is planned to be used to satisfy Plaintiff Bunce in this suit.

**Exercise Date: By 2 March 2021**

The Investor is hereby exercising the rights under clause 4 of the Agreement:
Amount of Investment : $29,000,000.
The Investor will exercise through a wire transfer to a bank account set up by VTI or its affiliates at Commerzbank or in the alternative the Investor will deliver a Standby Letter of Credit ("**SBLC**") for US $35 million that is acceptable for VTI and for the avoidance of doubt this will be in full consideration of a total investment in VTI of $ 30,000,000 under the Agreement.
Purpose: Begin the takeover process of the Ultra-D technology and kick start stalled projects.

That document was signed by McCarthy and VTI.  Exhibit 4 to Complaint.

Bunce also added to his Complaint a letter from the money manager of McCarthy's company

Burlington that provides in pertinent part:

We confirm that we are ready, willing and able upon the express instructions of our client Burlington Resources FZE ( a wholly owned subsidiary of Burlington Resources Asia Limited) to make a payment of  US$ 30  million from our bank DBS, Singapore to purchase certain shares in VTI subject to the terms and conditions in the Stock Purchase Agreement of 10 February 2021.

Exhibit 2 of Complaint. Burlington is the name McCarthy uses as his investment vehicle.  Plaintiff

admits through those attachments how important McCarthy was to his investment in VTI.  Plaintiff

was induced to invest in VTI due to McCarthy.

McCarthy list his accomplishments as:

The company [Burlington Asia Resource] retains Tim McCarthy as a special advisor. He is a graduate of Cambridge University in the UK and has an MBA from Cass Business School, City University of London.

Tim has over 35 years' experience as an investment banker, stockbroker for Japan and South East Asia, corporate finance specialist and entrepreneur. Previously he worked in the City of London from 1979-93 with Morgan Grenfell & Co, Bank of America International Limited , WI Carr, Swiss Bank Corporation and was a director of Asia Equity a South East Asian brokerage which subsequently merged with Banque Paribas.
He has been on the boards of public and private companies, most notably as a director of Victory Corporation plc, **Sir Richard Branson's Virgin** branded cosmetics and clothing company and his record label V2 Music Holdings plc. He has also been a director of a major private property group in Delhi, India - Sweta Estates Pvt. Ltd.

([www.burlingtonasia-resources.com](www.burlingtonasia-resources.com)) (clarification and emphasis added)

- 6 -

Plaintiff Bunce became enamored with McCarthy as he wanted to be a co-investor in a "McCarthy company." Plaintiff knew of McCarthy and actually met his brother at an event relating to Sir Richard Branson.

## III.    ARGUMENT

### A. <u>Introduction</u>

Defendants have filed for Partial Summary Judgment also against the claims of Plaintiff Bunce [docket 108]. Plaintiff Bunce is wasting the time of the Court and opposing counsel asking for summary judgment even on claims they know in good faith will have material issues that will be contested at trial. Plaintiff Bunce filed for Summary Judgment before [docket 35] and withdrew his motion. At that time, Bunce only sought summary judgment on his alleged breach of contract claim. Now he has re-filed and asks for more. He refiled for summary judgment and added his "fraudulent inducement" and "unjust enrichment claims which likewise are frivolous and without merit.

This is a filing citing authority, both factual and legal, why Plaintiff's Motion for Summary Judgment should be denied but also Summary Judgment should be granted against Plaintiff Bunce. His alleged breach of Contract Claim (his Count I) is simply premature. Plaintiff Bunce's "fraudulent inducement" and "unjust enrichment" claims cannot stand as a) they were brought against the wrong party and b) there is no evidence to argue there is no genuine dispute of material facts.

There are several exhibits hereto and the contents of which are incorporated by reference. The elements that Plaintiff must prove are contested.

**B.  <u>The Standard for Summary Judgment</u>**

Each time Plaintiff Bunce invested in VTI he did it with two documents[2]:  All documents provided that if any dispute arose between them in the future, Nevada law would apply[3].  Nevada law should be applied in this determination.

"A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Oehler v. Humana, Inc.,* 105 Nev. 348, 350 (Nev. 1989).  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).  "In short, what is required to defeat summary judgment is simply evidence "such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." " *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

As stated in footnote 3 below, Nevada law was chosen by the contracting parties.  The district court must not only properly consider the record on summary judgment but must consider that record in light of the "governing law." Zetwick v. Cnty. of Yolo, 850 F.3d 436, 441-42 (9th Cir. 2017) quoting *Anderson* , 477 U.S. at 248, 106 S.Ct. 2505 ; *Animal Legal Def. Fund ,* 836 F.3d at 989 (appellate review of a summary judgment ruling involves, inter alia , "decid[ing] whether the district court correctly applied the relevant substantive law"). Thus, where application of incorrect legal standards may have influenced the district court's conclusion, remand is appropriate. *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

---

[2] Every time Plaintiff Bunce invested it was with two documents: a) an investment document called a convertible loan agreement and b) an investment loan document called a convertible note.  Exhibit 7 to the Complaint has both the investment document and convertible loan agreement.  Exhibits 3 and 5 to the Complaint has just the convertible notes and the agreements are not included though signed by Plaintiff.  Exhibit G.

[3] The documents provide that for Governing Law: This Note shall be governed by, and construed in accordance with, the laws of the State of Nevada USA. Each of the parties hereto hereby consents to the nonexclusive jurisdiction of the courts of the State of Nevada and any federal court sitting in Las Vegas, Nevada USA. In Section 10 of Exhibit 3 to the Complaint, Section 10 of Exhibit 5 to the Complaint, and in Section 7 (b) of Exhibit 7 and Section 13 also of Exhibit 7 to the Complaint (multi-document Exhibit).

Two of the three claims of Plaintiff cannot be asserted under Nevada law. Resolution of those claims are entirely based on "credibility" assessments of Plaintiff and Defendant and Defendants witnesses. The final claim, an alleged breach of contract, is premature under basic contract law for the reasons argued.

C.  **Summary Judgment should be granted against Plaintiff on his claim for Fraudulent Inducement.**

Plaintiff Bunce raises another personal claim against VTI's executive, Defendant Mathu Rajan. <u>Complaint</u>, Count II, page 15 for "fraudulent inducement." Plaintiff alleges that Mathu Rajan, the executive of VTI, induced him to invest in VTI by fraud. This claim cannot exist as a matter of law by an express ruling by the Nevada Supreme Court.

Mathu Rajan did not speak to Bunce during his investment until the last investment of $50,000. ¶¶6-14 of Exhibit H. Plaintiff Bunce has provided two (2) declarations to support his summary judgment request. Exhibits C and S to Bunce's Brief for Summary Judgment. Notably absent from those declarations is that Plaintiff was directly misled by Mathu Rajan. Rather, Plaintiff Bunce argues that agents for VTI were also agents for Mathu Rajan personally. He alleges that VTI corporate documents allegedly misled him and Mathu Rajan and not VTI is responsible for fraud. The VTI documents that Davis forwarded to Plaintiff Bunce are extensive:

> 21.01.28. VTI Pitch Deck.pdf
> 21.01.15 VTI Business Strategy medium 01.15.2021.pdf
> 21.02.17. Visual Technology Innovations Inc.docx
> 21.02.17. VTI Initial Public Offering.docx

Exhibit B hereto.

Plaintiff Bunce's own answers to Interrogatories, which is attached hereto as Exhibit I, support the same conclusion. The interrogatory question that was asked of Plaintiff Bunce is

> 2. What are all of the alleged false representations that Mark Bunce relied upon to make investments in VTI (including all amendments thereto).
> ANSWER

Exhibit I, Section 2.

Plaintiff Bunce answers that interrogatory question with many express answers (a-t) and over and over again alleges fraud by VTI through third parties, Knight Davis by Glen Davis, Suby Joseph, a consultant of VTI, and even investors of VTI.  He does not claim that Mathu Rajan committed alleged fraud directly to Plaintiff Bunce at the time of his investments.

In answer to Interrogatory 2, Section "T" Plaintiff Bunce argues an investor of VTI by the name of "Patrick Allen" allegedly convinced Plaintiff Bunce to invest in VTI through alleged fraud. Plaintiff Bunce argues falsely and without any basis that Patric Allen had an agency with Defendant Mathu Rajan.  That allegation is without foundation and Counsel for Plaintiff should be sanctioned. Attachment G Suby Joseph Declaration, ¶¶16-18.  Plaintiff Bunce without foundation and support alleges those people were not only agents for VTI but also, they were agents for Defendant Mathu Rajan; that allegation is totally false. Attachment G Suby Jospeh Declaration, ¶¶16-18.  That false allegation cannot be used for granting summary judgment to Plaintiff Bunce according to the ruling of *Schlotfeldt,* supra. Without "imputing" an agency relationship with Mathu Rajan, Plaintiff's claim for unjust enrichment cannot stand.

Therefore, Plaintiff tries to argue that agents for VTI are also "imputed" agents for Mathu Rajan personally.  The Supreme Court of Nevada has held expressly that "…whether agency did exist **cannot be determined as a matter of law**." *Schlotfeldt v. Charter Hosp. of Las Vegas,* 112 Nev. 42, 47 n.3 (Nev. 1996) (emphasis added).

Plaintiff admits in his own declaration that

7. Exhibit P is an authentic copy of an email and "Investor Presentation" attachment and deal summary **sent to me on February 17, 2021 by Glen R. Davis** on behalf of Defendant Mathu Rajan, which is also filed as Document 1-1 in this action. **I relied on this email and deal presentation materials**, among other information provided to me by and on behalf of Rajan, to decide to loan $1,050,000 to Defendant Visual Technology Innovations, Inc.

Exhibit S to Plaintiff Brief in Support of Partial Summary Judgment. (emphasis added)

Plaintiff Bunce again admits that the alleged fraud is by an agent for VTI or investor presentations of VTI. ¶¶ 12-17 of Exhibit S to Plaintiff Brief in Support of Partial Summary Judgment.  That exhibit is Plaintiff own declaration!

Even in Plaintiff's Complaint, he admits the alleged fraud was from VTI documents or from others. Plaintiff writes that

> Rajan, **through Davis**, <u>falsely</u> represented to Bunce that there was such an agreement (McCarthy investment document) in order to induce Bunce into loaning money to VTI. When Bunce later loaned money to VTI, he reasonably relied on the representation that Burlington Resources Asia Limited had agreed to fund VTI through Knights Asia Limited.

<u>Complaint</u>, ¶ 18. (emphasis and clarification added)

But the engagement agreement of Knight Davis expressly provides that the latter works for VTI only. It is clearly written in that document that the Company is VTI, and the broker is Knight Davis.  Knight Davis was attempting to raise investment "capital" for VTI.  The document provides in pertinent part that

> We understand that K̲N̲I̲G̲H̲T̲-̲D̲A̲V̲I̲S̲ ̲I̲S̲ ̲A̲S̲S̲O̲C̲.̲ ̲L̲L̲P̲ (the "**Broker**") wishes to help make referrals to prospective investors to help raise capital for Visual Technology Innovations, Inc ("**Company**") and wishes to obtain compensation for such referral work. This letter agreement ("**Agreement**") provides the rights and obligations of each party for that effort.

Exhibit E hereto. (Exhibit F is an amendment which changed who Knight Davis worked)

Those allegations are false and most importantly, a finding of agency cannot be determined by the Court at the Summary Judgment stage.  *Schlotfeldt v. Charter Hosp. of Las Vegas,* 112 Nev. 42, 47 n.3 (Nev. 1996) (whether agency did exist cannot be determined as a matter of law). Without a trial this Court cannot decide that Glen Davis of Knight Davis was an agent for Mathu Rajan in his motion for Summary Judgment.  That case of *Schlotfeldt* is binding legal precedent.

Plaintiff Bunce cannot prevail on a claim for fraudulent inducement[4].  Plaintiff Bunce cannot produce proof of any of those elements against Mathu Rajan directly[5].  "To prevail on a claim for fraudulent inducement, a plaintiff is required to prove each of the elements discussed above **by clear and convincing evidence**. *Jett v. Mikelis*, No. 84032-COA, at *11 (Nev. App. Jan. 30, 2024) citing  *J.A. Jones Constr.,* 120 Nev. at 290, 89 P.3d at 1018. (emphasis added).

If all those arguments against granting summary judgment for Plaintiff, then the factual issue at trial is to determine what Bunce considered when he represented to VTI that he performed his own due diligence and conducted to his satisfaction independent investigation.  Complaint, Exhibit 7, (multi document Exhibit, Section 6 e of page 6 of 22 in Exhibit).  (emphasis added)

### D.  Summary Judgment should be granted against Plaintiff on his claim for Unjust Enrichment.

Plaintiff Bunce seeks summary judgment on his unjust enrichment claim but that claim should be dismissed.  That claim will be disputed at trial, but it has been asserted against the wrong party and cannot be brought in Nevada in any event.

In Nevada, the term "unjust enrichment" is a counterpart of the doctrine of quasi-contract. *Official Committee of Unsecured Creditors ex rel. Estate of Woodside Group, LLC v. Nilson (In re Woodside Group, LLC),* 427 B.R. 817, 838 (Bankr. C.D. Cal. 2010) citing *Unionamerica Mortgage,*626 P.2d at 1273. **Unjust enrichment generally is unavailable when a valid, express contract exists that governs the subject matter of the dispute**. Id. (emphasis added).

---

[4] To prevail on a claim for fraud in the inducement, a plaintiff must establish each of the following elements: (1) the defendant made a false representation; (2) the defendant knew or believed that the representation was false, or had knowledge that it lacked a sufficient basis for making the representation; (3) the defendant intended to induce the plaintiff to consent to  the contract's formation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) the plaintiff suffered damages as a result. *Jett v. Mikelis,* No. 84032-COA, at *6-7 (Nev. App. Jan. 30, 2024) citing J.A. *Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.,*120 Nev. 277, 290, 89 P.3d 1009, 1018 (2004) (setting forth the elements of a claim for fraud in the inducement).

[5] The basic reason for that fact is that Mathu Rajan did not speak to Bunce before or during his investments for the 1st and 2nd investments.  Mathu Rajan spoke only to Bunce before his 3rd Investment of $50,000, only limited to a very narrow issue relating to a landlord in China holding equipment necessary for the technology.  Judgement against Plaintiff Bunce for his first million dollars should be granted. Attachment H Mathu Rajan Declaration, ¶¶6-15.

Plaintiff Bunce has an express investment contract so his unjust enrichment claim must fail. *Rhodes v. Designer Distribution Servs., LLC,* 381 P.3d 655 (Nev. 2012) (if an unjust enrichment theory is separate and distinct from a contract it must fail) citing *Lipshie v. Tracy Investment Co.*,39 Nev. 370, 379, 566 P.2d 819, 824 (1977) ("To permit recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles.").

Again, a Nevada Court wrote that "Under Nevada and Delaware law, a claim for unjust enrichment cannot lie where there is a contract that governs the parties' relationship." *Mobius Connections Grp. Inc. v. Techskills, LLC*, Case No.: 2:10-cv-01678-GMN-RJJ, at \*10-11 (D. Nev. Jan. 20, 2012) *See Leasepartners Corp., Inc. v. Robert L. Brooks Trust,* 942 P.2d 182, 187 (Nev. 1997) (citing 66 Am.Jur.2d Restitution § 6 (1973)) ("**An action based on a theory of unjust enrichment is not available when there is an express written contract,** because no agreement can be implied when there is an express agreement.") (emphasis added) *accord Kuroda v. SPJS Holdings, L.L.C.,* 971 A.2d 872, 891 (Del.Ch. 2009)(a claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim).

Aside from the claim being barred under Nevada law, it is based on flawed allegations.  This whole claim is based on Plaintiff Bunces writes

> 17. Had I known that the Investor Presentation and deal summary in Exhibit P contained false information, including concerning VTI's officers, employees, subsidiaries— that it in fact had none—I would not have loaned any money to VTI. Had I known that the money I loaned to VTI would be used to pay for **Stream TV Network, Inc's bankruptcy lawyers**, I would not have loaned any money to VTI. Had I known that the money I loaned to VTI would be used to try to keep **Stream TV Network, Inc. in operation** rather than to purchase its assets, I would not have loaned any money to VTI.

¶17 <u>Exhibit S to Plaintiff Bunce's Brief for Summary Judgment</u>.  (emphasis added)

Plaintiff Bunce expressly wrote about Stream TV obtaining bankruptcy protections and now he claims using monies for those purposes is alleged fraud!   Plaintiff Bunce wrote in pertinent part that

3.    <u>Voluntary Conversion</u>.  The Holder may convert the Total Value of the Note at any time before **<u>Conversion Expiry</u>**, defined as the (i) five (5) working days after the Company informing the Holder that Stream TV Networks, Inc. has successfully filed for Chapter 11 protection with the US Bankruptcy Court (with such written proof as requested) and (ii) that the Company has received $1 million from a certain signed term sheet for an investment of US $30 million ("**<u>Proceeds</u>**") in Class A Common Shares ("**<u>Shares</u>**") of the Company; into Shares at a price of $0.23 per Share

Section 3 of Exhibit 3 to Complaint.

Plaintiff Bunce used broad use of funds language in his loan documents which read:

> *"Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general business purpose."*

Plaintiff Bunce argues paying for fees incurred by Stream TV in securing that ruling was improper[6].
He alleges the actual use of proceeds was against his broad use of funds specification which

read:

> *"Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general business purpose."*

Suby Joseph, a contractor for VTI, asserts that none of the funds of Plaintiff were used in

any manner inconsistent with the specifications provided by Plaintiff Bunce.  ¶¶ 8-14 of Exhibit G.

The claim for unjust enrichment should not survive.

**E.**    **<u>Summary Judgment should be granted against Plaintiff on his claim for Breach of Contract.</u>**

Plaintiff Bunce's alleged breach of contract claim is simply premature.  Plaintiff refuses to

admit to the Court the preconditions in his loan documents.  It is clear that the Bunce investment

loans had pre-conditions to repayment.  Exhibits, 3,6,7 to Complaint.

---

[6] Plaintiff uses the words of unsupported false allegations that are based on his "information and belief." Plaintiff alleges that: "On information and belief, the $1 million Bunce loaned to VTI was never used for company sales and expansion, as Rajan had claimed, and instead was used by Rajan for his own personal purposes." Complaint, page 1 -2, Section called "Introduction."  (emphasis added)

In his 1st Investment, Bunce made repayment or maturity contingent on VTI raising an additional one (1) million dollars (USD $1,000,000). Sections 1 and 3 of Exhibit 3 to <u>Complaint</u>. Bunce initially made his 2nd Investment due only 30 days later (Exhibit 5 to <u>Complaint</u>), but he amended it to mature only after VTI raised $10 million dollars (USD $10,000,000). Section 2 of Exhibit 6 to <u>Complaint</u>. That was an increase of contingency of ten (10) times! Plaintiff Bunce spoke to McCarthy before that change. The Amendment to Notes (the first investment was combined with the 2nd Investment) provided in pertinent part that

> 2. Section 1 of the Note VN21019-00 shall amended in its entirety and will read as follows:
>
> > The Note will Mature 10 days after the confirmation that the Company has received an aggregate total of US dollars Ten Million (US $10,000,000) in new capital from the date of this Amendment ("**<u>Maturity Date</u>**").

Section 2 of Exhibit 6 to <u>Complaint</u>.

Bunce was so enthusiastic of investment by McCarthy that he not only amended his first two loans to be contingent on VTI raising ten million dollars (USD $10,000,000) before maturity/repayment, but he did the same thing for his 3rd Investment. He made that investment loan in May of 2021 also contingent to only mature when VTI raised $10 million dollars (USD $10,000,000). Section 1 of Exhibit 7 to Complaint (Muli-document Exhibit, page 19 of 22 pages). The 3rd Investment documents provide in pertinent part that

> 1.    <u>Maturity Date</u>. The Note will Mature 10 days after the confirmation that the Company has received an aggregate total of US dollars Ten Million (US $10,000,000) in new capital from the date of this Amendment ("**<u>Maturity</u>**").

Section 1 of Exhibit 7 to <u>Complaint</u>. (multi-page Exhibit page 19 of 22 pages of exhibit packet) Plaintiff Bunce was shown on a zoom call a Bank Statement from McCarthy's company that showed an opening balance over $103 million dollars. Exhibit D hereto.

Plaintiff Bunce only demanded his money back in November of 2021. He forced a signature for repayment. Exhibit 8 to Complaint. That amendment was a loan modification which

requires consideration.  It is basic contract law that the loan modification requires consideration.  Consideration is the exchange of a promise or performance, bargained for by the parties." *Alter v. Resort Props. of Am.*, No. 59583, at *4-5 (Nev. May 30, 2014) citing *Jones v. SunTrust Mortg., Inc.,* 274 P.3d 762, 764 (Nevada Supreme Court 2012). "Consideration is not adequate when it is a mere promise to perform that which the promisor is already bound to do." *Cnty. of Clark v. Bonanza No, 1,* 96 Nev. 643, 650-51, 615 P.2d 939, 944 (1980).

Modification of contract must be supported by consideration. *Nenzel v. Rochester Silver Corporation*, 48 Nev. 41, 43 (Nev. 1924).  Plaintiff Bunce modified his investment loans several times.  Each time he had consideration, except for his last amendment/modification when he demanded his money back.  The money was not due back (not matured) until VTI raised ten million dollars (USD $10,000,000).

What was the benefit that VTI got for that amendment/modification for loans that were not due?  This situation is identical to lender that says no repayment will be require until the debtor obtains the raise the debtor was expecting at work.  When the raise at work falls through, the lender then modifies the loan for repayment.  That modification requires consideration to be valid.

There was consideration for Bunce's prior amendments. Bunce voided his first investment paperwork for $150,000. Exhibit C hereto.  The consideration Bunce gave VTI was that he invested new money of $850,000. Exhibit 5 to Complaint.   When Bunce amended his 2nd Investment, he changed maturity from thirty (30) days to mature only when VTI raised $10,000,000. Exhibit 5 to Complaint is 2nd Investment that had maturity at thirty (30) days. Exhibit 6 to Complaint is Bunce changing maturity contingent on VTI raising ten million dollars ($10,000,000).  VTI received as consideration more favorable terms on loan maturity.

There are numerous cases in almost every jurisdiction about loan modifications of defaulted mortgage loans.  In all cases the loan is already in default, so the modification gives the defaulting debtor a benefit to catch up on payments never made.  In this case, VTI was not in default or

overdue on payments, so it never obtained any consideration for Plaintiff Bunces' loan modification. Only, the last amendment provided VTI no consideration.

## IV. CONCLUSION

For the aforementioned reasons, Movants asks this Honorable Court to deny summary judgment for Plaintiff Bunce.

Dated: October 30, 2024    Respectfully submitted,

/s/ Raja Rajan
Raja Rajan, Esquire, Attorney I.D. 58849
2009 Chestnut Street
Philadelphia, PA 19103
215-550-1002
raja@rajanlawgroup.com

**Exhibit A**
**-McCarthy Investment Document-Subscription Agreement-**

VTI Stock Purchase Agreement 210210

## STOCK PURCHASEAGREEMENT

An agreement (this "**Agreement**"), dated as of February 10, 2021 (the "**Effective Date**") , by and betweenVisual Technology Innovations, Inc., a NevadaUSA Corporation(the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong(the "**Investor**"), with the Companyand the Investortogether referred to as the "**Parties**."

**WHEREAS**, the Company is anentity  formed pursuant to the laws of the State of Nevada USAas a Nevada corporation, and

**WHEREAS,**The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  aclass of common stock ("**Common Stock**") having a par value $0.00001 per share which is anticipated will be nullified and replaced on a one-for-one basis with shares of Class A Common Stock by an Amended and Restated Certificate of Incorporation which may soon be filed by the Company with the State of Nevada, such Class A Common Stock  is anticipated to be issued to Investor as a part of this Agreement; and

**WHEREAS**, it is anticipated that a new class of voting only (no economic rights) stock to be known as Class B Voting Stock would be issued to the Company's founder or his wholly-owned entity prior to the issuance of the Class A Common Stock to Investor, such Class B Voting Stock anticipated to have 10:1 voting rights, pursuant to that same Amended and Restated Certificate of Incorporation referenced above , and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor.

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

## TERMS

1)      Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Thirty Million US Dollars ($ 30,000,000) (the "**Purchase Price**") at a price per share of $1.40 per Share

2)      The Investor will deliver to the Company a satisfactory form of proof demonstrating the ready availability of the Purchase Price under the Investor's authority ("**Proof of Funds**").

3)      The Investorwillinvest one million US dollars (US $1,000,000) in the Shares immediately upon Execution. The funds would be made available in thirty (30) calendar days from Effective Date ("**Initial Closing**").



VTI Stock Purchase Agreement 210210

4)     The Company will present to the Investor a selection of business opportunities ("**Presentation**") with the required amount to fund the opportunity ("**Amount**") at various times during the Term, which has to be closed within twenty (20) business days.The form of the Presentation is shown in **Exhibit A**.

5)     The Initial Closing and each Presentationwill constitute a "**Closing**" and will be considered a part of the Purchase Price. Upon the absence of a Closing, the balance of the Purchase Price available to the Investor  that is not yet invested will be reduced by the Amount. Each Closing may be together referred to as "**Closings**".

6)     All Closings should be completed within the earlier of (i) eighteen (18) months from the Effective Date; or (ii) closing of an access to the public markets; or (iii) merger or acquisition when there is a change of control ("**Term**").

7)     The Investor shall pay to the Company in immediately available funds a payment equal to the Amount in each Closing to the Company's bank account ("**Payment**"). The Company's bank wiring instructions are reflected at **Exhibit B**hereto.

8)     In addition, the Company will issue to the Investor 987,839 Shares of the Company immediately on the Effective Date ("**Signing Bonus**").

9)     The Investor will be issued an additional 1,141,230 Shares of the Company if there has not been any further Closings during the Term after the Initial Closing ("**Contingent Bonus**").

10)     The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares will be the date of receipt of funds from each Closing in the designated bank account per Exhibit A.

11)     Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.

## REPRESENTATIONS AND WARRANTIES

12)     Representations and Warranties of the Company.  The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

     a.     Organization.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

     b.     Capitalization. The Company currently has one class of Common Stock. It is



VTI Stock Purchase Agreement 210210

contemplated in the future that the Company will have two classes of outstanding stock. Therewill be Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock will beas stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Nevada General Corporation Law.   All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will befully paid and non-assessable. The fully diluted capitalization of the Company as of close of business January 25, 2020 comprises of 4,349,050 Shares; 5,275,100 warrants that are exercisable into Shares; and 3,500,000 stock options that are exercisable into Shares amounting to a fully diluted total of 13,124,150 Shares.

      c.      Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing.  This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

      d.      Valid Issuance of Shares.  The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

      e.      Governmental or Other Consents and Filings.  Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

      f.      Litigation.   There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

      g.      Intellectual Property.  Except as set forth in the Disclosure Schedule:

      i.      The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property")



VTI Stock Purchase Agreement 210210

in all material respects necessary for its business as currently conducted.

      ii.     The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

      iii.     The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

      iv.     All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

      h.     Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

      i.     The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investoracknowledged that it has made its investment based solely on its own due diligence.

      j.     No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

13)     Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

      a.     Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding



VTI Stock Purchase Agreement 210210

obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

b.      Purchase Entirely for Own Account.  Investor confirms that the Sharesare being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

c.      Securities Laws.  The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares.  The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction.  The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons.  The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

d.      Disqualification.  Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

e.      Acknowledgment.  Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement.  The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence.Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto.  Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its



VTI Stock Purchase Agreement 210210

own independent investigation and verification

## MISCELLANEOUS

14)    Miscellaneous.

a.    <u>Successors and Assigns</u>.    This Agreement may not be assigned by the Investorwithout the express written consent of the Parties.  The provisions hereof shall inure to the benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

b.    <u>Expenses</u>.  Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

c.    <u>Confidentiality</u>.  Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

d.    <u>Placement Agents</u>.  Such placement agents as the Company may disclose to the Investor.  Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

e.    <u>Governing Law</u>.  This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of NevadaUSA without giving effect to any choice or conflict of law provision or rule (whether of the State of NevadaUSA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

f.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

g.    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

h.    <u>Notices</u>.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to



VTI Stock Purchase Agreement 210210

the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

     i.   <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

     j.   <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

     k.   <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

     l.   <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

     m.   <u>Dispute Resolution; Waiver of Jury Trial</u>.  The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR



VTI Stock Purchase Agreement 210210

THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n.    Publicity.  The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i)  Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii)  Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii)  Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state



VTI Stock Purchase Agreement 210210

performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A)  At the time of such sale, bars the person from:

(1)  Association with an entity regulated by such commission, authority, agency, or officer;

(2)  Engaging in the business of securities, insurance or banking; or

(3)  Engaging in savings association or credit union activities; or

(B)  Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv)  Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A)  Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B)  Places limitations on the activities, functions or operations of such person; or

(C)  Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v)  Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A)  Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B)  Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi)  Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii)  Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or



VTI Stock Purchase Agreement 210210

(viii)  Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

VTI Stock Purchase Agreement 210210

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |
| Litigation | The Company does not believe at this time that any claims are material to the Company's business or ongoing operations. |
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

VTI Stock Purchase Agreement 210210

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**



VTI Stock Purchase Agreement 210210

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or thesharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**



VTI Stock Purchase Agreement 210210

## Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

VTI Stock Purchase Agreement 210210

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _____

Name:    Mathu Rajan
Title:    President
Address:    1105 William Penn Dr
Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia Limited

By: _____

Name:    Timothy McCarthy
Title:    CEO
Address:    Old St. James's Vicarage,
Maxwell Road,
London SW6 2HR, UK

VTI Stock Purchase Agreement 210210

## ACCREDITED INVESTOR CERTIFICATION

### For Individual Investors Only
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

**Initial** _____   I certify thatI have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

**Initial** _____   I certify thatI have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

### For Non-Individual Investors
**(all Non-Individual Investors must *INITIAL* where appropriate):**

**Initial** _____   The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

**Initial** _____   The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

**Initial** _____   The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

**Initial** _____   The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

**Initial** _____   The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

**Initial** _____   The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

**Initial** _____   The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

**Initial** _____   The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

**Initial** _____   The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

**Initial** _____   The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

**Initial** _____   The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1]For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

VTI Stock Purchase Agreement 210210

## INVESTOR PROFILE

*(Must be completed by Investor)*

<u>**Section A - Personal Investor Information**</u>

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth:_____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth:_____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:
_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Stock Purchase Agreement 210210

## Section B – Entity Investor Information

Investor Name(s):  Burlington Resources Asia Limited

Authorized Individual executing Profile or Trustee:  Timothy McCarthy

Social Security Numbers / Federal I.D. Number:  _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust)  _____

Type of Business:  Investment Holding Company

Street Address:  20[th]Floor, 88 Gloucester Road, Wanchai, Hong Kong

City, State & Zip Code:  _____

Phone: _____+44 7768943655    Fax:  _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / Outside Broker/Dealer:  Knight-Davis Associates LLP

Page 18 of 20

VTI Stock Purchase Agreement 210210

## EXHIBIT A

Form of Presentation

1. Presentation of the opportunity
2. Cost of the opportunity
3. Subscription agreement for Shares with date of wire

## EXHIBIT B

### Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br><br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br><br>☐ Executed Paperwork<br><br>☐ KYC/ID<br><br>☐ Bank Wire confirmation | |

### Bank Wire Instructions for Payment to Company

| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
|---|---|
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: 8571165235<br>Routing/ABA Number:121000248 |



VTI Stock Purchase Agreement 210210

| International Wire | Account: 8571165235 |
|---|---|
| | SWIFT: WFBIUS6S |

**Exhibit B-**
**-Davis forwarding Bunces questions to VTI-**

| | |
|---|---|
| **From:** | Mathu Rajan |
| **To:** | Suby Joseph |
| **Bcc:** | mathu.rajan@vti-global.com |
| **Subject:** | Fwd: Questions and Requests from Mark Bunce |
| **Date:** | Friday, February 19, 2021 3:43:46 PM |

---------- Forwarded message ----------
**From:** Glen Davis <g.davis@knightdavis.com>
**Date:** Feb 18, 2021, 8:26 AM -0500
**To:** mathu.rajan@vti-global.com
**Cc:** frances@knightdavis.com
**Subject:** Questions and Requests from Mark Bunce

Mathu

Below is from Mark Bunce.

*"I have had a read of the attachments. It sounds interesting but before taking anything forward I really need to put some flesh on the bones. The detail is lacking.*

*Is it possible to supply the following as I would rather see these before having a conversation if possible.*

*Copies of latest statutory accounts and management accounts*

*Details of bank debt and charges*

*Copy of the agreement to fund the $30m inflow. Any pre conditions or break clauses?*

*Notes details on reverse target and any letters of comfort from brokers/lawyers*

*Details of financial investment undertaken by the directors*

*This cash injection would be to finance working capital for delivery of product that has*

firm orders. *The presentation talks about delivery of prototypes rather than production line items!"*

**MATHU:**

These are the attachments I sent to Mark some of the information is / could be out of date……….

21.01.28. VTI Pitch Deck.pdf

21.01.15  VTI Business Strategy medium 01.15.2021.pdf

21.02.17 .Visual Technology Innovations Inc.docx

21.02.17. VTI Initial Public Offering.docx

Kind regards

Glen

Glen R Davis

Partner Specialist Sectors

Knight - Davis Associates LLP

Mob + 44 (0) 7885 361789

g.davis@knightdavis.com

www.knightdavis.com

Knight-Davis Associates LLP is a limited Liability Partnership incorporated in England and Wales with registered number OC366497

**CONFIDENTIALITY: Privileged or Confidential Information may be contained in this message. If you are not the addressee of this message (or responsible for its delivery to the addressee), you may not review or copy it, deliver it to anyone else or use information contained herein. In such a case, you should destroy this message and kindly notify the sender by reply email. Opinions, conclusions and other information**

**in this message that do not relate to the official business of Knight-Davis Associates LLP are neither given nor endorsed by it.**

**Exhibit C**
**-Amendment to replace Bunce First Investment Loan-**

Bunce-VTI Amendment 210306

## AMENDMENT

THIS AMENDMENT dated as of March 7, 2021 ("**Amendment**") is between Mark Leonard Bunce or his/her/its registered assigns ("**Purchaser**") and Visual Technology Innovations, Inc., a Nevada USA corporation (the "**Company**"), with its principal offices at 1105 William Penn Drive, Bensalem, PA 19020 USA and amends the Agreement and Convertible Note dated on or about February 24, 2021 or signed simultaneously between the Company and Purchaser ("**Agreement**"). All capitalized terms not herein defined shall have the meaning ascribed to them in the Agreement, as amended.

## W I T N E S S E T H

**WHEREAS**, the Company and Purchaser wish to amend the Convertible Note Agreement 210224 and the related Convertible Note VN21017-00 in its entirety and replaced with a new agreement as reflected in **Exhibit A**.

**WHEREAS**, all instruments including warrants issued with respect to the Agreement stand voided and revoked.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed on the date first above written.

| COMPANY: | Visual Technology Innovations, Inc. | HOLDER: | Mark Leonard Bunce |
| --- | --- | --- | --- |
| SIGNED: NAME: | *[signature]* | SIGNED: NAME: | *[signature]* Mark Leonard Bunce |
| TITLE: | President | TITLE: | M.L. Bunce |
| DATE: | Mar 7, 2021 | DATE: | 07 March 2021 |

## **EXHIBIT A**

Agreement

**Exhibit D**
**-McCarthy/Burlington Bank Statement-**

 **DBS**

**Account Details**

| Account Number : | ██████ - USD | Account Name : | BURLINGTON RESOURCES ASIA LIMITED - ██████ - USD |
|---|---|---|---|
| Product Type : | FOREIGN CCY SAVINGS ACCOUNT | | |
| Opening Balance : | 103,032,089.05  04-Feb-2021 | Earmark Amount : | 0.00 |
| Ledger Balance : | 103,018,435.47  24-Feb-2021 | Overdraft Limit : | 0.00 |
| Available Balance : | 103,018,435.47  24-Feb-2021 | | |

| Date | Value Date | Transaction Details | Debit | Credit | Running Balance |
|---|---|---|---|---|---|
| 06-Feb-2021 | 06-Feb-2021 | TRANSFER REMITTANCE 0807OI0263042 Mgt Fee Jan UNION ALPHA C.P.A Mgt Fee Jan UETR Ref:b9327e7b-3ed9-4b0e-b5a4-12deea0ae88a | 13,627.10 | | 103,018,461.95 |
| 06-Feb-2021 | 06-Feb-2021 | TRANSFER REMITTANCE CHARGES 0807OI0263042 Mgt Fee Jan UNION ALPHA C.P.A Mgt Fee Jan UETR Ref:b9327e7b-3ed9-4b0e-b5a4-12deea0ae88a | 7.07 | | 103,018,454.88 |
| 07-Feb-2021 | 07-Feb-2021 | TRANSFER BK CHG OI0263042 | 19.41 | | 103,018,435.47 |

| | | | | |
|---|---|---|---|---|
| | Total Debit Count : | 3 | Total Debit Amount : | 13,653.58 |
| | Total Credit Count : | 0 | Total Credit Amount : | 0.00 |

Transactions performed on a non-working day will be posted on the next working day
If date requested is a non business day, please select the next business day to view your transaction(s)

**END OF REPORT**

**Exhibit E**
**-Knight Davis (Glen Davis) engagement contract with VTI-**

VTI-KD EL- 2101

**STRICTLY PRIVATE AND CONFIDENTIAL**

12 January 2021

Subject: Broker Agreement

Dear Sirs

We understand that _KNIGHT-DAVIS ASSOC. LLP_ (the "**Broker**") wishes to help make referrals to prospective investors to help raise capital for Visual Technology Innovations, Inc ("**Company**") and wishes to obtain compensation for such referral work. This letter agreement ("**Agreement**") provides the rights and obligations of each party for that effort.

1.    **APPOINTMENT**

1.1 The Company hereby confirms that Broker may act as a non-exclusive financial advisor/broker to the Company in relation to raising capital for the Company in a placement of the Company's stock ("**Placement**" or interchangeably "**Transaction**") as reflected in that certain private placement memorandum and accompanying documents ("**Memorandum**") provided by Company to Broker for the Transaction. For purposes of this Agreement, "**Shares**" shall mean only actual stock and not warrants of any kind. Broker understands that Company has no obligation to accept any investment of any kind for any reason. Notwithstanding anything to the contrary, if the Company accepts other terms for an investment different from the Placement from Broker's preapproved Approved Investors, then the compensation below applies for Broker unless Company obtains Broker's consent to revise compensation differently. Broker expressly acknowledges and agrees that Company is using different agents, or no agent at all, for the Placement and if there is a conflict ("**Conflict**") with any investor of any kind having been contacted by another agent, banker or representative also, claiming compensation rights, then Broker and the Company both agree in good faith to work together to resolve commission fees so that the Company does not pay more than single broker fees.

1.2  Broker hereby warrants that if it knows or has reason to know that investor or investor leads were introduced to the Company, either directly or indirectly from another broker, it will disclose that fact and the amounts to the Company before the payment of any compensation with respect to such; it is the Company's intention to avoid Conflicts or circumvention of other brokers and cannot do so without such open and advance disclosures.

1.3   Broker and Company agree that their compensation scheme hereunder shall be fully transparent; accordingly Broker and Company have agreed the compensation will be fully described in the Memorandum or closing documents.

1.4   Broker agrees that in order to qualify for any compensation from Company it shall use the Memorandum (specially coded for Broker), designed specifically for it describing its compensation rights and other approved Company documents ("**Approved Documents**") only in obtaining a Placement for the Company. To be clear, changes by the Company of Approved Documents does not impair or affect Broker's compensation rights hereunder.

VTI-KD EL- 2101

Broker agrees that it shall not change any of the Approved Documents in any way and shall only ask Company for changes if needed; Broker agrees to hold the Company and its employees harmless, including attorney's fees and other expenses, if Broker makes changes to Approved Documents.

1.5   Notwithstanding anything to the contrary, compensation of any kind to Broker only accrues from investment(s) in a Transaction during the Term hereof and potentially longer as specified below, for formal introduction or introductions to the Company of investors by Broker, without a Conflict, which utilize the Company Approved Documents that are expressly pre-approved by Company and listed on Exhibit A ("**Approved Investors**"). It is understood that Approved Investors, after approval, shall also include Approved Investors' and their investment vehicles or affiliate companies if that is the method Approved Investors use to invest.  Broker agrees that any compensation to such parties would be for Broker's own account and there would be no obligation on the part of the Company to contribute to such compensation with or for others. It is understood that access to Company Approved Documents or electronic data rooms for the Placement are not impliedly or otherwise preapproved by Company.

1.6 Broker understands that compensation hereunder is only for Approved Investors, as defined, and not for those introduced who seek their own compensation from the Company for soliciting other investors.  If Broker wants to bring on sub or affiliate brokers, then Broker will identify them as such for Company ("**Sub-brokers**"), and after Company approves them as Sub-brokers, the Company will add them to Exhibit B (for the avoidance of doubt, Sub-brokers are not Approved Investors). However, notwithstanding the foregoing, if Approved Investors invest in the Placement and also bring additional co-investors or follow on investors, those investments will be counted as Broker's efforts for compensation hereunder if a) there is no Conflict of the additional investors with another broker; b) there is written proof in the reasonable discretion of Company that the additional investments from co-investors or follow on investors were through Approved Investor of Broker and c) no other compensation is being solicited from such Approved Investor or related parties for such investments from Company (all those determinations to be made in good faith).

1.7   Broker represents and warrants that the activities relating to or arising from the Transaction, particularly not limited to any regulatory or legal requirements, are compliant with the laws in the countries in which Broker operates for the Transaction.

1.8   The Company will award the Broker upon the execution of this Agreement, one hundred thousand (100,000) warrants exercisable into Shares of the Company at an exercise price of $0.25 per share in the form as shown in Exhibit C.

## 2.    COMPENSATION AND EXPENSES

2.1 If during the Term hereof Broker successfully introduces parties, which conclude a Transaction (as defined in scope and timing) within the Term, the Company will compensate the Broker only under such circumstances, as follows:

VTI-KD EL- 2101

2.1.1    an amount equal to 5% (five percent) of the amounts invested by Approved Investors in a Transaction using the Company approved documents including specifically the Memorandum (the "**Cash Success Fee**"); and

2.1.2 entitle Broker to warrants to subscribe to Class A common stock such number of shares, issued in the Placement, with an exercise price being the price per share paid in the Transaction, equal to 5% (five percent) of the Shares issued to investors by the Company in a Transaction (the "**Warrants Success Fee**"). The Warrants will be issued in the form shown in Exhibit C

2.2 in addition, if Approved Investors invest in Company for a period of six (6) months after the expiration of the Term hereof ("**Tail Period**"), Broker shall be entitled to compensation. In order to qualify for compensation in the Tail Period, Broker must provide within seven (7) days of the expiration of the Term of this Agreement a written list to Company of directly or indirectly Approved Investors who will be fully identified for potential compensation if they invest in the Tail Period ("**Tail Period List**"). Broker and Company agree that parties who may have been on the Approved Investor list will not be placed on the Tail Period List if only general solicitations of interest occurred with such leads without oral communications or presentations about the Company.

2.3 All the compensation mentioned in this Agreement and any section will be inclusive of all payments to all other parties, brokers, representatives and affiliates and Broker shall be solely responsible for all taxes, fees, VAT, duties and the like.

2.4 The Broker agrees to invoice the Company and no compensation hereunder shall be initiated by Company until properly invoiced.

2.5 Broker agrees that it shall be fully responsible for its own expenses of all kinds except those where the Company has pre-approved the expense in writing from its Philadelphia headquarters.

## 3.    INDEMNITY AND REPRESENTATIONS

3.1 The Company agrees to comply with the legal and regulatory requirements and the obligations relating to Transaction and will indemnify Broker for all actions against Broker arising solely from actions or omissions of the Company in operation and support of Transaction that are unrelated to Broker's actions or omissions.

3.2 Broker agrees to indemnify and hold harmless the Company for Broker's activities relating to or arising from the Transaction particularly but not limited to any regulatory or legal requirements of Broker in the countries in which Broker operates for the Transaction. Broker further acknowledges that it is independent of Company and shall not make any representation of any kind as to the performance or value of the Company or otherwise speak for the Company but rather solely rely on written documentation from the Company for same.

## 4.    TERMINATION

4.1 Either party may terminate this Agreement immediately by serving a notice in writing in the event of any material breach of the terms of this Agreement by the other party of its obligations under this Agreement, which breach is either not capable of remedy or has not

VTI-KD EL- 2101

been remedied within five (5) days of its occurrence having been required to do so by written notice.

4.2    If this Agreement is terminated, then the rights and obligations of the parties will terminate accordingly except for any rights which have already accrued to any party and the provisions concerning Indemnity and paragraphs relating to Confidentiality, Miscellaneous and Notices set out herein shall remain in full force and effect.

4.3    Notwithstanding the above, this Agreement shall automatically terminate upon the occurrence of the earlier of i) June 30, 2021 or ii) the Company determines in its sole discretion, that Placement or Transaction, needs to terminate (the "**Term**").

## 5.    MISCELLANEOUS

5.1    This Agreement represents the entire agreement between the Company and Broker as Broker or Sub-broker.

5.2    All notices for the Company shall be addressed to 1105 William Penn Dr, Bensalem, PA 19020 USA and for Broker at the address above.

5.3    Any and all disputes of any kind arising or relating to this Agreement shall be governed by the laws of the Commonwealth of Pennsylvania USA and exclusively in the jurisdiction and venue of Philadelphia Pennsylvania USA.

5.4    This Agreement (i) shall be deemed to be entered into once signed by the Company and Broker and either executed copies are exchanged or are e-mailed back by the Company to Broker and by Broker to the Company and (ii) may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

5.5    Both the Company and Broker confirm acceptance of the terms of this Agreement by signing below:

| Agreed by Visual Technology Innovations, Inc. | Agreed by Broker: |
|---|---|
| Date: Jan 12, 2021 | Date: 12 JAN, 2021 |
| *Mathu Rajan* | |
| Authorized Representative: Mathu Rajan | Authorized Representative: FRANCES KNIGHT-DAVIS |
| Address: 1105 William Penn Dr Bensalem, PA 19020 | Address: EAST KINGS HOLT GREATHAM, LISS HANTS GU336AB, UK |

VTI-KD EL- 2101

## EXHIBIT A

### Approved Investors (and those rejected)

## EXHIBIT B

### Sub-brokers (and those rejected)

## EXHIBIT C

### Form of Warrant

**Exhibit F**
**- Amendment to Knight Davis (Glen Davis) engagement with VTI –**

## AMENDMENT TO ENGAGEMENT AGREEMENT

THIS AMENDMENT dated as of February 1, 2021 ("**Amendment**") is between Knight-Davis Associates LLP or his/her/its registered assigns ("**Broker**") and Visual Technology Innovations, Inc., a Nevada USA corporation (the "**Company**"), with its principal offices at 1105 William Penn Drive, Bensalem, PA 19020 USA and amends the engagement agreement dated on or about January 12, 2021 or signed simultaneously between the Company and Broker ("**Engagement**"). All capitalized terms not herein defined shall have the meaning ascribed to them in the Agreement, as amended.

### W I T N E S S E T H

**WHEREAS**, the Company and Broker wish to amend the Engagement such that there will be a modification to the clause pertaining to the award of warrants.

**NOW, THEREFORE**, the parties hereto, in consideration of the mutual promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby agree to amend the Note as follows:

1. Unless otherwise specified herein, each term used herein that is defined in the Agreement, as amended, shall have the meaning assigned to such term in the Note.

2. Section 1.8 of the Engagement shall be amended to reflect 300,000 warrants as of the date of this Amendment.

3. Except as expressly amended by this Amendment, the provisions of the Note, as amended, shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed on the date first above written.

| COMPANY: | Visual Technology Innovations, Inc. | HOLDER: | Knight-Davis Associates LLP |
|---|---|---|---|
| SIGNED: NAME: | Mathu Rajan | SIGNED: NAME: | GLEN R. DAVIS |
| TITLE: | President | TITLE: | |
| DATE: | March 16, 2021 | DATE: | 16 MARCH 2021 |

**Exhibit G**
**-Declaration of Suby Joseph-**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK L. BUNCE,<br>                    Plaintiff, | : <br> : | |
| vs. | : | |
| VISUAL TECHNOLOGY<br>INNOVATIONS, INC.<br>and<br>MATHU G. RAJAN,<br>        Defendants/Counterclaim and Third-<br>        Party Plaintiffs | :<br>:<br>:<br>:<br>:<br>: | Civil Action Case No.<br>C.A. No. 2:23-cv 01740<br><br>**Declaration of Suby<br>Joseph** |
| vs. | : | |
| Mark Bunce,<br>        Counterclaim Defendant and | :<br>: | |
| Timothy McCarthy<br>        Third -Party Defendant | :<br>: | |

## <u>DECLARATION</u>

1.      My name is Suby Joseph, and I used to work as a consultant that helped Visual Technology Innovations, Inc("**VTI**") during the time that Mark Bunce invested in VTI.

2.      VTI paid me consulting fees and directed my work.

3.      I got directions from Mathu Rajan, CEO of VTI and other consultants of VTI to accomplish what VTI needed.

4.      I coordinated the execution of a contract for services with VTI and the entity Knight Davis Associates, LLP, and its principals Glen and Francis Davis, ("**Knight Davis**").

5.      At no time did Knight Davis work for Mathu Rajan; rather, they contracted with VTI to help raise capital.

6.      I have communicated with Mark Bunce and Andrea Bunce in the past about the execution of agreements between Mark Bunce and VTI and was involved with some of his documentation.

7.      In my opinion Mark Bunce knew that Knight Davis worked for VTI.

8.      All of the investment monies from Mark Bunce were received by VTI and not Mathu Rajan. Mathu Rajan, as an authorized signatory for VTI, represented VTI in executing the agreement.

Page **1** of 3

9.      In my opinion, Mark Bunce had clear understanding of how the investment proceeds would be used by VTI. The investment documents carried broad language on the use of proceeds:

> *"Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general business purpose."*

10.      I was involved in the review of the VTI's bank accounts for the 2021–2022 period, and I can attest that the use of funds used were consistent to the "Use of Proceeds" language specified in the investment documents that were executed between Mark Bunce and VTI.

11.      Using monies from Mark Bunce for specific payments for another company called Stream TV Networks, Inc. ("**Stream TV**") was consistent with description of use of proceeds in the subscription agreements executed between VTI and Mark Bunce.

12.      VTI was trying to acquire the rights to use the technology and other assets of Stream TV which is in Bankruptcy proceedings.

13.      In fact, Mark Bunce agreed to specifics relating to Stream TV and its bankruptcy in his first investment loan to VTI executed on or about Feb 25, 2021- language from sec 3 of the note shown below:

> 3.      <u>Voluntary Conversion</u>.  The Holder may convert the Total Value of the Note at any time before <u>**Conversion Expiry**</u>, defined as the (i) five (5) working days after the Company informing the Holder that Stream TV Networks, Inc. has successfully filed for Chapter 11 protection with the US Bankruptcy Court (with such written proof as requested) and (ii) that the Company has received $1 million from a certain signed term sheet for an investment of US $30 million ("**Proceeds**") in Class A Common Shares ("**Shares**") of the Company; into Shares at a price of $0.23 per Share

14.      I understood that the clauses referring to Stream's bankruptcy were incorporated in the investment documents largely due to Mark Bunce's demands.

15.      I arranged most if not all of the investment paperwork at VTI.

16.      Patrick Allen is a real person who is an investor at VTI; at no time was Patrick Allen an agent of Mathu Rajan.

17.      I understood that Plaintiff Bunce talking to another prominent investor of VTI was simply to give Mark Bunce comfort by another investor who had confidence on VTI's business direction.

18.    I conveyed information to Mark Bunce and Andrea Bunce regarding VTI to help him invest in VTI; Mark Bunce also got much information through Knight Davis, who was an agent of VTI.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge on the date and time herein noted.*

DocuSigned by:

_Suby Joseph_
0B50EA69052C433...

_____

Suby Joseph

Date: 10/29/2024

**Exhibit H**
**- Declaration of Mathu Rajan-**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK L. BUNCE, <br> Plaintiff, | : <br> : | |
| vs. | : | |
| VISUAL TECHNOLOGY <br> INNOVATIONS, INC. <br> and <br> MATHU G. RAJAN, <br> Defendants/Counterclaim and Third-Party Plaintiffs | : <br> : <br> : <br> : <br> : <br> : | Civil Action Case No. <br> C.A. No. 2:23-cv 01740 <br><br> **Declaration of Mathu Rajan** |
| vs. | : | |
| Mark Bunce, <br> Counterclaim Defendant and | : <br> : | |
| Timothy McCarthy <br> Third -Party Defendant | : <br> : | |

## <u>DECLARATION</u>

1.　　I am providing this declaration in a legal process, and I understand that it may be used in Court.

2.　　My name is Mathu Rajan, and I am the founder and chief executive officer of Visual Technology Innovations, Inc.(**"VTI"**).

3.　　Mark Bunce sued VTI and me personally in above lawsuit.

4.　　Mark Bunce claims that I personally defrauded him into investing in VTI and also, I used his monies in an unjust manner.

5.　　Both allegations are false and without evidence.

6.　　I did not speak to Mark Bunce at or near his investments in February and March (which totaled $1million).

7.　　I only spoke to him in May of 2021 on a limited issue which is more fully described below.

8.    All of the communications with Mark Bunce concerning his investment and VTI

VTI was through Knight Davis ("**<u>Knight Davis</u>**") in Europe or Suby Joseph at and before Mark

Bunce's three investments.

9.    I communicated with Mark Bunce only by email dated March 3, 2021, in which

I answered Bunce's specific questions (black text is Bunce's questions and the blue text are my

responses) as follows:

> a) The original "Proceeds" agreement called for funds to go to the same bank account as in our agreement
>
> All Proceeds from the Investor will be sent to the Wells Fargo bank account that you're using. There may be an account that receives funds, those will be immediately forwarded to the Wells Fargo account.
>
> b) The term 'affiliates'. What is intended here - will the funds go to Vti - or a subsidiary? An affiliate to me is a company that Vti has influence over but not control of.
>
> The term 'affiliates' was used if it makes it faster to receive the funds during the transaction. There will be a contractual relationship between the affiliate and VTI and all funds will be forwarded to the VTI bank account at Wells Fargo that you're also using.
>
> c) Does the Investor have some control over the funds held at Commerzbank, if so what?
>
> The Investor has no control over the funds in Commerzbank
>
> d) Is the Investor being issued with Class A Common Shares in the Company (Vti) as per the original agreement and have these been issued?
>
> Yes, the Investor is being issued Class A Common Shares  - the same class of stock that you are being issued.
>
> e) When are you expecting cleared funds from the Investor?
>
> We're working as fast as possible and hoping to have clear funds very soon.
>
> > Apologies for asking so many questions but I hope you understand that the Notice sent through last night is not the same as detailed in my Convertible Note as the funds may not go to the Company and may not go into the detailed bank account.
>
> Thank you for your questions. Can you please forward the wire as we're anxious to get the projects, in particular the Eindhoven ones to get started.

11.    When Bunce asked questions about "Investor" he was referring to Timothy Mcarthy whose investment monies were to be used to repay Mark Bunce.

12.    I only spoke to with Bunce in May before his last investment relating to payments to be made to a Chinese landlord.

13.    Bunce characterizes the purpose of the call as

Please find attached the signed documents as requested. I attach these for you to hold to my account subject to being happy with the variation of the agreement with the Chinese landlord.

14.    Plaintiff Bunce wanted VTI to cause a change to the documents for the Chinese Landlord and hold his money from his last investment of $50,000 until then.

15.    All other information that Bunce was provided before his investments were simply email forwards by Suby Joseph or Glen Davis, agent for VTI relating to VTI plans for operations.

16.    I never used the monies of Bunce for any personal purpose but rather only for VTI business.

17.    I was not enriched by the investment of Mark Bunce personally; he was only an investor in my company VTI which had many other investors that closed in millions of dollars.

18.    VTI had investment of about $1,267,500 as convertible debt, about $2,679,036 invested as straight debt, and about $23,000 invested as straight equity.

19.    In April of 2021, Plaintiff Bunce became skeptical of investment from McCarthy into VTI so he could be repaid.  Bunce communicated with Glen Davis who forwarded his questions to Suby Joseph of VTI to answer.

20.    Plaintiff Bunce wanted to have a call with me and McCarthy or a call with McCarthy alone to discuss the delay of McCarthy money.

21.     Plaintiff Bunce describes his intentions in that meeting request as

I'll speak with him re: the inclusion of Tim on the call alternatively, it might be an idea to set up a separate call specifically with Tim.

22.      After that doubt, Bunce invested in VTI again a month later the sum of $50,000 and made repayment contingent on VTI I raising $10 million dollars, presumably because McCarthy convinced him.

23.     In November of 2021 Mark Bunce became very angry at McCarthy for not releasing his investment monies in VTI that Bunce indicated that he would help VTI sue Mcarthy for investment promises.

24.     Bunce demanded his monies back in November of 2021 and indicated that he would disrupt VTI operations if he was not repaid.

25.     When Plaintiff Bunce filed his lawsuit against VTI, I was surprised that he sued me personally instead of McCarthy as that is opposite of what he told me when we talked.

26.     Bunce knew that me and VTI were fooled by McCarthy but he blames me and VTI.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge on the date and time herein noted.*

_____          Date: 10/16/2024

            Mathu Rajan

**Exhibit I**
**- Answers to Plaintiffs Interrogatories-**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MARK L. BUNCE,

     Plaintiff,

  vs.

VISUAL TECHNOLOGY
INNOVATIONS, INC.

and

MATHU G. RAJAN,

     Defendants.

Civil Action

Case No. 2:23-cv-01740

### PLAINTIFF'S RESPONSES TO
### THIRD INTERROGATORIES FROM DEFENDANTS

  Under Federal Rules of Civil Procedure 26 and 33, Plaintiff Mark L. Bunce responds as follows to the third interrogatories served by Defendants on January 19, 2024. By agreement, the response date was extended up to and including February 23, 2024.

### DEFINITIONS

  As used in this response: "Bunce" means Plaintiff Mark L. Bunce; "Davis" means Glen R. Davis; "Rajan" means Defendant Mathu G. Rajan; and "VTI" means Defendant Visual Technology Innovations, Inc.

### RESPONSES TO INTERROGATORIES

  1.  Identify all of the cellphones, by cell phone number, and all computers, by serial numbers, that Plaintiff or his wife used in communicating with Mathu Rajan or anyone connected with VTI in 2021.

  **ANSWER:** Bunce objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to result in the discovery of relevant or admissible evidence. Bunce

1

objects to this Interrogatory to the extent it relies on the vague, undefined term "anyone connected with VTI."

Subject to and without waiving his objections, Bunce communicated with Mathu Rajan and Glen Davis, acting as agent of VTI, from cellphone number +44 7512 131312. Bunce's wife cellphone number is +44 7495 606806 but Bunce believes that she did not communicate with Rajan or Davis using that number. Bunce and his wife communicated with Mathu Rajan and Glen Davis from a 2020 iMac computer with serial number C02CL02JJ---. Bunce also communicated with Mathu Rajan and Glen Davis from another computer no longer in Bunce's possession, whose data was migrated to another computer having serial number D2DJ0PX--- and the discoverable information has been preserved and stored on a hard drive.[1]

Any communications between Bunce and his wife, originating from any of these devices, are protected by the spousal privilege.

2.     What are <u>all</u> of the alleged false representations that Mark Bunce relied upon to make investments in VTI (including all amendments thereto).

**ANSWER:**    Bunce objects to this Interrogatory overly broad insofar as it would require him to identify "all" misrepresentations by and on behalf of Defendants even though discovery remains incomplete. Bunce reserves the right to amend and supplement this response based on additional analysis and discovery. Subject to and without waiving his objections, Bunce states as follows:

A.     On February 17, 2021, Davis, acting as an agent of VTI and Rajan, contacted Bunce by phone. During that call, Davis orally represented to Bunce that VTI was raising money so that it could take over patents and other intellectual property and assets belonging to Stream TV Networks, Inc. and use that property to develop a new business through a publicly traded company. Rajan owned and controlled Stream TV Networks, Inc., which was experiencing financial difficulties. To induce Bunce to provide up to or over $1 million to VTI, Davis represented to

---

[1] The last three characters of serial numbers are not included for security purposes but are known to counsel.

Bunce that VTI and Rajan's plan was to use Bunce's investment to enable VTI to obtain such property from Stream TV Networks, Inc., to further develop and sell products using such property, and to reverse merge VTI into a company that would imminently become publicly traded. In fact, this plan was not presently capable of being carried out as represented to Bunce and could not possibly have been carried out as represented to Bunce even by using the funds he provided.

B.       On February 17, 2021, to induce Bunce to invest in VTI, Davis, acting as an agent of VTI and Rajan, orally told Bunce over the phone that Bunce could profit by loaning up to $1 million or more to VTI because it would entail Bunce having the option to convert his loan into shares in VTI, which shares would far exceed the value of Bunce's loan once VTI had merged into a publicly traded company as planned. In fact, Bunce's $1,050,000 loan to VTI was intended to be used by Rajan for other purposes and was in fact used by Rajan for other purposes that were inconsistent with Davis's representations to Bunce. Rajan did not have the preset intent to use the funds as represented to Bunce.

C.       On February 17, 2021, Davis, acting as an agent of VTI and Rajan, falsely represented to Bunce orally via phone that VTI itself was presently in the process of developing a new technology for viewing video screens in three dimensions (3D) without having to use 3D glasses. In fact, at that time VTI had no products and was not in the process of developing any such technologies.

D.       On February 17, 2021, Davis, acting as an agent of VTI and Rajan, falsely represented to Bunce orally via phone that VTI had a binding agreement with Burlington Resources Asia Limited, through Knight Asia Limited, to provide approximately $30 million investment in VTI to fund its transactions and operations. Davis told Bunce that the agreement between VTI and Burlington Resources Asia Limited required VTI to first obtain seed funding of $1 million, which Davis asked Bunce to provide. In fact, VTI did not have any such binding agreement with Burlington Resources Asia Limited or Knight Asia Limited. VTI and Rajan did not presently intend to use Bunce's loan as seed money for VTI as represented.

E.      On February 17, 2021, Davis, acting as an agent of VTI and Rajan, emailed to Bunce documents about VTI, about the plan for VTI's reverse merger into a publicly traded company, and about related matters. Rajan had provided these documents to Davis. A genuine copy of the email and its attachments, which were filed as an exhibit to the Complaint, 1, Doc. 1-1, are provided in **Exhibit A** to this Response. The documents falsely represented to Bunce, among other things, that VTI had well-established business relationships and agreements with Google, Lenovo, and other Silicon Valley companies to help VTI develop and sell 3D technologies. In fact, VTI had no business relationships or contracts with such entities. The documents also made, among other misrepresentations, the following:

i.      The powerpoint slides represented that "VTI will leverage its strategic relationship with BOE, the world's biggest panel maker." **Ex. A**, at 5. This representation was false because, among other things, VTI had no strategic relationship with BOE.

ii.      The powerpoint slides included images that gave the false impression that VTI possessed viable 3D technologies. *See, e.g.*, **Ex. A**, at 8. VTI did not in fact possess such technology.

iii.      The powerpoint slides referenced "the proprietary technology," falsely giving the impression that VTI possessed viable proprietary glasses-free 3D technology. **Ex. A**, at 8. VTI did not in fact possess such technology.

iv.      The powerpoint slides represented that "Visual Technology Innovations, Inc. is a unique and unrivaled 3D-without-glasses display technology." **Ex. A**, at 8. The powerpoint slides represented that VTI's "real-time conversion solution can convert virtually any content – 2D or 3D – to glasses-free 3D on the fly." *Id*. The powerpoint slides represented that "[c]onsumers can easily control the 3D effect, adjusting the amount of 3d pop and depth just like volume." *Id*. The powerpoint slides represented that "VTI technology is currently being developed in many shapes and sizes ranging from 5" to 75"." *Id*. The powerpoint slides also represented that VTI had technology and products that with other technological capabilities, as described in the slides. *Id*. at 9–11. Each of these

representations was false because VTI did not in fact possess such technology. VTI did not in fact have any such technologies or products, whether in protoype, in development, or for sale, that had such capabilities or that were consistent with such description.

v.        The powerpoint slides represented that VTI had a particular business model with certain characteristics and goals. **Ex. A**, at 14. These representations were false because, among other things, VTI in fact had no such business model or any actual business at all.

vi.        The powerpoint slides represented that Tracy Rees was President of VTI, that Bud Robertson was Executive VP of VTI, and that Cliff Morton was VP. Engineering of VTI. Ex. A, at 15. These representations were false because, among other things, those persons were not in fact officers or employees of VTI. In fact, VTI had no employees at all.

vii.        The powerpoint slides represented that Sara Brewer was Content Engineer for VTI, that Ziggy Papartis was Content Engineer for VTI, that Matt JJ Lo was Manager of Asia Sales for VTI, and that Mike George was in charge of North American and European Commercial Sales. **Ex. A**, at 17. These representations were false because those persons were not in fact employees of VTI. VTI had no sales. In fact, VTI had no employees at all.

viii.        The powerpoint slides represented that Raja Rajan was "General Counsel" of VTI. **Ex. A**, at 16. That representation was false because, among other things, VTI in fact had no employees.

ix.        The powerpoint slides represented that "[s]ignificant VTI market opportunities have resulted from previous technical and business developments." **Ex. A**, at 20. The powerpoint slides represented, among other things, that VTI had "[d]eveloped software tools and SDKs for content creators," that VTI's "IP has received patent grants in 10 patent families," that VTI had "[b]onding equipment designed, manufactured and proven to deliver 96% yield," that VTI had an "[e]stablished R&D subsidiary with 20+

person engineering team and on-site 3D bonding capability," that VTI had "[e]stablished subsidiaries in China for manufacturing & sales," that VTI had "[f]orged [a] strategic alliance with BOE, the world's biggest video panel manufacturer," and that VTI had "[o]btained technology libraries from TSMC foundry." **Ex. A.**, at 20. Each of these representations was false because, among other things, VTI had no products, had no technologies, had no subsidiaries, had no patents, had no bonding equipment, and had no alliance with BOE.

x.       The powerpoint slides represented that VTI had "existing clients" that included Huawei, Skyworth, Lenovo, and Chunghwa Telecom and "immediate opportunities" for potential revenue totaling over $150 million. **Ex. A**, at 21. Each of these representations was false because, among other things, VTI had no such clients, relationships, or immediate opportunities.

xi.       The powerpoint slides represented that VTI had a "strategic partnership" with BOE to "combine the high-resolution panels of BOE with Glasses-Free 3D technology." **Ex. A**, at 23. This representation was false because, among other things, VTI had no such relationship with BOE.

xii.       The powerpoint slides represented that "VTI is currently in negotiation with several government agencies and municipalities in Asia to establish supply chain financing and expansion capital." **Ex. A**, at 29. This representation was false because, among other things, VTI was not engaged in any such negotiations.

xiii.       The powerpoint slides represented that VTI's technology "development [was] at a critical phase. All POCs completed. SOCs need to be implemented." **Ex A.**, at 30. These representations were false because, among other things, VTI was not in the process of developing any technology or product.

xiv.       The powerpoint slides implied that Nicole Maneen and Suby Joseph were employees of VTI. **Ex. A**, at 31. These representations were false because those persons were not employees of VTI. In fact, VTI had no employees at all.

6

xv.        The Initial Public Offering document represented that VTI "has engaged with Public Market Bankers," which "are planning to complete the transaction and have the Company trading by the end of March 2021." **Ex. A**, at 32. These representations were false because VTI had no such engagement, there was no plan by Public Market Bankers to have the company publicly trading by the end of March 2021, and the proposed merger and initial-public-offering transactions could not possibly have been completed by the end of March 2021.

xvi.       The Business Plan represented that VTI was "now ready to create optics required for a variety of product categories." **Ex. A**, at 36. This representation was false because VTI was not ready to do so and in fact had no products at all.

xvii.      The Business Plan represented that VTI had "refined our design rules to achieve critical improvements" and that "we are now able to design optics to suit most applications." **Ex. A**, at 36. These representations were false because, among other things, VTI had no designs or rules for designs.

xviii.     The Business Plan represented that VTI had "worked extensively with our Japanese optics supplier through iterations of lens production to help them develop manufacturing methods that result in quality lenses. Our lens supplier is now ready for volume production." **Ex. A**, at 38. These representations were false because VTI had no relationship with any Japanese lens supplier and had not helped any such supplier develop manufacturing methods.

xix.       The Business Plan represented that VTI had "solidified our relationship with a key vendor that can tailor adhesives to our specific requirements. Our supplier is now ready to supply custom glues for volume production." **Ex. A**, at 38. These representations were false because VTI had no relationship with any glue vendor.

xx.        The Business Plan represented that VTI had "developed a valuable relationship with Iinuma Gauge Manufacturing Company in Japan, which built our small production line and MPL mass production line bonding equipment." **Ex. A**, at 28. These

representations were false because VTI had no relationship with Iinuma Gauge Manufacturing Company in Japan and had no production lines of any kind.

xxi.        The Business Plan represented that VTI had "developed a camera-based inspection station that uses computer algorithms to analyze specially-created video patterns and give a 'pass/no pass' evaluation of the 3D module. Units that pass are forwarded to the back-light assembly station. The results of any modules that do not pass are digitally sent to The Netherlands for immediate review so that any systemic failures on the line can be diagnosed and corrected quickly." **Ex. A**, at 39. These representations were false because, among other things, VTI had no inspections stations and had no 3D modules to inspect.

xxii.       The Business Plan represented that "the VTI R&D team has previously created a 4K rendering core for technology demonstrators. To secure customer commitments, work must now begin to create a prototype board with additional features." **Ex. A**., at 39. These representations were false because, among other things, VTI had no R&D team and had developed no rendering core.

xxiii.      The Business Plan represented that VTI had "built relationships with strategic launch partners as described below," referencing Google, JCDecaux, ExterionMedia, Skyworth, Huawei, and Chunghwa Telecom. **Ex. A**, at 39–40. These representations were false because VTI had no such relationships.

xxiv.      The Business Plan represented that VTI has "established business relationships with key brands in various other product categories and will solicit commitments for product development from them as soon as core components are available for integration," referencing MSi, Lenovo, HP, Apple, Huawei, Oppo, Vivo, Oneplus, HTC. **Ex. A**, at 43. These representations were false because VTI had no such relationships

xxv.       The "deal in summary" represented that "VTI has an institutional investor who has signed documents on the 10th February to invest $30 million into VTI at $1.40ps, commencing 12th March based on the latest information today the company is now planned to list in March so the total of $30m must be invested before then." **Ex. A**, at 45. This

8

representation was false because there was no binding agreement with an institutional investor in VTI and the company was not in fact planned to list for public trading in March.

xxvi.      The "deal in summary" represented that "VTI's own projected valuation [was] $150m." **Ex. A**, at 45. This representation was false because there was no legitimate basis for such valuation.

xxvii.      The "deal in summary" represented that "[t]he $1 million investment" by Bunce "will be used to finance the purchase orders, fulfillment and shipping or current orders of 5,000 off Glasses Free 3-D 8" Tablets and 5 off 250" large exterior signage screens (Airports, Shopping Malls and other forms of Exterior Advertising) plus the ever present expensive lawyers." **Ex. A**, at 44. These representations were false because, among other things, VTI had no pending or imminent purchase orders for any product, because VTI had no product to sell, and Rajan had the present intent to use the money for other purposes inconsistent with these representations. Rajan in fact used the money for other purposes inconsistent with these representations.

xxviii.      The "deal in summary" represented that "ongoing shipments will generate significant reoccurring revenue each quarter of between $5m & $7m although we are referring to February, March and April initially, which will then be ongoing albeit out of sync' with the calendar." **Ex. A**, at 45. These representations were false because, among other things, VTI had no products ready to sell, had no orders for any products, and there was no legitimate basis for stating VTI could do between $5 million and $7 million in quarterly sales at any time in 2021, much less beginning immediately.

F.      On February 20, 2021, Davis, acting as an agent of agent of VTI and Rajan, emailed additional information to Bunce. A genuine copy of the email is attached **Exhibit B** to this Response. The email made misrepresentations to Bunce, including the following:

i.      In the email, Davis represented to Bunce that the "$30m investment which we have introduced will enable VTI to commence the acquisition program and VTI are well placed to fulfil these projects and orders, generating very substantial and quick

revenues. The first acquisition will take place very quickly indeed." **Ex. B**, at MB-002508. These representations were false because VTI could not rely on a $30 million investment. There was no legitimate factual basis for representing that VTI would receive a $30 million investment, that VTI was ready to fulfill any projects or orders, or that any of the represented acquisition or revenues could take place imminently. VTI had no projects and no orders as represented.

      ii.      In the email, Davis represented to Bunce that the "cash injection would be to finance working capital for delivery of product that has firm orders" by representing that "there are purchase orders for 5,000 8" tablets and 5 x 250" large screens that are actual final products ready for shipment. Digital signage final products are also ready to ship now. Other companies may ask for prototypes of certain products, for example, high end 8K TVs or displays for the automotive industry." **Ex. B**, at MB-002509. These representations were false because VTI had no such products or signage ready for delivery or shipment and had no such prototypes.

      iii.      In the email, Davis represented to Bunce that "[t]he Directors have funded the business to the tune of $500,000." That representation was false. The Directors did not in fact fund VTI in that amount or in any amount exceeding $75,000, and no Director other than Rajan provided any funding. **Ex. B**, at MB-002509.

      G.      On February 21, 2021, Davis, acting as an agent of agent of VTI and Rajan, communicated with Bunce over the phone. Davis represented to Bunce that, once VTI had received $1 million in seed funding, it was possible and expected for Rajan to complete a reverse merger by VTI into another company and for that company to begin offering its shares for public purchase within five or six weeks. That representation was false. At that time, Stream TV Networks, Inc. was insolvent and did not have control over its own patents and other intellectual property and assets; the patents, other intellectual property, and assets were instead under the control of another company, SeeCubic, Inc., which was not controlled by Rajan but rather by unpaid creditors of Stream TV Networks, Inc. Davis falsely represented to Bunce that his seed money would be only

a short-term investment because VTI was ready to go public on NASDAQ via merger. VTI was not in fact ready to go public on NASDAQ. Davis also falsely represented to Bunce that VTI had products it was ready to sell as soon as it got seed funding. VTI in fact had no products ready to sell.

H.      On February 22, 2021, Davis, acting as an agent of Rajan and VTI, provided to Bunce a supposed letter from Knight Asia Limited dated February 18, 2021, saying that it was "ready, willing and able upon the express instructions of our client Burlington Resources FZE (a wholly owned subsidiary of Burlington Resources Asia Limited) to make payment of US$30 million from our bank DBS, Singapore to purchase certain shares in VTI ...." The letter is Exhibit 2 to the Complaint, Doc. 1-2 and it is attached here with its cover email and other attachments as **Exhibit C**. *See* **Ex. C**, at MB-002485. These representations were false because Burlington Resources Asia Limited was not in fact obligated to provide $30 million to VTI and was not in fact ready, willing, and able upon express instruction to purchase $30 million worth of shares in VTI. Rajan did not presently believe or intend for such funds to be invested in VTI and knew that such funds would not in fact be invested as represented. The email also attached "5 Year Forecasts" consisting of projected sales, profits, and other matters for VTI, which listed 12 products of VTI (Theater Solution, OOH Solution, Tablet Solution, 65" Signage, 65" Consumer (fpga), 65" Consumer (asic), 31" Signage, 31" Casino, 31" Consumer (fpga), 31" Consumer (asic), Special Products, 12" Clusters). *See* **Ex. C**, at MB-002458 & MB-002488. These representations were false because the forecasted numbers were entirely fabricated, had no legitimate factual basis, were not capable of being carried out as represented. VTI had no such products for sale and was incapable of manufacturing such products.

I.      On February 22, 2021, Davis, acting as an agent of Rajan and VTI, and Rajan had a videoconference with Bunce and other persons. Rajan sought to persuade Bunce to loan $1 million to VTI. During this conference Rajan orally communicated various false representations:

    i.      Rajan represented to Bunce that VTI owned $150 million worth of innovative technology capable of generating 3D images on flat computer screens.

This representation was false because VTI did not in fact own such technology as represented.

ii.      Rajan represented to Bunce that VTI was ready to sell at least 2,500 computer tablets for glasses-free 3D viewing and 250 very large glasses-free 3D computer screens for viewing in airports and shopping malls. Rajan represented to Bunce that VTI was ready to make these sales in March through May 2021, provided that VTI obtained $1 million in seed funding from Bunce. These representations were false because VTI did not in fact have such products ready for sale or any products ready for sale and could not have sold any such products during the referenced period.

iii.      Rajan represented to Bunce that VTI was ready to make the sales referenced above in March through May 2021, provided that VTI obtained $1 million in seed funding. VTI was not capable of making the represented sales.

iv.      Rajan represented to Bunce that it was possible for, and he intended for, VTI to complete a reverse merger into a publicly traded company and carry out public-offering transactions within a couple of months after receiving Bunce's $1 million loan. These representations were false because, when Rajan made them, it was impossible for those transactions to be carried out within the represented period, and Rajan did not have the present intent to cause such transactions to occur.

v.      Rajan represented to Bunce that VTI had Chinese-branded glasses-free 3D products that were already being sold. This representation was false because VTI did not in fact have such products for sale and had not ever sold such products.

vi.      Rajan represented to Bunce that VTI already had prototype very large glasses-free 3D screens installed in various locations, such as airports, and that it already had reached agreements to put large glasses-free 3D screens in various airports across the United States. These representations were false because

VTI in fact had no such agreements, had no such prototypes, and had not in fact placed any 3D screens in any airport or anywhere else.

vii.    Rajan represented to Bunce that Rajan's plans for VTI obtaining intellectual property from Stream TV Networks, Inc. and reverse merging into a company that would imminently become publicly traded were being opposed by other persons who had invested in Stream TV Networks, Inc. and that VTI's plans could not go forward without Bunce's investment of $1 million in seed funding. These representations were false because these plans, as represented by Rajan, were presently incapable of being carried out as represented and Rajan did not presently intend to use money provided by Bunce to carry out the plans as represented. In fact, Rajan used the money Bunce loaned for other purposes inconsistent with Rajan's and Davis's representations to Bunce.

viii.    Rajan represented to Bunce that, if Bunce obtained shares in VTI, his shares would increase in value as soon as VTI merged into a publicly traded company and sold its shares publicly on NASDAQ. These representations were false because, in fact, the planned transactions were presently incapable of being carried out or of creating share value as represented to Bunce by Rajan.

ix.    Rajan showed information on screen during the videoconference that was consistent with or excerpted from documents that Davis had emailed to Bunce. *See* **Ex. C**. This information was false for the reasons described above in paragraphs 2.H and 2.I.

J.    During the videoconference on or about February 22, 2021, Davis, acting as agent for VTI and Rajan, orally represented to Bunce that proceedings were going well for Rajan to gain control over Stream TV Network, Inc.'s patents and other assets. That representation was false at the time it was made. Davis represented that Burlington Resources Asia Limited in cooperation with Knight Asia Limited had set aside approximately $30 million for investment in VTI, which would by obligation be invested in VTI as soon as Bunce had provided $1 million in seed funding

to VTI. That representation was false because such funds had not in fact been set aside and there was no binding obligation or intent for such investment by Burlington Resources Asia Limited or Knight Asia Limited to be made in VTI.

K.      On February 23, 2021, to induce Bunce to invest in VTI, Davis, acting as agent of Rajan and VTI, provided Bunce via email a letter from an attorney named Dan Rink, which had been prepared at Rajan's request. The letter described as legitimate VTI's proposed merger and public-offering transactions. Rink was acting as an agent of Rajan and VTI. A genuine copy of the email and letter is attached as **Exhibit D**. These representations were false because the transaction was not legitimate as represented and Rajan did not presently intend for it to occur.

L.      On or about February 24, 2021, Davis, acting as agent of Rajan and VTI, orally represented to Bunce over the phone that Stream TV Networks, Inc. had around $6 million to $8 million in recurring product sales. This representation was false because, in fact, Stream TV Networks, Inc. did not have any products for sale.

M.      After loaning $150,000 to VTI on February 25, 2021, Bunce was awaiting money to be invested by Burlington Resources Asia Limited through Knight Asia Limited before loaning another $850,000 to VTI. Rajan sought to induce Bunce to make the loan. On February 27, 2021, acting as an agent for Rajan and VTI, Davis texted Bunce, representing that "they are expecting the $30m early next week. It may come through as early as tomorrow but he [Rajan] suggests that you wait for a call from us once we know for sure." A genuine copy of this text is attached in **Exhibit J**. This representation was false because there was no binding obligation for such investment by Burlington Resources Asia Limited or Knight Asia Limited to make such investment in VTI. Davis, Rajan, and VTI did not presently believe or intend that such investment would be made and in fact knew that it would not be made.

N.      Acting on behalf of VTI and Rajan, on March 2, 2021, Suby Joseph, who was described as an officer of VTI, emailed to Bunce, Rajan, Davis, and others a document entitled "Exercise of Drawdown Rights," which was executed by Rajan for VTI and purportedly by Timothy McCarthy for Burlington Resources Asia Limited. A genuine copy is attached as **Exhibit**

**E**. The drawdown document stated, among other things, that "[t]he Investor [Burlington Resources Asia Limited] is hereby exercising it's the rights under clause 4 of the Agreement" to invest $29 million in VTI, to occur through a wire transfer. These representations were false because Burlington Resources Asia Limited was not in fact ready to make this investment, had no obligation to make it, did not intend to make it, and never made it. Joseph was not in fact an officer of VTI. Joseph, Rajan, and Davis knew this letter was false and misleading and that Burlington Resources Asia Limited would not make the investment as represented. They had no present intent for the investment to be made. They provided the false information to Bunce to induce him to loan another $850,000 to VTI.

O.    On March 5, 2021, Bunce had a Zoom meeting over the internet with Rajan, Davis, and others. During this meeting, Rajan and Davis represented to Bunce that the transfer of an initial, supposedly expected $1 million from Burlington Resources Asia Limited to VTI (with $29 million to follow) had been delayed. Rajan and Davis described various contractual arrangements, including a standby letter of credit, by which the funds from Burlington Resources Asia Limited could be secured. To hide their deception, Davis told Bunce that if he independently contacted Timothy McCarthy, it could impede the investment by Burlington Resources Asia Limited and the effort to take VTI public. These representations were false because Burlington Resources Asia Limited was not in fact ready or obligated to provide any such funds to VTI imminently and the proposed standby letter of credit transaction was not legitimate. Davis and Rajan knew that Burlington Resources Asia Limited was not going to invest in VTI and did not presently intend for such investment to occur.

P.    After Bunce had loaned another $850,000 to VT on March 8, 2021, Rajan and VTI sought to induce Bunce to amend his notes with VTI to extend their maturity date, in exchange for warrants permitting him at his sole option to execute the warrants and thereby convert his loan into shares in VTI at a price favorable to Bunce. On March 27, 2021, Davis, acting as an agent for VTI and Rajan, forwarded to Bunce via a purported earlier email exchange between Timothy McCarthy and Suby Joseph. A genuine copy of the email is attached as **Exhibit F**. The email represented in

part that "Burlington Resources Asia Limited is fully committed to VTI and to invest $ 30 million in advance of its imminent IPO on NASDAQ for a controlling stake. We are making the investment through an SBLC [standby letter of credit] and working through this with Mathu [Rajan] who has arranged to monetise the Bank instrument for our investment. We will close this in the next few days." These representations were false because Burlington Resources Asia Limited was not in fact committed or obligated to invest or otherwise provide any money to VTI, Rajan was not arranging for that transaction to occur, the transaction could not possibly have closed within the next few days, and Rajan had no present intent for that transaction to occur.

Q.    After Bunce had agreed on or about April 5, 2021, to extend the maturity date for his loans to VTI, Rajan and VTI sought to induce Bunce to invest more money in VTI. On April 9, 2021, Davis, acting as an agent for VTI and Rajan, emailed Timothy McCarthy and copied Bunce. A genuine copy of the email is attached in **Exhibit G**. Davis represented to Bunce via this email that Burlington Resources Asia Limited was in fact presently in the process of closing on its investment in VTI by wiring money through Wells Fargo Bank. That representation was false. Davis knew that the investment was not in fact in the process of being made.

R.    To induce Bunce to invest more money in VTI, on April 16, 2021, Rajan emailed Bunce, representing that Bunce's warrants in VTI were expected to be worth up to or over $100 million, which Bunce could soon monetize by going ahead and converting his loan into shares in the VTI. A genuine copy of the email is attached as **Exhibit H**. These representations were false because VTI did not legitimately have, and could not possibly have had, such share value at any relevant time. In fact, VTI then had and continues to have no or negligible legitimate company value.

S.    On or about April 26, 2021, Bunce had a phone call with Davis. To induce Bunce to invest more money in VTI, Davis, acting as an agent of Rajan and VTI, orally represented to Bunce that he had a friend named "Patrick Allen" who had personally invested a large amount in both Stream TV Networks, Inc. and VTI, thereby suggesting to Bunce that he could trust Rajan

and should have no qualms about providing more money to VTI. These representations were false. On information and belief, "Patrick Allen" is a pseudonym created by or on behalf of Rajan and used by a third person cooperating with Rajan.

T.      To induce Bunce to invest more money in VTI, on April 29, 2021, someone calling himself Patrick Allen and acting on behalf of Rajan and VTI emailed Bunce. A genuine copy of this email is attached as **Exhibit I**. The email represented to Bunce that "I am delighted to see that they [VTI] are finally beginning to deliver their product against an array of obstruction. Please take this email as confirmation that I will be investing a further $50,000 into VTI, which I have now input with HSBC this evening." These representations were false because VTI was not delivering any products for sale and, in fact, had no products for sale. Acting on behalf of Rajan. On May 4, 2021, Bunce loaned an additional $50,000 to VTI.

3.      What are each and every benefit conferred to Mathu Rajan as alleged in Count III of the Complaint.

**ANSWER:**    Bunce conferred a monetary benefit on Rajan by loaning to his company, VTI, $1,050,000. Rajan totally dominated VTI and personally benefited from the loan to VTI and used the money for other purposes of his own, inconsistent with his representation to Bunce that the money would be used to help VTI develop a business and become publicly traded. Defendants have so far refused to explain how Rajan or VTI in fact used the money.

4.      Who are all the people that helped or participated in any way to the drafting of the document, a copy of which is attached as Exhibit 8 to the Complaint.

**ANSWER:** Bunce objects to this Interrogatory to the extent it seeks information not within Bunce's knowledge or that is protected by the spousal privilege. Without waiving his objections, Bunce states that the draft was provided to Bunce by Defendants. Bunce and his wife, Andrea

Bunce, reviewed the draft agreement and edited the document. Communications between Bunce and his wife are protected by the spousal privilege.

Signature for Responses:

*s/ Mark L. Bunce*

Plaintiff Mark L. Bunce

Dated: February 22, 2024

Respectfully submitted,

By:  */s/ Michael D. Homans*

Michael D. Homans
ID No. 76624
HOMANSPECK, LLC
230 Sugartown Road
Suite 218
Wayne, PA 19087
(215) 419-7463
mhomans@homanspeck.com

*Attorneys for Plaintiff Mark L. Bunce*

Michael P. Kohler*
MILLER & MARTIN PLLC
Regions Plaza Suite 2100
1180 West Peachtree Street, NW
Atlanta, Georgia 30309-3407
(404) 962-6100
Michael.Kohler@millermartin.com

Robert F. Parsley*
MILLER & MARTIN PLLC
832 Georgia Ave., Suite 1200
Chattanooga, Tennessee 37402
(423) 785-8211
Bob.Parsley@millermartin.com

*Attorneys for Plaintiff Mark L. Bunce*

_____

*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Robert F. Parsley, hereby certify that on this day the forgoing document was served via email and by U.S. Mail, certified and postage prepaid, or by third-party delivery service on the following:

Raja Rajan, Esq.
RAJAN LAW GROUP
P.O. Box 3753
Cherry Hill, NJ 08034

and

Raja Rajan, Esq.
RAJAN LAW GROUP
2009 Chestnut Street
Philadelphia, PA 19103

(215) 550-1002
raja@rajanlawgroup.com
raja@advisory-capital-solutions.com

*Counsel for Defendants*

Dated: February 22, 2024

*s/ Robert F. Parsley*

Robert F. Parsley*
MILLER & MARTIN PLLC
832 Georgia Ave., Suite 1200
Chattanooga, Tennessee 37402
(423) 785-8211
Bob.Parsley@millermartin.com

*Attorneys for Plaintiff Mark L. Bunce*

_____
*Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I, Raja Rajan, hereby certify that on October 31, 2024, a true and correct copy of the foregoing was served via email to counsel listed below:

Michael D. Homans

ID No. 76624

HOMANSPECK,

LLC

mhomans@homanspeck.com

Michael P. Kohler*

MILLER & MARTIN

PLLC

Michael.Kohler@millermartin.com

*Attorneys for Plaintiff Mark L. Bunce*


Timothy McCarthy

tim@burlingtonresources-asia.com


*Third-Party Defendant*


/s/ Raja Rajan                                          October 31, 2024

Raja Rajan,

Esquire Attorney

I.D. 58849

2009 Chestnut Street

Philadelphia, PA 19103

215-550-1002

raja@rajanlawgroup.com

*For Defendants Visual Technology Innovations, Inc. and Mathu Rajan*