IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK L. BUNCE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | Civil Action |
| vs. | : | No. 2:23-cv-01740 |
| | : | |
| VISUAL TECHNOLOGY INNOVATIONS, INC. | : | District Judge Scott |
| | : | |
| | : | Magistrate Judge Hey |
| and | : | |
| | : | |
| MATHU G. RAJAN | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Bunce responds in opposition to Defendants' motion for summary judgment, Doc. 107. Bunce sued VTI for breach of contract. It's undisputed that Bunce loaned VTI $1,050,000, and it's undisputed that VTI failed to repay the loan. Notwithstanding these undisputed facts, VTI remarkably seeks summary judgment in its favor, arguing that the loans somehow haven't matured. That defense is frivolous because it ignores the plain terms of the loan modification agreement.

Bunce sued Rajan, the individual Defendant, for making numerous misrepresentations to induce Bunce to make the loan. Rajan doesn't dispute the misrepresentations or that he was aware of the misrepresentations—he can't. Instead, Rajan claims he's entitled to summary judgment because he shouldn't be personally liable for misrepresentations that were included in his company's deal-related literature or misrepresentations that were made by people he admits were acting on behalf of his company. That argument is frivolous because the purpose of the

1

misrepresentations was to convince Bunce to make the loans so that Rajan could use the loan proceeds for his personal benefit, which he did. Rajan can't escape personal liability by merely funneling the loan proceeds through his company, which was nothing more than Rajan's alter ego anyway. Rajan's other argument, that Bunce somehow authorized him to use the money for personal purposes, is frivolous because this Court has already determined that the document he relies on has no application to this case.

Bunce sued Rajan for unjust enrichment because he used the loan proceeds for his own personal benefit. Rajan claims he's entitled to summary judgment because the loan proceeds were actually used for his company's benefit, but there's *nothing* in the record that supports his *conclusory* claim. What's more, Rajan doesn't dispute the considerable evidence Bunce marshalled into the record showing that Rajan used the loan proceeds for his personal benefit. His other arguments—that a document the Court has already determined to have no application to this case authorized him to use the loan proceeds for his personal benefit and that Bunce's exclusive remedy is under the loan documents, are frivolous too.

Defendants' motion for summary judgment is just their latest attempt to unreasonably and vexatiously expand and delay this proceeding. The Court should deny the motion.

I. <u>The Background</u>

These facts are undisputed.

**VTI is Rajan's Alter Ego.** Defendant Visual Technology Innovations, Inc. ("VTI") was formed in Nevada, but its entity status is "revoked." Pl's Facts [108-3] ¶ 17. Defendant Mathu G. Rajan dominated and controlled VTI: he was VTI's sole officer, its only President, Treasurer, and Secretary, a director, and its majority shareholder. Pl's Facts [108-3] ¶ 20. VTI had no employees, no parent company, no subsidiary companies, and never hired an accountant. Pl's

Facts [108-3] ¶ 19, 24, 27. VTI had no capital and less than $16,000 in assets, despite having numerous investors and lenders. Pl's Facts [108-3] ¶ 25. The only products VTI supposedly ever sold were five "tablets" for a total of less than $6,000. Pl's Facts [108-3] ¶ 26. Rajan commingled funds from VTI's investors and lenders and used VTI's assets as if they were his own personal funds for his own personal benefit. Pl's Facts [108-3] ¶¶ 29 – 32. VTI is inseparable from Rajan and has been merely Rajan's alter ego.

**The Loans.** Bunce made three loans (totaling $1,050,000) to VTI: $150,000 in February 2021, $850,000 in March 2021, and $50,000 in May 2021. Pl's Facts [ECF 108-3] ¶¶ 2 – 11. Although each loan granted Bunce an opportunity to "invest" in VTI by converting his loans into shares in the company, Bunce chose not to exercise that right. Pl's Facts [108-3] ¶ 12.

In November 2021, Bunce and VTI entered into an agreement, restructuring the repayment terms of the loans. Pl's Facts [ECF 108-3] ¶ 11. The parties agreed that VTI would repay Bunce in five installment payments, starting December 23, 2021. *Id.* If VTI missed a payment, the outstanding balance became due immediately if not paid within 5 days of the deadline. *Id.*

VTI never repaid a single penny of the loan by the deadlines—all $1,050,000 remains outstanding. Pl's Facts [108-3] ¶ 15.

**The Misrepresentations.** Rajan lied to Bunce to convince Bunce to make the loans.

First, Rajan made numerous representations in an deal presentation that Bunce relied upon, including that:

    1.    VTI had numerous experienced officers and employees. *Compare* Pl's Facts [108-3] ¶ 24 *with id.* ¶ 41(b)-(h).

2. VTI was a "technology provider . . . to both device makers/distributors and content makers/distributors" that had "previous technical and business developments" when VTI's total product sales consisted of five "tablets" for a total of $5,999.13. *Compare* Pl's Facts [108-3] ¶ 26 *with id.* ¶ 41(a), (i).

3. VTI had an "[e]xisting [r]elationship[ ]" and "strategic partnership with the world's biggest panel manufacturer," BOE, when it later admitted it had no such relationship. *Compare* Pl's Facts [108-3] ¶ 28 *with id.* ¶ 41(j)-(k).

4. VTI had "[e]stablished R&D subsidiary with 20+ person engineering team and on-site 3D bonding capability and "[e]stablished subsidiaries in China for manufacturing & sales," when VTI later admitted it had no subsidiaries." *Compare* Pl's Facts [108-3] ¶ 19 *with id.* ¶ 41(h).

These representations are demonstrably false.

Second, Rajan misrepresented the purpose of Bunce's loan to VTI. Rajan, through his admitted agent, told Bunce that the loan would be used to purchase Stream TV Networks, Inc.'s patents and other assets. Pl's Facts [108-3] ¶ 38. Also, the loan proceeds would help VTI sell 5,000 "tablets" and five large screens, thus helping it purchase assets from Stream TV Networks. Pl's Facts [108-3] ¶ 46; Def's Facts [107-2] ¶ 14. And any money spent on "ever present expensive lawyers" was to be for this purpose—not to help Stream TV Networks pay its bankruptcy lawyers to try to keep it in operation with Rajan as its CEO. Pl's Facts [108-19] at 46. But that's exactly what Rajan did—he used over $300,000 of the loan proceeds to pay Stream TV Network's bankruptcy lawyers. Pl's Facts [108-3] ¶ 34. The purpose of the bankruptcy proceeding was to try to use loans from VTI to keep Stream TV Networks in operation with Rajan in control of it—not to enable VTI to buy Stream TV Networks' assets or to

increase VTI's company value. Pl's Facts [108-3] ¶¶ 21 – 22, 33. What's more, VTI's money was not used to sell any products. Pl's Facts [108-3] ¶ 26.

**Rajan's Unjust Enrichment.** Rajan is the founder, owner, and the CEO of Stream TV Networks. Pl's Facts [108-3] ¶¶ 20, 25. When Stream TV Networks became financially distressed, Rajan caused it to file bankruptcy. Pl's Facts [108-3] ¶ 37. Rajan used VTI as a vehicle for funneling money to Stream TV Networks so that he could stay in control of it. Rajan commingled, in one or more bank accounts controlled by him, the $1,050,000 that Bunce loaned to VTI with money that VTI obtained from the other persons who invested in and made loan to it. Pl's Facts [108-3] ¶¶ 29 – 31. This money was used, in part, to pay for Stream TV Networks' bankruptcy attorneys. Pl's Facts [108-3] ¶ 34. Rajan, therefore, was using money loaned to one of his companies (VTI) to benefit another of his own companies (Stream TV Networks), ultimately for his own benefit as owner and CEO of Stream TV Networks.

We don't know the full scope of Rajan's self-dealing because, despite this Court's order, Rajan has refused to provide a full accounting of how Bunce's money was used. Order [ECF 87] ¶ 2. Bunce, therefore, has requested and is entitled to an inference that *all* the money was used to benefit him personally. Pl's Mot. Sanctions [ECF 89 at 10 - 13] (requesting as a sanction a finding that "Rajan personally controlled all the money and assets of [VTI] and used all that money and assets . . . for Rajan's own personal benefit").[1]

---

[1] Defendants submit a declaration and a spreadsheet, which they do not rely on for purposes of summary judgment, that purport to detail how VTI's money was used, Doc. 103 at 42-58. This declaration and exhibit is yet another example of Defendants' bad-faith litigation conduct. The Exhibit is so heavily redacted that it is useless. Similarly, Defendants provide yet further purported "efforts" to obtain exhibits from other lawsuits they were ordered to provide, yet have not; the "efforts" do not reflect a good-faith, genuine effort to comply with this Court Order compelling production, Doc. 87.

**The Lawsuit.** After VTI failed to repay the loans and upon learning of Rajan's fraud and self-dealing, Bunce filed suit, asserting a breach-of-contract claim against VTI and claims for fraud and unjust enrichment against Rajan. From the start, Defendants' defense strategy has been clear: delay, run up Bunce's legal bill, obstruct, and refuse to provide relevant evidence, even after being ordered by the Court to do so, all in an effort to avoid paying Bunce the money and damages he is owed. Order [ECF 87] ¶ 2; Pl's Mot. Sanctions [ECF 89]. Defendants' motion for summary judgment is filed for no legitimate purpose other than to advance their meritless defense strategy. The motion should be denied.

## II.     Argument & Citation of Authority

Defendants claim that they are entitled to summary judgment for multiple reasons. The reasons, however, are not supported by the record or the law. Bunce will address each in turn.

### 1.     Rajan is liable for unjust enrichment.

Rajan claims he can't be liable for unjust enrichment because (1) he used the money for purposes authorized by Bunce; (2) VTI used the money, not him; and (3) Bunce's exclusive remedy is pursuing VTI under the loan agreements. Each defense is without merit.

#### a.     Bunce didn't authorize Rajan to use the loan proceeds for Rajan's personal use.

Rajan argues he can't be liable for unjust enrichment because Bunce authorized him to use the loan proceeds for any "lawful general business purposes." Defs' MSJ Br. [ECF 107-1] at 10. The document Rajan relies upon, however, has no application here. Rajan points to a provision in one of the convertible note agreements, providing that: "In accordance with the direction of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general purpose." *See, e.g.*, Pl's Facts [108-11] at 3. But the Court has already held that the convertible note agreements are irrelevant because Bunce never

6

converted his loans into shares into VTI: "The Convertible Note Agreements do not govern the claims in this case. They pertain to Mr. Bunce's option to turn loaned amounts into shares in VTI. Because Mr. Bunce did not convert his loans into shares, the Convertible Note Agreements do not govern repayment under the Notes, which is the basis for the claims in this case." Memorandum Opinion [ECF 28] at 7 – 8; Pl's Facts [108-3] ¶ 12. Therefore, any language in the convertible note agreements is of no consequence and should be disregarded.

### b. Rajan used the loan proceeds for his personal benefit.

In support of their motion, Defendants attached a declaration from Rajan and Suby Joseph, an admitted agent of VTI. Defs' Facts [107-2] at 45 – 51. They conclusorily testify that Bunce's loan proceeds were generally used for "lawful general business purposes" as permitted by the convertible note agreements. Putting aside that the convertible note agreements have no application to this case as already determined by the Court, the Court should not consider this testimony.

As a preliminary matter, the Court ordered Defendants to "serve [by August 26, 2024] on plaintiff an answer, under oath, to Plaintiff's Interrogatory No. 16, explaining how VTI used and spent the $1,050,000 that plaintiff provided to VTI, or, in the alternative, explaining how VTI used and spent all of its money, identifying the dates, recipients, amounts and documentation as to each transfer or transaction involving any portion of such funds. To the extent the defendants are unable to answer this interrogatory, they must explain, under oath, the reasons why they cannot answer it." Order [ECF 87] ¶ 2. Defendants failed to comply with this order, claiming "only educated guesses and estimations are possible." ECF 89-4 at 5 - 6. Bunce, therefore, has moved for sanctions against Defendants for their failure to comply with the Court's Order, which motion remains pending. ECF 89.

Despite not providing the required information by the Court's deadline, Defendants now contend that they "summarized and categorized all payments made by VTI using the monies from Mark Bunce" and concluded that the Bunce's loans were used consistent with the "Use of Proceeds" provision of the convertible note agreement. Defs' Facts [107-2] at 46. In other words, Defendants have failed to comply with this Court's Order by contending that it is impossible to prove the details they have been ordered to provide; yet they now contend that they were able to do just that. This is contumacious conduct by Defendants. Regardless, the purported evidence shouldn't be considered for multiple reasons.

First, the Court should not consider Joseph's (or Rajan's) conclusory testimony because Defendants failed to provide the information they purportedly rely upon by the Court's August 26, 2024 deadline. ECF 87. Second, the Court should not consider their testimony because it's immaterial. Fed. R. Evid. 401. Specifically, Joseph conclusory states that Bunce's loans were used in accordance with the convertible note agreement, but as addressed above the convertible note agreements have no application to this case as already been determine by the Court. ECF 28. Third, the Court should not consider Joseph's testimony because it's conclusory—it doesn't provide the basis (*e.g.*, the summary and categorization of all payment made by VTI using Bunce' loans) of his opinion. Fed. R. Evid. 602, 701, 1002. Fourth, the undisputed evidence confirms that the loan proceeds were in fact used for the personal benefit of Rajan, which is not a lawful purpose. Pl's Facts [108-3] ¶ 34.

### c. Bunce is not limited to just suing VTI under the loan agreements.

Rajan argues that he can't be held to account for using the loan proceeds for his personal purposes and benefit because Bunce has a contract with VTI, and an unjust enrichment claim is not available if there's a contract involved. Defs' MSJ Br. [ECF 107-1] 12 -13. That's wrong

8

because there is *no* contract between Bunce and *Rajan*, and VTI was just *Rajan*'s alter ego anyway.

Rajan is correct that "[a]n action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement." *Leasepartners Corp. v. Robert L. Brooks Tr. Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).  That's because "[t]he doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another [or should pay for]." *Id.*

It's undisputed, however, that there's no contract between Bunce and Rajan—the person who personally benefited from the loan proceeds and who should not in good conscience and justice retain them.  The unjustness of this is reiterated by Rajan's defiance of this Court' order requiring him to detail how VTI's funds were in fact used.  Rajan's reliance on a contract between Bunce and VTI, therefore, provides him no protection.  The critical analysis is whether a contract exists between the plaintiff and the person being sued for unjust enrichment—Rajan.  If there's no contract with him, then there's no bar in pursuing a theory of unjust enrichment against him.

This rationale is confirmed by *Leasepartners Corp.*—a case relied upon by Defendants. LeasePartners financed a long-term sign lease for Danzig Corp., the tenant at a hotel owed by the Brooks Trust.  *Leasepartners Corp.*, 942 P.2d at 183. After Danzig Corp. defaulted on its lease with Brooks Trust, neither Danzig Corp. (who signed the lease) nor Brooks Trust (whose hotel benefited from the sign) made any payments to LeasePartners for financing the sign.  *Id.* LeasePartners sued, in part, for unjust enrichment against Brooks Trust.  *Id.* at 187.  Brooks

Trust claimed it couldn't be sued for unjust enrichment because a contract existed between LeasePartners and Danzig Corp. (relating to the financing of the sign) and between Brooks Trust and Danzig Corp. (relating to the lease of the hotel). *Id.* The Nevada Supreme Court, however, rejected Brooks Trust's defense because "no written contract [actually] existed between LeasePartners [the plaintiff] and Brooks Trust [the party being sued for unjust enrichment]." *Id.* The unjust-enrichment claim, therefore, was allowed to go forward. For the same reason, the Court should reject Rajan's reliance on someone else's contract to prevent his personal accountability.

Regardless, Rajan also shouldn't be allowed to hide behind VTI's corporate veil because VTI is nothing more than Rajan's alter ego. As detailed above, and at length in Bunce's motion for summary judgment [ECF 108-2 at 16 -18], VTI's corporate veil should be disregarded because (1) corporate formalities were essentially non-existent; (2) VTI barely existed; (3) VTI was severely undercapitalized; (4) Rajan commingled funds from all the investors and lenders as his own; and (5) Rajan used VTI's funds as if they were his own personal funds—all satisfying the alter-ego relationship test under both Nevada and Pennsylvania law. *LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904 (2000); *Mortimer v. McCool*, 667 Pa. 134, 145 (2021). Under these circumstances, it would be unjust to permit Rajan to hide behind VTI's corporate veil. The Court, therefore, should alternatively hold that the corporate veil of VTI should be disregarded and Rajan should be held liable for any debt that VTI owes to Bunce, including its liability under the notes. *See, Baroi v. Platinum Condo. Dev., LLC*, No. 2:09-CV-00671-PMP, 2012 WL 2847912, at *9 (D. Nev. July 11, 2012) ("[A] plaintiff may not pursue an unjust enrichment claim against a parent corporation where the plaintiff has an express written contract with a subsidiary absent a showing of alter ego or some other theory of liability.").

10

## 2. Rajan fraudulently induced Bunce to make the loans.

In his motion for summary judgment, Bunce identified over 10 misrepresentations made by Rajan to induce Bunce to make the loans. Pl's MSJ Br. [ECF 108-2] at 6 – 7. It is noteworthy that Rajan does *not* dispute that these representations were false or that he knew they were made. *See generally*, Rajan Decl. [ECF 107-2] at 48 -51; Rajan Decl. [ECF 109] at 60 - 63. Instead, Rajan claims he should not be liable for these misrepresentations because they were either made by admitted agents of VTI or were included in VTI's deal-related literature. Defs' MSJ Br. [ECF 107-1] at 14 - 15. In other words, Rajan claims he should not be liable because the misrepresentations didn't come directly out of his mouth and instead were made by his agents with his knowledge.

But all the misrepresentations were made for the ultimate benefit of Rajan: Rajan received the loan proceeds after they were fraudulently procured, and Rajan used the loan proceeds for his personal benefit, not for the benefit of VTI as promised to Bunce. And Rajan does not dispute that he was aware of or directed the false statements. Regardless, VTI was merely Rajan's alter ego for the reasons addressed above and in Bunce's motion for summary judgment. Pls' MSJ Br. [108-2] at 4 – 6, 16 –18. Rajan, therefore, cannot escape these misrepresentations. "[A] principal is liable to third parties for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances and misfeasances of his agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment." *Aiello v. Ed Saxe Real Est., Inc.*, 499 A.2d 282, 285 (Pa. 1985) ("This rule of liability is not based upon any presumed authority in the agent to do the acts, but on the ground of public policy, that it is more reasonable

that when one of two innocent persons must suffer from the wrongful act of a third person, that the principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger."); *Nev. Nat'l Bank v. Gold Star Meat Co., Inc*., 514 P.2d 651, 653–54 (Nev. 1973) ("[W]here a bank office through its officer undertakes to give advice, even gratuitously, that officer is bound to use the skill and expertise which he has or which he could be presumed to have. When that officer negligently or carelessly attempts to discharge that duty by misrepresenting facts within his knowledge, the bank should be held responsible for those misrepresentations.").

Moreover, Rajan's claim that he did not personally make any misrepresentations to Bunce is false. Bunce testified to Rajan's directly personal involvement in soliciting loans from Bunce. Pl's Resp. to Defs' Facts, **Ex. A**. Specifically, on February 22, 2021, Rajan personally participated in a videoconference with Bunce in which he orally represented to Bunce that: "(a) VTI owned $150 million worth of innovative technology for the presentation of glasses-free 3D images on flat computer screens; (b) VTI was ready to sell 2,500 computer tablets for glasses-free 3D viewing and 250 very large glasses-free 3D computer screens for viewing in airports and shopping malls; (c) VTI was ready to make these sales in March through May 2021 provided that VTI obtained $1 million in seed funding; (d) it was possible and intended for VTI to complete a merger into a publicly traded company and public-offering transactions within a couple of months after receiving a $1 million loan from me; (e) VTI had Chinese-branded glasses-free 3D products that were already being sold; (f) VTI already had prototype, very large glasses-free 3D screens installed in various locations, such as airports, and it already had reached agreements to put large glasses-free 3D screens in various airports across the United States; (g) VTI's plans were being opposed by other persons who had invested in another company owned by [ ] Rajan,

Stream TV Networks, Inc., and VTI's plans could not go forward without my investment of $1 million in seed funding; and (h) if [Bunce] obtained shares in VTI, their value would dramatically increase once VTI soon became publicly traded on NASDAQ." **Ex. A.** These representations were false. Pl's Facts [108-3] at ¶¶ 24 – 26; [Doc. 108-14] at ¶ 10. And Bunce would not have loaned any money to VTI absent such representations. **Ex. A.**[2]

Finally, Rajan seems to attack Bunce's reliance on the false statements. Defs' MSJ Br. [107-1] at 15 – 16. He does so by pointing to an acknowledgement provision contained in the convertible note agreements. *Id.* But for the reasons discussed above, and as already determined by the Court, the convertible note agreement has no application to this case because Bunce never converted his loan amounts into shares in VTI. Memorandum Opinion [ECF 28] at 7 – 8; Pl's Facts [108-3] ¶ 12.

### 3. Payments under the notes have come due.

Rajan claims the breach-of-contract claim is premature because the notes haven't matured. Defs' MSJ Br. [107-1] at 17 – 18. To get there, Rajan claims that the November 2021 agreement restructuring the repayment terms of the loans lacks consideration. And because it purportedly lacks consideration, the notes actually do not mature until VTI raises $10,000,000 in capital (whenever that might be, especially since VTI's entity status has been revoked by Nevada). Defs' MSJ Br. [107-1] at 18. The November 2021 agreement, however, is supported by consideration.

"Consideration is the exchange of a promise or performance, bargained for by the parties." *Jones v. SunTrust Mortg., Inc.*, 274 P.3d 762, 764 (Nev. 2012). "A party's affirmation

---

[2] This issue of disputed fact, however, doesn't require a jury to resolve since Rajan is responsible for the undisputed misrepresentations made by his agents and the undisputed misrepresentations that were included in his company's deal-related literature.

13

of a preexisting duty is generally not adequate consideration to support a new agreement. However, where a party's promise, offered as consideration, differs from that which it already promised, there is sufficient consideration to support the subsequent agreement." *Cain v. Price*, 415 P.3d 25, 28 (Nev. 2018).  It appears Rajan contends that because VTI always had a duty to repay the notes, agreeing to change the date the loans are due isn't sufficient consideration.  He's wrong.

First, as announced in *Cain*, "where a party's promise . . . differs from that which it already promised, there is sufficient consideration to support the subsequence agreement." *Id.* at 28.  Here, the parties voluntarily agreed to modify the due dates of the loans.  Pl's Facts [ECF 108-3] ¶ 11.  Moreover, the parties agreed that VTI would repay Bunce in five installment payments, starting on December 23, 2021. *Id.*  If VTI missed a payment, VTI had a five-day cure window to pay without the entire balance becoming due. *Id.*  The change in the repayment terms constitutes sufficient consideration. *Cain*, 415 P.3d at 28.  But that's not all.

VTI benefited from this loan modification, in part, because VTI could have received additional time to repay the loans, VTI could repay the loans in installments instead of in a lump sum, and VTI received a 5-day period to cure any potential payment default.  Pl's Facts [ECF 108-3] ¶ 11.  Bunce also benefited from this loan modification, in part, because he was awarded 7,000,000 warrants, *i.e.*, the option to obtain shares in VTI at a set price. *Id.*  All of these additional promises constitute consideration for the agreement. *Jones*, 274 P.3d at 764.

If that were not enough, VTI admitted consideration supported the loan modification: "the parties hereto, in consideration of the mutual promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged[.]"  Pl's Facts [ECF 108-3] ¶ 11.

### III.     Conclusion

There's no merit to Defendants' motion for summary judgment. For the reasons addressed above, it should be denied. And for the reasons advanced in Bunce's motion for summary judgment [ECF 108-2], the Court should enter judgment in favor of Bunce as a matter of law and award him any additional relief that is just and proper.

Dated: Nov. 18, 2024

                                            Respectfully submitted,

                                  By:    s/ Robert F. Parsley

                                            Michael D. Homans
                                            ID No. 76624
                                            HOMANSPECK, LLC
                                            230 Sugartown Road
                                            Suite 218
                                            Wayne, PA 19087
                                            (215) 419-7463
                                            mhomans@homanspeck.com

                                            *Attorneys for Plaintiff Mark L. Bunce*

Michael P. Kohler, *admitted pro hac vice*
MILLER & MARTIN PLLC
Regions Plaza Suite 2100
1180 West Peachtree Street, NW
Atlanta, Georgia 30309-3407
(404) 962-6100
Michael.Kohler@millermartin.com

Robert F. Parsley, *admitted pro hac vice*
Tennessee Bar. No. 23819
MILLER & MARTIN PLLC
832 Georgia Ave., Suite 1200
Chattanooga, TN 37402
Office: 423.756.6600
Bob.Parsley@millermartin.com

*Attorneys for Plaintiff Mark L. Bunce*