**IN THE UNITED STATES DISTRICT COURT FOR**

**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARK L. BUNCE,<br><br>                    Plaintiff, | : <br> : <br> : | |
| vs. | : | |
| VISUAL TECHNOLOGY<br>INNOVATIONS, INC.<br>and<br>MATHU G. RAJAN,<br><br>        Defendants/Counterclaim and Third-<br>        Party Plaintiffs | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Civil Action Case No.<br>C.A. No. 2:23-cv 01740 |
| vs. | : | |
| Mark Bunce ,<br>        Counterclaim Defendant<br>        and | : <br> : <br> : | |
| Timothy McCarthy<br>        Third -Party Defendant | : <br> : | |

**REPLY MEMORANDUM OF LAW IN SUPPORT**

**OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This memorandum of law is in reply to Plaintiff's Opposition [Docket 111] to Defendants'

motion for summary judgment.

## Table of Contents

I.    **REPLY PROCEDURAL HISTORY** ................................................................- 1 -

II.   **REPLY SUMMARY OF FACTS** ..................................................................- 2 -

III.  **REPLY FOR UNDISPUTED MATERIAL FACTS** ...................................- 3 -

IV.   **REPLY ARGUMENT** .....................................................................................- 6 -

V.    **CONCLUSION** ...............................................................................................- 10 -

**I.    REPLY PROCEDURAL HISTORY**

Before the Court are:

- Plaintiffs Motion for Summary Judgment [docket 107].

- Defendants Motion for Partial Summary Judgment [docket 108].

- Defendants Motion to Reinstate the Third Party Complaint against Timothy McCarthy ("**McCarthy**") [docket 110]. The Court dismissed the Third party complaint and wrote that service was taking too long but dismissed without prejudice [docket 100]. However, McCarthy was served before the Court's dismissal [Exhibit A and attachment A thereto of docket 110].

- Plaintiff's Motion to Exclude Certain Evidence for Proposed Facts for Summary Judgment [ docket 113] which has not yet been fully briefed as Defendants have not yet responded.

## II.    REPLY SUMMARY OF FACTS

Plaintiff Mark Bunce ("**Bunce**") sued the Company VTI for repayment of his investments but also its Chief Executive Officer for the same thing. But Bunce added two (2) attachments to his Complaint that relate to Timothy McCarthy ("**McCarthy**") the third party defendant who should be liable to Plaintiff instead of Defendant Mathu Rajan. Plaintiff Bunce added exhibit 4 to his Complaint which provides in pertinent part:

### Exercise Date: By 2 March 2021

The Investor is hereby exercising the rights under clause 4 of the Agreement:
Amount of Investment : $29,000,000.
The Investor will exercise through a wire transfer to a bank account set up by VTI or its affiliates at Commerzbank or in the alternative the Investor will deliver a Standby Letter of Credit ("**SBLC**") for US $35 million that is acceptable for VTI and for the avoidance of doubt this will be in full consideration of a total investment in VTI of $ 30,000,000 under the Agreement.
Purpose: Begin the takeover process of the Ultra-D technology and kick start stalled projects.

That document was signed by McCarthy and VTI. Exhibit 4 to Complaint.

Bunce also added to his Complaint, a letter from the money manager of Timothy McCarthy's company Burlington that provides in pertinent part:

> We confirm that we are ready, willing and able upon the express instructions of our client Burlington Resources FZE ( a wholly owned subsidiary of Burlington Resources Asia Limited) to make a payment of US$ 30 million from our bank DBS, Singapore to purchase certain shares in VTI subject to the terms and conditions in the Stock Purchase Agreement of 10 February 2021.

Exhibit 2 of <u>Complaint</u>. Burlington is the name McCarthy uses for his investment. Bunce admits through those attachments how important McCarthy was to his investment in VTI. Bunce was induced to invest in VTI due to McCarthy and McCarthy's promises in writing to invest in VTI thirty Million dollars ($30,000,000).

## III.    REPLY FOR UNDISPUTED MATERIAL FACTS

Defendants provided the Court with undisputed facts to support its request for summary judgment. Plaintiff responded to those facts [docket 111-#2] The words Plaintiff chose to dispute should be subject to sanction as many are extreme untruths. For example, on undisputed facts 1, Plaintiff disputes the word "investment" entirely due to the fact he never converted his loans to VTI equity did not exercise the enormous warrants that he received from VTI. This should be sanctioned because in each of his loans, Bunce provided VTI he was called an "Investor". The whereas recital in the agreement it specifically states the purposes as

> **WHEREAS,** The Company desires to issue and sell to the Investor a convertible note issued by the Company (the "**Note**");

Complaint, exhibit 7.

Bunce also provided to VTI that he was an "accredited" investor as defined by the SEC. He provided VTI representations and warranties. Those promises are not nullified or terminated because did not convert his investment loans and bonus warrants into equity of VTI. Many investors in companies use "venture debt" as their preferred security than straight stock. That is an example of Plaintiff's outright mistruths!

For undisputed fact #2, he again raises the same untruth by unequivocally providing that "Bunce did not "invest" in VTI; he made loans." Plaintiff does not deny the truth of the averment but rather he argues the allegation is not verified or supported.

For undisputed fact #3, he does not deny that McCarthy's investment paperwork specified his thirty million dollars would come thirty (30) days later but rather claims document is hearsay.  VTI will in fact authenticate that document at trial.  For now Suby Jospeh's declaration hereto, ₱12 and addendum C thereto, authenticates McCarthy's investment promises.

For undisputed fact #4-5, Bunce does not dispute the averment but rather say it based on hearsay though Bunce wrote those words.  If Bunce wanted to be truthful, he could produce the actual email and contest specific words as alleged fraud; Bunce does not do that route because he wants to mislead the Court to get a ruling at this stage.  Bunce knowns at trial he will be cross examined how he provided VTI a list of diligence questions before his first investment.

For undisputed fact #6, is another example of outrageous responses. He challenges materiality, not the truth of the words in his own documents.

For undisputed fact #7, Bunce denies that fact as lacking authentication but he signed the contract.  This is another example of disingenuousness which will not withstand cross examination in trial.  Bunce voided his first investment loan—that is an undisputed fact—Bunce signed a document to that effect---it is attached hereto as Exhibit A.

**WHEREAS**, the Company and Purchaser wish to amend the Convertible Note Agreement 210224 and the related Convertible Note VN21017-00 in its entirety and replaced with a new agreement as reflected in **Exhibit A**.

For undisputed fact #8, again Bunce challenged materiality and denies he invested which he knows is untruthful.

For undisputed fact #9, Bunce does not deny the averment that a bank statement showing $130,000,00 + was shown to him for diligence purposes rather he claims it is without foundation.

For undisputed fact #10, Bunce challenges materiality though he changed the "maturity" of the investment loan from 30 days to only when VTI raised $10,000,000.  That is a document that Bunce attached to his Complaint as exhibit 6.  The fact is Own word of Bunce in writing.

For undisputed fact #11, again Bunce challenges materiality not on truth of his own writing. He again also denies he made an investment loan.

For undisputed fact #12, Bunce denies his own writing of use of funds for his investment loan and argues its irrelevant.

For undisputed fact #13, Bunce denies his own writing as to choice of law largely on materiality grounds.

For undisputed fact #14-15, Bunce denies a written engagement letter and argues somehow Glen Daivs was also an agent for Mathu Rajan personally in addition to VTI. Bunce contradicts a written engagement contract.

For undisputed fact #16, Bunce admits the averment but argues its relevancy.

For undisputed fact #17, again Bunce denies his own writings when he gave VTI a representation as to what he investigated before investing; the implication of his denial is that Bunce lied to VTI when investing.

For undisputed fact #18-19, Bunce admits the averment but again raises relevancy.

For undisputed fact #20, basically Bunce admit he cannot answer the fact because he does not know how his money was used by VTI.  He does not and cannot dispute Bunce provided very board use of funds that required his money be used for any lawful purpose.

For undisputed fact #21-23, Bunce denial of this averment is indication why this matter cannot be resolved in the summary judgment stage but rather only when a jury assesses credibility can the averment be decided.

For undisputed fact #24-25, Bunce does not dispute directly that he spoke with McCarthy as stated but rather claims the record does not support such an allegation.  There are emails connecting

McCarthy and Plaintiff.  His denial will not only never withstand cross examination it makes no sense---he wants Court do believe he invested in VTI without even looking at McCarthy's investment documents?

Basically, Bunce disputes everything, even his own writings rather than simply stating which facts he disputes genuinely.  This is not how summary judgment evaluation are supposed to work if parties to litigation are reasonably truthful.

## IV.    REPLY ARGUMENT

Plaintiff mischaracterizes Defendants arguments, so they have an easier target to "knock down." By employing that strategy, Plaintiff is misleading the Court.  The task for the Court is to resolve the summary judgment motions by determining if a trial by jury is necessary or not necessary based on the existence of genuine disputes of material facts.  *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citation omitted) *Ideal Dairy Farms, Inc. v. Labatt*, 90 F.3d 737, 743 (3d Cir. 1996) citing Fed.R.Civ.P. 56(c). *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). (emphasis added).

Plaintiff investment loan to VTI is no different than a mortgage loan for a house.  If a mortgage lender told a homeowner that monthly mortgage repayments would not occur until the homeowners obtained a raise at work, then the facts would be similar to VTI and Plaintiff.  Plaintiff made all repayment of his loans to VTI <u>due only</u> when VTI raises ten million dollars ($10,000,000).

If the mortgage lender, in that case, changed its mind and told the homeowner it now wanted repayment to begin regardless of the contingency of increased income, everyone would see that as a fundamental loan modification that required legal consideration.  In the same way, Plaintiff tried to modify his loans with VTI seven (7) months after his original loan.  Plaintiff changed his mind and wanted repayment regardless of the precondition—VTI raising ten million dollars, presumably from

McCarthy.  Plaintiff simply changed his mind like the mortgage company in the other example.

The analysis of the validity of the loan modification (exhibit 8 to Complaint) for lack of

consideration is complicated by the fact that the plain meaning of the modification is different[1]

from Plaintiff's earlier amendment documents.

Plaintiff obtained enormous benefit[2] or consideration for the loan modification but VTI got

nothing.  What was VTI's consideration for starting repayment of loan that was not yet mature?

VTI never needed to sign that modification as nothing was due yet.

Plaintiff's loans are simply not mature until VTI raises more money.  *Bank of America v.

Narula*, 261 P.3d 898, 909 (Kan. Ct. App. 2011) (court properly determined that this one-sided

bargain failed for lack of consideration.)  "Such consideration is not present when one party merely

agrees to do that which it was already legally liable to do for a greater consideration, nor is it

present when one party agrees to do less than it is already obligated to do for the same or greater

consideration." *Twin River Constr. Co. v. Public Water Dist. No. 6,* 653 S.W.2d 682, 690 (Mo. App.

1983). *Medicare Glaser Corp. v. Guardian Photo, Inc.*, 936 F.2d 1016, 1020 (8th Cir. 1991) (No

consideration for modifying payments to a monthly basis than just quarterly).

Plaintiff admits[3] that his Motion for Summary Judgment should be denied on the personal

claims against Mathu Rajan as there are genuine issues of material facts.  Plaintiff sued Mathu

Rajan for fraudulent inducement and unjust enrichment, but those questions involve a resolution of

---

[1] The first of three loans of Plaintiff was voided by Amendment.  The amendment voiding the first loan is attached hereto as Exhibit A.  The amendment uses language to fully "replace" by using word like "entirety" and "replaced." Plaintiff second loan was also amended to add a contingency for repayment and again uses words to "replace" by using words of "amended in its entirety." Section 2 to exhibit 6 of Complaint. But in the amendment for the loan modification (9 months later), Plaintiff does not use the same word of "replacement."  The words like "entirety" and "replaced" are noticeably absent.  Therefore, the repayment schedule demanded by Plaintiff is a "supplement "to the contingency of VTI raising money to repay Plaintiff.  Plaintiff simply provides a schedule for repayment without using words replacing prior language as used in all earlier amendments.  Plaintiff even confirms that his loan modification is not to disturb prior preconditions, and they remain in "full force and effect" since it is not expressly addressed.  Section 5 to exhibit 8 to Complaint.
[2] Plaintiff obtained 7,000,000 warrants for the loan modification.  Section 4 of exhibit 8 of <u>Complaint</u>. Plaintiff got also to force repayment of a loan that never met preconditions for repayment.
[3] PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, page 1

many facts that must go to a jury in order to even survive. Those claims are completely disputed and should be resolved at trial  Caselaw makes it clear that such issues should not be resolved at the summary judgment stage.

The personal claims also involved additional factual determinations as Plaintiff has to demonstrate grounds to pierce the corporate veil protection of Mathu Rajan, VTI's executive.  That is a jury question of fact.  *Melikian v. Corradetti*, 791 F.2d 274, 282 (3d Cir. 1986) (The issue of whether the corporate veil can be pierced is primarily a question of fact).

In a jury trial, Defendants will demonstrate that

- VTI had corporate bank accounts not personal bank accounts of Mathu Rajan. Suby Joseph declaration ⁋ 14 exhibit B hereto.

- VTI had many board members like Glen Hasen, Tracy Reese, Cliff Morton and even Timothy McCarthy and his colleague Sophia Kheddouci.  Joseph declaration ⁋ 5 exhibit B hereto.

- VTI had many shareholders that invested over $1,267,500 as convertible debt, about $2,679,036 invested as straight debt, and about $23,000 invested as straight equity.  Joseph declaration ⁋ 4 exhibit B hereto.

With those basic corporate formalities, piercing the corporate veil at this stage would be inappropriate[4].  Court have written "…that the 'weight of authority' favors submitting the question of corporate disregard to the jury." *Peltz Boxing Promotions, Inc. v. Big Fights, Inc.* , No. 02–2062, 2004 WL 2137823, at *1 n. 1 (E.D.Pa. Sept. 23, 2004) ; *Cantiere DiPortovenere Piesse S.p.A. v. Kerwin* , 739 F.Supp. 231, 236 (E.D.Pa.1990). See also *Regent Nat'l Bank v. Dealers Choice Automotive Plan., Inc.* , No. CIV. A. 96–7930, 1999 WL 357364, at *6 (E.D.Pa. June 2, 1999) ("A finding of alter-ego liability is a factual determination that must be supported by the

---

[4] In determining whether to "pierce the corporate veil," courts consider the following *factors:* gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder. *Trustees, Nat Elevator Indus. Pension v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) citing "*Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.*, 736 F.2d 879, 886 (3d Cir. 1984))"

record. Thus, whether there are facts sufficient to support the piercing of the corporate veil is an issue that may be decided by a jury."). *Clientron Corp. v. Devon IT, Inc.*, 154 F. Supp. 3d 132, 140-41 (E.D. Pa. 2015)

Plaintiff Bunce now complains that his investment money was used for lawyer costs for bankruptcy of another company called Stream TV Networks. Inc. ("**Stream TV**"). Plaintiff now blames Mathu Rajan for using VTI funds for those bankruptcy costs that he (Bunce) required.  In his first investment, he required proof that Stream TV declared Chapter 11 Bankruptcy protections! See <u>exhibit 3 to Complaint</u>.  Bunce knew that the technology of Stream TV was instrumental to VTI as it was to be a seller and distributor of the technology of Stream TV under a "Sales and Distribution Support Agreement" if approved by the Bankruptcy Court that Bunce required.  ⁋ 11 and addendum B of exhibit B, declaration of Suby Joseph.  VTI was negotiating to be a "dip" financer of Stream TV to get it reorganized and emerging out of bankruptcy; Addendum A to declaration of Suby Joseph, exhibit B hereto.

Plaintiff Bunce whole argument is that Mathu Rajan directed use of VTI monies to pay Stream TV bills and that was personal benefit to him though the Stream TV's estate controlled by the Bankruptcy Trustee controls Stream TV assets.  Bunce writes

> When Stream TV Networks became financially
> distressed, Rajan caused it to file bankruptcy. Pl's Facts [108-3] ¶ 37. Rajan used VTI as a vehicle for funneling money to Stream TV Networks so that he could stay in control of it. Rajan commingled, in one or more bank accounts controlled by him, the $1,050,000 that Bunce loaned to VTI with money that VTI obtained from the other persons who invested in and made loan to it. Pl's Facts [108-3] ¶¶ 29 – 31. This money was used, in part, to pay for Stream TV Networks' bankruptcy attorneys. Pl's Facts [108-3] ¶ 34. Rajan, therefore, was using money loaned to one of his companies (VTI) to **<u>benefit another of his own companies (Stream TV Networks)</u>**, <u>ultimately for his own benefit</u> as owner and CEO of Stream TV Networks.

Page 5 of PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. (emphasis added).

Suby Joseph, exhibit B hereto, confirms that Bunce specified that VTI could and would use broad parameters in his use of funds requirement.  Bunce wrote:

> *"Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general business purpose."*

Exhibit B, Declaration of Suby Joseph, ⁋ 10.  Also, in exhibit 7 of Complaint, specifically section 4, page 2 (multi-document exhibit, page 3 of 22 pages of that attachment to Complaint).

Bunce is asking this Court to find that paying Stream TV bills is inconsistent with Bunce use of funds specification.  He ignores that Bunce required VTI to force Stream TV into bankruptcy and the relationship of VTI and technology and leads of Stream TV were paramount to VTI.  The relationship of VTI and Stream TV is the reason Bunce invested in VTI.  Bunce believed VTI would have a great opportunity with Stream TV after the McCarthy investment of thirty million dollars ($30,000,000) Ultimately, Bunce is trying to make a false fraud and unjust enrichment claim against Mathu Rajan for following requirements he specified for VTI.

That flawed logic and false reasoning is false should be presented to a jury.  The claims of Bunce should not be resolved in his favor at the summary judgment stage; there are too many issues that need to be resolved by a jury.

## V.    CONCLUSION

For the aforementioned reasons, Movants asks this Honorable Court to grant the proposed Order.

| Dated: November 24, 2024 | Respectfully submitted, |
|---|---|
| | /s/ Raja Rajan |
| | Raja Rajan, Esquire, Attorney I.D. 58849 |
| | 2009 Chestnut Street |
| | Philadelphia, PA 19103 |
| | 215-550-1002 |
| | raja@rajanlawgroup.com |

# EXHIBIT A

Bunce-VTI Amendment 210306

## AMENDMENT

THIS AMENDMENT dated as of March 7, 2021 ("**Amendment**") is between Mark Leonard Bunce or his/her/its registered assigns ("**Purchaser**") and Visual Technology Innovations, Inc., a Nevada USA corporation (the "**Company**"), with its principal offices at 1105 William Penn Drive, Bensalem, PA 19020 USA and amends the Agreement and Convertible Note dated on or about February 24, 2021 or signed simultaneously between the Company and Purchaser ("**Agreement**"). All capitalized terms not herein defined shall have the meaning ascribed to them in the Agreement, as amended.

## W I T N E S S E T H

**WHEREAS**, the Company and Purchaser wish to amend the Convertible Note Agreement 210224 and the related Convertible Note VN21017-00 in its entirety and replaced with a new agreement as reflected in **Exhibit A**.

**WHEREAS**, all instruments including warrants issued with respect to the Agreement stand voided and revoked.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed on the date first above written.

| COMPANY: | Visual Technology Innovations, Inc. | HOLDER: | Mark Leonard Bunce |
|---|---|---|---|
| SIGNED:<br>NAME: | | SIGNED:<br>NAME: | Mark Leonard Bunce |
| TITLE: | President | TITLE: | M.L. Bunce |
| DATE: | Mar 7, 2021 | DATE: | 07 March 2021 |

## EXHIBIT A

Agreement

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK L. BUNCE,<br>Plaintiff, | : <br> : | |
| vs. | : | |
| VISUAL TECHNOLOGY<br>INNOVATIONS, INC.<br>and<br>MATHU G. RAJAN,<br>Defendants/Counterclaim and Third-<br>Party Plaintiffs | :<br>:<br>:<br>:<br>:<br>: | Civil Action Case No.<br>C.A. No. 2:23-cv 01740<br><br>**Declaration of Suby<br>Joseph** |
| vs. | : | |
| Mark Bunce,<br>Counterclaim Defendant and | :<br>: | |
| Timothy McCarthy<br>Third -Party Defendant | :<br>: | |

## <u>DECLARATION</u>

1. My name is Suby Joseph, and I formerly was a consultant that supported Visual Technology Innovations, Inc.("**VTI**") during the time that Mark Bunce invested in VTI.

2. VTI compensated me with consulting fees and directed my work.

3. I acted upon directions from Mathu Rajan, CEO of VTI and other consultants of VTI to perform my services.

4. Overall, VTI received investments totaling approximately $1,267,500 in convertible debt, $2,679,036 in straight debt, and $23,000 in straight equity.

5. VTI had over time numerous board members including Glen Hasen, Tracy Reese, Cliff Morton, Timothy McCarthy and Sophia Kheddouci.

6. Attached is a unanimous consent of those board members reflected as Addendum A hereto which consents to VTI's plan tp be as a DIP financer in the Stream TV Networks, Inc ("**<u>Stream TV</u>**") bankruptcy proceeding.

7. I have communicated with Mark Bunce and Andrea Bunce in the past concerning the execution of agreements between Mark Bunce and VTI.

8. Mark Bunce included in his initial investment documents that Stream TV declare bankruptcy to seek the protections afforded – shown below:

3.    <u>Voluntary Conversion</u>.  The Holder may convert the Total Value of the Note at any time before **<u>Conversion Expiry</u>**, defined as the (i) five (5) working days after the Company informing the Holder that Stream TV Networks, Inc. has successfully filed for Chapter 11 protection with the US Bankruptcy Court (with such written proof as requested) and (ii) that the Company has received $1 million from a certain signed term sheet for an investment of US $30

9.  VTI understood that the payment of legal fees relating to Stream TV was entirely consistent with the directives of Mark Bunce.

10. In reviewing the investment documents which Mark Bunce executed, it is clear that he understood how his investment funds could be utilized by VTI - Mark Bunce accepted that his money be used as follows:

*"Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general business purpose."*

11. VTI intended to become a distributor for Stream TV and offer certain sales related functions.  Attached hereto as Addendum B is a true and correct copy of a document called Sales and Distribution Support Agreement between the parties.

12. I understood that Mark Bunce was interested in  VTI's prospects as a company because a) Stream TV was to file to seek Bankruptcy protection and b) it had already secured a promise of investment from Mr. Timothy McCarthy for a total of thirty million dollars ($30,000,000) in VTI.  Attached as Addendum C hereto is a true and correct copy of investment documents from Mr. McCarthy promising VTI that he would invest thirty million dollars ($30,000,000) through his firm Burlington Resources Asia Limited.

13. VTI owned and operated appropriate corporate bank accounts under its name with Wells Fargo (a/c #s 8571165235, 2359498918); Bank of America (ac #s 383021924060, 383025073386), Chase (a/c # 732627697) and HSBC (ac #s 141-002247, 141-025417). I have not noticed any monies in these accounts being commingled with Mathu Rajan's personal funds.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge on the date and time herein noted.*

DocuSigned by:

*Suby Joseph*
_____
Suby Joseph
B50EA69052C433...

Date: 11/24/2024

Addendum A

UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

June 9, 2021

## VISUAL TECHNOLOGY INNOVATIONS, INC.

### UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

June 9, 2021

THE UNDERSIGNED, being all of the current duly-elected directors of the Board of Directors (the "**Board of Directors**") of Visual Technology Innovations, Inc., a Nevada corporation (the "**Company**"), acting pursuant to the provisions of the Company's bylaws, hereby waive the calling or holding of a meeting of the Board of Directors, consent to the action set forth below, waive any right to dissent from such action, and direct that this Unanimous Written Consent of the Board of Directors (this "**Consent**") be filed in the minutes of the proceedings of the Board of Directors:

**WHEREAS**, Stream TV Networks, Inc. ("Stream TV"), a Delaware Corporation, has developed a best-in-class glasses-free 3D technology trademarked Ultra-D™ but ownership of the Ultra-D technology is currently disputed between Stream TV and SeeCubic, Inc. ("SeeCubic"), a Delaware Corporation;

**WHEREAS**, certain of its unsecured creditors filed a petition to force Stream TV into involuntary bankruptcy on May 23, 2021 and Stream TV is currently seeking debtor-in-possession financing ("DIP Financing") to pay its secured debt, unsecured debt, operational and reorganization expenses, and legal fees to pursue claims and causes of action it believes it has against SeeCubic and its secured creditors for fraudulent conveyance;

**WHEREAS**, the Company's Board of Directors believes that the Ultra-D™ technology would be a valuable addition to the Company's portfolio;

**WHEREAS**, the Company's Board of Directors deems it to be advisable and in the best interests of the Company to provide DIP Financing to Stream TV in the amount of up to $200 million under conditions substantially similar to those defined in the Term Sheet attached hereto;

**WHEREAS**, the Company's Board of Directors deems it to be advisable and in the best interests of the Company to empower Daniel J. Rink, as in-house legal counsel for the Company, to negotiate the final terms of the DIP Financing with Stream TV and to commit to such financing by signing a Term Sheet and related financing documents on behalf of the Company;

**NOW, THEREFORE, BE IT HEREBY RESOLVED**, that the Company shall enter into a DIP Financing arrangement with Stream TV, subject to negotiation between the parties on terms substantially similar to those defined in the Term Sheet attached hereto; and

**RESOLVED**, that Daniel J. Rink, as in-house legal counsel for the Company, is hereby strictly and solely empowered to negotiate the final terms of the DIP Financing with Stream TV and commit to such financing by signing a Term Sheet and related financing documents on behalf of the Company.

[ Signature Page to Follow ]

This Consent may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).


_____        _____
Mathu Rajan, Director                                Cliff Morton, Director


_____        _____
Tracy Rees, Director                                 Timothy McCarthy, Director


_____        _____
Glenn Hasen, Director                                Sofia Kheddouci, Director

This Consent may be executed in any num er of counter arts, each of which shall  e an original, but all of which together shall constitute one instrument. This Agreement may  e executed by facsimile, e-mail or . df format signature(s).


Mathu Rajan, Director                                    Cliff Morton, Director


*Tracy Rees*  JUNE 9, 2021
Tracy Rees, Director                                    Timothy McCarthy, Director


Glenn Hasen, Director                                   Sofia Kheddouci, Director


2

This Consent may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).


_____          _____
Mathu Rajan, Director                      Cliff Morton, Director



_____          _____
Tracy Rees, Director                       Timothy McCarthy, Director


_____  6·9·21   _____
Glenn Hasen, Director                      Sofia Kheddouci, Director

This Consent may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).

_____          _____  Jan 9th, 2021
Mathu Rajan, Director                      Cliff Morton, Director


_____          _____
Tracy Rees, Director                       Timothy McCarthy, Director


_____          _____
Glenn Hasen, Director                      Sofia Kheddouci, Director

This Consent may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).


_____          _____
Mathu Rajan, Director                      Cliff Morton, Director


_____          _____
Tracy Rees, Director                       Timothy McCarthy, Director


_____          _____
Glenn Hasen, Director                      Sofia Kheddouci, Director

This Consent may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).


_____          _____
Mathu Rajan, Director                                      Cliff Morton, Director


_____          _____
Tracy Rees, Director                                       Timothy McCarthy, Director


_____          _____
Glenn Hasen, Director                                      Sofia Kheddouci, Director

*SOFIA KHEDDOUCI*

## SENIOR DIP CREDIT FACILITY PROPOSAL
## SUMMARY

Borrower:               Stream TV Networks, Inc.

Lender:                 Visual Technology Innovations, Inc.

DIP Facility:           $200,000,000 Debtor-in-Possession term loan to be funded upon
                        entry by the United States Bankruptcy Court for the District of
                        Delaware of an acceptable Interim DIP Order. The Borrower will
                        consent to a voluntary Chapter 11 bankruptcy case, obtain an
                        acceptable Final DIP Order, and seek to confirm a Chapter 11
                        reorganization plan that is acceptable to the DIP Lender and
                        Borrower.

                        Each borrowing of the DIP Loans shall be in a minimum amount
                        of $5,000,000 with the exception of the Initial Amount.

Initial Amount:         An initial amount of up to $500,000 will be borrowed from the
                        Lender as soon as the DIP Facility is approved by the Bankruptcy
                        Court, for the purpose of investigating any action, cause of action,
                        proceeding, claim, allegation or objection with respect to the
                        Company's Secured Debt, the Omnibus Agreement and the Letter
                        Agreement, including breach of fiduciary duties, civil conspiracy,
                        and fraud, among others causes of action.

Availability:           Funds will be available to Borrower according to the following
                        proposed schedule:
                        - June 18, 2021:   $5,000,000
                        - July 02, 2021:  $45,000,000
                        - July 16, 2021:  $70,000,000
                        - July 30, 2021:  $80,000,000

Purpose:                To finance (i) the costs associated with Borrower's Chapter 11
                        bankruptcy filing; (ii) the maintenance of Borrower's assets during
                        the pendency of the bankruptcy; (iii) repayment of approximately
                        $150,000,000 in secured debt; (iv) repayment of approximately
                        $25,000,000 in general unsecured debt; (v) Borrower's operations
                        during the pendency of the bankruptcy; and (vi) Borrower's exit
                        from bankruptcy.

Maturity:               One hundred eighty (180) days from the date the Bankruptcy Court
                        enters the Interim DIP Order.

Security:               The DIP Facility will be secured by a first priority and senior
                        priming security interest under 11 U.S.C. Section 364(d) on all of
                        the Borrower's pre-petition and post-petition assets and capital
                        stock.

| Commitment Fee: | 2.0% of the Commitment (which may be in the form of OID), payable to the Lender from the first interim draw under the DIP Loan Documents. |
|---|---|

| Interest: | All amounts outstanding under the DIP Facility will bear interest at a rate of 12.0% per annum. During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 2.0% per annum above the interest rate otherwise applicable. |
|---|---|

| Collateral Account: | DIP Loans shall be funded into a deposit account under the control of the Borrower (the "Collateral Account") and shall be immediately available to the Borrower. Any disbursements from the Collateral Account shall be substantially in accordance with the Company's prepetition cash management system, the DIP Loan Documents, the Interim Order and the Final Order. DIP Loans may be requested by the Borrower via a withdrawal notice ("Withdrawal Notice") on one Business Day's notice. |
|---|---|

| Conditions Precedent: | Closing shall be conditioned upon satisfaction of the following conditions customary to transactions of this type, or reasonably required by the Lender: |
|---|---|

1. An acceptable DIP Budget to fund the purposes defined above;

2. Appointment of a Chief Restructuring Officer by the Borrower;

3. All necessary consents and approvals to the financing shall have been obtained by both Lender and Borrower, including corporate resolutions;

4. Approval of an acceptable interim DIP Order by the Bankruptcy Court; and

5. Preparation, execution and delivery of definitive documentation satisfactory to the Lender, containing representations, covenants, events of default, expense reimbursement, and indemnification provisions customary for transactions of this size, type, and purpose.

| Option to Convert: | Lender shall have to option to convert its debt under the DIP Facility to equity in the Borrower at the price of $1 per share pursuant to the terms of a chapter 11 reorganization plan that eliminates pre-petition debt of the Borrower. |
|---|---|

| Operations: | Borrower's budgeted expenses for operations shall include allocation of expenses per project (as described more fully in the term sheet) in the approximate amounts set forth as follows: |
|---|---|

- 8K Two-View Special Project: $8.9 million
- 4K Render-Only Screens: $2.8 million
- 8K Drive Train: $2.4 million
- Rendering ASIC: $2.55 million
- Bosch Project: $7.3 million

Expiration:                     This letter shall expire on June 30, 2021 at 11:59pm Eastern time, if prior to such date the Borrower has not accepted this letter by returning a signed copy to the Lender.


**These terms and conditions are provided for proposal purposes only and do not represent a commitment to provide financing. Such commitment can only be made by a written commitment by an authorized officer or agent of the Lender.**

# STREAM TV NETWORKS, INC.

### SUMMARY OF TERMS AND CONDITIONS FOR DEBTOR-IN-POSSESSION FINANCING

*The following describes the terms of a debtor-in-possession financing ("**DIP Facility**") of Stream TV Networks, Inc., a Delaware corporation (the "**Company**" or "**Borrower**") during the pendency of the case that three of its unsecured creditors have filed before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under chapter 7 (the "**Chapter 7 Case**") of the United States Bankruptcy Code (the "**Bankruptcy Code**"). The terms herein shall also apply to Company's reorganization under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the event that the Company converts its Chapter 7 Case to a Chapter 11 Case or in the event that the Company's Chapter 11 appeal in Federal District Court is successful.*

*This term sheet ("Term Sheet") is non-binding and is intended for discussion purposes only and does not constitute a commitment to lend.  The Lender's (as defined below) commitments and other obligations hereunder are subject to: (i) the preparation, execution and delivery of mutually acceptable loan documentation incorporating substantially the terms and conditions outlined in this Term Sheet; (ii) the accuracy and completeness of all representations that the Company makes to the Lender and all information that it furnishes to the Lender; and (iii) the Company's compliance with the terms and conditions contained in this Term Sheet, including, without limitation, the payment in full of all fees, expenses and other amounts payable hereunder.  Except as expressly provided in any binding written agreement the parties may enter into in the future, with and upon approval of the Bankruptcy Court, no past, present or future action, course of conduct, or failure to act relating to the transactions or proposals referred to in this Term Sheet or relating to the negotiation of the terms of such transactions or proposals shall give rise to or serve as the basis for any obligation or other liability on the part of the Lender. The terms and conditions set forth herein are mutually dependent on each other, and the Lender shall not be obligated to extend credit unless agreement with the Borrower and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole.*

| | |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Stream TV Networks, Inc., debtor in the Chapter 7 Case (the "**Company**" or "**Borrower**"). |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Visual Technology Innovations, Inc. (the "**Lender**" or "**DIP Lender**"). |
| **Prepetition Facility** | The Lender and the Borrower are parties to that certain Support Agreement, dated as of February 26, 2021 (as amended, modified and supplemented from time to time, the "**Prepetition Facility**," and all instruments and documents executed at any time in connection with the Prepetition Facility, shall be referred to collectively as the "**Prepetition Facility Documents**"). |
| **DIP Facility/Use of Proceeds**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | The DIP Facility shall comprise a multi-draw new money term loan in an aggregate amount of up to $200,000,000 (the "**DIP Loans**," and the commitment of the Lender to make the DIP Loans, the "**Commitment**"). The Lender on the Closing Date shall fund the Commitment under and in accordance with this Term Sheet.  Each borrowing of the DIP Loans shall be in a minimum amount of $5,000,000, except in the case of the Initial Amount (defined below).<br><br>Subject to the terms and conditions herein, the proceeds of the DIP Loans will be used in accordance with the terms of the Budget (as defined below), including, without limitation to provide for payment of (i) fees and other expenses due and payable under the DIP Facility and/or the Interim |

| | |
|---|---|
| | Order (as defined below), (ii) administration costs of the Chapter 11 Case, and administration, (iii) funds for payment to secured creditors, (iv) funds for payment of critical vendors and executory contracts counterparties, (v) balance of allowed unsecured creditors at time of the confirmation of the plan for those unsecured general creditors who opt into the plan, (vi) funds for preservation of equity for shareholders that opt into the plan, and (vii) other amounts in accordance with the Budget.

An initial amount of up to $500,000 will be borrowed from the Lender (the "**Initial Amount**") as a part of the DIP Loans as soon as the DIP Facility will be approved by the Bankruptcy Court. The Initial Amount may be used by the Company to investigate any action, cause of action, proceeding, claim, allegation or objection with respect to or related to: (i) the claims, liens, converted equity interest or security interests of the Secured Creditors, and (ii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to the execution of the Omnibus Agreement and the Letter Agreement, including, the breach of fiduciary duties, civil conspiracy, fraud, among others causes of action. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(iii) | DIP Liens shall not encumber, and the DIP Collateral shall not include claims or causes of action arising under chapter 5 of the Bankruptcy Code (collectively, "**Avoidance Actions**"), including Avoidance Actions asserted with respect to the Debtor-Reserved Claims (provided that, subject to entry of the Final Order, the DIP Collateral shall include the proceeds of Avoidance Actions). |
| **Documentation** | Definitive financing documentation with respect to the DIP Loans satisfactory in form and substance to the Lender (as defined below) in its reasonable discretion and approved by the Bankruptcy Court (the "**DIP Loan Documents**") and delivered in executed form to the Borrower. |
| **Availability** | The DIP Loans shall be available to be drawn, subject to compliance with the terms, conditions and covenants described in the Interim Order and the DIP Loan Documents, and will be subject to the following schedule:<br><br>• June 18, 2021:  $5,000,000<br>• July 02, 2021:  $45,000,000<br>• July 16, 2021:  $70,000,000<br>• July 30, 2021:  $80,000,000 |
| **Budget/Collateral Account** | The 15-week statement of cash receipts and disbursements for the next 15 weeks of the Borrower, broken down by week, including the anticipated uses of the DIP Facility for such period ("**Initial Budget**") is attached as Exhibit 1 to the proposed Interim Order.<br><br>At the end of each week, the Borrower shall provide to the Lender an updated rolling 15-week projection for the subsequent 15-week period (which in each case must be satisfactory in the sole discretion of the Lender). Any amendments or modifications to the approved Initial Budget and each subsequent approved Budget, must be requested in writing by the |

Borrower and consented to in writing by the Lender.  Each week the Borrower shall provide to the Lender a variance report, prepared and certified by the Borrower, comparing actual results to budgeted amounts for all categories appearing on the Budget, to be delivered to the Lender every Wednesday night for the week-ending Friday prior.

The DIP Loans shall be funded into a deposit account, which shall be under the control of the Borrower (the "**Collateral Account**").  The Collateral Account shall be one of the Company's existing operating or disbursement accounts, or a new account created for this particular purpose.  Funds on deposit in the Collateral Account shall be immediately available to the Borrower.  Any disbursements from the Collateral Account shall be substantially in accordance with the Company's prepetition cash management system, the DIP Loan Documents, the Interim Order and the Final Order.  DIP Loans may be requested by the Borrower solely in accordance with the Budget, subject to Permitted Deviations, and the delivery of a withdrawal notice ("**Withdrawal Notice**"), on one Business Day's notice in the form attached to the DIP Agreements.

The Borrower shall deliver a Withdrawal Notice to the Lender in order to withdraw funds from the Collateral Account and: (a) such funds shall be used to pay line-itemed expenses in accordance with the Budget, subject to Permitted Deviations[1], (b) the amount of each withdrawal from the Collateral Account, when aggregated with all amounts previously withdrawn from the Collateral Account, shall not exceed the total amount set forth in the Budget (taking into account any Permitted Deviation), and (c) the Borrower shall have satisfied all conditions necessary for funds to be disbursed from the Collateral Account pursuant to the Interim Order, the Final Order and the DIP Loan Documents.  The Lender shall have no obligation to monitor compliance with the above or with any provision of this Term Sheet by the Borrower, and shall rely on the Withdrawal Notice.

As used herein, "**Permitted Deviation**" means, at any time, that:

> (a) the actual cumulative net cash flow of the Borrower through the end of the calendar week most recently ended prior to such time, without giving effect to any disbursement of the DIP Loans and after giving effect to the payment of all Allowed Professional Fees (such cumulative amount, the "**Cumulative Net Cash Flow**"), is not less than

> (b) the Cumulative Net Cash Flow through the end of such calendar week as set forth in the Budget (such amount the "**Budgeted Net Cash Flow**"),

>> by more than 10% of the amount of such Budgeted Net Cash Flow, exclusive of the fees and expenses of the DIP Agent, DIP Lender, and the Prepetition Secured Parties.

---

[1] NTD: Measurement period and line-item comparison still under consideration by lender.

| | Upon acceleration of the DIP Loans, the funds available in the Collateral Account will be used to pay down the outstanding DIP Loans. |
|---|---|
| **Budgeted Projects** | Borrower's budgeted expenses for operations shall include allocation of expenses per project in the approximate amounts set forth as follows:<br><br>• 8K Two-View Special Project: $8.9 million to design a custom back light, chassis and program a mass production PCBA<br>• 4K Render-Only Screens: $2.8 million to manufacture 27"-32" monitors - including tooling for custom back light, chassis and content creation software. Also includes upgrade for existing equipment<br>• 8K Drive Train: $2.4 million toward optical design, custom back light and software support<br>• Rendering ASIC: $2.55 million for design, development and production costs for chips<br>• Bosch Project: $7.3 million for special project commissioned by Bosch to have automotive specific hardware kit with outsourced FPGA programming, hardware simulation tools, "B Samples" and specialized manufacturing equipment |
| **Priority and Liens/ Ranking/ Security/ Collateral**<br><br>Bankruptcy Rule4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | <u>**Collateral**</u>. "Collateral" shall mean any and all assets of the Borrower, unless otherwise agreed by the Lender.<br><br><u>**Priority/Collateral**</u>. All obligations of the Borrower to the Lender and the Agent under the DIP Loan Documents, including all DIP Loans, shall, subject to the Carve-Out (as defined below), at all times:<br><br>(a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Case, which claims in respect of the DIP Facility shall be superior to all other claims;<br><br>(b) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Borrower (now or hereafter acquired and all proceeds thereof);<br><br>(c) pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all encumbered assets of the Borrower (now or hereafter acquired and all proceeds thereof);<br><br>(d) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on cash in the Collateral Account (and all proceeds thereof);<br><br>(e) pursuant to Bankruptcy Code section 364(d), have a first priority priming lien on all assets of the Borrower (now or hereafter acquired and all proceeds thereof) that were subject to a lien securing the Prepetition Facility as of the petition date of the Chapter 7 Case (the "**Petition Date**").<br><br>It is understood and agreed that the priming liens described herein shall prime the liens securing any prior financing agreement or financing facility entered by Stream TV, but that the liens so created as described in clauses |

(c), (d) and (e) above shall be subject to "Permitted Liens" (as such term is defined under the Prepetition Facility) as of the Petition Date.

The liens to be granted by the Bankruptcy Court shall cover all property of the Borrower (now or hereafter acquired and all proceeds thereof), including property or assets that are not currently in its possession.  Except until entry of the Final Order, the DIP Liens shall not attach to claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "**Avoidance Actions**"), and as otherwise agreed to by the Lender in its sole discretion.

As used in the DIP Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court (including any noticing agent) and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iv) below); (iii) all reasonable fees and expenses up to $100,000 incurred by the Agent and its legal counsel ; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") accrued and incurred by persons or firms retained by the Borrower or the potential Committee pursuant to Sections 327, 328, or 1103 of the Bankruptcy Code (the "**Estate Professionals**") at any time before or on the first business day following delivery by the Borrower of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (v) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the Borrower of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (v) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Agent to the Borrower, its lead restructuring counsel, counsel to the Committee, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

All of the liens described herein with respect to the assets of the Borrower shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements. Except to the extent expressly set forth in this Term Sheet, the Interim Order and the Final Order shall contain provisions prohibiting the Borrower from incurring any indebtedness which (x) ranks *pari passu* with

| | |
|---|---|
| | or senior to the loans under the DIP Facilities or (y) benefits from a first priority lien under Section 364 of the Bankruptcy Code. |
| **Adequate Protection** | The holders of the Existing Primed Secured Facilities, shall be granted the following protection (collectively, the "**Prepetition Secured Creditor Protection**"), pursuant to Sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its pre-petition security interests for the consent of such Secured Creditor to the priming effectuated by the DIP Facility, consent to the use of its collateral (either in possession of the Prepetition Secured Creditor or in possession of Stream TV) (including the Company's cash collateral and other cash (such cash collectively, the "**Cash Collateral**")), consent to the transaction contemplated by the DIP Facility, and for the diminution in the value (each such diminution, a "**Diminution in Value**") of the prepetition security interests of such party, whether or not such Diminution in Value results from the sale, lease or use by the Borrower of the collateral securing the Existing Primed Secured Facilities (including, without limitation, Cash Collateral), the priming of the prepetition security interests of such lender or the stay of enforcement of any prepetition security interest arising from Section 362 of the Bankruptcy Code, or otherwise: <br><br> (a) <u>Adequate Protection Lien</u>. The Prepetition Secured Creditors (SLS Holdings VI, LLC and Hawk Investment Holdings Limited) shall be granted for their benefit and the benefit of the applicable secured creditors, effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all assets of the Borrower (together, the "**Adequate Protection Liens**"), subject and subordinate only to (x) the Carve-Out, (y) the liens securing the DIP Facilities; provided that the Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order and (z) Permitted Liens. <br><br> (d) <u>Interest</u>. All obligations, including accrued but unpaid interest, under the Prepetition Secured Creditors Facilities owing by the Borrower thereunder and other fees owing by the Borrower thereunder shall continue to accrue interest (including interest on interest) at the default rate applicable on the Petition Date under the Prepetition Secured Creditors Facilities, and shall not be payable in cash except on the Maturity Date. <br><br> (e) <u>Payment of Professionals</u>. The Borrower shall provide for the payment of the Prepetition Secured Creditors professionals, in connection with the current Debtor-in-possession financing. <br><br> All intercompany liens of the Borrower and its subsidiaries, if any, will be contractually subordinated to the DIP Facilities and to the Adequate Protection on terms satisfactory to the Lender and consistent with the subordination terms set forth above. <br> Since DIP Loans may be used for the payment of the claims asserted by |

| | |
|---|---|
| | Secured Creditors, the payment of such claims will result in the extinguishment of their liens and pledges, thereby rendering unnecessary the adequate protection provided. |
| **DIP Closing Date** | The date on or after the Interim Order Entry Date on which the conditions precedent have been satisfied or waived by the Lender (the date of such closing, the "**DIP Closing Date**"), subject to satisfaction (or waiver by the Lender) of the applicable conditions precedent set forth herein, which date shall be no later than one business day after the Interim Order Entry Date. |
| **Maturity** <br> Bankruptcy Rule 4001(c)(1)(B), Local Rule4001-2(a)(ii | The DIP Loans shall be repaid in full, and the Commitment shall terminate on the earliest to occur (the "**Maturity Date**") of (i) October 31, 2021, (ii) one hundred eighty (180) days after the entry of the Interim DIP Order, unless the Bankruptcy Court enters a final order (the "**Final Order**") approving the DIP Facility in form and substance satisfactory to the Lender on or before such date, (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Case to a Chapter 7 liquidation or the dismissal of the Chapter 11 Case, (iv) the date of the acceleration of the DIP Loans and the termination of the Commitment under the DIP Facility, (v) the closing of the Transaction (including the 363 Sale Transaction), and (vi) additional maturity events to be determined. |
| **Interest Rate/Default Interest Rate/Fees** <br><br> Bankruptcy Rule 4001(c)(1)(B) | The interest rate, default rate and fees are appended as Annex I hereto. |
| **Option to Convert** | Lender shall have the option to convert any debt under the DIP Facility to equity in the Borrower at the price of $1 per share pursuant to the terms of a chapter 11 reorganization plan that eliminates all pre-petition debt of the Borrower. |
| **Mandatory Prepayments** | The DIP Loans will be subject to customary mandatory prepayments to be included in the definitive DIP Loan Documents (including, without limitation, prepayments with the proceeds of incurrence of debt (other than under the DIP Facility), sales of assets and casualty events by the Company or the Project Companies). |
| **Optional Prepayments** | The DIP Loans may be permanently prepaid in full by the Borrower at any time subject to payment of a prepayment fee of one percent (1%) of the full amount of the DIP Loan; provided, however, that the Prepayment Fee shall not accrue, be earned or be paid in connection with the repayment of the DIP Loans from the proceeds of the Transaction whether under a sale order or confirmation order. |
| **Representations** | The DIP Facility shall contain representations and warranties as are customary or appropriate in the context of the proposed DIP Facility (including, without limitation, as to priority, collateral, Interim Order and Final Order, DIP Loan Documents, Budget and Use of Proceeds) or as otherwise required by the Lender. |

| Covenants | The DIP Loan Documents will contain information, affirmative and negative covenants to reflect customary debtor-in-possession financing provisions, this specific transaction, the Transaction Milestones, the current state of business operations of the plants operated by the Project Companies, and current market conditions), other customary or appropriate covenants in the context of the proposed DIP Facility (including, without limitation, as to the Budget and Permitted Deviation, the Transaction Milestones, and delivery of copies of pleadings, motions, etc. to be filed by the Borrower in the Chapter 7 or Chapter 11 Case) or as otherwise required by the Lender. |
|---|---|
| Transaction Milestones | Unless otherwise agreed to by the Borrower and the Lender, the Transaction will be consummated in accordance with the following milestones (collectively, the "**Transaction Milestones**"):<br><br>• on June 14, 2021, the Borrower shall file with the Bankruptcy Court a motion seeking entry of the Interim Order and the Final Order;<br><br>• on or before October 31, 2021 Bankruptcy Court approval of the U.S. Trustee's Chapter 7 plan or, alternatively, approval of Borrower's Chapter 11 reorganization plan<br><br>• on or before October 31, 2021, Payment of the Borrower's senior secured debt<br><br>• on or before October 31, 2021, Payment of the Borrower's junior secured debt |
| Budget Covenants | Compliance with the Budget with actual results to be tested against such Budget on a rolling two-week, aggregate basis, subject to the Permitted Deviation. [2] |
| Events of Default | The DIP Loan Documents will contain Events of Default consistent with customary debtor-in-possession financing provisions, this specific transaction and current market conditions and other customary or appropriate Events of Defaults in the context of the proposed DIP Facility, including, without limitation:<br><br>(a) *Budget.* The proceeds of any DIP Loan shall have been expended in a manner, or a withdrawal from the Collateral Account shall be used for a purpose (in either case notwithstanding the delivery of a duly executed Withdrawal Request), which is not in accordance with the Budget (subject to the Permitted Deviation); or<br><br>(b) *Collateral Documents.* The Interim Order and the Final Order, as applicable, shall cease to create a valid and perfected lien with such priority required by this term sheet, subject to permitted liens, on a material portion of the Collateral purported to be covered thereby; or<br><br>(c) *Alternate Financing.* Any Credit Party shall file a motion in the Chapter 11 Case without the express written consent of Lender, to |

---

[2] NTD: Measurement period and line-item comparison still under consideration by lender.

obtain additional financing from a party other than Lender under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code; or

(d) *Prepetition Claims*. Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first-day orders" and included in the Budget or (y) otherwise consented to by the Lender in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $1,000,000 in the aggregate or to permit other actions that would have a material adverse effect on the Borrower or its estate, or (iii) except with respect to the obligations under the Prepetition Facility as provided in the Interim Order and the Final Order, as applicable, approving any settlement or other stipulation not approved by the Lender and not included in the Budget with any secured creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor; or

(e) *Order With Respect to the Chapter 7 Case*. An order with respect to the Chapter 7 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (and with respect to any provisions that affect the rights or duties of the Agent, the Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the Interim Order and the Final Order, as applicable, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Chapter 7 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Borrower and the Lender in respect of the obligations (other than the Carve Out) or (iii) to grant or permit the grant of a lien on the Collateral (other than permitted liens); or

(f) *Application for Order by Third Party*. An application for any of the orders described in clauses (f) through (i) above shall be made by a person other than the Borrower and such application is not contested by the Borrower in good faith or the relief requested is not withdrawn, dismissed or denied within 30 days after filing or any person obtains a final order under Section 506(c) of the Bankruptcy Code against the Lender or obtains a final order adverse to the Lender or any of their respective rights and remedies under the DIP Loan Documents or in the Collateral; or

(g) *Liens*. (i) Any Credit Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the Lender, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by Collateral Documents or the

|  | Bankruptcy Court Orders with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Borrower which contests the validity, perfection or enforceability of any of the liens and security interests of the Lender created by any of the Interim Order, the Final Order, or the DIP Loan Documents; or |
|---|---|
|  | (h) *Invalidation of Claims*.  The Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Borrower) any other person's motion to, disallow in whole or in part (i) the Lender's claim in respect of the obligations or contest any material provision of any DIP Loan Document or (ii) the Prepetition Lender's claim in respect of the obligations or contest any material provision of any Prepetition Facility Document, or any material provision of any DIP Loan Document or any Prepetition Facility Document shall cease to be effective; or |
|  | (i) *Violation of Bankruptcy Court Orders/Amendment of Bankruptcy Court Orders*.  The violation of any term, provision or condition in the Interim Order or the Final Order.  The Interim Order or the Final Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Lender (and with respect to amendments, modifications or supplements that affect the rights or duties of the Agent, the Agent); or |
|  | (j) *Payments*. Any Credit Party or any of their affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be materially inconsistent with the treatment of any such Person under the Interim Order or the Final Order, as applicable, without the prior written consent of the Lender. |
| **Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the Lender shall, (i)(a) declare all obligations to be immediately due and payable, (b) declare the termination, reduction or restriction of any further Commitment, to the extent any such Commitment remains, and (c) terminate the DIP Facility as to any future liability or obligation of the Lender, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or post-petition administrative superpriority claim status; and (ii) declare a termination, reduction or restriction on the ability of the Borrower to use any cash collateral derived solely from the proceeds of Collateral (any such declaration shall be made to the Borrower, the Committee (if applicable), the Trustee (if applicable) and the United States Trustee (if applicable).<br><br>Following five (5) days' notice of such Event of Default to the Borrower, the Committee, the Trustee, and the Office of the United States Trustee, unless such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the Agent and the Lender shall |

| | have relief from the automatic stay to exercise remedies under the DIP Loan Documents. The Borrower shall have the right to use Cash Collateral during such 5-day notice period, pending further order of the Bankruptcy Court. |
|---|---|
| **Release** | The Borrower will provide customary releases for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to or arising out of the DIP Loans (the "**Release**") to the Lender, its representatives, employees and advisors. |
| **Assignments and Participations** | The DIP Loan Documents shall include rights of assignment, subject solely to the Lender's consent (not to be unreasonably withheld or delayed), and participation rights. |
| **Indemnity** | Without prejudice to the provisions of the Supporting Agreement, the Borrower shall, be obligated to indemnify and hold harmless the Lender, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any administration, investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this Term Sheet. |
| **Governing Law** | The DIP Loan Documents will provide that the Borrower will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of Delaware; and shall waive any right to trial by jury.<br><br>Delaware law shall govern the DIP Loan Documents except to the extent preempted by federal bankruptcy laws. |
| **Fees and Expenses** | The Borrower shall pay the reasonable documented fees and expenses of the Prepetition Lender under the Prepetition Facility Documents and under the DIP Financing, including (i) legal counsel; (ii) any financial advisor and other expert(s); and (iii) any other reasonable costs and expenses of, or related to, the Transaction (collectively, the "**Fees and Expenses**"). Any such Fees and Expenses accrued as of the Maple Petition Date (as defined in the Interim Order) shall be paid by the Borrower from the Interim Amount. |

The preceding summary of proposed terms and conditions is not intended to be all-inclusive for purposes of the DIP Loan Documents and the Final Order. Any terms and conditions that are not specifically addressed above would be subject to future negotiations between the parties and comprehensive documentation of the transaction that is acceptable to the Lender will have to be prepared and executed.

## Annex I

### Interest and Fees

| | |
|---|---|
| **Interest Rates**: | All amounts outstanding under the DIP Facility will bear interest at a rate of 12.0% *per annum*. |
| **Default Interest**: | During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 2.0% *per annum* above the interest rate otherwise applicable. |
| **Upfront Fee**: | An amount equal to 2.0% of the Commitment (which may be in the form of OID), payable to the Lender, provided, that any fees shall be paid from the first interim draw under the DIP Loan Documents. |
| **Commitment Fee** | A commitment fee will accrue on the unused amount of the Commitments from and after the date of entry of the Final Order at a rate per annum equal to 0.50% and be payable monthly in arrears and upon termination of the Commitments. |
| **Nature of Fees**: | Non-refundable under all circumstances. |

Agreed and accepted by                             Agreed and accepted by
Visual Technology Innovations, Inc.            Stream TV Networks, Inc.


_____        _____
Daniel J. Rink                                          Mathu Rajan
In-House Legal Counsel to                       CEO
Visual Technology Innovations, Inc.

Addendum B

SALES AND DISTRIBUTION SUPPORT AGREEMENT

May 15, 2021

## SALES AND DISTRIBUTION SUPPORT AGREEMENT

This Sales and Distribution Support Agreement, with an effective date of May 15, 2021 or otherwise as may be determined by the U.S. bankruptcy Court (as it may be amended, restated, modified or supplemented from time to time, this "**Agreement**"), is made by and between Visual Technology Innovations, Inc. ("**VTI**"), a Nevada corporation, and Stream TV Networks, Inc. ("**Stream**"), a Delaware corporation (each a "**Party**" and collectively, the "**Parties**").

**WHEREAS**, VTI has identified certain glasses-free 3D products for sale and distribution to global markets, has identified potential customers in those markets, and desires to leverage Stream's technical expertise to maximize the market potential of such products;

**WHEREAS**, Stream has more than a decade of experience in the field of glasses-free 3D technology, including valuable business relationships and expertise in content creation and various aspects of 3D engineering, and seeks to generate revenue from such expertise; and

**WHEREAS**, Stream filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code and therefor will require approval of this Agreement by the Bankruptcy Court pursuant to a motion that Stream will file for such approval, which it believes will be reasonably granted due to the benefits that this Agreement will confer upon Stream's estate;

**NOW THEREFORE**, the Parties agree that it is in their mutual interests to engage in this technology support agreement according to the following terms and conditions. 

### 1. Products.

This Agreement shall apply to glasses-free 3D products as specifically described in Exhibit A attached hereto and incorporated by reference herein (the "**Products**"). Exhibit A may be amended from time to time by mutual agreement of the Parties, with such amended Exhibit A becoming effective upon written approval by both Parties of such amendment.

Further, the Parties agree that for each new Product added to Exhibit A, there shall be a corresponding additional Exhibit to this agreement containing the necessary technical and business information to sufficiently define the Product for purposes of the non-disclosure and non-circumvention clauses herein.

As of the date hereof, the Products include:
  A.  Two-view 10.75-inch glasses-free 3D tablet (Exhibit B)
  B.  Two-view 250-inch glasses-free 3D video wall (Exhibit C)



## 2. Services and Obligations.

The Parties acknowledge the following services to be provided by each Party and the obligations related thereto.

A. <u>Product Determination</u>. VTI shall identify the Products and secure the distribution and sales rights from the Product developer(s), manufacturer(s) and/or agent(s) as appropriate.

B. <u>Product Sales and Royalties</u>. VTI shall sell the Products in the global market at terms and conditions solely determined between VTI and its customers. Notwithstanding the foregoing, VTI shall charge its customers a royalty fee (the "**<u>Royalty Fee</u>**") of not less than ten percent (10%) of the total gross amount on each and every sale.

C. <u>Support from Stream</u>. Stream shall support the VTI sales effort by providing technical expertise as requested by VTI. Such expertise may include, but is not limited to, Product evaluation, quality control analysis, provision of Product enhancement suggestions, and 3D content creation. Stream shall not be required to participate in actual Product sales or Product deliveries; rather, Stream's obligation shall be limited to provision of advice, analyses, certain Product enhancement activities and content creation.

D. <u>Content Creation Support</u>. Stream shall use its best efforts to provide content creation services to VTI and its customers, subject to the nature of any specific requests and Stream's availability. Stream makes no guarantee herein that it can or will accommodate every content creation request, and Stream's inability to meet such request shall not impact the other terms of this Agreement in any way.

## 3. Compensation.

A. <u>Gross Sales</u>. VTI shall share all Royalty Fees generated by the sale of the Products with Stream on an equal basis, with VTI retaining fifty percent (50%) of each Royalty Fee and paying fifty percent (50%) of the Royalty Fee to Stream according to the payment schedule below. For purposes of clarity, if VTI fails to define a specific Royalty Fee in any purchase or sales agreement with its customer, the Parties agree that there shall be an implied Royalty Fee equal to ten percent (10%) of the gross sale.

B. <u>Product Evaluation and Quality Analysis</u>. Compensation for technical review and analysis of Products is included in the Royalty Fee.

C. <u>Content Creation</u>. Compensation for any and all content creation services to be provided by Stream under this Agreement is not included in the Royalty Fee. Additional compensation for content creation services shall be negotiated in good faith between the Parties on a case-by-case basis subject to the specific requirements of each request. Content creation services shall be rendered only according to the terms of separate written agreements between the Parties that shall define the specific services to be rendered, delivery and acceptance criteria, and other terms.

D. <u>Engineering Services</u>. Compensation for any and all Product enhancement and other engineering services to be provided by Stream under this Agreement is not included in the

VTI-Stream Sales and Distribution Support Agreement



Royalty Fee. Additional compensation for engineering services shall be negotiated in good faith between the Parties on a case-by-case basis subject to the specific requirements of each request. Engineering services shall be rendered only according to the terms of separate written agreements between the Parties that shall define the specific services to be rendered, delivery and acceptance criteria, and other terms.

E. Payments.
   1. Royalty Fees due to Stream shall be calculated on a quarterly basis. VTI shall pay such compensation to Stream within fifteen (15) days following the end of each calendar quarter. All payments shall be accompanied by an accounting that details individual sales made during the period and the gross amounts and Royalty Fees related thereto.
   2. Payments for content creation and engineering services shall be paid by VTI to Stream per invoices from Stream on a monthly basis within fifteen (15) days following the end of each month. All invoices from Stream shall be made against purchase orders issued by VTI, and VTI reserves the right to reject any invoice not in accordance with a valid VTI purchase order.

## 4.  Books and Records; Right to Audit

A. Books and Records. VTI shall keep complete and accurate records regarding its activities under this Agreement including its sales contracts and receipts for the Products.

B. Right to Audit. Stream shall have the right to audit VTI's books and records to verify compliance with this Agreement upon at least five (5) business days' notice and during regular business hours. The records shall be maintained and made available in electronic, searchable form. Stream shall bear its own expenses in such audit unless the audit shows a material breach of the requirements of this Agreement, in which case VTI shall pay the cost of the audit. The frequency of such audit shall not be greater than twice per year provided that any prior audit has not revealed such an underpayment or breach described in the previous sentence for which VTI is responsible, in which case the next audit may be made within ninety (90) days.

## 5.  Representations and Warranties.

A. Organization. VTI is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted. Stream is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted.

B. Authorization. All corporate action required to be taken by each of the Parties' Boards of Directors, if any, has been taken or will be taken prior to the Effective Date. All action on the part of the Parties' officers and directors necessary for the execution and delivery of this Agreement and the performance of all obligations under this Agreement, if any, has been taken or will be taken prior to the Effective Date.

### 6.    Term and Termination

A. <u>Effective Date</u>. This Agreement is subject to approval of the Bankruptcy Court as stated in the preamble of this agreement. Accordingly, the Agreement shall not become effective and binding upon the parties until and unless the Bankruptcy Court issues an Order approving Stream's motion for approval. The date of the Bankruptcy Court's approval Order shall be deemed the effective date (the "Effective Date").

B. <u>Term</u>. This Agreement shall have a term of two (2) years from the Effective Date. This Agreement may be extended for an additional one (1) year, and for subsequent additional periods of one (1) year annually thereafter upon notice by one Party and acceptance thereof by the other Party prior to the termination date or extended termination date.

C. <u>Termination</u>. Either Party may terminate this Agreement without cause upon thirty (30)-day written notice to the other Party.

D. <u>Surviving Terms</u>. Upon termination of this Agreement for any reason, the following terms shall remain in effect:

1. Stream shall be entitled to all compensation due under this Agreement for any sale by VTI of any Product defined in Exhibit A for a period of one (1) year following the termination of this Agreement. For purposes of clarity, a sale shall be defined as (i) a contractual commitment by any customer to VTI for purchase of any Product, regardless of payment or delivery schedule, (ii) receipt by VTI of a deposit payment from a customer relative to the proposed purchase of a Product, (iii) delivery of any Product to a customer in advance of a deposit payment or purchase contract, or (iv) commitment by VTI to purchase any Product from the Product manufacturer, irrespective of whether VTI has a confirmed customer for such Products. The Parties acknowledge that sub-clause iv is included herein because Stream's provision of Product analysis and quality review have value to VTI and should be compensated upon VTI's sale or liquidation of any such Product, regardless of whether such liquidation occurs during the term of this Agreement or in the one (1)-year period following its termination.

2. <u>Confidentiality</u>. The non-disclosure and non-circumvention clauses herein shall remain in effect for a period of three (3) years following the termination of this Agreement except as noted below.

### 7.    Confidentiality; Non-Circumvention.

A. <u>Confidentiality</u>. "**Confidential Information**" shall mean information disclosed by one Party or its Affiliates (the "**Disclosing Party**") to the other Party or its Affiliates (the "**Receiving Party**") pursuant to this Agreement, which if disclosed in tangible form is marked "Confidential" or with other similar designation to indicate its confidential or proprietary nature, or if disclosed orally is indicated orally to be confidential or proprietary by the Disclosing Party at the time of such disclosure or is confirmed in writing as confidential or proprietary by the Disclosing Party within a reasonable time after such disclosure. Without limiting the foregoing, all information related to the products described in Exhibit A

(including the designs therefor as well as all business information related thereto) is the Confidential Information of VTI regardless of whether it is marked "Confidential."

B. <u>Exceptions</u>. Notwithstanding the foregoing, Confidential Information shall not include information that, in each case as demonstrated by written documentation: (a) was already known to the Receiving Party, other than under an obligation of confidentiality, at the time of disclosure; (b) was generally available to the public or otherwise part of the public domain at the time of its disclosure to the Receiving Party; (c) became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the Receiving Party in breach of any confidentiality obligations; (d) was subsequently lawfully disclosed to the Receiving Party by a person other than a party without an obligation of confidentiality; or (e) was independently developed by the Receiving Party without reference to or use of any Confidential Information disclosed by the Disclosing Party.

C. <u>Non-Use and Non-Disclosure</u>. The Receiving Party may use or disclose the Disclosing Party's Confidential Information solely to the extent such use or disclosure is reasonably necessary for exercising its rights (including the grant of a permitted sublicense) or performing its obligations under this Agreements, provided, however, that any such use or disclosure shall be subject to the Receiving Party requiring any recipients of Confidential Information to agree to written agreements containing non-use and non-disclosure obligations at least as protective as those set forth in this Agreement.

D. <u>Maintenance of Confidentiality</u>. The Receiving Party agrees that it shall use the same degree of care to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the Disclosing Party that it uses to protect its own confidential information of similar importance, but no less than reasonable care. The Receiving Party shall reproduce the Disclosing Party's proprietary rights notices on all copies of Confidential Information, in the same manner in which such notices were set forth in or on the original. Each party shall immediately notify the other party in the event of any unauthorized use or disclosure of the Confidential Information.

E. <u>Terms of Agreement</u>. Each party agrees not to disclose to any third party the terms of this Agreement (including all amendments, Exhibits) without the prior written consent of the other party, except: (i) as may be required by law; (ii) in confidence, to legal counsel of the party; (iii) in connection with the requirements of a securities filing; (iv) in confidence, to a party's accountants, banks, investors, and other current and prospective financing sources and their advisors; (v) in connection with the enforcement of this Agreement or rights under this Agreement; or (vi) in confidence, in connection with a merger.

F. <u>Required Disclosures</u>. Nothing in this Agreement shall be deemed to prohibit the Receiving Party from disclosing any Confidential Information that is required by law; provided, however, that in the event of such requirement, prior to disclosing any Confidential Information, the Receiving Party shall notify the Disclosing Party of the scope and source of such legal requirement and shall cooperate reasonably with the Disclosing Party to minimize and/or limit the scope of disclosed information.

G. <u>Non-Circumvention</u>. Stream agrees that it shall not, for a period of three (3) years following the termination of this Agreement, engage with, either directly or indirectly, any developer, manufacturer, or agent of any of the Products without the written consent of VTI.

### 8.  Notices.

All notices required under this Agreement shall be delivered to the applicable Party at the address set forth below. Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

**VTI:**
Visual Technology Innovations, Inc.
30 Strada di Villaggio
Suite 103
Henderson, NV 89011
Email: VTI.Board@VTI-Global.com

**Stream:**
Stream TV Networks, Inc.
1105 William Penn Drive
Bensalem, PA 19020
Email: mathu@streamacquisitiongroup.com

With a copy to:
Lawrence G. McMichael, Esquire
DILWORTH PAXSON LLP
1500 Market Street – 3500E
Philadelphia, PA 19102
Email: lmcmichael@dilworthlaw.com

### 9.  Governing Law; Jury Trial Waiver.

A. <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the laws of the State of Delaware without regard to principles of conflict of law that would defer to the laws of another jurisdiction.

B. <u>Jury Trial Waiver</u>. VTI AND STREAM AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF THE PARTIES HERETO WITH RESPECT TO ANY MATTER RELATING TO OR ARISING OUT OF THE ENGAGEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF THE PARTIES HEREUNDER.

C. <u>Jurisdiction</u>. VTI and Stream agree, to the extent permitted by applicable law, (1) that any federal court sitting within the District of Delaware shall have exclusive jurisdiction over any litigation arising out of this Agreement; (2) to submit to the personal jurisdiction of the Courts of the United States District Court for the District of Delaware; (3) to waive any and all personal rights under the law of any jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to jurisdiction or venue within the State of Delaware for any litigation arising in connection with this Agreement; and (4) in the event that Stream commences a Bankruptcy Case, that (a) the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement and that each of the Parties hereby consents to entry by the Bankruptcy Court of a final order in



any dispute arising out of or related to this Agreement and (b) VTI shall be entitled to participate and be heard in any matters implicating, in any way, the scope, extent, timing, or enforceability of, or obligations under, this Agreement.

### 10. Counterparts; Entire Agreement; Electronic Execution.

A. <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

B. <u>Entire Agreement</u>. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, any prior written or oral agreement between the Parties on the subject matter herein.

C. <u>Commencement of Effect</u>. Notwithstanding the provisions of Section 13 below, this Agreement shall become effective when it shall have been executed by each Party hereto and each Party shall have received counterparts hereof which, when taken together, bear the signatures of each of Party hereto. Thereafter this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

D. <u>Electronic Execution</u>. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

### 11. Severability.

If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law and are consistent with the Parties' intentions with respect to the applicable invalid, illegal or unenforceable provisions.

### 12. Transfer; Assignment.

A. This Agreement shall be binding upon VTI and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of Stream and its successors and assigns.

B. VTI's rights and obligations under this Agreement may not be assigned without the prior written consent of Stream, which may be withheld in its sole and absolute discretion.

C. Stream's rights and obligations under this Agreement may not be assigned without the prior written consent of VTI, which may be withheld in its sole and absolute discretion.



## 13. Contingency on Bankruptcy Court Approval.

A. The Parties acknowledge that, as of the date hereof, Stream has filed a petition for protection under Chapter 11 of the United States Bankruptcy Code, and that this agreement shall not be binding on the Parties and shall have no force and effect unless approved by the Bankruptcy Court pursuant to a formal motion to be submitted by Stream.

B. In the event that Court approval is granted, this Agreement shall take effect immediately upon the granting of such Court approval.

C. In the event that Court approval is denied, this Agreement shall be non-binding until and unless Stream emerges from bankruptcy through i) successful reorganization according to its approved plan with the Court, or ii) dismissal of the bankruptcy petition by the Bankruptcy Court, at which time this Agreement shall be binding upon the Parties.

**IN WITNESS WHEREOF,** and intending to be legally bound, the Parties hereto have executed this Agreement as of the date first written above.

Acknowledged and agreed by
Visual Technology Innovations, Inc.

_____

Timothy McCarthy
Director

_____
Date

Acknowledged and agreed by
Stream TV Networks, Inc.

_____

Mathu Rajan
Chief Executive Officer

_____April 28, 2021_____
Date

# EXHIBIT A

Updated as of April 28, 2021

This Exhibit A lists all Products that fall under the terms and conditions of the Sales and Distribution Support Agreement between Visual Technology Innovations, Inc. and Stream TV Networks, Inc.

Products
1. Two-view 10.75-inch glasses-free 3D tablet (see Exhibit B)
2. Two-view 250-inch glasses-free 3D video wall (see Exhibit C)

## EXHIBIT B

This Exhibit B describes a **10.75-Inch Glasses-Free 3D Tablet** Product that falls under the terms and conditions of the Sales and Distribution Support Agreement between Visual Technology Innovations, Inc. and Stream TV Networks, Inc.

## EXHIBIT C

This Exhibit B describes a **250-Inch Glasses-Free 3D Video Wall** Product that falls under the terms and conditions of the Sales and Distribution Support Agreement between Visual Technology Innovations, Inc. and Stream TV Networks, Inc.



**GLASSES-FREE 3D 10.75-INCH TABLET – SPECIFICATIONS**



## Product Parameters

| Form Factor | Overall size | 258.7*180*8.5mm |
|---|---|---|
| Accessories | LCD Specifications | 10.75-inch 1600*2560 |
| | TP Specifications | 10 points |
| | Webcam | The first 5M/13MAF, with flash |
| | Number of keys | 4 physical buttons: volume+/-, power switch, reset |
| | Battery capacity | 7000mAh (capacity is evaluated according to the size of the model) |
| | Charger specifications | 5V/2A TYPE-C charger / DC interface – Compatible |
| | Data line | 16pin TYPE-C |

## Hardware Specifications

| Hardware platform | CPU: MT6797 GPU: T880 780MHz | 64-bit ten-core processor Two A72 2.6GHz, four A53 1.85GHz GSM quadband/CDMA1X/WCDMA/CDMA200/FDDLET/TDDLET |
|---|---|---|
| RAM | LPDDR3 | 2G, 3G, 4G |
| | EMMC | 32G, 64G, 128G |
| Frequency band | Six Mode | GSM: B2/3/5/8 |
| SIM card | Single SIM card | Single SIM card supports 2G/3G/VoLTE calls |
| Data | Data link | 4G: TDD LTE FDD LTE, VoLTE |
| | Wi-Fi | IEEE 802.11 a/b/g/n/ac |
| | Bluetooth | Bluetooth 4.1 |
| Interfaces | USB Interface | TYPE-C |
| | Headphone jack | 3.5mm Apple headphone jack (interface definition L-R-G-M) |
| | Charging port | TYPE-C |
| | Extended memory | TF card 256G |



## GLASSES-FREE 3D 10.75-INCH TABLET – SPECIFICATIONS

| Features | Sensor | G-sensor (3D) |
|---|---|---|
| | GPS | GPS navigation, A-GPS technology, GLONASS navigation, BeiDou navigation |
| | FM | Support |
| | OTG | Support |
| | Charging indicator | Charging indicator |
| | Speaker | Double K class BOX speakers |
| | Microphone | Support |
| | Hall | Compatible |
| | Gyro | Compatible |
| | Compass | Compatible |
| | Vibration | Support |
| Software platform | Android 8.0 | |
| Interface style | Google | |
| Language | Supports multi-language | |
| Input | Standard Android soft keyboard (support third-party handwriting input method/support external hard keyboard) | |
| Audio codecs supported | MP3, MP2, AMR, AWB, APE, M4A, MIDI, OGG, WAV, FLAC, 3GP (Need License: AAC, WMA) | |
| Video codecs supported | MPEG4-SP, H.264/AVC, H.263, 3GP, 3G2, MP4, MKV, AVI, WEBM | |

## List of Pre-installed Software

| Communication | Dialing, SMS, contacts |
|---|---|
| Internet | Email, Gmail, browser, Google Talk, Play Store, download content |
| Entertainment | Ultra-definition player, music, camera |
| Tools | Calendar, clock, recorder, calculator, settings, file manager, search, Flash Player |
| GMS applications (optional) | Google Search, Search by Voice, Gmail, Contact Sync, Calendar Sync, GTalk chat, Google Maps, Google Street View, YouTube, Google Play, Google+ social application service |

Specifications are preliminary and subject to change.



## GLASSES-FREE 3D VIDEO WALL – SPECIFICATIONS



## Features





150° Viewing Angle
Horizontal

| Screen size | 4.8m × 2.7m |
|---|---|
| Screen resolution | 3840(W) × 2160(H) |
| Content support | 2D, Glasses-Free 3D, Active 3D with glasses |
| Glasses-Free 3D support | Customized nine grid (9 points of view) or six grid (6 points of view) |
| Maximum glasses-free 3D viewing distance | ≥4 meters |
| Optional temperature control device | Internal temperature detection and automatic cooling/heating function for optimal performance |
| Display life | ≥ 100,000 hours |



## GLASSES-FREE 3D VIDEO WALL – SPECIFICATIONS

### Basic Parameters

| | |
|---|---|
| View angles | ≥150°Horizontal / ≥120°Vertical |
| Maximum brightness | ≥1500cd/㎡ |
| Luminance uniformity | ≥97% |
| Color uniformity | ±0.003 Cx, Cy |
| Contrast ratio | ≥5000:1 |
| Gray scale | 16bit |
| Chromatic aberration correction | Single point brightness correction<br>Single point color correction |
| Refresh rate | ≥3840 Hz |
| Frame changing frequency | 60 Hz |
| Quantity of video modules | 12(L) × 9(H) |
| Module size | 200mm × 150mm |
| Module resolution | W160 dot × H120 dot |
| Pixel composition | Each pixel has 3 LEDs (1 red, 1 green, 1 blue) |
| Pixel runaway point | ≤0.0001 |
| Pixel pitch | ≥1.25mm |
| Physical pixel density | ≥640000 dot/㎡ |
| LED requirements | SMD1010 gold wire copper bracket |
| Size of chassis | 400mm × 300mm |
| Material of chassis | magnesium alloy/die-cast aluminum standard chassis |
| Power | ≤300W/㎡ Operating / ≤900W/㎡ Maximum |
| Working voltage | 110-240 AC±10%   50-60Hz |
| Drive power | LED special drive power supply, with PFC function, super quiet, no fan |
| Drive mode | constant current drive |
| Control mode | synchronous control |
| Screen weight | ≤30kg/㎡ |
| Flatness | ≤0.2mm |
| Modular joint | ≤0.2mm |
| Average barrier-free time | ＞5000h |
| Working environment temperature and humidity | -10℃ -+ 45℃/ 10-90%RH |
| Storage temperature and humidity | 20℃ - +55℃/10- 90%RH |

### Optical Parameters

| | |
|---|---|
| Parallax barrier optics | • Made of ultra-white tempered whole glass with a thickness of ≥8mm<br>• Compatible with 9-grid glasses-free 3D video playback, and can also be compatible with 2D and 3D left-right video playback format<br>• Multi-view optical path design and achieves the purpose of separating the left and right eye signals through barrier isolation<br>• No moire pattern, picture is fine and uniform |
| Transmittance | The transmission part of the lens is ≥95%, and the transmittance of the isolation part is ≤0.1% |
| Reflection | Ultra-white glass surface lens fringe is matte black, to achieve the purpose of dispersing and matt diffuse reflection processing |



## GLASSES-FREE 3D VIDEO WALL – SPECIFICATIONS

| | |
|---|---|
| Brightness occlusion | not less than 1000CD per square meter after passing the lens |
| Lens horizontal height difference | ≤0.001mm, lens equal spacing error is ≤0.0001mm |
| Linear bending of the lens line | ≤0.01%, edge of the line is smooth without blur |
| Installation accuracy | Lens and light emitting panel parallel, parallelism error ≤0.1% |

## Server and Content Management

| | |
|---|---|
| Processor | Intel Core i7 or higher processor （14nm process, clocked at 3.G GHz, four cores and eight threads) |
| RAM | 16 GDDR4 （Up to 32G） 1250MHZ |
| Hard disk | 1T or more mechanical hard disk + SSD hard disk |
| Graphics card | Two high-speed graphics-level independent graphics cards above 4G (smooth playback of 8K resolution videos) |
| Operating system | Windows 10 |
| Display | Standard LCD display above 21.5 inches |
| Expand | Front power button audio interface USB3.0*2, the rear power supply connects to the Q audio interface USB3.0*2, HDMI*2, VGA*2 DP interface, nine-pin serial network cable interface |
| Control System | Includes all glasses-free 3D dedicated sending and receiving control cards, dedicated video controller, control cable, multi-function card, etc. Real-time playback and monitoring of glasses-free 3D content, remote switch on and off by software, temperature monitoring, smoke detection, automatic brightness adjustment and other functions. |
| 3D playback management platform | Glasses-free 3D universal player system:<br>• Plays pictures, animations and videos in standard Glasses-free 3D format with nine viewpoints (including five viewpoints or six viewpoints).<br>• Compatible with two-view format (left/right or top/bottom) content<br>• Playing flat pictures, animations, and video advertisements<br>• Multi-threading function so multiple players can be opened at the same time (the spare can be cut into the background without affecting the playback of the foreground player)<br>• Can customize the size of the video playback window for any window size, any stretch, any position, or full-screen playback.<br>• Can be placed on the top manually, one-key mute, etc.<br>• Equipped with a dongle device to realize real-time authorized playback monitoring.<br>• Automatically saves when the playlist changes. |
| Intelligent power distribution system (AC control) | Intelligent power distribution cabinet: including circuit breakers, relays, etc., with over-current, short-circuit, over-voltage, and under-voltage protection.<br>High-quality components; high-temperature resistant shell material, good flame retardancy; good wire performance, low temperature rise, and the sheath is made of flame-retardant plastic.<br>Good insulation performance, intelligent PLC control, no less than 20KW, multi-channel separate control, balanced load. |

Construction period: 70 days for China installation, 120 days for all others.

Specifications are preliminary and subject to change.

Contact@VTI-Global.com

3

Addendum C

STOCK PURCHASE AGREEMENT

Feb 10, 2021

VTI Stock Purchase Agreement 210210

## STOCK PURCHASEAGREEMENT

An agreement (this "**Agreement**"), dated as of February 10, 2021 (the "**Effective Date**") , by and betweenVisual Technology Innovations, Inc., a NevadaUSA Corporation(the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong(the "**Investor**"), with the Companyand the Investortogether referred to as the "**Parties**."

**WHEREAS**, the Company is anentity  formed pursuant to the laws of the State of Nevada USAas a Nevada corporation, and

**WHEREAS,**The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  aclass of common stock ("**Common Stock**") having a par value $0.00001 per share which is anticipated will be nullified and replaced on a one-for-one basis with shares of Class A Common Stock by an Amended and Restated Certificate of Incorporation which may soon be filed by the Company with the State of Nevada, such Class A Common Stock  is anticipated to be issued to Investor as a part of this Agreement; and

**WHEREAS**, it is anticipated that a new class of voting only (no economic rights) stock to be known as Class B Voting Stock would be issued to the Company's founder or his wholly-owned entity prior to the issuance of the Class A Common Stock to Investor, such Class B Voting Stock anticipated to have 10:1 voting rights, pursuant to that same Amended and Restated Certificate of Incorporation referenced above , and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor.

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

## TERMS

1)      Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Thirty Million US Dollars ($ 30,000,000) (the "**Purchase Price**") at a price per share of $1.40 per Share

2)      The Investor will deliver to the Company a satisfactory form of proof demonstrating the ready availability of the Purchase Price under the Investor's authority ("**Proof of Funds**").

3)      The Investorwillinvest one million US dollars (US $1,000,000) in the Shares immediately upon Execution. The funds would be made available in thirty (30) calendar days from Effective Date ("**Initial Closing**").

VTI Stock Purchase Agreement 210210

4) The Company will present to the Investor a selection of business opportunities ("**Presentation**") with the required amount to fund the opportunity ("**Amount**") at various times during the Term, which has to be closed within twenty (20) business days.The form of the Presentation is shown in **Exhibit A**.


5) The Initial Closing and each Presentationwill constitute a "**Closing**" and will be considered a part of the Purchase Price. Upon the absence of a Closing, the balance of the Purchase Price available to the Investor that is not yet invested will be reduced by the Amount. Each Closing may be together referred to as "**Closings**".

6) All Closings should be completed within the earlier of (i) eighteen (18) months from the Effective Date; or (ii) closing of an access to the public markets; or (iii) merger or acquisition when there is a change of control ("**Term**").

7) The Investor shall pay to the Company in immediately available funds a payment equal to the Amount in each Closing to the Company's bank account ("**Payment**"). The Company's bank wiring instructions are reflected at **Exhibit B**hereto.

8) In addition, the Company will issue to the Investor 987,839 Shares of the Company immediately on the Effective Date ("**Signing Bonus**").

9) The Investor will be issued an additional 1,141,230 Shares of the Company if there has not been any further Closings during the Term after the Initial Closing ("**Contingent Bonus**").

10) The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares will be the date of receipt of funds from each Closing in the designated bank account per Exhibit A.

11) Use of Proceeds. In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.


## REPRESENTATIONS AND WARRANTIES

12) Representations and Warranties of the Company. The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a. Organization. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b. Capitalization. The Company currently has one class of Common Stock. It is

VTI Stock Purchase Agreement 210210

contemplated in the future that the Company will have two classes of outstanding stock. Therewill be Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock will beas stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Nevada General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will befully paid and non-assessable. The fully diluted capitalization of the Company as of close of business January 25, 2020 comprises of 4,349,050 Shares; 5,275,100 warrants that are exercisable into Shares; and 3,500,000 stock options that are exercisable into Shares amounting to a fully diluted total of 13,124,150 Shares.

c.      Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing.  This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

d.      Valid Issuance of Shares.  The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

e.      Governmental or Other Consents and Filings.  Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

f.      Litigation.  There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

g.   Intellectual Property.  Except as set forth in the Disclosure Schedule:

i.      The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property")

VTI Stock Purchase Agreement 210210

in all material respects necessary for its business as currently conducted.

      ii.     The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

      iii.     The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

      iv.     All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

      h.     Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

      i.     The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investoracknowledged that it has made its investment based solely on its own due diligence.

      j.     No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

13)    Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

      a.     Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding



VTI Stock Purchase Agreement 210210

obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

b.     Purchase Entirely for Own Account.  Investor confirms that the Sharesare being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

c.     Securities Laws.  The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares.  The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction.  The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons.  The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

d.     Disqualification.  Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

e.     Acknowledgment.  Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement.  The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence. Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto.  Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its

VTI Stock Purchase Agreement 210210

own independent investigation and verification

## MISCELLANEOUS

14)    Miscellaneous.

a.    <u>Successors and Assigns</u>.    This Agreement may not be assigned by the Investorwithout the express written consent of the Parties.  The provisions hereof shall inure to the benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

b.    <u>Expenses</u>.  Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

c.    <u>Confidentiality</u>.  Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

d.    <u>Placement Agents</u>.  Such placement agents as the Company may disclose to the Investor.  Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

e.    <u>Governing Law</u>.  This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of NevadaUSA without giving effect to any choice or conflict of law provision or rule (whether of the State of NevadaUSA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

f.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

g.    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

h.    <u>Notices</u>.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to

Docusign Envelope ID: 5AEA536D-4954-4C2C-8ACF-B9E02A83411C

VTI Stock Purchase Agreement 210210

the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

      i.    <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

      j.    <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

      k.    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

      l.    <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

      m.    <u>Dispute Resolution; Waiver of Jury Trial</u>.  The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR



VTI Stock Purchase Agreement 210210

THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n.    Publicity.  The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i)  Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii)  Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii)  Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state

VTI Stock Purchase Agreement 210210

performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A)  At the time of such sale, bars the person from:

(1)  Association with an entity regulated by such commission, authority, agency, or officer;

(2)  Engaging in the business of securities, insurance or banking; or

(3)  Engaging in savings association or credit union activities; or

(B)  Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv)  Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A)  Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B)  Places limitations on the activities, functions or operations of such person; or

(C)  Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v)  Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A)  Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B)  Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi)  Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii)  Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

VTI Stock Purchase Agreement 210210

(viii)  Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

VTI Stock Purchase Agreement 210210

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |
| Litigation | The Company does not believe at this time that any claims are material to the Company's business or ongoing operations. |
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

Page 11 of 20

VTI Stock Purchase Agreement 210210

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

Page 12 of 20



VTI Stock Purchase Agreement 210210

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or thesharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**



VTI Stock Purchase Agreement 210210

## Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

VTI Stock Purchase Agreement 210210

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _____

Name:    Mathu Rajan
Title:     President
Address: 1105 William Penn Dr
          Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia Limited

By: _____

Name:    Timothy McCarthy
Title:     CEO
Address: Old St. James's Vicarage,
          Maxwell Road,
          London SW6 2HR, UK

VTI Stock Purchase Agreement 210210

## ACCREDITED INVESTOR CERTIFICATION

### For Individual Investors Only
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

Initial _____     I certify that I have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

Initial _____     I certify that I have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

### For Non-Individual Investors
**(all Non-Individual Investors must *INITIAL* where appropriate):**

Initial _____     The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

Initial _____     The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

Initial _____     The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

Initial _____     The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

Initial _____     The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

Initial _____     The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

Initial _____     The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

Initial _____     The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

Initial _____     The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Initial _____     The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

Initial _____     The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1]For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.



VTI Stock Purchase Agreement 210210

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth:_____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth:_____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:
_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Stock Purchase Agreement 210210

## **Section B – Entity Investor Information**

Investor Name(s): <u>Burlington Resources Asia Limited</u>

Authorized Individual executing Profile or Trustee: <u>Timothy McCarthy</u>

Social Security Numbers / Federal I.D. Number: _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust) _____

Type of Business: <u>Investment Holding Company</u>

Street Address: <u>20<sup>th</sup>Floor, 88 Gloucester Road, Wanchai, Hong Kong</u>

City, State & Zip Code: _____

Phone: _____+44 7768943655    Fax: _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / <u>Outside</u> Broker/Dealer: <u>Knight-Davis Associates LLP</u>

VTI Stock Purchase Agreement 210210

## EXHIBIT A

Form of Presentation

1. Presentation of the opportunity
2. Cost of the opportunity
3. Subscription agreement for Shares with date of wire

## EXHIBIT B

### Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br><br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br><br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |

### Bank Wire Instructions for Payment to Company

| | |
|---|---|
| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: 8571165235<br>Routing/ABA Number:121000248 |

VTI Stock Purchase Agreement 210210

| International Wire | Account: 8571165235 |
| | SWIFT: WFBIUS6S |

## CERTIFICATE OF SERVICE

I, Raja Rajan, hereby certify that on November 25, 2024, a true and correct copy of the foregoing was served via email to counsel listed below:


Michael D. Homans
ID No. 76624
HOMANSPECK,
LLC
mhomans@homanspeck.com


Michael P. Kohler*
MILLER & MARTIN
PLLC
Michael.Kohler@millermartin.com


*Attorneys for Plaintiff Mark L. Bunce*


Timothy McCarthy

tim@burlingtonresources-asia.com


*Third-Party Defendant*


/s/ Raja Rajan                                                    November 25, 2024
Raja Rajan,
Esquire Attorney
I.D. 58849
2009 Chestnut Street
Philadelphia, PA 19103
215-550-1002

raja@rajanlawgroup.com

*For Defendants Visual Technology Innovations, Inc. and Mathu Rajan*

- 1 -