# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK L. BUNCE** | : | |
| | : | |
| v. | : | No. 2:23-cv-01740-KNS |
| | : | |
| **VISUAL TECHNOLOGY**, | : | |
| **INNOVATIONS INC.**, *et al* | : | |

**DEFENDANTS, VISUAL TECHNOLOGY INNOVATIONS, INC. AND MATHU G. RAJAN'S *PROPOSED* RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants, Visual Technology Innovations, Inc. ("VTI") and Mathu G. Rajan ("Mr. Rajan"), by and through their undersigned counsel, hereby provide this *Proposed* Response to Plaintiff, Mark L. Bunce's ("Mr. Bunce") Statement of Material Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ"), as follows[1]:

1.      Admitted.

2.      Admitted.

By way of further response, attached hereto as Exhibit 4 is an authentic copy of the Note Agreement, dated February 24, 2021, regarding Convertible Note # VN21017-00, executed by Mr. Bunce on his own behalf and by Mr. Rajan on behalf of VTI. *See* Exhibit 4.

3.      Admitted.

4.      Admitted.

5.      Admitted.

---

[1]      Attached hereto is a verification, executed by Mr. Rajan subject to the penalties of 18 Pa.C.S. § 4904, that the factual averments and denials set forth herein are true and correct to the best of his knowledge, information and belief. Mr. Rajan also authenticated all documents attached herein.

By way of further response, attached hereto as Exhibit 5 is an authentic copy of the Amendment and Convertible Note Agreement, both dated March 7, 2021, executed by Mr. Bunce on his own behalf and by Mr. Rajan on behalf of VTI. *See* Exhibit 5.

6.  Admitted.

7.  Admitted.

8.  Admitted.

9.  Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. Admitted.

14. Admitted.

15. Admitted.

However, by way of further response, VTI has made six (6) partial repayments, totaling $30,000, to Mr. Bunce since the date of Mr. Bunce's declarations filed in support of his Motion for Partial Summary Judgment. *See* Exhibit 2.

16. Admitted.

However, by way of further response, attached hereto as Exhibit 1 is an authentic copy of the State of Nevada's web page for VTI, showing that VTI is currently active. *See* Exhibit 1.  A Certificate of Existence with Status of Good Standing issued by the State of Nevada is also attached hereto as Exhibit 3. *See* Exhibit 3.

17. Admitted in part, denied in part. It is admitted that VTI was created under the laws of the State of Nevada. It is denied that VTI's entity status is "revoked." *See* Exhibit A, Exhibit 1.

By way of further response, attached hereto as Exhibit 1 is an authentic copy of the State of Nevada's web page for VTI, showing that VTI is currently active. *See* Exhibit 1.  A Certificate of Existence with Status of Good Standing issued by the State of Nevada is also attached hereto as Exhibit 3. *See* Exhibit 3.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Denied. VTI's Directors engaged in substantial oversight of the management of VTI's operations. *See e.g. generally* Exhibit 6.

24.     Denied. As of the date of the cited document, i.e. January 22, 2024 – three years *after* the relevant time period, VTI had no employees. However, as detailed in the Declaration of Charles M. Robertson – who served as the Executive Vice President of VTI from January 2021 through December 2021 – the following individuals served on the VTI management team during the relevant time period: Mathu Rajan, Tracey Rees, Cliff Morton, and Charles M. Robertson. *See* Exhibit 6, ¶ 6. Moreover, VTI employed additional staff, including Grazina Seskeviciute, Sara Brewer, Ziggy Papartis, Matt JJ Lo, Lizzy Zhou, Misa Itaya, A.J. Yeh, Mike George, Daniel J. Rink, Esq., Suby Joseph, Amanda Von Ahnen, and Nicole Maneen. *Id.* at ¶¶ 7, 9-11. There were an additional twenty employees employed through ST4M in Beijing, China working for the benefit of VTI. *Id.* at ¶ 8.

25.     Admitted, as of the date of the cited document, i.e. January 22, 2024.

26.     Admitted, as of the date of the cited document, i.e. January 22, 2024.

By way of further response, VTI had substantial market opportunities in 2021. *See* Exhibit 6, ¶¶ 12-19.

Moreover, VTI had obtained a commitment from Timothy McCarthy ("Mr. McCarthy"), an individual residing in the United Kingdom, through his company, Burlington Resources Asia Limited ("Burlington"), on February 10, 2021, to invest up to $30,000,000 in VTI, with a minimum of $1,000,000 (the "Burlington Commitment"). *See* Exhibits 7 & 8. The Burlington Commitment consisted of an initial Term Sheet and a subsequent Stock Purchase Agreement, both dated February 10, 2021. True and correct copies of the Burlington Commitment Term Sheet and the Burlington Commitment Stock Purchase Agreement are attached hereto as Exhibits 7 & 8, respectively. The Burlington Commitment stated that (a) the investment was to be a purchase of VTI common stock with no right of repayment, and (b) VTI would receive the investment funds thirty (30) days later. *Id.*

Only after Mr. McCarthy signed the Burlington Commitment did he inform VTI and Mr. Rajan that Burlington would not provide the promised $30,000,000 in investment funds until VTI secured a "seed" investor providing a pre-requisite investment of at least $1,000,000. This demand by Mr. McCarthy resulted in expanded capital raising activities by VTI and identification of Bunce as a potential investor.

Like Mr. McCarthy, Mr. Bunce demanded a contingency of his own before making any investment into VTI. Mr. Bunce required that Mr. Rajan, as director and CEO of Stream TV Networks, Inc. ("Stream"), file a Chapter 11 petition for Stream to commence bankruptcy proceedings. Mr. Rajan caused Stream to file for bankruptcy on February 24, 2021, and Mr. Bunce wired first funds to VTI the following day.

Convertible Note #VN21017-00 issued by VTI to Bunce on February 25, 2021 specifically contemplated the Chapter 11 Bankruptcy filing of Stream and used the date of such filing to partially define the deadline by which Mr. Bunce would have the right to convert the debt to shares of VTI:

> Voluntary Conversion. The Holder may convert the Total Value of the Note at any time before Conversion Expiry, defined as the (i) five (5) working days *after the Company informing the Holder that Stream TV Networks, Inc. has successfully filed for Chapter 11 protection with the US Bankruptcy Court* (with such written proof as requested)

*See* Plaintiff's MSJ, Exhibit B, at ¶ 3 (emphasis added). Neither the Note Agreement nor the Note itself required VTI to repay the Bunce loan if Mr. McCarthy failed to fulfill the Burlington Commitment. Plaintiff's MSJ, Exhibit B, at ¶ 1; *see also* Exhibit 4. In fact, the "Maturity Date" of Convertible Note #VN21017-00 was explicitly defined as fifteen (15) days after Stream's Chapter 11 bankruptcy filing *and ten (10) days after VTI received the first $1 million promised under the Burlington Commitment*. *See* Plaintiff's MSJ, Exhibit B, at ¶ 1. Until VTI received initial funds from Mr. McCarthy and Burlington, Convertible Note #VN21017-00 would not mature, and repayment would not be due. *Id.*

Defendants VTI and Mr. Rajan had every reasonable expectation that Burlington would honor its investment commitment to VTI and fund VTI's business plan. *See e.g.* Exhibits 9 (an executed RWA Commitment Letter), 10 (an executed Exercise of Drawdown Rights), 11 (an executed Deposit Agreement), and Exhibit 12 (the McCarthy Declaration).

Mr. Bunce was fully aware of the Burlington Commitment. In Convertible Note #VN21019-00, Mr. Bunce gave VTI the right to convert the debt to equity upon confirmation that VTI had received 50% or more of the investment funds promised under the Burlington Commitment. *See* Plaintiff's MSJ, Exhibit E, at ¶ 3.

5

On May 6, 2021, Mr. McCarthy executed an Amended Stock Purchase Agreement (the "Burlington Amendment") which confirmed the commitment of Burlington to invest $180,000,000 in VTI and increased its option to invest up to $300,000,000 in total. A true and correct copy of the Burlington Amendment is attached hereto as Exhibit 13. On May 10, 2021, Mr. McCarthy executed another Amended Stock Purchase Agreement ("Burlington Amendment 2") in which the option to invest was increased to $500,000,000 in total. A true and correct copy of Burlington Amendment 2 is attached hereto as Exhibit 14.

That same day, on May 10, 2021, Mr. McCarthy testified under penalty of perjury in Bankruptcy Court, confirming both the commitment and the wherewithal of Burlington to make its significant investment in VTI. A true and correct copy of the 5/10/21 Hearing Transcript is attached hereto as Exhibit 15. Mr. McCarthy testified:

> *This is a commitment as far as I'm concerned*. I'm doing this investment. And I don't know if you're aware of it, I've actually increased the amount that I'm investing to 500 [million] and *that is an absolute firm commitment*.[2]
>
> [VTI Counsel]: Is Burlington Resources committed to funding its investment in VTI and Stream?
> [McCarthy]: *Absolutely*
> [VTI Counsel]: Do you consider that a personal conviction?
> [McCarthy]: *I consider that a corporate commitment*.
> [VTI Counsel]: Do you consider that a legal commitment?
> [McCarthy]: *Correct.*
> [VTI Counsel]: So you would consider your -- Burlington Resources legally bound to make the funding that's been discussed here today?
> [McCarthy]: *I do.[3]*
>
> [VTI Counsel]: What are the amount of assets under management for Burlington Resources?
> [McCarthy]: *Billion*.
> [VTI Counsel]: I'm sorry, what?
> [McCarthy]: *One billion*.

---

[2] 5/10/21 Hearing Transcript at 154:1-4, emphasis added
[3] 5/10/21 Hearing Transcript at 184:14-23, emphasis added

[VTI Counsel]: One billion. And who controls those assets?
[McCarthy]: *I do*.[4]

[Stream Counsel]: [W]ith regard to the size of the transaction with VTI, you were describing it [in your deposition] on Friday as small. Is that correct?
[McCarthy]: *Correct*.
[Stream Counsel]: And why do you say that?
[McCarthy]: *Because historically, I've done bigger transactions, and also, the fact that I see it as small relative to its potential valuation*.
[Stream Counsel]: And does Burlington use its own money to make these investments?
[McCarthy]: *It uses money that it controls, its money and others'*.
[Stream Counsel]: Okay. And was it your testimony [in your deposition] on Friday that it uses approximately 70 percent of its own money?
[McCarthy]: *Correct.*
[Stream Counsel]: Okay. Now, just to clarify, your testimony [in your deposition] on Friday was that the funding of the $180 million is not contingent or conditional. Is that correct?
[McCarthy]: *Correct.*[5]

[The Court]: I think you made it very clear that you're excited about this venture and that you're committed. That was abundantly made clear to me. But so far it appears you've made a $500 [million] commitment, correct?
[McCarthy]: *Correct.*

[The Court]: Okay. And was I correct in hearing that you said that the funds will be transferred this month?
[McCarthy]: *The agreement anticipates tranche payments, and the first payment is 60 million and that will be made this month*.
[The Court]: Okay. And then walk me through how the next tranches are going to be made.
[McCarthy]: *So basically, on a monthly basis thereafter there will be four tranches of 110 million.*
[The Court]: And so that's on a monthly basis.
[McCarthy]: *Correct.*[6]

[The Court]: So even if the Ultra-Do assets aren't made available to VTI in some form or capacity, you're prepared to fund 500 million to VTI?
[McCarthy]: *Yes. I mean, I'd be very disappointed, however, if the Ultra-D wasn't available, as well. I have to tell you. But that is correct.*

---

[4] 5/10/21 Hearing Transcript at 188:18-24, emphasis added
[5] 5/10/21 Hearing Transcript at 189:1-17, emphasis added
[6] 5/10/21 Hearing Transcript at 195:3-18, emphasis added

[The Court]: Okay. And your commitment is to VTI, correct, not Stream, necessarily?

[McCarthy]: ***It is to VTI, although patently I see Stream as part of VTI's greater plan at maximum achievement***…[7]

VTI incurred damages from Mr. McCarthy's breach of contract and failure to provide funding necessary for VTI to implement its business plan. VTI has commenced litigation against Mr. McCarthy and Burlington in the U.S. District Court for the District of Nevada (Case No. 2:24-cv-00728-ART-EJY). A true and correct copy of the original complaint against Mr. McCarthy and Burlington is attached hereto as Exhibit 16.

27.    Denied. VTI engaged Non-Party, Suby Joseph to provide an in-house accounting for VTI.

28.    It is admitted that Defendants did not list "BOE" as a company that VTI "has entered into a contract that involved the actual payment of consideration". It is further admitted that Defendants objected to Plaintiff's Interrogatory No. 10 as "vague and unclear…". *See* Plaintiff's MSJ, Exhibit K, Page 3.

By way of further response, Defendants incorporate their Response to Paragraph 26 hereof as if set forth herein.

29.    Admitted.

30.    Admitted.

31.    Admitted.

32.    Admitted.

33.    Admitted.

34.    Admitted.

By way of further response, each Note Agreement executed between Mr. Bunce and VTI contained an explicit acknowledgment, under the header "Use of Proceeds," that the funds

---

[7]    5/10/21 Hearing Transcript at 196:21-197:5, emphasis added

provided by Mr. Bunce could be used by VTI "for any lawful general business purpose." *See* Exhibit 4 (Page 2), Exhibit 5 (Page 3), and Plaintiff's MSJ, Exhibit H (Page 2). VTI used a portion of the proceeds for its stated purpose of supporting Stream's bankruptcy while seeking Bankruptcy Court approval of a plan of reorganization that would have made VTI the sole shareholder of Stream and the ultimate owner of Stream's assets.

35.    Admitted.

36.    Admitted.

37.    Admitted.

38.    Admitted in part, denied in part. It is admitted that Glen R. Davis ("Mr. Davis") communicated with Mr. Bunce concerning VTI. It is specifically denied that Mr. Davis communicated that VTI was raising money "to purchase Stream TV Network, Inc.'s patents and other assets." At all material times, Mr. Bunce was informed that VTI was raising funds to support Stream's bankruptcy while VTI sought Bankruptcy Court approval of a plan of reorganization for Stream that would have made VTI the sole shareholder of Stream and the ultimate owner of Stream's assets.

39.    Admitted.

40.    Admitted.

41.    Denied. As the document attached to Plaintiff's Motion for Summary Judgment as Exhibit P is a document that speaks for itself, Plaintiff's piecemeal characterizations thereof are denied. *See* Exhibit 6.

By way of further response, pursuant to the *three* Note Agreements executed by Mr. Bunce in advance of the execution of the corresponding Notes, Mr. Bunce "acknowledged that neither the Company nor any other person acting on behalf of the Company has made any

representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6). In fact, Mr. Bunce agreed that he had "conducted to [his] satisfaction an independent investigation and verification… [and] relied on the results of [his] own independent investigation and verification." *Id.* As such, anything Mr. Bunce "learned" was the result of his "own independent investigation and verification" and not upon "any representation or warranty, express or implied" of Defendants.

Moreover, Defendants incorporate their Response to Paragraph 26 hereof as if set forth herein.

42.    Admitted.

43.    Admitted.

44.    Admitted.

By way of further response, pursuant to the three Note Agreements executed by Mr. Bunce in advance of the execution of the corresponding Notes, Mr. Bunce "acknowledged that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6). In fact, Mr. Bunce agreed that he had "conducted to [his] satisfaction an independent investigation and verification… [and] relied on the results of [his] own independent investigation and verification." *Id.* As such, anything Mr. Bunce "learned" was the result of his "own

independent investigation and verification" and not upon "any representation or warranty, express or implied" of Defendants.

45.     Denied. Mr. Bunce "conducted to [his] satisfaction an independent investigation and verification… [and] relied on the results of [his] own independent investigation and verification." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6).

46.     Denied. At all material times, the purpose of obtaining the funds from Mr. Bunce was for VTI to use a portion of the proceeds to support Stream's bankruptcy while VTI sought Bankruptcy Court approval of a plan of reorganization for Stream that would have made VTI the sole shareholder of Stream and the ultimate owner of Stream's assets.

47.     Denied. Any information that Mr. Bunce relied upon was "the results of [his] own independent investigation and verification." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6). Pursuant to the three Note Agreements executed by Mr. Bunce in advance of the execution of the corresponding Notes, Mr. Bunce "acknowledged that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6).

Moreover, each Note Agreement contained an explicit acknowledgment, under the header "Use of Proceeds," that the funds provided by Mr. Bunce could be used by VTI "for any lawful general business purpose." *See* Exhibit 4 (Page 2), Exhibit 5 (Page 3), and Plaintiff's MSJ, Exhibit H (Page 2). At all material times, the purpose of obtaining the funds from Mr. Bunce was for VTI to use a portion of the proceeds to support Stream's bankruptcy while VTI sought

Bankruptcy Court approval of a plan of reorganization for Stream that would have made VTI the sole shareholder of Stream and the ultimate owner of Stream's assets.

48.    Denied. Any information that Mr. Bunce relied upon was "the results of [his] own independent investigation and verification." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6). Pursuant to the three Note Agreements executed by Mr. Bunce in advance of the execution of the corresponding Notes, Mr. Bunce "acknowledged that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6).

Moreover, each Note Agreement contained an explicit acknowledgment, under the header "Use of Proceeds," that the funds provided by Mr. Bunce could be used by VTI "for any lawful general business purpose." *See* Exhibit 4 (Page 2), Exhibit 5 (Page 3), and Plaintiff's MSJ, Exhibit H (Page 2). At all material times, the purpose of obtaining the funds from Mr. Bunce was for VTI to use a portion of the proceeds to support Stream 's bankruptcy while VTI sought Bankruptcy Court approval of a plan of reorganization for Stream that would have made VTI the sole shareholder of Stream and the ultimate owner of Stream's assets.

49.    Denied. Any information that Mr. Bunce relied upon was "the results of [his] own independent investigation and verification." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6). Pursuant to the three Note Agreements executed by Mr. Bunce in advance of the execution of the corresponding Notes, Mr. Bunce "acknowledged that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any

information regarding the Company, except as expressly set forth in Section 2 of this

Agreement." *See* Exhibit 4 (Page 5), Exhibit 5 (Page 6), and Plaintiff's MSJ, Exhibit H (Page 6).

Moreover, each Note Agreement contained an explicit acknowledgment, under the header

"Use of Proceeds," that the funds provided by Mr. Bunce could be used by VTI "for any lawful

general business purpose." *See* Exhibit 4 (Page 2), Exhibit 5 (Page 3), and Plaintiff's MSJ,

Exhibit H (Page 2). At all material times, the purpose of obtaining the funds from Mr. Bunce was

for VTI to use a portion of the proceeds to support Stream's bankruptcy while VTI sought

Bankruptcy Court approval of a plan of reorganization for Stream that would have made VTI the

sole shareholder of Stream. and the ultimate owner of Stream's assets.


Respectfully submitted,

**WEISBERG LAW**
 */s/ Matthew B. Weisberg*
Matthew B. Weisberg, Esq.
Attorney Id. No. 85570
L. Anthony DiJiacomo, III, Esq.
Attorney Id. No. 321356
7 S. Morton Avenue
Morton, PA 19070
(610) 690-0801 – Office
(610) 690-0880 – Fax
mweisberg@weisberglawoffices.com
*Counsel for Defendants, Visual Technology*
*Innovations, Inc. and Mathu Rajan*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK L. BUNCE** | : | |
| | : | |
| v. | : | No. 2:23-cv-01740-KNS |
| | : | |
| **VISUAL TECHNOLOGY**, | : | |
| **INNOVATIONS INC.**, *et al* | : | |

## VERIFICATION

I, Mathu G. Rajan, hereby verify that the factual averments and denials set forth in the foregoing *Proposed* Response to Plaintiff's Statement of Material Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment are true and correct to the best of my knowledge, information and belief. I make the foregoing unsworn statement subject to the penalties of 18 Pa.C.S. § 4904.

I, Mathu G. Rajan, further verify that the documents attached to the foregoing *Proposed* Response to Plaintiff's Statement of Material Undisputed Facts in Support of Plaintiff's Motion for Summary Judgment as Exhibits 1-16 are authentic copies of the documents.

_____        August 20, 2025_____
Mathu G. Rajan                                    Date

# EXHIBIT 1


(https://www.nvsilverflume.gov/home)

Logout (/Account/Logout)

## BusinessInformation

### Entity Information

☰

# Menu

My Dashboard (/OnlineDashboard/Index)

Trust Accounts (/OnlineTrustAccount/TrustAccoun

Entity Search ✎

○ Entity Search (/EntitySearch/OnlineEntitySearch)

Annual Renewals ⌄

Business Formations ⌄

Amendments ⌄

Miscellaneous ⌄

Reinstatements and Revivals ⌄

Cancellations Dissolutions Terminations ⌄

Copies, Certificates, and Apostilles ⌄

Name Reservations ⌄

Mergers, Exchanges, and Conversions ⌄

Other SOS Filing Types ⌄

### Entity Information

**Entity Name:**

VISUAL TECHNOLOGY INNOVATIONS, INC.

**Entity Number:**

E11483612021-8

**Entity Type:**

Domestic Corporation (78)

**Entity Status:**

Active

**Formation Date:**

01/06/2021

**NV Business ID:**

NV20211985058

**Termination Date:**

**Annual Report Due Date:**

1/31/2026

**Compliance Hold:**

### Registered AGENT INFORMATION

**SilverFlume**
NEVADA'S BUSINESS PORTAL
(https://www.nvsilverflume.gov/home)

Logout (/Account/Logout)

≡

# Menu

My Dashboard (/OnlineDashboard/Index)

Trust Accounts (/OnlineTrustAccount/TrustAccoun

Entity Search ✎

○ Entity Search (/EntitySearch/OnlineEntitySearch)

Annual Renewals ⌄

Business Formations ⌄

Amendments ⌄

Miscellaneous ⌄

Reinstatements and Revivals ⌄

Cancellations Dissolutions Terminations ⌄

Copies, Certificates, and Apostilles ⌄

Name Reservations ⌄

Mergers, Exchanges, and Conversions ⌄

Other SOS Filing Types ⌄

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

NV20131735999

**Office or Position:**

Manager

**Jurisdiction:**

**Street Address:**

732 S 6TH ST, STE R, Las Vegas, NV,
89101, USA

**Mailing Address:**

---

**OFFICER INFORMATION**

☐ **View Historical Data**

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| President | Mathu G. Rajan | 1105 William Penn Dr, Bensalem, PA, 19020, USA | 01/06/2021 | Active |


(https://www.nvsilverflume.gov/home)

Logout (/Account/Logout)    ⋮

☰

# Menu

My Dashboard (/OnlineDashboard/Index)

Trust Accounts (/OnlineTrustAccount/TrustAccoun

Entity Search    ✓

○ Entity Search (/EntitySearch/OnlineEntitySearch)

Annual Renewals    ⌄

Business Formations    ⌄

Amendments    ⌄

Miscellaneous    ⌄

Reinstatements and Revivals    ⌄

Cancellations Dissolutions Terminations    ⌄

Copies, Certificates, and Apostilles    ⌄

Name Reservations    ⌄

Mergers, Exchanges, and Conversions    ⌄

Other SOS Filing Types    ⌄

|  |  |  |  |  |
|---|---|---|---|---|
|  | G.<br>Rajan | William<br>Penn Dr,<br>Bensalem,<br>PA,<br>19020,<br>USA |  |  |
| Treasurer | Mathu<br>G.<br>Rajan | 1105<br>William<br>Penn Dr,<br>Bensalem,<br>PA,<br>19020,<br>USA | 01/06/2021 | Active |
| Director | Mathu<br>G.<br>Rajan | 1105<br>William<br>Penn Dr,<br>Bensalem,<br>PA,<br>19020,<br>USA | 01/06/2021 | Active |

**Page 1 of 1, records 1 to 4 of 4**

**CURRENT SHARES**

| Class/Series | Type | Share<br>Number | Value |
|---|---|---|---|
|  | Common | 400,000,000 | 0.00001 |

**Page 1 of 1, records 1 to 1 of 1**

Number of No Par Value Shares:

**0**

Total Authorized Capital:

**400,000**


(https://www.nvsilverflume.gov/home)

Logout (/Account/Logout)

Return to Search    Return to Results

## Menu

My Dashboard (/OnlineDashboard/Index)

Trust Accounts (/OnlineTrustAccount/TrustAccou...

Entity Search ✎

○ Entity Search (/EntitySearch/OnlineEntitySearch)

Annual Renewals ˅

Business Formations ˅

Amendments ˅

Miscellaneous ˅

Reinstatements and Revivals ˅

Cancellations Dissolutions Terminations ˅

Copies, Certificates, and Apostilles ˅

Name Reservations ˅

Mergers, Exchanges, and Conversions ˅

Other SOS Filing Types ˅

**EXHIBIT 2**

# Payment Transaction Report
## VISUAL TECHNOLOGY INNOVATIONS, INC



## Wire Transfer Transactions

| Transaction Number | Template Name | Transaction Date | Debit Account | Beneficiary Bank ID | Beneficiary Name | Status | Amount |
|---|---|---|---|---|---|---|---|
| DWR-01760618 | Mark Bunce | 07/16/2025 | *7062 (VISUAL TECHNOLOGY INNOVATIONS, INC (12228T7251) | | | | |
| | **Originator Name** Mark Bunce **Beneficiary Bank Name** Santander Inernational **Correspondent Bank ID** **Created Date** 07/16/2025 | | | VISUAL TECHNOLOGY INNOVATIONS, INC) - bofi | | | |
| | | | | ANILJESH | M L Bunce | Completed | $5,000.00 |
| DWR-01758952 | Mark Bunce | 07/15/2025 | *7062 (VISUAL TECHNOLOGY INNOVATIONS, INC (12228T7251) | | | | |
| | **Originator Name** Mark Bunce **Beneficiary Bank Name** Santander Inernational **Correspondent Bank ID** **Created Date** 07/15/2025 | | | VISUAL TECHNOLOGY INNOVATIONS, INC) - bofi | | | |
| | | | | ANILJESH | M L Bunce | Completed | $5,000.00 |
| DWR-01755248 | Mark Bunce | 07/11/2025 | *7062 (VISUAL TECHNOLOGY INNOVATIONS, INC (12228T7251) | | | | |
| | **Originator Name** Mark Bunce **Beneficiary Bank Name** Santander Inernational **Correspondent Bank ID** **Created Date** 07/14/2025 | | | VISUAL TECHNOLOGY INNOVATIONS, INC) - bofi | | | |
| | | | | ANILJESH | M L Bunce | Completed | $5,000.00 |
| DWR-01757174 | Mark Bunce | 07/14/2025 | *7062 (VISUAL TECHNOLOGY INNOVATIONS, INC (12228T7251) | | | | |
| | **Originator Name** Mark Bunce **Beneficiary Bank Name** Santander Inernational **Correspondent Bank ID** **Created Date** 07/14/2025 | | | VISUAL TECHNOLOGY INNOVATIONS, INC) - bofi | | | |
| | | | | ANILJESH | M L Bunce | Completed | $5,000.00 |
| DWR-01753062 | Mark Bunce | 07/10/2025 | *7062 (VISUAL TECHNOLOGY INNOVATIONS, INC (12228T7251) | | | | |
| | **Originator Name** Mark Bunce **Beneficiary Bank Name** Santander Inernational **Correspondent Bank ID** **Created Date** 07/11/2025 | | | VISUAL TECHNOLOGY INNOVATIONS, INC) - bofi | | | |
| | | | | ANILJESH | M L Bunce | Completed | $5,000.00 |
| DWR-01751730 | Mark Bunce | 07/09/2025 | *7062 (VISUAL TECHNOLOGY INNOVATIONS, INC) (12228T7251) | ANILJESH | M L Bunce | Completed | $5,000.00 |



Payment Transaction Report - VISUAL TECHNOLOGY INNOVATIONS, INC

| Transaction Number | Template Name | Transaction Date | Debit Account | Beneficiary Bank ID | Beneficiary Name | Status | Amount |
|---|---|---|---|---|---|---|---|
| | Originator Name | | VISUAL TECHNOLOGY INNOVATIONS, INC | | | | |
| | Beneficiary Bank Name | | Santander Inernational | | | | |
| | Correspondent Bank ID | | | | | | |
| | Created Date | 07/09/2025 | | | | | |

# EXHIBIT 3





# CERTIFICATE OF EXISTENCE
# WITH STATUS IN GOOD STANDING

I, FRANCISCO V. AGUILAR, the duly qualified and elected Nevada Secretary of State, do hereby certify that I am, by the laws of said State, the custodian of the records relating to filings by corporations, non-profit corporations, corporations sole, limited-liability companies, limited partnerships, limited-liability partnerships and business trusts pursuant to Title 7 of the Nevada Revised Statutes which are either presently in a status of good standing or were in good standing for a time period subsequent of 1976 and am the proper officer to execute this certificate

I further certify that the records of the Nevada Secretary of State, at the date of this certificate, evidence **Visual Technology Innovations, Inc.** as a DOMESTIC CORPORATION (78) duly organized or formed and existing, or duly qualified or registered, as applicable, under and by virtue of the laws of the State of Nevada since 01/06/2021, and in good standing in this State.

I further certify that the above DOMESTIC CORPORATION (78) has its formation or qualification document and no amendments on file in this office as of the date of this certificate.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of this State, at my office on 03/28/2025.

FRANCISCO V. AGUILAR
Secretary of State

Certificate Number: B202503285572791
You may verify this certificate
online at https://www.nvsilverflume.gov/home

# EXHIBIT 4

VTI Convertible Note Agreement 210224

## CONVERTIBLE NOTE AGREEMENT

An agreement (this "**Agreement**"), dated as of Feb 24, 2021 (the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada Corporation (the "**Company**") and Mark Leonard Bunce, with an address at Les Preaux, La Route de Sausmarez, St Martin, Guernsey GY4 6SF  (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

WHEREAS, the Company is an entity  formed pursuant to the laws of the State of Nevada USA as a Nevada corporation, and

**WHEREAS,** The Company desires to issue and sell to the Investor a convertible note issued by the Company (the "**Note**");

**WHEREAS**, the Investor  desires to purchase the Note on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  a class of common stock ("**Common Stock**") having a par value $0.00001 per share which is anticipated will be nullified and replaced on a one-for-one basis with shares of Class A Common Stock by an Amended and Restated Certificate of Incorporation which may soon be filed by the Company with the Stae of Nevada, such Class A Common Stock  is anticipated to be issued to Investor as a part of this Agreement; and

**WHEREAS**, it is anticipated that a new class of voting only (no economic rights) stock to be known as Class B Voting Stock would be issued to the Company's founder or his wholly-owned entity prior to the issuance of the Class A Common Stock to Investor, such Class B Voting Stock anticipated to have 10:1 voting rights, pursuant to that same Amended and Restated Certificate of Incorporation, and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor.

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

TERMS

1)      Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Note for the purchase price of USD $150,000 (the "**Purchase Price**").

2)      The Investor shall pay to the Company in immediately available funds a payment equal to the Purchase Price to the Company's bank account. The Company's bank wiring instructions are reflected at **Exhibit A** hereto.

3)      The purchase and sale of the Note shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof (the "Closing").  The Note shall be in



VTI Convertible Note Agreement 210224

the form as attached at **Exhibit B** hereto. The issue date of the Note will be the date of receipt of Purchase Price in the designated bank account per Exhibit A.

4)      Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general business purpose.

## REPRESENTATIONS AND WARRANTIES

5)      Representations and Warranties of the Company.  The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a.      Organization.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b.      Capitalization.  The Company currently has one class of Common Stock.The Company will have two classes of outstanding stock. There will be Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock are as stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Nevada General Corporation Law.  All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will be fully paid and non-assessable.

c.      Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Note has been taken or will be taken prior to the Closing.  This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

d.      Valid Issuance of Note.  The Note has been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

e.      Governmental or Other Consents and Filings.  Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or



VTI Convertible Note Agreement 210224

authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

     f.    Litigation.  There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

     g.  Intellectual Property.  Except as set forth in the Disclosure Schedule:

        i.    The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefor; and (iii) copyrights and registrations and applications therefor (collectively, the "Intellectual Property") in all material respects necessary for its business as currently conducted.

        ii.    The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

        iii.    The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

        iv.    All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

     h.    Compliance with Other Instruments.  The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

     i.    The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investor acknowledged that it has made its investment based solely on its own due diligence.

     j.    No Further Representations.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY



VTI Convertible Note Agreement 210224

DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

6)      Representations and Warranties of Investor.  Investor hereby represents and warrants to the Company that:

        a.      Authorization.  Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

        b.      Purchase Entirely for Own Account.  Investor confirms that the Note is being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Note. The Investor has not been formed for the specific purpose of acquiring the Note.

        c.      Securities Laws.  The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Note or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Note, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Note.  The Investor's subscription and payment for and continued beneficial ownership of the Note will not violate any applicable securities or other laws of the Investor's jurisdiction.  The Investor hereby represents that it is not acquiring the Note for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Note, directly or indirectly, in the United States or to U.S. Persons. The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Note or any securities issued in respect of or exchange for the Note except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Note unless in compliance with the Securities Act.

        d.      Disqualification.  Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the

Page 4 of 17



VTI Convertible Note Agreement 210224

"Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

e.    Acknowledgment. Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement. The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence. Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto. Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its own independent investigation and verification

## MISCELLANEOUS
7)    Miscellaneous.

a.    Successors and Assigns. This Agreement may not be assigned by the Investor without the express written consent of the Parties. The provisions hereof shall inure to the benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

b.    Governing Law. This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada.

c.    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

d.    Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

e.    Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day



VTI Convertible Note Agreement 210224

after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

      f.    <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

      g.    <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

      h.    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

      i.    <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

      j.    <u>Dispute Resolution; Waiver of Jury Trial</u>.  The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court



VTI Convertible Note Agreement 210224

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

      k.    Publicity.  The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

      l.    <u>Closing Documents</u>. The Company has not prepared a private placement memorandum because it is newly established and has no operating or financial history.

# ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i)  Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii)  Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;



VTI Convertible Note Agreement 210224

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(1) Association with an entity regulated by such commission, authority, agency, or officer;

(2) Engaging in the business of securities, insurance or banking; or

(3) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation



VTI Convertible Note Agreement 210224

A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Note, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Note | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |



VTI Convertible Note Agreement 210224

Litigation                              The Company does not believe at this time that any claims are material to the Company's business or ongoing operations.

| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?



VTI Convertible Note Agreement 210224

> **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or the sharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**



VTI Convertible Note Agreement 210224

## Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**



VTI Convertible Note Agreement 210224

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**

Visual Techno

By:

Name:

Title:      President

Address:   1105 William Penn Dr
           Philadelphia, PA 19020

**INVESTOR**

By:

Name:    Mark Leonard Bunce

Title:

Address:  Les Preaux, La Route de
          Sausmarez, St Martin, Guernsey
          GY4 6SF

Page 13 of 17

VTI Convertible Note Agreement 210224

## ACCREDITED INVESTOR CERTIFICATION

**For Individual Investors Only**
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

Initial     I certify that I have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

Initial _____    I certify that I have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

**For Non-Individual Investors**
**(all Non-Individual Investors must *INITIAL* where appropriate):**

Initial _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

Initial _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

Initial _____    The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

Initial _____    The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

Initial _____    The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

Initial _____    The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

Initial _____    The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

Initial _____    The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

Initial _____    The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Initial _____    The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

Initial _____    The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1] For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

VTI Convertible Note Agreement 210224

**INVESTOR PROFILE**

*(Must be completed by Investor)*

<u>**Section A - Personal Investor Information**</u>

Investor Name(s): _MARK    LEONARD    BUNCE_

Individual executing Profile or Trustee: _____

Social Security Numbers / ~~Federal I.D. Number~~: _GY 697933_

Date of Birth: _10·04·60_  Marital Status: _MARRIED_

Joint Party Date of Birth: _____
Investment Experience (Years): _40_

Annual Income: _____
Liquid Net Worth: _____

Net Worth: _____

Resident of: _GUERNSEY_
Home Street Address: _LES PLENY, LA ROUTE DE SHOT MARLER_
Home City, State & Zip Code: _ST MARTIN, GUERNSEY GY46SF_
Home Phone: _+44 1487 230724_  Home Fax: _____
Home Email: _MARK @ BUNCE · CLUB_

Employer: _____

Employer Street Address: _____

Employer City, State & Zip Code: _____

Bus. Phone: _____  Bus. Fax: _____

Bus. Email: _____

Type of Business: _RETIRED COMPANY DIRECTOR._

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Convertible Note Agreement 210224

## **Section B – Entity Investor Information**

Investor Name(s): _____

Authorized Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Investment Experience (Years): _____

Assets: _____

Was the entity formed for the specific purpose of purchasing the Common Stock?

[ ] Yes [ ] No

Principal Purpose (Trust) _____

Type of Business: _____

Street Address: _____

City, State & Zip Code: _____

Phone: _____        Fax: _____

Email: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____



VTI Convertible Note Agreement 210224

EXHIBIT A

### Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☑ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☑ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☑ Executed Paperwork<br>☑ KYC/ID<br>☐ Bank Wire confirmation | |

### Bank Wire Instructions for Payment to Company

| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
|---|---|
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: 8571165235<br>Routing/ABA Number :121000248 |
| International Wire | Account: 8571165235<br>SWIFT: WFBIUS6S |

## EXHIBIT B

Form of Note



# EXHIBIT 5

Bunce-VTI Amendment 210306

## AMENDMENT

THIS AMENDMENT dated as of March 7, 2021 ("**Amendment**") is between Mark Leonard Bunce or his/her/its registered assigns ("**Purchaser**") and Visual Technology Innovations, Inc., a Nevada USA corporation (the "**Company**"), with its principal offices at 1105 William Penn Drive, Bensalem, PA 19020 USA and amends the Agreement and Convertible Note dated on or about February 24, 2021 or signed simultaneously between the Company and Purchaser ("**Agreement**"). All capitalized terms not herein defined shall have the meaning ascribed to them in the Agreement, as amended.

## W I T N E S S E T H

**WHEREAS**, the Company and Purchaser wish to amend the Convertible Note Agreement 210224 and the related Convertible Note VN21017-00 in its entirety and replaced with a new agreement as reflected in **Exhibit A**.

**WHEREAS**, all instruments including warrants issued with respect to the Agreement stand voided and revoked.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed on the date first above written.

| COMPANY: | Visual Technology Innovations, Inc. | HOLDER: | Mark Leonard Bunce |
|---|---|---|---|
| SIGNED: NAME: | *signature* | SIGNED: NAME: | *signature* Mark Leonard Bunce |
| TITLE: | President | TITLE: | M.L. Bunce |
| DATE: | Mar 7, 2021 | DATE: | 07 March 2021 |

## EXHIBIT A

Agreement

VTI Convertible Note Agreement 210306

**Exhibit A to the Amendment**
**CONVERTIBLE NOTE AGREEMENT**

An agreement (this "**Agreement**"), dated as of ___3/7/21___ (the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada Corporation (the "**Company**") and Mark Leonard Bunce, with an address at Les Preaux, La Route de Sausmarez, St Martin, Guernsey GY4 6SF (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

**WHEREAS**, the Company is an entity  formed pursuant to the laws of the State of Nevada USA as a Nevada corporation, and

**WHEREAS,** The Company desires to issue and sell to the Investor a convertible note issued by the Company (the "**Note**");

**WHEREAS**, the Investor  desires to purchase the Note on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  a class of common stock ("**Common Stock**") having a par value $0.00001 per share which is anticipated will be nullified and replaced on a one-for-one basis with shares of Class A Common Stock by an Amended and Restated Certificate of Incorporation which may soon be filed by the Company with the Stae of Nevada, such Class A Common Stock  is anticipated to be issued to Investor as a part of this Agreement; and

**WHEREAS**, it is anticipated that a new class of voting only (no economic rights) stock to be known as Class B Voting Stock would be issued to the Company's founder or his wholly-owned entity prior to the issuance of the Class A Common Stock to Investor, such Class B Voting Stock anticipated to have 10:1 voting rights, pursuant to that same Amended and Restated Certificate of Incorporation, and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor.

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.


**TERMS**

1)      Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Note for the purchase price of USD $1,000,000 (the "**Purchase Price**").

2)      The Purchase Price shall be comprised of payments made in two tranches (i) US $150,000 which has already been paid to the Company on or about February 25, 2021; and (ii) the balance US $850,000 in immediately available funds to the Company's bank account on or before March 8, 2021 (the "**Balance Funds**"). The Company's bank wiring instructions are reflected at **Appendix A** hereto.



VTI Convertible Note Agreement 210306

3)     The purchase and sale of the Note shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date of receipt the Balance Funds (the "**Closing**"). The Note shall be in the form as attached at **Appendix B** hereto. The issue date of the Note will be the date of receipt of Balance Funds in the designated bank account per Appendix A.

4)     Use of Proceeds. In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Note for any lawful general business purpose.

## REPRESENTATIONS AND WARRANTIES

5)     Representations and Warranties of the Company.  The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a.     Organization.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b.     Capitalization. The Company currently has one class of Common Stock. The Company will have two classes of outstanding stock. There will be Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock are as stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Nevada General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will be fully paid and non-assessable.

c.     Authorization. All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Note has been taken or will be taken prior to the Closing.  This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

d.     Valid Issuance of Note.  The Note has been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.



VTI Convertible Note Agreement 210306

e.     Governmental or Other Consents and Filings.  Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

f.     Litigation.  There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

g.  Intellectual Property.  Except as set forth in the Disclosure Schedule:

i.     The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefor; and (iii) copyrights and registrations and applications therefor (collectively, the "Intellectual Property") in all material respects necessary for its business as currently conducted.

ii.     The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

iii.     The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company.  None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

iv.     All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

h.     Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

i.     The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investor acknowledged that it has made its investment based solely on its own due diligence.

j.     No Further Representations.  EXCEPT FOR THE REPRESENTATIONS AND



VTI Convertible Note Agreement 210306

WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

6)      Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

        a.      Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

        b.      Purchase Entirely for Own Account. Investor confirms that the Note is being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Note. The Investor has not been formed for the specific purpose of acquiring the Note.

        c.      Securities Laws. The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Note or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Note, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Note. The Investor's subscription and payment for and continued beneficial ownership of the Note will not violate any applicable securities or other laws of the Investor's jurisdiction. The Investor hereby represents that it is not acquiring the Note for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Note, directly or indirectly, in the United States or to U.S. Persons. The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Note or any securities issued in respect of or exchange for the Note except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Note unless in compliance with the Securities Act.

Page 4 of 17



VTI Convertible Note Agreement 210306

    d.     Disqualification. Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

    e.     Acknowledgment. Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement. The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence. Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto. Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its own independent investigation and verification

## MISCELLANEOUS

7)    Miscellaneous.

    a.     <u>Successors and Assigns</u>. This Agreement may not be assigned by the Investor without the express written consent of the Parties. The provisions hereof shall inure to the benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

    b.     <u>Governing Law</u>. This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada.

    c.     <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

    d.     <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

    e.     <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given or made upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business



VTI Convertible Note Agreement 210306

hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

f.    <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

g.    <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

h.    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

i.    <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

j.    <u>Dispute Resolution; Waiver of Jury Trial</u>.  The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court



VTI Convertible Note Agreement 210306

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

k.    Publicity.  The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

l.    <u>Closing Documents</u>. The Company has not prepared a private placement memorandum because it is newly established and has no operating or financial history.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii)  Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;



VTI Convertible Note Agreement 210306

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(1) Association with an entity regulated by such commission, authority, agency, or officer;

(2) Engaging in the business of securities, insurance or banking; or

(3) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation



VTI Convertible Note Agreement 210306

A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii)  Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Note, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement.  The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules.  Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement.  In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement.  Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| Organization | No exceptions |
|---|---|
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Note | No exceptions |

Governmental or Other Consents and Filings

No exceptions

Page 9 of 17



VTI Convertible Note Agreement 210306

Litigation                                    The Company does not believe at this time that any
claims are material to the Company's business or ongoing operations.

Intellectual Property                    No exceptions

Compliance with Other Instruments     No exceptions

No Further Representations              No exceptions

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?

Page 10 of 17



VTI Convertible Note Agreement 210306

> As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or the sharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**



VTI Convertible Note Agreement 210306

## Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**



VTI Convertible Note Agreement 210306

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**                                                    **INVESTOR**

Visual Techno

By: _____                                          By: _____

Name:                                                        Name:   Mark Leonard Bunce

Title:                                                       Title:

Title:    President

Address:  1105 William Penn Dr                               Address:  Les Preaux, La Route de
          Philadelphia, PA 19020                                       Sausmarez, St Martin, Guernsey
                                                                       GY4 6SF

VTI Convertible Note Agreement 210306

## ACCREDITED INVESTOR CERTIFICATION

**For Individual Investors Only**
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

Initial _____  I certify that I have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

Initial _____  I certify that I have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

**For Non-Individual Investors**
**(all Non-Individual Investors must *INITIAL* where appropriate):**

Initial _____  The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

Initial _____  The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

Initial _____  The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

Initial _____  The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

Initial _____  The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

Initial _____  The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

Initial _____  The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

Initial _____  The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

Initial _____  The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Initial _____  The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

Initial _____  The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1] For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.



VTI Convertible Note Agreement 210306

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _MARK LEONARD BUNCE_

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _GY 697933_

Date of Birth: _10·04·1960_ Marital Status: _MARRIED_

Joint Party Date of Birth: _____
Investment Experience (Years): _40_

Annual Income: _____
Liquid Net Worth: _____

Net Worth: _____

Resident of: _GUERNSEY_
Home Street Address: _LES PREAUX, LA ROUTE DE SAUSMAREZ_

Home City, State & Zip Code: _ST MARTIN, GUERNSEY, GY4 6SL_

Home Phone: _+441481 230724_ Home Fax: _____

Home Email: _MARK@BUNCE.CLUB_

Employer: _____

Employer Street Address: _____

Employer City, State & Zip Code: _____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _RETIRED COMPANY DIRECTOR_

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Convertible Note Agreement 210306

## Section B – Entity Investor Information

Investor Name(s): _____

Authorized Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Investment Experience (Years): _____

Assets: _____

Was the entity formed for the specific purpose of purchasing the Common Stock?

[ ] Yes [ ] No

Principal Purpose (Trust) _____

Type of Business: _____

Street Address: _____

City, State & Zip Code: _____

Phone: _____     Fax: _____

Email: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

Page 16 of 17



VTI Convertible Note Agreement 210306

## APPENDIX A

**Checklist for complete documentation**

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☑ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☑ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |

**Bank Wire Instructions for Payment to Company**

| | |
|---|---|
| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: 8571165235<br>Routing/ABA Number :121000248 |
| International Wire | Account: 8571165235<br>SWIFT: WFBIUS6S |

## APPENDIX B

Form of Note

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MARK L. BUNCE

           Plaintiff

     v.

VISUAL TECHNOLOGY
INNOVATIONS, INC.

and

MATHU G. RAJAN,

          Defendants.

Civil Action

Case No. 2:23-cv-01740

**DECLARATION OF CHARLES M. ROBERTSON
IN SUPPORT OF DEFENDANTS' PROPOSED UNDISPUTED FACTS**

I, Charles M. Robertson, hereby declare under penalty of perjury:

**<u>Introduction</u>**

    1.     My legal name is Charles M. Robertson, but professionally I am known by the nickname Bud Robertson. I was a contract employee of Visual Technology Innovations, Inc. ("<u>VTI</u>"), one of the Defendants in the above captioned case. I submit this declaration in connection with *Defendants' Response to Plaintiff's Proposed Undisputed Material Facts* [ECF No. 108].

    2.     I served as Executive Vice President of VTI from the date of the company's formation in January 2021 through December 2021, when VTI experienced cash flow problems resulting from the failure of Burlington Resources Asia Limited ("<u>Burlington</u>") to invest in VTI as contractually obligated. As Executive Vice President, I was closely involved with VTI's global operations, business development, and sales activities.

3.      Prior to providing services to VTI, I served from May 2018 until December 2020 as Chief Executive Officer of SeeCubic, B.V. ("SCBV"), the Netherlands R&D subsidiary of Stream TV Networks, Inc. ("Stream").  At SCBV, I supervised approximately 30 engineers engaged in research and development work related to glasses-free 3D technology.

4.      I also served as Executive Vice President of Stream prior to and concurrent with my service as CEO of its subsidiary, SCBV. Consequently, I am quite familiar with the overall glasses-free 3D industry and key business relationships developed by Defendant Rajan ("Rajan") and other former key employees of Stream, who provided services to VTI when Stream encountered legal and financial difficulties.

5.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of VTI, personal experiences and interactions, and information learned from my review of relevant documents.  If called upon, I can and will testify competently to the facts set forth herein.

**The VTI Team**

6.      VTI had a management team with decades of high-tech experience among them. The management team included:

a.  Mathu Rajan. Rajan developed a water purification system and founded Zero Technologies, LLC to commercialize its ZeroWater products. Rajan subsequently founded and managed Stream as a technology company to develop glasses-free 3D technology from 2009 until the end of 2024. Rajan served as a Director, President and CEO of VTI from its formation, but the board of directors was expanded shortly thereafter and plans were implemented to formalize appointments of an alternate President, Chief Financial Officer, and other officers subject to VTI's receipt of investment committed by Burlington, which failed to occur.

b.  Tracy Rees ("Rees"). Rees served as President and CEO of Intrinsyc Technology Corporation ("Intrinsyc") from 2007 until 2020. Intrinsyc was instrumental in assisting Stream implement its 3D technology into the Qualcomm Snapdragon™ computer chip. Prior to Intrynsic, Rees had eight years of technology experience with companies such as CalAmp Corporation,

BSQUARE Corporation, and Anna Technology/Annasoft Systems. Rees served as a director of VTI. He also served as de facto co-President alongside Rajan, though his formal appointment was contingent on VTI's receipt of investment committed by Burlington, which failed to occur.

c. Cliff Morton ("Morton"). Morton served in several roles during his twenty years at Intrinsyc, including project management, operational management, and businesses development. As project manager, he supervised the integration of Stream's 3D technology into the Qualcomm chip. Twenty years of additional experience included system engineering for the European Space Agency, the modernization of Indian National Airports Authority, and other international engineering projects. Morton served as a director of VTI. He also served as de facto VP of Engineering and attended numerous customer, technology, and project planning meetings. Morton's formal appointment was contingent on VTI's receipt of investment committed by Burlington, which failed to occur.

d. Bud Robertson. As stated above, prior to joining VTI, I served as CEO of Stream's R&D engineering subsidiary for more than two and a half years. As a contract employee of VTI, I coordinated various activities with Rajan, Rees, and Morton, all of whom I had worked with in various capacities for several years.

7. VTI enhanced its management team with an Advisory Board of professionals with both high-tech, financial, and legal expertise. I personally engaged with each of them on a frequent basis. The Advisory Board included:

a. Glen Hasen ("Hasen"). Hasen was a 30-year technology veteran with deep experience in global go-to-market (GTM) strategy and execution. He had domestic and international hands-on successes with various B2B solutions, multiple company integrations, several M&A activities, and an IPO. Hasen had been on the forefront of technological pioneering in application integration, Big Data Analytics, Hybrid Cloud services, CRM, DaaS and numerous other business services. In addition to providing general advisory services, Hasen also served as a director of VTI.

b. George Resnik ("Resnik"). Resnik had more than thirty years of finance experience, with nearly two decades of that as a CEO in the technology industry. He had extensive knowledge of the NASDAQ market public and related corporate regulatory requirements, making him an excellent choice to guide VTI through its planned IPO. Although Resnik served in an advisory capacity only, he and VTI intended that Resnik would assume the role of Chief Financial Officer upon VTI's receipt of investment committed by Burlington, which failed to occur.

c. Raja Rajan, Esq. ("RRajan"). RRajan had both legal and operational expertise, He was a partner at the law firm of Shumaker Williams, PC. He co-founded Zero Technologies and served as COO there. From 2009 to 2020, RRajan served as General Counsel and COO of Stream, where he negotiated critical intellectual property licenses, customer contracts, and other strategic documents. RRajan provided services as general counsel to VTI but was not an officer or director.

8.      As stated above, VTI engaged a team of Asia employees through ST4M. My understanding is that there were approximately 20 employees located in the Beijing, China office working for the benefit of VTI.

9.      VTI engaged technical staff to implement certain aspects of the company's business plan. I personally engaged with them on a very frequent, if not daily, basis. The technical staff included:

a. Grazina Seskeviciute ("Seskeviciute"). Seskeviciute had nearly two decades of experience in glasses-free 3D content creation, having worked first at Koninklijke Philips N.V. ("Philips") in the Netherlands, then at Stream's R&D subsidiary, SCBV, and finally for Stream itself in the U.S. As VP of Content for VTI, Seskeviciute coordinated the activities of Brewer and Papartis, which included original content creation as well as conversion from 2D to 3D. Seskeviciute provided her services to VTI on a contract employment basis.

b. Sara Brewer ("Brewer"). Brewer's graphic design experience initially included product marketing and publishing, but prior to joining VTI, she had nearly a decade of glasses-free 3D content creation experience with Stream. At VTI, Brewer supervised all corporate branding and also engaged in content creation and conversion activities. Brewer provided her services to VTI on a contract employment basis.

c. Ziggy Papartis ("Papartis"). Papartis had nearly two decades of experience in content creation as both a freelance artist and a full-time employee of Stream's R&D subsidiary, SCBV. During his ten years at SCBV, Papartis created animations for corporate use as well as glasses-free 3D demonstration. He also converted content from 2D to 3D for both sales team demos and customer use. Papartis provided his services to VTI on a contract employment basis.

10.    VTI engaged sales staff to develop and maintain customer relationships and

secure sales to support the company's business plan. I personally engaged with them on a

periodic basis. The sales staff included:

a.    Matt JJ Lo ("Lo"). Lo had an extensive sales career, with more than 25 years' experience in the consumer electronics industry, including more than a decade as the chief sales engineer for Stream. Lo founded ST4M, Inc. ("ST4M") as an Asia-based company to service consumer electronics brands across all product categories. Lo's deep customer relationships include Hisense, Lenovo, Huawei, Samsung, LG, Dell, HP, and many others. His deep strategic relationships include Original Equipment Manufacturers like Pegatron Corporation in Taiwan as well as critical supply chain vendors like chip maker MStar Semiconductor, chip foundry TSMC, and the world's largest manufacturer of video panels, BOE. Lo's also maintained relationships with key retailers like Best Buy and Costco. On behalf of VTI, Lo supervised a team of employees at ST4M which performed duties including sales and business development for the vast Asia markets. Lo provided his services to VTI on a contract employment basis.

b.    Lizzy Zhou ("Zhou"). Zhou worked for VTI in close cooperation with Lo. Zhou had relationships with key Chinese consumer brands, having provided sales and business development services to Stream through ST4M for a decade. Zhou worked in Beijing and provided her services to VTI on a contract employment basis.

c.    Misa Itaya ("Itaya"). Itaya is a Japanese national who worked for VTI in close cooperation with Lo. Itaya had relationships with key Japanese consumer brands like Sony, Panasonic, NEC, Toshiba, and Sharp. Itaya worked in VTI's satellite office in Taiwan and provided her services to VTI on a contract employment basis.

d.    A.J. Yeh ("Yeh"). Yeh provided engineering sales services to VTI in close cooperation with Lo. Yeh worked in VTI's satellite office in Taiwan and provided his services to VTI on a contract employment basis..

e.    Mike George ("George"). George had more than three decades of sales experience in the high-tech industry, most recently for Intrinsyc working at the direction of Rees. George sold a wide variety of products, ranging from hardware and software products to integration and other engineering services. George's customers ranged from government entities and defense agencies to retailers and distributors. With Lo focused primarily the Asia markets, George was tasked with developing sales leads for North America and Europe. Although George served as a periodic advisor and committed to supervising VTI's western sales activities, his full-time and formal engagement was

5

dependent upon VTI's receipt of investment committed by Burlington, which failed to occur.

11.     VTI engaged full-time independent contractors to handle certain administrative tasks as well, rounding out the overall VTI team. I personally engaged with them on a very frequent, if not daily, basis. The administrative staff included:

a.  Daniel J. Rink, Esq. ("Rink"). Rink is both an attorney (Active status in Pennsylvania since October 8, 1975) – Attorney # 21258) and former Certified Public Accountant (Inactive status in Pennsylvania – Certificate # CA-13240-L issued August 1, 1978) with five decades of experience in legal, financial and business affairs for companies in the petroleum, chemicals, real estate development and consumer electronics industries. In addition to a Juris Doctor degree granted by Villanova University School of Law, Rink also holds an LL.M. graduate legal degree in Taxation issued by New York University Graduate School of Law. For more than ten years, Rink served as head of business affairs for Stream, overseeing activities like contract negotiation and management, investor relations, third-party licensing, strategic partnerships, and various other aspects of corporate governance. Rink joined VTI upon the company's formation and served as in-house corporate counsel. Rink provided his services to VTI on a contract employment basis.

b.  Suby Joseph ("Joseph"). Joseph has a Masters degree in Finance & Control, a Masters degree in Investment Management, and a Post-Graduate Diploma in Business Management. Joseph has more than two decades of corporate finance and advisory experience, including with firms like Citigroup, Zurich Financial Services, and more than ten years as VP of Finance for Stream. Upon the founding of VTI, Joseph consulted to oversee corporate finance matters. Joseph provided his services to VTI on a contract consulting basis.

c.  Amanda Von Ahnen ("Von Ahnen"). Von Ahnen served as an executive assistant and custodian of VTI's corporate files from the time of VTI's founding. Von Ahnen provided her services to VTI on a contract employment basis.

d.  Nicole Maneen ("Maneen"). Maneen served as an executive assistant, with a focus on marketing and operations. Maneen provided her services to VTI on a contract employment basis.

e.  VTI engaged other third-party contractors for basic accounting and bookkeeping services.

**Significant Market Opportunities**

12.    Rajan and Lo had deep and longstanding business relationships in virtually every aspect of the consumer electronics industry. Customers Rajan and Lo had engaged while developing glasses-free 3D technology for Stream were eager to have VTI provide products and services. I am personally aware of requests from (a) Lenovo for laptop computers, (b) Huawei for televisions and mobile phones, (c) HP for laptop computers and PC monitors, (d) Dell for laptop computers and PC monitors, (e) OPPO for mobile phones, (f) Skyworth for televisions, (g) Chunghwa Telecom for televisions and mobile phones, and (h) Marvel Digital for digital signage monitors.

13.    VTI's business model was similar to the "Intel Inside" model, in which VTI intended to provide critical glasses-free 3D components to consumer brands that would make the ultimate end-user products. As such, VTI would be a "technology provider" rather than a seller of products. Accordingly VTI's business development activities were focused on identifying technologies that existed or could be adapted/improved to satisfy the consumer brands routinely making inquiries of VTI's sales and management team.

14.    VTI explored available glasses-free 3D solutions and identified a certain "stitching & tiling" technology in Asia that it believed would be acceptable to various global brands.

15.    VTI entered into a Design, Build, Operate, Transfer, and Own Agreement (the "BOTO Agreement") in April 2021 with Musen, S.A., a Swiss distributor with plans to sell glasses-free 3D products in the global market, with an emphasis on the Middle East. I personally assisted in negotiating the BOTO Agreement and signed it as a witness.

16.    In August 2021, VTI entered into a license agreement with JoveAI Innovation, Inc. ("JoveAI"), a Silicon Valley engineering firm that Rajan, Lo, and I had previously worked

with at Stream to develop cutting edge electronics for a special project with Google. VTI licensed certain JoveAI designs, intellectual property, and related hardware computer source code for development of high-resolution products that would satisfy VTI's growing list of expectant customer prospects.

17.    Rajan and Lo maintained their personal and professional relationships with key executives as BOE, the world's leading manufacturer of video panels. BOE confirmed its ongoing desire to include glasses-free 3D functionality in all its products and was supportive of VTI's business development efforts. BOE offered to provide cutting-edge panel products to VTI for product development in a pre-emptive attempt to monopolize market opportunities it expected VTI to generate. VTI never entered into a contractual relationship with BOE, as VTI's ability to commence mass production was dependent on its receipt of investment funds committed by Burlington, which failed to occur.

18.    Overall, the VTI business and marketing plans were designed to maximize the personal and professional relationships VTI executives and staff had developed over a period of more than a decade of glasses-free 3D activity. As detailed above, these strategic relationships included both technology vendors (supply chain) and consumer brands (customers).

19.    The entire VTI global team – located in the U.S., China, and Taiwan – was focused on executing the VTI business plan, but the company was ultimately unable to do so because investment from Burlington was never made as contractually obligated.


Date: July 27, 2025

Charles M. Robertson

# EXHIBIT 7

VTI-TS(30) 210210-Common

**TERM SHEET**

**Proposed Private Placement Investment inConvertible Debt**

The following is a summary of the principal terms with respect to a proposed investment inClass A Common Shares of Visual Technology Innovations, Inc. as an offering to accredited investors. This is a non-binding Term Sheet setting for a summary of the proposed terms of the transaction and is intended solely as a basis for further discussion and is not intended to be, and does not constitute, a legally binding obligation of any party. A legally binding obligation will be established only pursuant to mutually acceptable definitive written agreements executed by the parties. In the event of any inconsistency between this summary and such definitive written agreements, the definitive agreements will govern.

| | |
|---|---|
| Issuer: | Visual Technology Innovations, Inc., a Nevada, USA Corporation(the "**Company**"). |
| Purchaser: | The purchaserBurlington Resources Asia Limited("**Purchaser**") is an accredited investor and has a principal place of business at 20<sup>th</sup>Floor, 88 Gloucester Road, Wanchai, Hong Kong. Purchaser and the Company may together be referred to as the "**Parties**" and individually as "**Party**." |
| Amount: | Purchaser will invest a total of thirtymillion US dollars (US $30,000,000) ("**Investment**") in the Securitystarting on or before <u>February10, 2021</u>("**Execution**") through the Term. |
| Proof of Funds: | The Purchaser will deliver to the Company a satisfactory form of proof demonstrating the availability of the Investment amount. |
| Closings: | The Purchaser elects to exercise the option to purchase one million US dollars (US $1,000,000) in the Security immediately upon Execution. The funds would be made available in thirty (30) calendar days from Execution ("**Initial Closing**").The Company will present to the Purchaser a selection of business opportunities ("**Presentation**") needing additional funds ("**Amount**") at various times during the Term, which has to be closed within twenty (20) calendar days from the Presentation. The form of the Presentation will be included in the closing documents. Each Presentation will constitute a "**Closing**" and will be considered a part of the Investment. Upon the absence of a Closing, the Investment balance will be reduced by the Amount. Each Closing, including the Initial Closing may be together referred to as "**Closings**". All Closings should be completed within the earlier of eighteen (18) months from Execution or Exit ("**Term**"). |
| Exit: | The earlier of (i) closing of an access to the public markets; (ii) merger or acquisition when there is a change of control |
| Security: | Class A Common Shares of the Company (the "**Security**"). |
| Price: | The price of the Security will be $1.40 per share. |
| Signing Bonus: | The Purchaser will be issued 987,839 shares of the Security upon execution of the closing documents to be issued pursuant to the acceptance of this Term Sheet. |
| Contingent Bonus: | In the situation that the Purchaser has not exercised any option to invest beyond the Initial Closing, the Purchaser will be issued an additional 1,141,230 shares of the Security upon at the end of the Term. |
| Board Seat: | The Purchaser will be awarded one (1) board seat on the Company's Board of Directors as soon as the total value of the Closings is more than five million US dollars (US $5,000,000). If Purchaser has made Closings to a total value of fifteen |

VTI-TS(30) 210210-Common

| | |
|---|---|
| | million US Dollars ( US$ 15,000,000)the Purchaser may have three (3) board seats on the Company's Board of Directors in which there are a maximum of six (6) Directors. |
| **Placement Agents:** | Such placement agents as the Company may disclose to the Purchaser. Such placement agents shall be compensated on such terms as the Company may agree to in its discretion. |
| **Use of Proceeds:** | The Company will use the proceeds, net of applicable placement agent fees, for any lawful general business purpose related to the Company. |
| **Confidentiality:** | Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Term Sheet or the agreements contemplated herein, discussions or negotiations relating to this Term Sheet or the agreements contemplated herein, the performance of its obligations under the agreements contemplated herein or the ownership of the shares purchased under such agreements. |
| **Expenses:** | Each party to this transaction shall bear its own expenses, including but not limited to legal fees. |

Accepted and agreed to, this ___ day of February,2021, by each of the Parties set forth below:

Company: Visual Technology Innovations, Inc.       Purchaser: Burlington Resources Asia Limited

By: _Mathu Rajan_                                  By: _(signature)_

Name: Mathu Rajan                                  Name: Timothy McCarthy

Title: President                                   Title: CEO

Date: February 10, 2021                            Date: 10/02/21

# EXHIBIT 8

VTI Stock Purchase Agreement 210210

## STOCK PURCHASEAGREEMENT

An agreement (this "**Agreement**"), dated as of February 10, 2021 (the "**Effective Date**") , by and betweenVisual Technology Innovations, Inc., a NevadaUSA Corporation(the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong(the "**Investor**"), with the Companyand the Investortogether referred to as the "**Parties**."

**WHEREAS**, the Company is anentity  formed pursuant to the laws of the State of Nevada USAas a Nevada corporation, and

**WHEREAS,**The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  aclass of common stock ("**Common Stock**") having a par value $0.00001 per share which is anticipated will be nullified and replaced on a one-for-one basis with shares of Class A Common Stock by an Amended and Restated Certificate of Incorporation which may soon be filed by the Company with the State of Nevada, such Class A Common Stock  is anticipated to be issued to Investor as a part of this Agreement; and

**WHEREAS**, it is anticipated that a new class of voting only (no economic rights) stock to be known as Class B Voting Stock would be issued to the Company's founder or his wholly-owned entity prior to the issuance of the Class A Common Stock to Investor, such Class B Voting Stock anticipated to have 10:1 voting rights, pursuant to that same Amended and Restated Certificate of Incorporation referenced above , and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor.

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

## TERMS

1)       Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Thirty Million US Dollars ($ 30,000,000) (the "**Purchase Price**") at a price per share of $1.40 per Share

2)       The Investor will deliver to the Company a satisfactory form of proof demonstrating the ready availability of the Purchase Price under the Investor's authority ("**Proof of Funds**").

3)       The Investorwillinvest one million US dollars (US $1,000,000) in the Shares immediately upon Execution. The funds would be made available in thirty (30) calendar days from Effective Date ("**Initial Closing**").



VTI Stock Purchase Agreement 210210

4)    The Company will present to the Investor a selection of business opportunities ("**Presentation**") with the required amount to fund the opportunity ("**Amount**") at various times during the Term, which has to be closed within twenty (20) business days.The form of the Presentation is shown in **Exhibit A**.


5)    The Initial Closing and each Presentationwill constitute a "**Closing**" and will be considered a part of the Purchase Price. Upon the absence of a Closing, the balance of the Purchase Price available to the Investor  that is not yet invested will be reduced by the Amount. Each Closing may be together referred to as "**Closings**".

6)    All Closings should be completed within the earlier of (i) eighteen (18) months from the Effective Date; or (ii) closing of an access to the public markets; or (iii) merger or acquisition when there is a change of control ("**Term**").

7)    The Investor shall pay to the Company in immediately available funds a payment equal to the Amount in each Closing to the Company's bank account ("**Payment**"). The Company's bank wiring instructions are reflected at **Exhibit B**hereto.

8)    In addition, the Company will issue to the Investor 987,839 Shares of the Company immediately on the Effective Date ("**Signing Bonus**").

9)    The Investor will be issued an additional 1,141,230 Shares of the Company if there has not been any further Closings during the Term after the Initial Closing ("**Contingent Bonus**").

10)    The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares will be the date of receipt of funds from each Closing in the designated bank account per Exhibit A.

11)    Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.


## REPRESENTATIONS AND WARRANTIES

12)    Representations and Warranties of the Company.  The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a.    Organization.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b.    Capitalization. The Company currently has one class of Common Stock. It is



VTI Stock Purchase Agreement 210210

contemplated in the future that the Company will have two classes of outstanding stock. There will be Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock will be as stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Nevada General Corporation Law.   All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will be fully paid and non-assessable. The fully diluted capitalization of the Company as of close of business January 25, 2020 comprises of 4,349,050 Shares; 5,275,100 warrants that are exercisable into Shares; and 3,500,000 stock options that are exercisable into Shares amounting to a fully diluted total of 13,124,150 Shares.

      c.     Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing.  This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

      d.     Valid Issuance of Shares.  The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

      e.     Governmental or Other Consents and Filings.  Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

      f.     Litigation.  There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

      g.  Intellectual Property.  Except as set forth in the Disclosure Schedule:

          i.     The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property")



VTI Stock Purchase Agreement 210210

in all material respects necessary for its business as currently conducted.

   ii. The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

   iii. The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

   iv. All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

  h. Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

  i. The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investoracknowledged that it has made its investment based solely on its own due diligence.

  j. No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

13) Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

  a. Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding



VTI Stock Purchase Agreement 210210

obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

b.      Purchase Entirely for Own Account.  Investor confirms that the Sharesare being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

c.      Securities Laws.  The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares.  The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction.  The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons.  The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

d.      Disqualification.  Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

e.      Acknowledgment.  Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement.  The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence.Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto.  Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its



VTI Stock Purchase Agreement 210210

own independent investigation and verification

## MISCELLANEOUS

14)    Miscellaneous.

     a.    <u>Successors and Assigns</u>.    This Agreement may not be assigned by the Investorwithout the express written consent of the Parties.  The provisions hereof shall inure to the benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

     b.    <u>Expenses</u>.  Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

     c.    <u>Confidentiality</u>.  Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

     d.    <u>Placement Agents</u>.  Such placement agents as the Company may disclose to the Investor.  Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

     e.    <u>Governing Law</u>.  This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of NevadaUSA without giving effect to any choice or conflict of law provision or rule (whether of the State of NevadaUSA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

     f.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

     g.    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

     h.    <u>Notices</u>.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to



VTI Stock Purchase Agreement 210210

the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

     i.    <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

     j.    <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

     k.    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

     l.    <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

     m.    <u>Dispute Resolution; Waiver of Jury Trial</u>.  The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR

Page 7 of 20



VTI Stock Purchase Agreement 210210

THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n. Publicity. The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

# ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state



VTI Stock Purchase Agreement 210210

performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A)  At the time of such sale, bars the person from:

(1)  Association with an entity regulated by such commission, authority, agency, or officer;

(2)  Engaging in the business of securities, insurance or banking; or

(3)  Engaging in savings association or credit union activities; or

(B)   Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv)  Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A)   Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B)  Places limitations on the activities, functions or operations of such person; or

(C)  Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v)  Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A)   Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B)  Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi)  Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii)  Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or



VTI Stock Purchase Agreement 210210

(viii)  Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

VTI Stock Purchase Agreement 210210

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |
| Litigation | The Company does not believe at this time that any claims are material to the Company's business or ongoing operations. |
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

Page 11 of 20

VTI Stock Purchase Agreement 210210

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**



VTI Stock Purchase Agreement 210210

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or thesharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**



VTI Stock Purchase Agreement 210210

### Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

VTI Stock Purchase Agreement 210210

**SIGNATURE PAGE**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _Mathu Rajan_
Name:   Mathu Rajan
Title:   President
Address:  1105 William Penn Dr
        Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia Limited

By: _____
Name:   Timothy McCarthy
Title:   CEO
Address:  Old St. James's Vicarage,
        Maxwell Road,
        London SW6 2HR, UK

VTI Stock Purchase Agreement 210210

## ACCREDITED INVESTOR CERTIFICATION

**For Individual Investors Only**
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must**
*INITIAL*)**:**

Initial _____  I certify thatI have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

Initial _____  I certify thatI have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

**For Non-Individual Investors**
**(all Non-Individual Investors must *INITIAL* where appropriate):**

Initial _____  The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

Initial _____  The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

Initial _____  The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

Initial _____  The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

Initial _____  The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

Initial _____  The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

Initial _____  The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

Initial _____  The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

Initial _____  The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Initial _____  The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

Initial _____  The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1]For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

VTI Stock Purchase Agreement 210210

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth:_____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth:_____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:

_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Stock Purchase Agreement 210210

### Section B – Entity Investor Information

Investor Name(s):  Burlington Resources Asia Limited

Authorized Individual executing Profile or Trustee:  Timothy McCarthy

Social Security Numbers / Federal I.D. Number:  _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust)  _____

Type of Business:  Investment Holding Company

Street Address:  20th Floor, 88 Gloucester Road, Wanchai, Hong Kong

City, State & Zip Code:  _____

Phone: _____ +44 7768943655    Fax: _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / Outside Broker/Dealer:  Knight-Davis Associates LLP

VTI Stock Purchase Agreement 210210

**EXHIBIT A**

Form of Presentation

1. Presentation of the opportunity
2. Cost of the opportunity
3. Subscription agreement for Shares with date of wire


**EXHIBIT B**

### Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |


### Bank Wire Instructions for Payment to Company

| | |
|---|---|
| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: 8571165235<br>Routing/ABA Number:121000248 |



VTI Stock Purchase Agreement 210210

| International Wire | Account: 8571165235<br>SWIFT: WFBIUS6S |
| --- | --- |

# EXHIBIT 9

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Stream TV Networks, Inc. | : | Case No. 21-10433 (KBO) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

**DECLARATION OF BURLINGTON RESOURCES ASIA LIMITED IN SUPPORT OF
DEBTOR'S RESPONSE TO
STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS REGARDING THE MOTIONS TO
DISMISS THIS CHAPTER 11 CASE AND JOINDER TO THE OMNIBUS OBJECTION**

1.     I, Tim McCarthy, hereby state that at all times relevant hereto, I have been over 18 years old and am competent to make this declaration.

2.     I am a Special Advisor and lead the business at Burlington Resources Asia Limited ("Burlington"), a Hong Kong Limited Company. Burlington is funding Visual Technology Innovations, Inc. ("VTI") which is the proposed Debtor- in-Possession financier in the above captioned bankruptcy matter. A copy of documents showing the background and bona fides of me and Burlington Resources Asia Ltd. are attached hereto as **Exhibit 1**.

3.     I have conducted due diligence on the Debtor and VTI, and I am generally familiar with the Debtor's day-to-day operations, organization, financial affairs, and books and records.

4.     I have over thirty-five years of experience as an investment banker and stockbroker for Japan and South East Asia. Previously, I worked in the City of London from

1979 to 1993 with Morgan Grenfell & Co, Bank of America International Limited, and WI Carr, Swiss Bank Corporation. I also was a director of Asia Equity a South East Asian brokerage which subsequently merged with Banque Paribas.

5.    Further, I have served on the boards of public and private companies, most notably as a director of Victory Corporation plc, which is Sir Richard Branson's Virgin branded cosmetics and clothing company, and V2 Music Holdings plc., which is a record label. Finally, I have served as a director of a major private property group in Delhi, India - Sweta Estates Pvt. Ltd.

6.    I have committed to fund certain operations and activities of VTI and its business, including and not limited to, Debtor-in-Possession financing for Stream TV Networks, Inc. ("Stream"), as well as the financing that will be needed for Stream to fund exit financing through the bankruptcy process.

7.    As part of this commitment, Burlington and its associates are providing VTI with USD $180 million with an option to go to $230 million and have executed agreements with VTI on Monday, May 3, 2021. Because these funds are coming from overseas to the United States, and from institutional investors of Burlington, the transfer of funds will need to take a few business days due to regulatory and banking procedures involved in the large transfer of funds cross borders. But this process is being initiated on the opening of business, May 3, 2021 and has been closed. Prior commitments have been restructured to address the disputed, but outstanding debt alleged by certain alleged secured creditors of the Debtor.



Signed under the pains and penalties of perjury.

Date: May 2, 2021                          BURLINGTON RESOURCES ASIA LTD.

By: _____

Timothy McCarthy
Special Advisor

3

**EXHIBIT 10**

Pursuant to VTI Stock Purchase Agreement 210210

## EXERCISE OF DRAWDOWN RIGHTS

This is pursuant to the signed agreement (this "**Agreement**"), dated on or about February 10, 2021 (the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong    (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

## Exercise Date: By 2 March 2021

The Investor is hereby exercising the rights under clause 4 of the Agreement:
Amount of Investment : $29,000,000.
The Investor will exercise through a wire transfer to a bank account set up by VTI or its affiliates at Commerzbank or in the alternative the Investor will deliver a Standby Letter of Credit ("**SBLC**") for US $35 million that is acceptable for VTI and for the avoidance of doubt this will be in full consideration of a total investment in VTI of $ 30,000,000 under the Agreement.
Purpose: Begin the takeover process of the Ultra-D technology and kick start stalled projects.

**COMPANY**
Visual Technology Innovations, Inc.

By: _Mathu Rajan_
Name:    Mathu Rajan
Title:    President
Address:    1105 William Penn Dr
        Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia
Limited

By: _____
Name:    Timothy McCarthy
Title:    CEO
Address:    Old St. James's Vicarage,
        Maxwell Road,
        London SW6 2HR, UK

**EXHIBIT 11**

# DEPOSIT AGREEMENT

An agreement (this "**Agreement**"), dated as of 8 March 2021(the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

**WHEREAS**, the Investor has pursuant to the signed Stock Purchase Agreement dated on or about 10 February 2021 between the Parties exercised his rights to purchase Class A common Shares in the Company for a total of Thirty Million Dollars ( $ 30,000,000).

**WHEREAS,** The Investor has undertaken inter alia with its lender") to deliver to the Company a Standby Letter of Credit ("**SBLC**") in the amount of Thirty-Five Million Dollars ($ 35,000,000) in full consideration of the purchase of the Class A common Shares above.

**WHEREAS**, the Investor in the event has agreed with the Company to deliver an SBLC with its lender HSBC, London ("**HSBC**") which is in excess of the Thirty five Million Dollars ($ 35,000,000) required and will actually deliver an SBLC in the amount of Two Hundred Fifty Million Euro ( € 250,000,000) ( "**Actual SBLC**") ; and

**WHEREAS**, the Company has undertaken to monetize the Actual SBLC on terms that are acceptable to the Investor in his sole discretion.

**NOW THEREFORE**, in consideration of the recitals above the Parties agree to be bound by the terms as set out below.

TERMS

1)      All surplus amounts ("Surplus Amounts") from the monetization of the Actual SBLC, net of Thirty Million Dollars ($ 30,000,000) for the purchase of the Class A common Shares and after all agreed costs connected to said monetization, will be deposited for the entire and sole benefit of the Investor at bank coordinates acceptable to the Investor in his sole discretion.

2)      The Investor will instruct the Company at any time, after the deposit of the Surplus Amounts, for the wire transfer of the Surplus Amounts or tranches thereof to banking coordinates of its choosing for its sole benefit with 2 business days' notice in writing.

3)      The Investor will also agree to the terms and conditions of the monetization agreement between the Company and the monetizing party ("**Monetizer**") at the time of such agreement ("**Monetizing Agreement**"). A form of an agreement to such terms is shown in **Exhibit A**. All issues arising out of the Monetization Agreement will be settled between the Monetizer and HSBC.

Governing Law.  This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of Nevada USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada USA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

a.      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

b.      Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

c.      Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

d.      Amendments and Waivers.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

e.      Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

f.      Delays or Omissions.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

g.    Entire Agreement.  This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

h.    Successors and Assigns.  The provisions hereof shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto.

i.    Termination. Except as provided in this Agreement, the Company's obligations, and the rights of the Investor under this Agreement shall continue in full force and effect through the earlier of the following dates, on which date such rights and obligations shall terminate in their entirety the earlier of: (a) 18 months after the Effective Date; (b) the date of closing of the sale of securities of the Company in a firm commitment underwritten public offering pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") or (c) the date of closing of a sale, lease, or other disposition of all or substantially all of the Company's assets or the Company's merger with or into or consolidation with any other corporation or other entity, or any other corporate reorganization, in which the holders of the Company's outstanding voting securities immediately prior to such transaction own, immediately after such transaction, securities representing less than a majority of the voting power of the corporation or other entity surviving or resulting from such transaction; provided, however, the covenants set forth in paragraph 2 shall terminate and be of no force or effect when the Company first becomes subject to the periodic reporting requirements of the Securities Exchange Act of 1934, as amended, if such date is earlier than the closing of the sale of securities pursuant to a registration statement filed by the Company under the Securities Act.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _____
Name:    Mathu Rajan
Title:    President
Address:    1105 William Penn Drive
            Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia
Limited

By: _____
Name:    Timothy McCarthy
Title:    CEO
Address:    Old St. James's Vicarage
            Maxwell Road,
            London SW6 2HR

**EXHIBIT 12**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Stream TV Networks, Inc. | : | Case No. 21-10433 (KBO) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

**DECLARATION OF BURLINGTON RESOURCES ASIA LIMITED IN SUPPORT OF**
**DEBTOR'S RESPONSE TO**
**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS REGARDING THE MOTIONS TO**
**DISMISS THIS CHAPTER 11 CASE AND JOINDER TO THE OMNIBUS OBJECTION**

1.    I, Tim McCarthy, hereby state that at all times relevant hereto, I have been over 18 years old and am competent to make this declaration.

2.    I am a Special Advisor and lead the business at Burlington Resources Asia Limited ("Burlington"), a Hong Kong Limited Company. Burlington is funding Visual Technology Innovations, Inc. ("VTI") which is the proposed Debtor- in-Possession financier in the above captioned bankruptcy matter. A copy of documents showing the background and bona fides of me and Burlington Resources Asia Ltd. are attached hereto as **Exhibit 1**.

3.    I have conducted due diligence on the Debtor and VTI, and I am generally familiar with the Debtor's day-to-day operations, organization, financial affairs, and books and records.

4.    I have over thirty-five years of experience as an investment banker and stockbroker for Japan and South East Asia. Previously, I worked in the City of London from

1979 to 1993 with Morgan Grenfell & Co, Bank of America International Limited, and WI Carr, Swiss Bank Corporation. I also was a director of Asia Equity a South East Asian brokerage which subsequently merged with Banque Paribas.

5.      Further, I have served on the boards of public and private companies, most notably as a director of Victory Corporation plc, which is Sir Richard Branson's Virgin branded cosmetics and clothing company, and V2 Music Holdings plc., which is a record label. Finally, I have served as a director of a major private property group in Delhi, India - Sweta Estates Pvt. Ltd.

6.      I have committed to fund certain operations and activities of VTI and its business, including and not limited to, Debtor-in-Possession financing for Stream TV Networks, Inc. ("Stream"), as well as the financing that will be needed for Stream to fund exit financing through the bankruptcy process.

7.      As part of this commitment, Burlington and its associates are providing VTI with USD $180 million with an option to go to $230 million and have executed agreements with VTI on Monday, May 3, 2021. Because these funds are coming from overseas to the United States, and from institutional investors of Burlington, the transfer of funds will need to take a few business days due to regulatory and banking procedures involved in the large transfer of funds cross borders. But this process is being initiated on the opening of business, May 3, 2021 and has been closed. Prior commitments have been restructured to address the disputed, but outstanding debt alleged by certain alleged secured creditors of the Debtor.



Signed under the pains and penalties of perjury.

Date: May 2, 2021                           BURLINGTON RESOURCES ASIA LTD.

                                            By:
                                            _____
                                            Timothy McCarthy
                                            Special Advisor

**EXHIBIT 13**

BRAL-VTI Amendment to Stock Purchase Agreement 210506

## AMENDMENT

THIS AMENDMENT ("**Amendment**"), dated as of May 10, 2021 is between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong   (the "**Investor**") and amends the Stock Purchase Agreement executed on or about May 6, 2021 ("**Agreement**"). All capitalized terms not herein defined shall have the meaning ascribed to them in the Agreement. The Company and the Investor together referred to as the "**Parties**."

W I T N E S S E T H

**WHEREAS**, the Company and the Investor wish to amend the Agreement

**NOW THEREFORE**, the Parties hereto, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby agree to amend the Agreement as follows:

1)      Unless otherwise specified herein, each term used herein that is defined in the Agreement, shall have the meaning assigned to such term in the Agreement.

2)      Section 2 of the Agreement is amended in its entirety and will henceforth read as follows:

>    Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Five Hundred Million US Dollars (US$ 500,000,000) (the "**Investment Amount**").

3)      Section 3 of the Agreement is amended in its entirety and will henceforth read as follows:

>    a.   The Investment Amount is split into five (5) separate tranches ("**Tranche**"). The first Tranche for an amount of Sixty Million US Dollars (US $60,000,000) invested on or before May 24, 2021; the next four (4) Tranches of One Hundred and Ten Million US Dollars (US $110,000,000) each invested a month from the prior Tranche (each a "**Closing**" and together the "**Closings**"). Each Tranche, when combined with each other Tranche, shall be referred to as the "**Tranches**." Each Closing has a 7 business-day cure period in case the funds are not received by the Company by the date of the Closing.

4)      Section 4 of the Agreement is voided.

5)      Except as expressly amended by this Amendment, the provisions of the Agreement, shall remain in full force and effect.

SIGNATURE PAGE FOLLOWS

Page 1 of 2

BRAL-VTI Amendment to Stock Purchase Agreement 210506

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed on the date first written above.

**COMPANY**

Visual Technology Innovations, Inc.

By: _Mathu Rajan_
Name:     Mathu Rajan
Title:    President
Address:  1105 William Penn Drive
          Philadelphia, PA 19020

**INVESTOR**

Burlington Resources Asia Limited

By: _____
Name:     Timothy McCarthy
Title:    CEO
Address:  Old St. James's Vicarage,
          Maxwell Road,
          London SW6 2HR, UK

**EXHIBIT 14**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| . | Chapter 11 |
| IN RE: | . |
| . | Case No. 20-10766 (KBO) |
| STREAM TV NETWORKS, INC., | . |
| . | Courtroom No. 1 |
| . | 824 North Market Street |
| . | Wilmington, Deleware 19801 |
| Debtors. | . |
| . | May 10, 2021 |
| . . . . . . . . . . . . . . . . | . 9:37 a.m. |

TRANSCRIPT OF OMNIBUS HEARING ON SEECUBIC, INC.'S MOTION TO
DISMISS THE CHAPTER 11 CASE VIA ZOOM TELECONFERENCE
BEFORE THE HONORABLE KAREN OWENS
UNITED STATES BANKRUPTCY COURT

TELEPHONIC APPEARANCES:

For the Debtor:                Martin J. Weis, Esq.
                               DILWORTH PAXSON, LLP
                               One Customs House
                               704 King Street, Suite 500
                               Wilmington, DE 19899

                               - and -

                               Lawrence G. McMichael, Esq.
                               Anne M. Aaronson, Esq.
                               DILWORTH PAXSON, LLP
                               1500 Market Street
                               Suite 3500E
                               Philadelphia, PA 19102


(Appearances continued on next page.)

Audio Operator:                Madaline Dungey

Transcription Company:         Reliable
                               1007 N. Orange Street
                               Wilmington, Delaware 19801
                               (302)654-8080
                               Email: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

```
APPEARANCES (Cont'd):

For the U.S. Trustee:        Rosa Sierra, Esq.
                             OFFICE OF THE U.S. TRUSTEE
                             U. S. Department of Justice
                             844 King Street, Suite 2207
                             Lockbox #35
                             Wilmington, DE 19801

For the Official Committee   Christopher Samis, Esq.
of Unsecured Creditors:      POTTER, ANDERSON & CORROON, LLP
                             1313 N. Market Street, 6th Floor
                             Wilmington, DE 19801

For Visual Technology        John Sten, Esq.
Innovations, Inc.:           ARMSTRONG TEASDALE, LLP
                             225 Franklin Street
                             26th Floor
                             Boston, MA 02110

                             - and -

                             Jonathan Stemerman, Esq.
                             ARMSTRONG TEASDALE, LLP
                             300 Delaware Avenue
                             Suite 210
                             Wilmington, DE 19801

For SeeCubic, Inc.:          Jason Liberi, Esq.
                             Joseph Larkin, Esq.
                             Cameron Fee, Esq.
                             Carl Tullson, Esq.
                             Marley Ann Brumme, Esq.
                             SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                             One Rodney Square
                             920 North King Street
                             PO Box 636
                             Wilmington, DE 19899

                             - and --

                             Eben Colby, Esq.
                             SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                             500 Boylston Street
                             Boston, MA 02116

Also Appearing:              Reji Abraham
                             JAMUNA TRAVELS, INC.

                             Shad Stastney
```

INDEX

OPENING STATEMENTS:                                              Page

By:  Mr. Joseph Larkin                                           12
By:  Ms. Sierra                                                  24
By:  Mr. Samis                                                   25
By:  Mr. McMichael                                               30
By:  Mr. Sten                                                    41

WITNESSES:

MATHU RAJAN

        Cross-Examination by Mr. Larkin                          62
        Examination by the Court                                104
        Redirect Examination by Mr. LaMichael                   115
        Recross Examination by Mr. Stemerman                    118
        Examination by the Court                                120
        Recross Examination by Ms. Sierra                       125

TIMOTHY McCARTHY

        Cross-Examination by Mr. Colby                          131
        Cross-Examination by Mr. Sten                           183
        Cross-Examination by Mr. Weis                           188
        Examination by the Court                                194

CHARLES ROBERTSON

        Cross-Examination by Mr. Colby                          198
        Examination by the Court                                221
        Cross-Examination by Ms. Sierra                         224
        Cross-Examination by Ms. Aaronson                       230
        Cross-Examination by Mr. Stemerman                      234

BARBARA RUMORA-SCHELTEMA

        Cross-Examination by Mr. Liberi                         237
        Cross-Examination by Mr. Stemerman                      248
        Cross-Examination by Mr. Weis                           251

SVEN DUMOULIN

        Cross-Examination by Ms. Aaronson                       254

4

<u>INDEX</u>

| <u>EXHIBITS:</u> | | <u>I.D.</u> | <u>REC'D</u> |
|---|---|---|---|
| Declarations of Mathu Rajan | | 9 | 9 |
| Declarations of Charles Roberton | | 9 | 9 |
| Declarations of Burlington Resources | | 9 | 9 |
| Declarations of Shad Stastney | | 9 | 9 |
| Expert Report of Sven Dumoulin | | 9 | 9 |
| Expert Report of Barbara Rumora-Scheltema | | 9 | 9 |
| | | | |
| TX 44 | Email, Tavill-Stastney | 83 | -- |
| TX 179 | Email, M. Rajan-McCarthy, 2/8/21 | 91 | -- |
| TX 181 | Email, Tavill-M. Rajan | 80 | -- |
| TX 193 | Stock purchase agreement, 2/10/21 | 140 | -- |
| TX 197 | Exercise of Drawdown Rights | 142 | -- |
| TX 261 | Email, R. Rajan | 102 | -- |
| TX 268 | Email, M. Rajan-Davis | 87 | -- |
| TX 285 | Declaration of Timothy McCarthy | 134 | -- |

1          (Proceedings commence at 9:37 a.m.)

2          THE COURT:  Good morning, Counsel.  This is Judge

3    Owens.  We're gathered today for the motion to dismiss in

4    Stream, as well as a few other matters that are scheduled on

5    the agenda.  We have a lot of ground to cover today, so why

6    don't I turn the podium over to counsel for -- or excuse me,

7    all the counsel and why don't you let me know how you're going

8    to proceed today.

9          MR. LARKIN:  Good morning, Your Honor.  Joe Larkin of

10   Skadden Arps on behalf of SeeCubic, Inc.  Your Honor, I'm happy

11   to lead off here in terms of the agenda.  We're here on

12   SeeCubic's motion to dismiss the Chapter 11 case.  I think

13   there are a couple of housekeeping items before we get started

14   on that.

15         We've met and conferred with counsel for the debtor

16   and VTI in terms of witness order and the submission of the

17   declarations, so I'm happy to walk through that for Your Honor

18   before we get to openings.

19         THE COURT:  That would be great; thank you.

20         MR. LARKIN:  So with respect to the declarations,

21   Your Honor, that have been submitted by the respective parties

22   here, I think we have an agreement with counsel for VTI and the

23   debtor that we'll all sort of jointly move those declarations

24   into evidence before we get to the witnesses.  There's no

25   objections to the admission of those declarations subject to

1  cross-examination from our standpoint.

2           THE COURT:  Okay.  Counsel for the debtors and VTI,

3  do you agree with that approach?

4           MR. McMICHAEL:  Good morning, Your Honor.  This is

5  Larry McMichael for the debtor.  My partners, Anne Aaronson and

6  Marty Weis are with me.  Yes, we agree.

7           THE COURT:  Okay; great.

8           Mr. Stemerman?

9           MR. STEMERMAN:  Good morning, Your Honor.  Jonathan

10 Stemerman on behalf of VTI.  Your Honor, we agree, as well.

11          THE COURT:  Okay; great.  Well, should we -- should i

12 go ahead and move them in now, Mr. Larkin, or do you want to

13 wait until we're ready for evidence?

14          MR. LARKIN:  I think that's fine, Your Honor.  We can

15 move them in now.

16          THE COURT:  Okay.  So just for the record --

17          MR. ABRAHAM:  Your Honor, my name is Reji Abraham.

18 I'm one of the creditors for Stream TV.  Can I have a minute to

19 talk?

20          THE COURT:  I'm sorry; I didn't catch your name?

21          MR. ABRAHAM:  Reji Abraham from Jamuna Travels, one

22 of the creditors for Stream TV.  Is it possible to get one

23 minute --

24          THE COURT:  I'm sorry; who do you represent?

25          MR. ABRAHAM:  Jamuna Travels, one of the creditors.

1  I'm in the Creditors' Committee, also, but I just want to say

2  one thing, you know?

3          THE COURT:  Okay.

4          MR. ABRAHAM:  Is it possible to give me one minute?

5          THE COURT:  Sure.

6          MR. ABRAHAM:  Because I voted yes to seek a big

7  proposal, but we got only one proposal that time, you know.

8  That is the reason I voted for that.  But a couple of days ago,

9  I got the proposal from Stream TV Network, and they are

10  proposing 100 percent to the unsecured creditors.  I really

11  wanted to go along with the 100 percent creditors.  I just want

12  to let the Court know.  That is the only reason I wanted to say

13  that.

14          Your Honor, thank you so much for your time.

15          THE COURT:  I'm sorry.  You said you wanted --

16          MR. SAMIS:  Your Honor, this is --

17          THE COURT:  I'm sorry.  I'm so sorry.  I'm having

18  trouble understanding you, and I apologize.  It's between the

19  video connection.  But I'm sorry, you just wanted to say that

20  you support what?

21          MR. ABRAHAM:  Stream TV proposal because they are

22  offering 100 percent of the unsecured creditors.  I just wanted

23  to let you know.  Can you hear me?

24          THE COURT:  Okay; thank you.

25          MR. ABRAHAM:  Okay.

1    THE COURT:  I can.

2    Mr. Samis, did you want to say something?

3    MR. SAMIS:  Your Honor, yes.  Can you hear my audio?

4    THE COURT:  I can.

5    MR. SAMIS:  Your Honor, this is Chris Samis from

6  Potter Anderson as proposed counsel for the Official Committee

7  of Unsecured Creditors.  Mr. Abraham is a member of the

8  Creditors' Committee.  His entity is Jamuna Travels.  That is

9  the name of the creditor.

10    I think he's trying to state that he was outvoted by

11  the other two committee members with regard to approval of the

12  settlement that was proposed by SeeCubic.  So he's the

13  dissident member of the Creditors' Committee that did not vote

14  to approve the settlement.

15    However, under the governance document of the

16  Committee and bylaws, you know, as a duly-constituted creditors

17  committee, it does provide for majority to approve such an

18  offer.

19    So I think he's stating that, you know, he is the

20  dissident member of the Creditors' Committee.  He is supporting

21  the alternative proposal.  But I just wanted to make that clear

22  for the record.

23    THE COURT:  Okay.  Thank you, Mr. Samis.

24    And thank you, Mr. Abraham, for putting that on the

25  record today.  I appreciate it.

1          Okay.  So turning back to the declarations, I want to

2    be clear as to the docket numbers of the declarations that are

3    being entered into evidence today because I have a stack in

4    front of me.

5          So there's two declarations by Mr. Rajan, Docket

6    Number 51 and 179.  I have three declarations by Mr. Robertson;

7    77, 178, and I believe there's one more.  Can someone give me

8    that docket number?

9          MR. LARKIN:  Your Honor, I think it's 180 if it's the

10   second supplemental declaration that came in on Friday.

11         THE COURT:  Okay.  I have a declaration of Burlington

12   Resources at 168.  And I have two declarations by Mr. Stastney

13   for Docket Number 47, Docket Number 170.  And I have a

14   declaration -- excuse me, not a declaration but an expert

15   report of Mr. Dumoulin at 171.  Are we admitting the expert

16   reports?

17         MR. LARKIN:  Yes, Your Honor.

18         THE COURT:  Okay.

19         MR. LARKIN:  Your Honor?

20         THE COURT:  And I apologize.  Then there's one more

21   expert report, and that would be -- sorry, give me a moment --

22   Ms. Rumora's at Docket Number 182.

23         Okay.  Did I miss anything?

24                   (No audible response)

25         THE COURT:  Okay.  Well, they're admitted subject to

1  the parties' rights to cross-examine and redirect the

2  witnesses.

3    (Declarations of Mathu Rajan, Charles Robertson, Burlington

4   Resources, Shad Stastney and Expert Reports of Sven Dumoulin

5      and Barbara Rumora-Scheltema admitted into evidence)

6          MR. LARKIN:  Thank you, Your Honor.

7          THE COURT:  Okay.  Mr. Larkin --

8          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9          THE COURT:  -- anything else in terms of

10  housekeeping?

11          MR. LARKIN:  I think just in terms of the witness

12  order that we would propose, we have some witnesses who are

13  overseas and so we've agreed with the other side that the

14  witness order today subject to Your Honor's views, obviously,

15  would be Mathu Rajan; Tim McCarthy of Burlington Resources Asia

16  will testify second; Mr. Robertson from VTI and the debtor will

17  testify third; Ms. Rumora-Scheltema, VTI's Dutch law expert,

18  will testify after Mr. Robertson; then Mr. Dumoulin, our Dutch

19  law expert, and then Mr. Stastney will round out the batting

20  order today.

21          THE COURT:  I'm sorry.  Who was the last witness?

22          MR. LARKIN:  Mr. Shad Stastney, Your Honor.

23          THE COURT:  Oh, okay; thank you.

24          MR. LARKIN:  And, Your Honor, just one other --

25          THE COURT:  Okay.

1          MR. LARKIN:  -- (indiscernible) before I get

2     started.  I'm obviously at the podium right now.  Some of my

3     colleagues will also be presenting today.  They're not on

4     screen.  I think they're on another room, but my partner Eben

5     Colby from our Boston office will be presenting; my colleague

6     Jason Liberi will be presenting; and my partner Carl Tullson

7     will also be presenting, if necessary, Your Honor.

8          And with us today is also Mr. Stastney who's the

9     executive chairman of SeeCubic and a principal of SLS Holdings

10    is on the line today, as well, Your Honor.

11                              (Pause)

12         THE COURT:  Mr. Larkin, I can't recall.  Did the

13    parties agree on short openings?

14         MR. LARKIN:  We did, Your Honor, and I anticipate our

15    opening, at least on behalf of SeeCubic and SLS, will be about

16    15 minutes.  And we've also agreed to a chess-clock format,

17    parties supporting the motion versus parties opposing the

18    motion to split the time evenly over the next couple of days.

19         THE COURT:  Okay.  And you have -- you corresponded

20    -- for the record, you corresponded about this prior to today's

21    hearing via email with the chambers, and I communicated that

22    you should each designate time-clock keepers and that I will

23    not be responsible for keeping that time.  So I assume you all

24    have done that?

25         MR. LARKIN:  We have, Your Honor.  Mr. Cameron Fee

1  will be keeping the chess clock for the movants.

2          THE COURT:  Poor Mr. Fee.  Okay, thank you.  Thank

3  you, sir.

4          MR. LARKIN:  Among many other (indiscernible)

5  --

6          THE COURT:  Okay.

7          MR. LARKIN:  -- that he's doing in this case, Your

8  Honor.  He will bear that responsibility.

9          THE COURT:  Okay; great.  All right.  Well, then if

10 there's no opposition, why don't we just jump right into the

11 openings.  Is that acceptable to everyone?

12         UNIDENTIFIED SPEAKER:  Yes, Your Honor.

13         UNIDENTIFIED SPEAKER:  Good for the debtor, Your

14 Honor.

15         THE COURT:  Okay.  Okay; great.  All right.  Well,

16 Mr. Larkin, when you're ready.

17         MR. LARKIN:  Thank you, Your Honor.

18         Your Honor, we're here on our and the U.S. Trustee's

19 motion to dismiss the Chapter 11 case.  In an effort to help

20 orient the Court with the facts, we've prepared a short

21 presentation that I think provides a helpful roadmap for what

22 we're going to talk about today.

23         Your Honor, we filed our motion to dismiss shortly

24 after the petition was filed because we believe that the debtor

25 and, most importantly, its controlling stockholder and CEO, Mr.

1  Rajan, were attempting to use bankruptcy to escape final

2  judgment in the underlying court of chancery litigation.

3         The evidence that we've developed over the last month

4  has confirmed that the debtor filed this case to escape the

5  tentacles of the preliminary injunction and to attack the

6  validity of the omnibus agreement and the transfer of the

7  assets from the debtor to SeeCubic.

8         Expedited discovery has also confirmed that the

9  Chapter 11 case was filed in bad faith, in our view.  As we

10 explained in our papers and Your Honor will hear today, Mr.

11 Rajan is attempting to use his newly created VTI vehicle to

12 acquire the debtor's assets at a fraction of their value.  And

13 those are his words to Mr. McCarthy, his source of financing in

14 February of this year before the Chapter 11 case was filed.

15        And although the debtor has tried to persuade the

16 Court in its papers that bankruptcy will result in a

17 reorganization that will benefit all stakeholders, including

18 the unsecured creditors, I have to say I couldn't dream up a

19 plot that is more antithetical to the interests of creditors

20 than what Mr. Rajan attempted to pull off here.  And that's why

21 all of the parties that have seen the evidence, including the

22 U.S. Trustee and the Unsecured Creditors' Committee, agree that

23 this case should be dismissed.

24        Next slide, please.

25        Your Honor, the legal issue on our motion is

1  straightforward, was the Chapter 11 petition filed in good
2  faith.  We believe the evidence shows overwhelmingly that the
3  answer's no.  The Third Circuit has made clear that the Court
4  should examine the totality of the circumstances in making that
5  determination.
6         But there's two particular threshold inquiries here:
7  Does the petition serve a valid bankruptcy purpose, does it
8  maximize value of the estate's assets and does it preserve
9  going-concern value?  And then, secondly, was the petition
10 filed merely to obtain a tactical litigation advantage?  When
11 applying the evidence to that standard, Your Honor, it's
12 overwhelming that this case was filed in bad faith.
13        And you're going to hear from the debtor and VTI
14 about matters that are irrelevant to the motion to dismiss,
15 such as the debtor's alleged relationships, business contacts,
16 and events that occurred prior to the execution of the omnibus
17 agreement, and facts that have already been litigated in
18 Delaware.  Really all of that is meant to obfuscate the record
19 and distract from the dispositive inquiry before the Court of
20 whether the debtor's petition wasn't filed in good faith.
21        And let me just, you know, rest on this point.  The
22 U.S. Trustee has moved to dismiss the claim.  The UCC after
23 looking at the same discovery that we looked at and sitting
24 through the same depositions and reviewing the same documents
25 has concluded that dismissal of the Chapter 11 case is in the

1  best interest of the unsecured creditors.  And I'll note that

2  it was the debtor that pushed for the U.S. Trustee to form an

3  unsecured creditors' committee in response to our motion to

4  dismiss.

5          Next slide.

6          With respect to the first inquiry, Your Honor,

7  whether it serves a valid bankruptcy purpose, there's no

8  evidence that the bankruptcy will maximize the value of the

9  assets.  There's no evidence that bankruptcy will preserve

10 going-concern value.

11         Now the debtor, these aren't -- again, these aren't

12 my words, these aren't my witnesses' words.  The debtor's

13 witnesses and their documents confirm the following facts.  The

14 debtor has no employees.  It has no operations.  It has no

15 cash.  It has no revenue right now or prospect of generating

16 revenue in the near future.  And it has no assets.  And it has

17 no executed contracts with customers or distributors.

18         Next slide.

19         Your Honor, when I asked Mr. Robertson who wears two

20 hats here, he's an executive vice-president of the debtor and

21 he serves in a similar executive role at VTI under Mr. Rajan,

22 and he's the debtor's first-day declarant.  When I asked him

23 last week about the debtor's ability to generate revenue, these

24 were the answers he gave.

25         The debtor has not received any income or revenue

1  from a particular manufacturer who Mr. Robertson couldn't even

2  identify in his first-day declaration.  "Yes, Stream has no

3  financial resources."  Have there been any discussions or

4  negotiations with any of these potential customers?  Answer

5  would be no.

6         With respect to a product line that Mr. Robertson

7  talks about in his declaration that he will support future

8  revenue, I said is Stream currently pursuing that product line

9  or the development of that product line.  "Stream is not

10 currently pursuing anything given its lack of financial capital

11 to do so."  Those are the words of the first-day declarant and

12 the senior vice-president of the debtor.

13        With respect to the assets, I know that that's a word

14 that has been thrown around a lot in this case already.

15        Next slide, please.

16        These are the words of the debtor about a week after

17 Vice-Chancellor Laster entered his preliminary injunction order

18 in Delaware.  Again, these are Mr. Raja Rajan, then the general

19 counsel of the debtor, his words, on December 17th, 2020.  This

20 is an email that was sent to third parties after the PI order

21 was entered: "Does the assets of Stream TV and its subsidiaries

22 have all been transferred to a Delaware USA corporation named

23 SeeCubic Inc.?  Assets not only include tangible property, like

24 equipment, but may also include things like papers, plans,

25 strategies, and other documentation."

1          Your Honor, I couldn't have said it better myself.

2    This was the debtor's position in December of last year after

3    the PI had been entered, after they had been enjoined from

4    interfering with the omnibus agreement, past tense, assets have

5    all been transferred.

6          And when I asked Mr. Mathu Rajan about this email, he

7    said he hadn't seen it but, of course, he believed his brother

8    was being honest and wasn't trying to mislead anybody.

9          Your Honor, when you strip away -- next slide.  When

10   you strip away the rhetoric and the empty promises about

11   sources of financing that the debtor has secured and

12   manufacturing contracts that it thinks it can secure, it

13   becomes crystal clear that this Chapter 11 case was filed by

14   Mathu Rajan to obtain a tactical litigation advantage.  The

15   plan is very straightforward, and it's evident from their own

16   contemporaneous documents.  Let's escape the effects of the

17   preliminary injunction so that we can use VTI to acquire the

18   debtor's assets at a steep discount.

19         Now let's take a look, Your Honor -- and, again, just

20   to pause there, the debtor and its counsel have conceded that

21   they don't contest the validity of the omnibus agreement.

22   That's what they've said.  They've said it to Your Honor.

23   They've said it in depositions.

24         I asked Mr. Robertson about this -- this is slide 6.

25   I said, "You're not challenging what are the omnibus agreement,

1 are you?"  "No."  And, in fact, it goes beyond that.  "Are you

2 challenging any of the factual findings that the court of

3 chancery made in its December 8th, 2020 opinion?  Not that I'm

4 aware of."

5          But time and again since this case was filed, we've

6 heard about a tax -- collateral tax on the omnibus agreement

7 and the transfer of assets.  Your Honor, none of those issues

8 matter for today.

9          Now let's talk about some of the conflicts that we've

10 uncovered over the last month or so in discovery.

11          This is slide 7, please.

12          Your Honor, we talked about this in our reply brief,

13 and you're going to hear about it a lot today.  In our view,

14 and I think it's the position that the UCC and the U.S. Trustee

15 have also drawn after seeing the evidence, the debtor and VTI,

16 which is a vehicle that Mr. Rajan formed shortly after the

17 preliminary injunction was entered in December, are hopelessly

18 conflicted here.

19          Mr. Rajan is the sole director, the chief executive

20 officer, and the controlling stockholder of Stream.  Mr.

21 Robertson, the debtor's first-day declarant, is the executive

22 vice-president of Stream.

23          They also wear similar hats at VTI.  Mr. Rajan's the

24 president, the director, and the controlling shareholder of

25 VTI, the proposed plan sponsor and DIP lender of the debtor.

1  And Mr. Robertson is the executive at VTI, and he works

2  director under Mr. Rajan.

3          And as the testimony bore out in deposition, when

4  Stream TV and VTI are negotiating with each other, it's Mr.

5  Rajan on one side and Mr. Robertson on the other.  And

6  depending on what's being negotiated, they may be wearing their

7  Stream hat or their VTI hat or both hats.

8          And I asked Mr. Rajan -- slide 8, please -- you know,

9  how do you determine that the decisions you're making on behalf

10 of Stream are fair to the stakeholders of Stream and not the

11 stakeholders of VTI if you're a fiduciary of both companies.

12 And he said, well, because I take my VTI hat off when I'm

13 negotiating for Stream.

14          If it were only that easy, Your Honor.  There's no

15 special committee, there's no independent counsel, there's no

16 independent directors.  There's none of the procedural

17 safeguards that we all think about as sort of basic tenets of

18 fairness to protect minority stockholders and other

19 stakeholders.

20          Now let's talk about the timeline here in terms of

21 the tactical litigation advantage.  Your Honor, the omnibus

22 agreement was executed on May 6th, 2020.  As the court of

23 chancery found, the Rajan brothers, including Mr. Mathu Rajan

24 who's here today, refused to take any action to comply with the

25 omnibus agreement.

1          They filed in the court of chancery seeking to block
2    the transfer of assets pursuant to the omnibus agreement in
3    September of last year.  And on December 8th after a very full
4    record, Your Honor, seven depositions, twelve sworn
5    declarations, hundreds of exhibits, Vice Chancellor Laster
6    found that the debtor and Mr. Rajan were enjoined from taking
7    any action to interfere with the omnibus agreement.

8          And that includes asserting ownership rights to any
9    of the assets that used to belong to Stream TV, including the
10   Ultra-D technology and other IP, and asserting ownership rights
11   or control over TechnoVative or the Dutch subsidiaries.

12         Now with respect to some of the arguments that you're
13   going to hear today from the debtor, the Court found -- Vice
14   Chancellor Laster found on that record that the evidence that
15   the outside directors of Stream who approved the omnibus
16   agreement were validly appointed or acted as de-factor
17   directors and that that finding would support a grant of
18   summary judgment in SeeCubic's favor.

19         And he also found, contrary to what the debtor and
20   VTI have tried to argue here, that there was no evidence on
21   that record that the members of the resolution committee, the
22   independent directors, breached their fiduciary duties.  So
23   after that opinion came out, what happened?

24         Mr. Rajan went into full -- he went full board to try
25   to undo the omnibus agreement, incorporated VTI, which is

1  essentially an alter-ego company.  Shortly thereafter, he works

2  with a team and discusses a plan to cherry-pick the assets of

3  Stream TV for his new venture, VTI.  He discusses with

4  investors of VTI and the debtor to move the case out of the

5  court of chancery to federal court, i.e., bankruptcy court.

6          In February, he meets up with Mr. McCarthy, and he

7  makes him a proposal.  He makes Mr. McCarthy a proposal, and he

8  says VTI -- now he's wearing his VTI hat -- he says VTI has the

9  exclusive right to acquire all the assets of Stream TV, the

10  assets that were transferred to SeeCubic, but Mr. Rajan was

11  enjoined from interfering with them.

12          He says we have the exclusive right to acquire them,

13  and no only do we have the exclusive right to acquire them, I

14  have a plan that's going to allow us to acquire them in a

15  fraction of their value.  And Mr. McCarthy gets on board, as

16  we've seen from some of the filings over the last couple of

17  weeks.

18          Your Honor, two days before the Court was prepared to

19  enter a summary judgment in Delaware in favor of my clients and

20  against the Rajans and the debtor, they filed the petition.

21  And they filed a bare-bones petition.  There's no first-day

22  motions, no first-day declarations.  The plan was to avoid

23  final judgment in Delaware, plain and simple.

24          It wasn't until about a month later that we saw the

25  normal first-day filings that you would expect to see from the

1  debtor.  And it was only after we cried foul.

2          Again, Your Honor, don't take my word for it.

3          Can we go to slide 11?

4          Your Honor, this is an email from Knight Davis to Mr.

5  Rajan January 24th, a month before the filing.  Knight Davis is

6  a broker dealer that Mr. Rajan was working on to try and secure

7  financing for VTI.

8          And this was their narrative to investors like Mr.

9  McCarthy: "Attached is the revised back story as discussed."

10  It says, "Mathu will continue to challenge the Delaware court's

11  decision, and once he has the assets of Stream TV returned to

12  the company" -- Mr. Rajan knew that those assets had been

13  transferred to SeeCubic -- "Once the assets of Stream TV were

14  returned to the company, he will then be able to cherry-pick

15  from those assets."

16          February 8th -- next slide.  Mr. Rajan contacts Mr.

17  McCarthy who's with us today and you'll hear from.  He sends

18  him an investor deck on behalf of VTI, not Stream.  He says,

19  "It's the opportunity of a lifetime, Mr. McCarthy.  VTI has the

20  exclusive right to acquire Stream TV Networks, another blast of

21  (indiscernible) company."

22          He says, "We can acquire the company for a fraction

23  of the value" -- approximately U.S. $25 million, Your Honor,

24  after saying in the same email that he believes that Stream --

25  Mr. Rajan believes that Stream is actually worth between 200

1  and 600 million dollars.

2        I can't think of a more flagrant breach of fiduciary

3  duties of a director of the debtor working on behalf of VTI to

4  acquire the assets for a fraction of their value.  And you'll

5  hear from Mr. McCarthy, Your Honor.  Mr. McCarthy confirmed for

6  us last Friday that that was the plan.  He said it full stop

7  that was the plan.  He got the email, that was the plan.

8        Slide 13.

9        Here's the testimony, "That was your plan, right?

10  You're wearing your VTI hat, VTI would acquire Stream for a

11  fraction of its value?"  "Yes."  Mr. McCarthy, a week later in

12  deposition under oath says, "We can acquire the company" -- and

13  that's Stream TV -- "for a fraction of the value."

14        "That was the investment opportunity that you looked

15  at, correct?  And that was the plan as of the time you elected

16  -- at the time you elected to invest?"  "Correct."

17        That plan has not changed, Your Honor.

18        Next slide.

19        Your Honor -- can we go to the last slide, please?

20        The Chapter 11 case is nothing more than elaborate

21  attempt to violate the omnibus agreement, unwind the

22  transactions that had taken place, and funnel the debtor's

23  assets to Mr. Rajan through VTI.  The debtors have argued that

24  Prime Stone (phonetic) requires the Court to deny dismissal.

25  We disagree, Your Honor.  We think the Prime Stone factors

1  warrant dismissal.

2          There's no single factor here that's determinative,
3  Your Honor.  But the record will demonstrate that Stream's
4  Chapter 11 petition falls squarely on the patented abuse as
5  part of the filing spectrum.  There's no ongoing business.
6  It's effectively a two-party dispute that will be resolved in
7  the pending chancery court action if we're allowed to go back
8  there.  No cash.

9          There's no pressure from non-moving creditors like
10  the UCC.  There's improper pre-petition conduct.  We know VTI's
11  an alter-ego entity.  There's no possibility of reorganization
12  for the reasons I discussed.  And let's just thinks about the
13  subjective intent of the debtor that's evident from the
14  documents and testimony.  Prime Stone warrants dismissal here,
15  Your Honor.

16          Thank you, Your Honor.  And we look forward to
17  presenting out case today.  And I'm happy to answer any
18  questions.

19          THE COURT:  I have no questions at this time.  Thank
20  you, Mr. Larkin.

21          Before I turn the podium over to the parties that are
22  opposing the motion to dismiss, let me ask, Ms. Sierra, do you
23  have any presentation for opening?

24          MS. SIERRA:  Good morning, Your Honor.  Rosa Sierra
25  on behalf of the U.S. Trustee.  I do not have a presentation.

1  I just have a few remarks to make.

2          I just wanted to make the record clear the U.S.

3  Trustee still stands by its motion filed at Docket Entry 84 to

4  dismiss this case under Section 1112 of the Code because we

5  continue to believe this case was filed in bad faith to

6  relitigate or to use the tools of bankruptcy to second-guess

7  what the work that the chancery court already did pre-petition.

8          In that vein, Your Honor, you will be hearing a lot

9  more from SeeCubic and SLS during the course of this trial.

10 But the U.S. Trustee will participate in cross-examination and

11 closing arguments to the extent we deem necessary to assert our

12 position.

13         THE COURT:  Okay.  Thank you very much.  I appreciate

14 that.

15         Mr. Samis, given that the Committee supports

16 dismissal, did you have any opening remarks before I turn the

17 podium over to the debtors and VTI?

18         MR. SAMIS:  I do, Your Honor.  They'll be brief.

19         For the record again, Your Honor, Chris Samis from

20 Potter Anderson & Corroon as proposed counsel for the Official

21 Committee of Unsecured Creditors, I suppose for the next 48

22 hours or so anyway.

23         Just to discuss briefly what has transpired since the

24 last hearing, I think it will give Your Honor some useful

25 context in considering our position as it relates to the

 1  filings of the parties.  Your Honor, when we were formed in

 2  this case, we had an initial meeting where we established two

 3  goals as an official committee of unsecured creditors.

 4          One, we were going to examine the debtor's current

 5  assets and liabilities and its ability to successfully

 6  reorganize in these Chapter 11 cases and then, two, we were

 7  going to analyze all of the options available to fill our

 8  fiduciary duties to maximize recovery for general unsecured

 9  creditors.

10          In fulfilling those goals, Your Honor, we decided

11  that we needed to investigate four key items in these cases:

12  first, the validity, amount, nature, and extent of the SLS

13  senior secured notes and the Hawk Investment Holdings Limited

14  junior secured notes; second, the current assets of the debtor,

15  including its asserted ownership interest in TechnoVative Media

16  and its subsidiaries and related corporate governance issues;

17  third, whether the omnibus agreement could be avoided or

18  declared otherwise unenforceable in this Chapter 11 case; and

19  fourth, the viability of any potential claims as to the assets

20  that the debtor could bring or could be brought on behalf of

21  the debtor to create a pathway to value.

22          In performing and concluding those investigations,

23  Your Honor, we reached a series of four related conclusions:

24          First, the SLS notes and the Hawk note appear to be

25  valid and perfected to the tune of over $150 million and not

1  subject to viable challenge through recharacterization or

2  subordination.

3          Second, Stream validly transferred its equity

4  interest in TechnoVative prior to the petition date.  Thus, the

5  debtor's estate should not include the TechnoVative assets or

6  its interest in its subsidiaries or their assets.

7          Third, the omnibus agreement is likely valid and

8  enforceable.

9          And, fourth, the salient value transferred by the

10 omnibus agreement via fraudulent transfer claim under Section

11 548 of the Bankruptcy Code is unlikely to be successful and,

12 similarly, a preference claim to avoid same is likely to be

13 unsuccessful.

14         Your Honor, reaching those conclusions, we were faced

15 with a pretty harsh outcome for general unsecured creditors, to

16 say the least.  At the time we were reaching those conclusions,

17 Your Honor probably recalls at the last hearing, I had made

18 mention of maybe the parties could find a creative solution to

19 reach some sort of pathway to value in an otherwise very

20 difficult case.

21         To their credit, SeeCubic did exactly that.  They

22 approached the Committee, and they outlined a settlement that

23 we then proceeded to negotiate.  And it resulted in a

24 settlement agreement.

25         The terms of the -- the salient terms of the

1   settlement agreement at a high level are the funding of the

2   liquidating -- litigation trust, I mean, out of $225,000; a

3   promissory note for $2.5 million maturing in three years at a

4   rate of 3 percent per annum; the contribution to the trust of

5   equity interests in SeeCubic up to a total of two million

6   shares; and then causes of action against the Rajans which I

7   think Your Honor will see may be valuable as suggested by

8   certain pre-petition and post-petition conduct that is going to

9   be discussed during the course of these proceedings.

10          Your Honor, the Committee examined that offer through

11  the lens, as I mentioned before, of a likely -- through the

12  lens of likely pathways to value.  And in conducting its

13  analysis, as set forth in our statement that we filed, it

14  necessarily needed to consider the hurdles that are in front of

15  the debtor and VTI.

16          Those are namely four items.  First, you know, in

17  order to succeed on their pathway to value, the debtors and VTI

18  would need denial of the motions to dismiss.  They would need

19  to timely receive adequate financing.  They would need to

20  either avoid of reject the omnibus agreement.

21          And when I talk about rejection of the omnibus

22  agreement, it's unclear what effect rejection of the omnibus

23  agreement at this juncture would even have if the omnibus

24  agreement's mandate was already effectuated.  Other corporate

25  action to take control of the assets was already completed.

1          And it's also unclear what good that would do if the

2    existing secured debt remained in place and there was no way to

3    negotiate with SLS or Hawk or eliminate that, which dovetails

4    to the last hurdle, which is the invalidation or restructuring

5    of the secured debt.

6          So, Your Honor, in considering those items, we

7    reached this settlement.  Importantly, I'd note a couple of

8    things about the settlement beyond merely its terms or its

9    salient economic terms.  One, there's essentially what amounts

10   to a fiduciary out.  If the motions to dismiss are denied, the

11   Committee is released from its obligations to support, and we

12   can recalibrate our strategy accordingly.

13         But I also want to note that we're not asking the

14   Court to approve or retain jurisdiction over the settlement

15   because it's going to be effectuated post-dismissal.  And then

16   the last thing I would note is that we discussed this

17   previously with the United States Trustee and they are not

18   opposing the settlement.

19         So I would save additional detail for our closing.  I

20   can recap.  We can respond to any arguments that are made about

21   the Committee's participation or the settlement itself.  But I

22   wanted Your Honor to hear all this before you heard evidence

23   because I think that it adds useful background context to where

24   the Committee sits in the case and what it is that we hope to

25   accomplish.

1          THE COURT:  Okay.  Thank you very much, Mr. Samis.  I

2     appreciate that.

3          MR. SAMIS:  Thank you..

4          THE COURT:  Okay.  Well, why don't -- is there anyone

5     else that wishes to make any opening statements in support of

6     the motions to dismiss?

7                    (No audible response)

8          THE COURT:  Okay.  Why don't I turn the podium over

9     to the opposition parties, the debtor and counsel for -- or,

10    excuse me, the debtor and VTI.

11         MR. McMICHAEL:  Good morning, Your Honor.  This is

12    Larry McMichael.  I am counsel for the debtor.  And I just

13    started my time clock so I can keep track of my time.

14         The one thing you have not heard from any of the

15    parties advancing the theory that the case should be dismissed

16    is a discussion of the law.  The law actually is a little

17    important here.  And it starts, as the Court knows, with the

18    Third Circuit's decision in SGL Carbon, one of my favorite

19    cases because, actually, it was my case.  Unfortunately, I was

20    trying another case that week so my partner Jim Rodgers argued

21    it.

22         I actually wrote the briefs.  And SGL Carbon, you

23    know, set in motion a series of decisions, both of the Third

24    Circuit and in lower courts, which developed a doctrine, it's a

25    judge-made doctrine of the good-faith requirement.  And it's

1  important we focus on what that requirement is and how it

2  relates to the so-called tactical litigation advantage.

3         Now, as we all know, every single bankruptcy results

4  in an automatic stay of pending litigation.  So every single

5  bankruptcy by definition creates some sort of tactical

6  advantage.  That's not what the law is; that's not what the

7  Third Circuit was talking about in SGL Carbon or in Integrated

8  Telecom.

9         What they're talking about is when a debtor seeks to

10 take advantage of the bankruptcy process when it is not in

11 financial distress.  That is the theme that runs throughout

12 those cases, is the debtor in financial distress.

13        I can stop just there for one second and point out

14 that our friends in the other side have made that case for me.

15 This debtor clearly is in financial distress.  There's no

16 question about it.  And this is the kind of case that is

17 perfectly appropriate to go into a bankruptcy proceeding.

18        Now there have been a number of Delaware bankruptcy

19 court decisions involving dismissal.  The Rent-A-Wreck case,

20 relatively recent case by Judge Silverstein, is actually very

21 helpful and very supportive because, once again, picking up on

22 what the Third Circuit has pointed out, it considers whether

23 the debtor was in financial distress.

24        If the debtor is not in financial distress and goes

25 into bankruptcy just to get the automatic stay, which is what

1  happened in SGL Carbon, or it goes into bankruptcy just to cap

2  a landlord's damages claim, which is what happened in In re

3  Telecom, or it goes into bankruptcy just to reject a license

4  agreement, which is what happened in Rent-A-Wreck, when the

5  company is otherwise not in financial distress, that is where

6  abuse occurs where courts have found there is no bad faith --

7  no good faith and the case could be dismissed.

8          That is not this case.  We are clearly in financial

9  distress.  This debtor is about as distressed as you can get.

10  So let's look at another Delaware case, and I think this is an

11  area where we actually agree with the other side about the

12  factors that the Court has to look at.  There are a variety of

13  factors that the Court looks at.  And that's why we're having a

14  hearing today because it is, as the Third Circuit said, a fact-

15  intensive inquiry.

16          The case that I think is most helpful here is a

17  decision by former Judge Gross in a case called Crown Village

18  Farm.  And that was a single-asset real estate case.  It was a

19  case where the debtor, like here, was seeking to adjudicate

20  some things in the bankruptcy court that would deprive

21  creditors of state-law rights.

22          And what Judge Gross pointed out in that case is the

23  factors, and he distilled them from a number of cases,

24  including SGL Carbon, the factors that courts should look at,

25  and I'll just go through them one by one.

1          Is it a single-asset case?  Okay, this case is not a
2  single-asset case.  There are numerous assets.  Okay, there is
3  intellectual property.  There is equipment.  There are customer
4  relationships.  There are assets.  It's not a single-asset
5  case.

6          Few unsecured creditors?  We have 100 unsecured
7  creditors owed $20 million.  This is not a case where there are
8  few unsecured creditors.

9          No ongoing business or employees?  Well, prior to the
10  stripping away of Stream's assets pre-petition by the insider
11  creditors, Stream had assets, and it had a business.  It was
12  developing the technology taking it to market.  And it had
13  employees.  Those employees for now are housed at VTI because
14  the debtor has no money because we haven't been able to get a
15  DIP loan in this case yet, but once we get past the motion to
16  dismiss and get a DIP loan, the debtor will have employees.  So
17  that factor doesn't point toward dismissal at all.

18          Petition filed on the eve of foreclosure?  No, this
19  was filed after foreclosure.  Effectively, SeeCubic has stepped
20  in as an agent for the two secured lenders and acquired assets
21  from the debtor under the omnibus agreement.  We don't deny
22  that that happened.  We do deny that they acquired all the
23  assets.  I think some of the assets actually were not
24  transferred.  But that's a question for another day.  That's
25  not a test that we need to speculate about today as to what

1  assets are still in the estate or what assets aren't in the

2  estate.  Section 544 and 548 will guide us there.

3          Is it a two-party dispute?  That was something that

4  Mr. Larkin mentioned somewhat cavalierly, I thought.  It's

5  interesting that he thinks it's a two-party dispute.  As I

6  count them, there are two secured creditors; there's a debtor,

7  that's three; there's an unsecured creditors' committee, that's

8  four.  And that's assuming you don't count the unsecured

9  creditors individually.  If you do, there's another hundred.

10 All of those people have interests in the outcome of this case.

11         And those hundred unsecured creditors, not a single

12 one of them is a party to the chancery court.  Chancery has no

13 jurisdiction to weigh and balance the fairness to creditors.

14 That's not the chancery court's job.  That's the bankruptcy

15 court's job.  And that's one of the principal reasons why this

16 case should not be dismissed.

17         No cash?  That's not true.  The debtor has arranged

18 for cash.  The debtor proposed to bring in a million dollars

19 right after the case was filed through a DIP loan.  We haven't

20 gotten there yet, but the debtor will have cash and will have

21 the ability to prosecute its case and to reorganize.

22         Pre-petition conduct improper?  Hard to tell.  You

23 know, I mean I'm not going to argue that big time.  You know,

24 we can all point to things that people did pre-petition and

25 whether it makes sense or not.  There's this whole business

35

1   about acquiring assets at a fraction of their value.  That's --

2   and I don't want to overstate it, it's a silly argument.  The

3   assets, if this case succeeds, will come back into the debtor.

4        Who acquired those assets before the bankruptcies?

5   SeeCubic acquired them.  How much did SeeCubic pay?  So far

6   nothing.  What are they obligated to do?  Well, they're

7   obligated to forgive their debt, but they haven't done that

8   yet.  And even if they did, it's $140 million worth of debt,

9   and everybody agrees the assets are worth two or three times

10  that, at least, okay.

11       Don't take my word for that.  You will see in

12  evidence SeeCubic's balance sheet valuing the assets and

13  putting a footnote saying this is their estimated fair market

14  value.  By the way, it's 336 million.  So, at most, they paid

15  140 for the 336.  So Mr. Rajan's not acquiring any assets for

16  himself.  He has no right to do that and no authority to do

17  that.

18       If we succeed, the assets will come back into the

19  estate.  I represent the estate.  And they will be subject to a

20  plan of reorganization, and the disposition of the assets will

21  be pursuant to a plan that will be confirmed by this Court.

22  And that will by definition be a fair disposition.  No one's

23  running off with assets here, nor could they.  It's just not

24  possible in a bankruptcy case to do that.

25       No pressure from creditors?  Well, that's not true.

1  We have enormous pressure from the secured creditors who are

2  stripping the assets out of the debtor, and we also have

3  lawsuits filed by unsecured creditors.  There is plenty of

4  pressure by creditors.

5          Debtor formed immediately pre-petition?  Debtor was

6  formed ten years ago.  This is not a case where the debtor was

7  created in order to take advantage of a bankruptcy.

8          And the subject of intent of the debtor?  So the

9  subject of intent's a little hard to measure because people

10 will point to various pieces of evidence and things like that.

11 But the bottom line here is that the debtor has an interest

12 itself, and the debtor has a fiduciary responsibility to its

13 creditors to maximize the value of the estate's assets and to

14 distribute fairly to creditors.

15         The debtor believes it can do 100-percent plan here,

16 and it has the financing to do that.  You'll hear a lot about

17 that later today briefly from Mr. McCarthy who is providing

18 financing to VTI who, in turn, will provide it to the debtor

19 through DIP loans or through exit financing.  There's plenty of

20 cash available or will be plenty of cash available to do what

21 needs to be done here and to treat people fairly.

22         So what is the consequence of dismissing the case?

23 Let's go back to the omnibus agreement.  The omnibus agreement

24 is a contract governed by state law.  State courts enforce

25 contracts.  That's what they do.  Secured creditors have

1  contracts all the time, and those contracts are enforced by

2  state courts.

3         It's not up to a state court to determine what's fair

4  to the estate or what's fair to other creditors.  That is

5  beyond the jurisdiction of the state court, beyond the

6  jurisdiction in this case.  So the chancery court because the

7  estate was not a party to the case because they didn't exist

8  until the petition was filed.  And not a single unsecured

9  creditor was a party to that case.

10        It approved -- the state court approved the

11 enforcement of the secured creditors' contract.  So we need to

12 look at that contract.  And on its face, you don't need to read

13 very far, you don't need to study it very carefully because on

14 its face, it is a fraudulent transfer in at least two ways.

15        The first way that's obvious is all of the assets of

16 Stream under the contract get moved to SeeCubic.  SeeCubic

17 assumes the secured debt and a tiny little fraction of the

18 unsecured debt, leaving 17 or 18 million dollars of unsecured

19 creditors behind.  It says it right in the contract.  That is a

20 contract designed to hinder, delay, or defraud the collection

21 of debt by unsecured creditors.  They have nothing left.  They

22 have claims against Stream that has no assets after the omnibus

23 is enforced.

24        As I said, it's right there on the face of it.  And

25 to make matters worse, SeeCubic takes on the equity.  Except

1  for the equityholders they don't like, the Rajans, all the

2  other equityholders in Stream become equityholders in SeeCubic.

3  So SeeCubic -- it's a great deal, SeeCubic gets the assets for

4  a half of what they're worth based on its own balance sheet,

5  assuming they forgive all the debt that they're supposed to

6  forgive.  The equity keeps their equity.  And $18 million of

7  unsecured creditors are left holding the bag with nothing in

8  it.

9          That's a fraudulent transfer.  Now we don't need to

10 decide today whether we have a good claim or not, and, you

11 know, I'm a little confused by Mr. Samis' position on that

12 because the last conversation I had with him before he switched

13 sides, he wanted to be a co-plaintiff and thought it was an

14 extremely strong claim.

15         But whether the claim is successful or not is not the

16 issue for today.  The question is is it a proper bankruptcy

17 purpose to challenge the transaction under the Bankruptcy Code,

18 Section 548, for the benefit of the estate, and it absolutely

19 is.  There's no question about that whatsoever.

20         Second thing is I've mentioned it before, there's a

21 valuation done by the debtor pre-petition valuing the

22 intellectual property between two and six hundred million.

23 There's the balance sheet of SeeCubic putting it at 336

24 million.  Close enough because the one thing we can agree to,

25 it's worth a lot.

1        There's enough value there to pay creditors and pay

2   them in full in a plan that's properly financed, which we have

3   arranged for.  That is what bankruptcy is here to do.  And, you

4   know, this theory that we're attacking the omnibus, yeah, we're

5   attacking it because it's a fraudulent transfer under the

6   Bankruptcy Code.

7        The chancery court doesn't look at Section 548 when

8   it decides to enforce contracts.  State courts don't do that.

9   That's not what they're there for.  This is a different legal

10  system.  And once it's in bankruptcy court, the contract is

11  subject to bankruptcy scrutiny.

12       The asset transfers, those that have occurred, are

13  also subject to bankruptcy scrutiny under 544.  And we'll see

14  how good those transfers are.  We have serious doubt as to

15  whether the TechnoVative stock would survive scrutiny under 544

16  but, once again, that's not a decision anybody has to make

17  today.  That's a case built on a separate record to be decided

18  later, but it's a valid bankruptcy purpose to look at transfers

19  and to bring assets back into the estate for the benefit of the

20  many unsecured creditors who are left holding the bag by the

21  omnibus agreement.

22       Now the fact that the Creditors' Committee made an

23  eleventh-hour deal and switched sides getting, you know, maybe

24  ten cents on the dollar if it works for them, that has little

25  to do with anything.  That's not one of the tasks.  That's not

1   one of the things the Court looks at.  What the Court looks at

2   is are we in financial distress?  Clearly we are.  Do we have a

3   valid bankruptcy purpose for the case?  Clearly we do.  I just

4   described it.

5           And can we reorganize?  It's very, very -- every

6   secured creditor in every debtor's case I've had for the last

7   40 years has told me you'll never reorganize, there's too much

8   secured debt, we have a veto right.  And, guess what, somehow

9   we find a way to reorganize because deals get made.  Money

10  comes in, creditors scratch their heads and say, okay, fine,

11  we'll take some cash and we'll go.  A lot of different ways of

12  reorganizing cases.

13          And I would submit it's very premature for the Court

14  today to say there's no possibility that this case can

15  reorganize, particularly when we have a very large amount of

16  incoming available capital to do that.

17          So that's the debtor's case, and that's why the Court

18  should deny the motions to dismiss.  It's not a plebiscite.

19  You know, this is not a vote of creditors.  What we have right

20  now is we've got the secured creditors who want their deal, and

21  we've got unsecured creditors who have hedged their bets.

22          And, by the way, two out of the three are the

23  unsecured creditors.  That's two members of the Committee out

24  of a hundred unsecured creditors.  That's not what the Court

25  should be looking at.  What the Court should be looking at is

1  the standards that are articulated by the Third Circuit and by

2  the case law -- financial distress, legitimate bankruptcy

3  purpose.  And we meet those.  We meet them easily.

4          Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. McMichael.

6          Okay.  Does VTI want to make an opening statement?

7          MR. STEN:  I do, Your Honor.  Good morning.  My

8  name's John Sten.  I represent Visual Technology Innovations.

9  As you know, it's referred to often as VTI.  I'll try to keep

10 this brief.  I know those are famous last words for me, but I'm

11 running my clock we I know.

12         So VTI is the proposed financer of the debtor.  I

13 think that's fair.  And I want to talk a little bit about what

14 the evidence we believe is going to show here, Your Honor.  Now

15 you've heard, you know, from a lot of people and I'm batting

16 cleanup here, but I think the pieces that I'm going to talk

17 about are some of the most relevant here, which is as I just

18 said, VTI is the proposed financer of the debtor.

19         The evidence is going to show you, Your Honor, and

20 Mr. McCarthy who's going to testify is going to talk about this

21 and I invite the Court to ask whatever questions it wants of

22 him.  But it's going to show that it's VTI's intention to put

23 in place a financing plan in this case to pay off all the

24 creditors in the action, secured and unsecured, and to provide

25 enough capital so that any reorganized entity can move forward

1  with a viable going concern and business plan.

2         And as I said, this plan calls for an initial funding

3  which is in the neighborhood of 180 million.  You will hear

4  from Mr. McCarthy it originally started with an option to

5  increase it a bit more, around 120.  Now it's actually up to a

6  total of option to increase of up to $500 million, Your Honor.

7         So for something that everybody says on the other

8  side, movant's motion to dismiss says it's not really worth

9  much, we're foreclosing in order to pay off some of our debt,

10 the fact that there's someone who is going to tell you is

11 ready, willing, and able to fund this debtor to the tune of 180

12 million of 500 million should tell you something about the

13 perceived value of the assets here.

14        Now, Your Honor, I'm going to ask so I've had the

15 benefit of listening to everyone else, but you'd expect a plan

16 of financing like this to be met with open arms by everybody.

17 And, instead, what have you heard?  You've heard derision,

18 you've heard hostility, and you've heard some outright

19 mischaracterizations, which the evidence is going to show you.

20 I'll touch on some of them, but I don't really need to because

21 I know what the evidence is going to show.

22        But I want to step back and I'm not a bankruptcy

23 lawyer by trade.  I'm sure that will show up at some point

24 here.  But I asked myself why is this case that someone who

25 wants to come in and pay off the secured creditors in full with

1  interest, the unsecured in full, is met with such hostility.
2  In my mind, I'm like there must be something else at play here.
3  Why wouldn't they want to be repaid?

4          You know, and you heard a lot about Mathu Rajan and
5  Mr. McCarthy saying, oh, we could pick up this asset at, you
6  know, a fraction of the value.  Well, anything that's going to
7  occur here is going to occur under the bankruptcy court's watch
8  if it stays in a motion to dismiss.  And so anything that
9  occurs in that regard, Your Honor's going to have supervision
10 and oversight on.

11         So it sort of boggles the mind.  In fact, the only
12 way that something like that could happen is if this motion to
13 dismiss is allowed and then, with all due respect, then movants
14 -- SLS, Hawk, Shad Stastney, who we're going to talk about, and
15 SeeCubic -- then they can do something, you know, along the
16 line of which they've already tried to accomplish out of the
17 sight of both the debtor and this Court.

18         So it's obvious to me the secured debtors for all of
19 what they're saying is they don't want to be repaid.  What they
20 want is Stream's assets because they know they are more
21 valuable than their secured debt and that they're going to --
22 and that if they're able to acquire them fully and keep them
23 fully, they're going to have a windfall that benefits them and
24 a select few because, certainly, under that settlement of the
25 unsecured creditors, it's really not going to benefit them very

1  much.  I think that equals just a little bit over ten cents on

2  the dollar.

3          So, Your Honor, I want to talk a little bit and give

4  you some background because you've heard this case as being

5  about two individuals, and movants have made a big show of

6  trying to say, oh, it's Mathu Rajan as this alter ego of VTI.

7  It's not the case, and we're going to talk about that, Your

8  Honor, a little bit.

9          But before I do that, I want to talk about why this

10  is important to talk about, Mr. Stastney, SLS, and SeeCubic,

11  because I think you're going to understand that there is a

12  pattern of conduct here that is very important as to why this

13  case was filed in good faith because the pattern of conduct is

14  just what I'm saying, which is a predatory lender who is going

15  to take out and pull out at all stops in order to enrich

16  himself and his, for lack of a better word, cronies at the

17  expense of others.

18          Now people may ask why is the motivation of Stastney

19  and SeeCubic, which you're going to hear a lot about here,

20  relevant of whether or not the debtor filed this case in good

21  faith.  Well, it's because the subjective belief of the debtor

22  in filing in good faith has to be understood through their

23  eyes.  And as much as they want to say that this is a

24  litigation tactic, it's not.  Debtor came here seeking this

25  Court's protection.  It came here seeking this Court's

1    protection against a predator.  And this is a predatory action,

2    make no mistake.

3          You're going to hear, you know, you've heard a lot

4    about this chancery court.  Originally, debtor went to chancery

5    court to try to find protection.  No avail, we're not going to

6    get into whether that was a good or bad decision, but it found

7    itself at the end of it with SLS and SeeCubic and emboldened

8    and trying to take all the assets and leave it with all the

9    secured creditors -- or unsecured creditors, pardon me, Your

10   Honor.  With all the unsecured creditors.

11         Think of that.  You have at the end of December, as

12   the evidence is going to show, a schedule that comes out that

13   says that SeeCubic's going to take a million dollars of

14   unsecured creditors and assume those liabilities and leave

15   Stream holding the bag.  And there's email after email about

16   Mr. Stastney actually encouraging the creditors to go after

17   Stream in that regard.  So what choice did it have?  Well, one

18   choice was to file for bankruptcy, and that's what it did.

19         So I want to move back with my limited time to talk

20   about Mr. Stastney.  And you'll see why this is important

21   because this is not, as movants say, two individuals with a

22   dispute.  What this is is, as I say and the theme is going to

23   be the same which is this is a predator.  Mr. Stastney is a

24   predator.  And it shows he operates in the gray areas of

25   corporate and finance law.

1          And here's some examples, and it's interesting
2   psychology in a way because a lot of things of what you hear on
3   the other side, you know, obviously, that's how they would view
4   them because that's how they are.  That's how they operate.
5   And so, of course, they're going to project that on someone
6   else.  And here's where I'm showing it.
7          SLS is the movant along with SeeCubic, but both
8   SeeCubic and SLS, they're basically Shad Stastney.  That gets
9   hidden.  The lawyers kind of do their three-card monty, try to
10  keep that from showing it.  But Stastney's testimony's going to
11  show that SLS is Shad and two partners, neither of whom were
12  actually involved in Stream or currently involved in SeeCubic.
13  He admits they're passive investors and that he pulls all the
14  strings.
15         As to SeeCubic, it's actually, again, it's -- when
16  you boil it down, it's actually Stastney.  Now it tries to
17  dress it up by taking on the idea that because it purportedly
18  has the assets of Stream now that it has all these business
19  operations.  But, again, those are all downstream in the same
20  subsidiaries that they've always been in.  SeeCubic itself
21  didn't exist until May 20th.  Stastney's incorporator is the
22  executive chairman of the board of SeeCubic.
23         Now you've seen claims that it has 120 shareholders,
24  but it hasn't issued a single share of stock according to Mr.
25  Stastney.  Think about that, not a single share of stock has

1  been issued.  And there's no evidence of a corporate resolution
2  putting either Mr. Kabacinski or Stastney on the board.
3  They're the supposedly two board members.

4          For all intents and purposes, if you want to talk
5  about alter egos, SeeCubic is the alter ego of Stastney because
6  as the evidence in this case is going to show you, he does what
7  he wants, when he wants, and how he wants.

8          And talk about the pot calling the kettle black.  You
9  heard a lot about fiduciary duties and corporate formalities
10  and all that.  And you'll watch the evidence show you Mr.
11  Stastney just rides rough shot over it all.  Using this power
12  of attorney that he has for seemingly everything, he puts
13  himself on both sides of a number of transactions without
14  regard.  He makes up a document when he needs to and signs it
15  on both sides of it and sends it along to his lawyers.

16          There are no checks and balances on this man, and the
17  evidence is going to show this.  And this is the same pattern
18  he did for SLS and the same pattern that he did for the asset
19  company that -- asset management company that he had before.
20  And you're going to hear about that.  We're going to show you a
21  pattern of conduct that goes back years as to Mr. Stastney and
22  that runs through this case today, and it's very important
23  because it really bears on the reason why the debtor needed
24  bankruptcy protection.

25          For example, Mr. Stastney was an investment manager

1  of a company.  And the company -- the management company ran a

2  $5-billion investment fund.  Mr. Stastney's no longer that.  He

3  was barred by the SEC because as part of that, he took $2

4  million and didn't disclose it to his -- either to the fund or

5  to other management -- his other management partners who, by

6  the way, actually happened to be the same partners in SLS who

7  are termed as passive investors.

8          He had this inside deal that he just -- if you're

9  running a $5 billion fund, I don't know why you need to do

10  something like that, which actually bows up your ability to

11  operate as an investment manager in the future since he's

12  barred now.  But he did.  It did.

13          I'm also going to show you how since that -- since I

14  think going back ten years, Mr. Stastney's found himself as a

15  defendant in at least five different lawsuits as a defendant

16  for conduct that's very similar to what he does here.  It's

17  breach of fiduciary duty, fraud, breach of contract, tortuous

18  interference.  And I'm not even counting the litigations in

19  this case.

20          These are all separate litigation where he and his

21  companies acted as a predator to other companies and had to

22  fight off and, lo and behold, it wouldn't shock you, there are

23  a lot of lawyers here today are probably the lawyers in that

24  case -- those cases.  But this pattern of conduct shows you a

25  predatory lender who has a pattern of what he does.  He gives

1   money, he blows up the company, he takes the assets, he flips

2   them, he sells them, he does something, he never seems to run

3   them, for a profit.  And that's the pattern here, and it

4   carries over in their present dispute.

5          As the evidence is going to show, when Stastney --

6   when Mr. Stastney was on the board of directors of Stream and

7   serving as the CFO, he actively discouraged potential investors

8   from investing.  When he -- now this is at a time when Mr.

9   Stastney was on the board and CFO.  He learned about the

10  existence of the omnibus agreement.  Did he turn around and

11  tell his fellow board members or inform the company to which he

12  owed a fiduciary duty about that agreement?  No.  No, he

13  didn't.

14         Further, this sort of gray area slided through.  It

15  even runs into the Court here.  Now as Your Honor remembers,

16  when Mr. Stastney first came on the scene, he filed a

17  declaration here.  Exhibit 1, he states, was a true and correct

18  copy of the omnibus agreement.  He states that under oath.  As

19  you're going to see, Your Honor, that's not even true.

20  Instead, if you look at Exhibit 1 of that declaration, he tried

21  to slide it by everybody, including this Court.

22         There's a letter agreement and an omnibus agreement.

23  In fact, now magically, there are two different exhibits in

24  movant's papers.  But when he did it there, he tried to slide

25  it by just like he did in the chancery court, it turns out.

1   And, again, we're not going to -- we don't need to talk about

2   the validity of the omnibus agreement.  It's irrelevant.  It's

3   a red herring by the other side.

4        But what we do need to talk about is the pattern of

5   conduct that it represents because what it is is Mr. Stastney,

6   it's always deals within deals within deals that benefit him

7   and it's always a pattern that when someone gets in the way, he

8   buys them off just like he did to the Creditors' Committee

9   counsel here.  That's what he did, and I'll show you.

10       The omnibus agreement, it has Stream, it has certain

11  investors, it has SLS and Hawk.  So it has four ones.  So

12  that's the agreement we all originally came into this case

13  thinking about.  Well, as I just said, it turns out there's a

14  second one.  This is a little bit of the inner circle because

15  this time Stream's not in that contract.  Stream wasn't even

16  told about it.  The resolution committee didn't officially seem

17  to consider it.

18       Now we have found evidence that those people knew on

19  their personal emails and personally knew about it, but it's

20  not part of Stream's corporate record when it approved the

21  omnibus agreement.  So for all intents and purposes, it didn't

22  exist as a corporate matter.  But what it did do is it actually

23  obligated Stream to issue 48 million shares of Stream stock to

24  SLS, Hawk, and the investors.  So a side deal right from day

25  one.

1        Now it turns out we thought there were two

2   agreements.  Now we find out there's even an inner circle to

3   the inner circle.  Last week, we were given a document called,

4   weirdly enough, omnibus agreement.  This time it's just Hawk

5   and SLS.  And in answer to the question, one, Hawk has a 150

6   million in debt here.  Mr. Stastney and his SLS company have

7   like 11.

8        So why is Mr. Stastney the man about town and

9   everything here?  Well, it turns out that deal within a deal

10  within a deal which is Hawk gave up all power in this case to

11  Mr. Stastney and SLS to do what he wanted, when he wanted, and

12  how he wanted.  And, again, the investors who were a part of

13  that middle deal, they're not on this.  It's always with him.

14  There's always a deal within a deal within a deal.  And you're

15  going to see that here, as well.

16       So instead of the one omnibus agreement, now we're

17  dealing with three.  And, again, that pattern is important

18  because Mr. Stastney buys people's cooperation.  That's his

19  habit.  That's what's shown through all these things.  It's

20  even shown where magically in June 2020, you're going to see

21  the two resolution board people who voted for the omnibus,

22  they somehow magically are showing up in this private placement

23  that's going out to investors for SeeCubic as board designees

24  for SeeCubic.

25       Now in some sort of weird revisionist history, Mr.

Stastney waves his hands and now they're no longer involved in
that at all and it's just him and Mr. Kabacinski again.  But
you're going to see the document that shows that they
originally were -- as early as June 2020 were going to be part
of SeeCubic.  And, again, it doesn't go towards the validity of
the omnibus agreement.  That's irrelevant here.

What it goes to is that this is a predator who buys
people off when it's in his best interest.  And he'll cut them
out when it's not, just like the creditors' committee, which
was cut out until we filed for -- until the debtor filed for
bankruptcy here.

And you're going to see in this whole case that his
whole predatory lending and predatory way of action is in full
view here.  Now, before we -- and as I hit my time limit, I
want to -- I'm going to jump around a little bit.  But I want
to talk about some of the things about assets.

Now you heard a lot about how supposedly Mr. Rajan
said that there was no assets here.  Well, what you're going to
hear is on the opposite side is Mr. Stastney says there are
assets here.

You're going to hear Mr. Stastney admit, as he did in
his deposition, that the debt of Hawk and SLS wasn't discharged
because there's still assets that remain outstanding as to the
debtor.  He admits straight out in his deposition debtor has
not conveyed, transferred, delivered, and assigned all of

1  Stream's assets to SeeCubic.  He admits it; not even a

2  question.

3           And they're not just small assets.  In fact -- and,

4  in fact, this isn't even one that he says he wants.  It turns

5  out, as my brother had mentioned, Mr. Stastney says that

6  SeeCubic did not take the goodwill of Stream.  And the reason

7  why is because if you take the goodwill of Stream, you're

8  actually in some ways considered a successor liability, and all

9  of the liabilities come with you.

10          So at some point, they figured this out and they say,

11  okay, well, we're going to now rewrite history again and say

12  we're not taking that goodwill.  But prior to not taking it,

13  they were valuing it around 270 million.  So if they didn't

14  take it, then that goodwill is now back as part of the debtor

15  and it's an asset, which is very, very important to understand

16  is that there are --

17          THE COURT:  I'm sorry.  I'm sorry.  I want to

18  interrupt you for one second.  How do you even take goodwill?

19  Explain that to me.  And that's just me --

20          MR. STEN:  When you --

21          THE COURT:  -- not understanding.  So how do you

22  actually buy goodwill?  What is goodwill?

23          MR. STEN:  Well, you can't -- well, that's the thing.

24  In an asset purchase, you can't buy goodwill because you're

25  only purchasing the assets.

1              And so -- and I can show accounting treatment, which
2     I do a lot of finance things, so that if you were to take
3     goodwill of a company, you're essentially taking the company
4     itself and you set yourself up for successor in interest
5     liability for that reason because goodwill is obviously -- you
6     can value goodwill, but it's actually, you know, the name, the
7     sort of business enterprise intangible value that you've built
8     up.
9              And it's not that you can't take it.  The problem is
10    if you take it, then really most times you're finding yourself
11    in a trap where you have successor in interest liability
12    because you're more or less taking the entire company.  When
13    you want to do an asset sale, you absolutely cannot take
14    goodwill without falling into that trap.
15              MR. McMICHAEL:  Your Honor, may I just address your
16    question?
17              THE COURT:  Thank you for clarifying.
18              Sure.  I hate to derail Mr. Sten's opening.  I just
19    wanted to --
20              MR. STEN:  But actually --
21              THE COURT:  -- clarify --
22              MR. STEN:  -- actually it's good because it gives me
23    that little breather where I can get to the end to kind of try
24    to wrap it up, Your Honor.
25              THE COURT:  Okay, good.  Well, Mr. McMichael, why

1  don't I turn the podium over to you and then Mr. Sten can

2  organize his last remaining remarks then.

3          MR. McMICHAEL:  Thank you, Your Honor.  And I just

4  want to answer to the Court's question very directly.  The

5  goodwill in this case is the prospective value of the

6  technology.  That's really what it comes down to.  And it does

7  line up with the debtor's valuation.  The valuation that

8  SeeCubic put on its balance sheet is generally consistent with

9  the debtor's valuation.  That's --

10         THE COURT:  Okay.  And you said that was roughly

11 around 200 million?

12         MR. McMICHAEL:  No.  The debtor's valuation --

13         UNIDENTIFIED SPEAKER:  About 300 --

14         MR. McMICHAEL:  -- is 200 to 600.  The SeeCubic

15 valuation is 336 million.  So the SeeCubic valuation is in the

16 range of the debtor's valuation.

17         THE COURT:  Okay.  Thank you.

18         MR. McMICHAEL:  Thank you, Your Honor.  Sorry to

19 interrupt.

20         MR. STEN:  No, it's good.  And I'll -- I have three

21 more points and then I'm done because I want to address this.

22         Movants in their opening, in their papers, they're

23 said this is a litigation tactic to avoid final judgment in

24 chancery court.  One of the things that -- again, sometimes I

25 just go back to basic common sense.  What litigation tactic

1  would that serve?  I mean the opinion of the chancery court on

2  the preliminary injunction which, again, is only preliminary,

3  still exists.  The statements of the chancery court still

4  exist.

5          So what is that something extra that the final

6  judgment would have gotten movants that they say debtors so

7  needed to avoid?  Final judgment?  Well, what would that have

8  done?  Well, you know what it would have done?  It would have

9  allowed the debtor to appeal a chancellor who actually finds

10 himself reversed quite often.

11         So if you want to talk about a bridge to nowhere,

12 which is the term you'll hear out of movant's mouth quite a

13 bit, you know, staying the chancery court at that stage is a

14 bridge to nowhere because now it's in the status Quorum.

15         I don't understand what the litigation tactic there

16 would have been given the fact that the -- you know, the terms

17 of the preliminary injunction order at that time.  And it

18 didn't seem to impede SeeCubic at all.  So it's an odd thing.

19         But I also think that's why they switched to this

20 acquire the assets cheap.  But that's not a litigation tactic.

21 That's -- isn't that really a tactic that happens in bankruptcy

22 normally, which is the debtor reorganizes and, you know, deals

23 are cut with creditors and everything else?

24         Now because of the fact and Mr. Stastney's actions

25 here, that's not going to happen.  It's VTI and debtor's

1  intention to pay 100 cents on the dollar, as you're going to

2  hear from Mr. McCarthy.  And I do want to touch on Mr.

3  McCarthy.

4          It's absolutely unfair for them to disparage him the

5  way it is.  He has come into this case, and he's going to

6  testify, Your Honor, he is a director of VTI which, by the way,

7  is a real company.  It has five current directors, two -- one

8  of them is Mr. McCarthy, one's picked by him, and one is going

9  to be picked by him to make six.  And then the other three are

10 the Rajans.

11         But it's not an alter ego, not even close.  And

12 Burlington Resources, by the way, Your Honor, it's a financial

13 investment company based in Hong Kong that has over a billion

14 dollars in assets.  To them this is not a big deal.  And a

15 majority of those assets are owned by Mr. McCarthy.  He's going

16 to be testifying here today from Spain, so we appreciate that

17 and hopefully we don't have any technological issues.

18         But he's going to come on and he's going to tell you

19 he's committed to financing VTI and the debtor, no

20 contingencies.  He's committed to paying off the secured

21 debtors in full, no contingencies.  He's committed to paying

22 off the unsecured debtors in full, no contingencies.  And he's

23 committed to financing the ongoing operations and needs of the

24 debtor.

25         Your Honor, normally in a bankruptcy, that would be

1  met with trumpets and open arms.  It never happens.  But,

2  again, I go back to look what you're met with, derision and

3  hostility because they don't want their debt -- the debt paid.

4  They want these assets which they know give them a windfall

5  that's commercially unreasonable for given the debt that they

6  have.  And Mr. Stastney has taken actions to make sure that

7  that happens, which is why the debtor ended up in bankruptcy

8  here.

9          One last thing is, as I said, the theme here, you

10  know, when the going get tough -- gets tough, Stastney cuts a

11  deal.  And that's exactly what happened.  The Unsecured

12  Creditors' Committee was formed which, by the way, is already a

13  positive aspect of the bankruptcy as is the fact that now

14  there's up to $500 million which could potentially be available

15  to recapitalize, refinance, and fund the debtor.  Those are two

16  fruits that would be expected when you file in good faith,

17  which is what happened here.

18          Well, let's talk about that unsecured creditor deal.

19  One thing that's important, one, it's basically trip insurance.

20  It goes away if the motion to dismiss is denied.  So while, you

21  know, I do question the fact that the only cash being turned

22  over now goes directly to the lawyers, the fact is is that if

23  the motion to dismiss is denied, the Creditors' Committee is

24  more or less in the same position.

25          Now Mr. Samis jokes that at least for 48 hours he's

1  the counsel for the Creditors' Committee.  And he doesn't mean

2  that to mean that whether it's the motion to dismiss or not, I

3  suspect.  But putting that aside, let's actually see what they

4  did.  They traded in order to get this trip insurance, which

5  only kicks in really if they're outside of bankruptcy.  They

6  say they're going to support SeeCubic's motion to dismiss.

7

8          So, again, here's somebody who is out in the cold,

9  all the creditors totally out in the cold.  The debtors file

10 for bankruptcy.  All of a sudden, Stastney cuts a deal with

11 them to get them on his side to get his way.  That's his

12 pattern.

13         But what do they actually do here?  Now it's

14 interesting.  I was listening to Mr. Samis talk about this

15 because I wondered what he was going to say.  He went through

16 and he basically says, yeah, the odds are -- you know, we don't

17 feel the odds are good for the debtor to do all these things.

18 So we hedged our bets.  Debtor has a tough road to hoe, and so

19 we hedged our bets.

20         But he never actually talks about the bad-faith

21 filing of the debtor that supposedly is the basis for the

22 motion to dismiss.  He talks about everything else saying,

23 well, we may not get such a good deal in bankruptcy.  But he

24 also knows that his motion to dismiss, you know, all those

25 things come on the table.  But he never ever talks about the

1  fact that there was any bad faith by the debtor in filing this.

2          And the same thing holds true in his papers, Your

3  Honor.  What the most he ever says which -- and it's

4  interesting because this term it appears at bottom, it shows up

5  a lot actually in Skadden's papers, so either Mr. Samis is the

6  sincerest form of flattery or something else.  But it says, "It

7  appears at bottom that the underlying dispute is more akin to a

8  two-party dispute that does not bar the bankruptcy."  That's

9  the most derogatory thing he says about the actual filing of

10  the debtor for bankruptcy.  And I think that's very telling in

11  this.

12          So, anyway, there you have it, Your Honor.  We

13  believe that this motion to dismiss should be denied because

14  not only does the evidence plainly show that it was filed in

15  good faith, but there have already been tangible benefits both

16  to the unsecured creditors and to the debtor.  It's given them

17  a chance to breathe.  It's given them a chance to secure

18  financing to move forward.  It's given them a chance to start

19  to take steps, hopefully, to reorganize, recapitalize, and

20  recover assets.

21          Now none of those things are a sure thing, but those

22  battles have yet to be won.  And so trying to figure that part

23  out, that's not what we're here for.  We're here for should

24  this debtor be in bankruptcy.  And I think when looked at in

25  totality, absolutely it should.  And all the good things that

1  are already starting to happen for it are all evidence that

2  that good-faith filing was made because these are the natural

3  things that would flow from such a filing.

4           Thank you, Your Honor.

5           THE COURT:  Okay.  Thank you very much, Mr. Sten.

6           Okay.  Well, then I think we're ready to proceed to

7  the -- for our first witness.  I'd actually like to take a

8  brief five-minute break before we do that.  So let's take a

9  five-minute break and we'll resume at 11, and then we'll hear

10 from Mr. Rajan.  Thank you so much.

11           (Recess at 10:54 a.m./Reconvened at 11:00 a.m.)

12           THE COURT:  Okay, parties, this is Judge Owens.  It's

13 11 o'clock, and we are back on the record.

14           So when you're ready.  I see Ms. Sierra.  Okay, VTI,

15 counsel for VTI, and the debtor are on.  And there is Mr.

16 Larkin.  So, okay, it looks like we're ready to go.

17           So, Mr. Larkin, should we swear in Mr. Rajan?

18           MR. LARKIN:  Apologies, Your Honor.  Yes, please.

19 Sorry about that.

20           THE COURT:  Okay.  And is it Mr. Rajan?  Is that

21 correct --

22           MR. RAJAN:  Yes, it is.

23           THE COURT:  -- how I pronounce your name, sir?  Okay.

24 Mr. Rajan, thank you very much for appearing in court today.

25 I'm going to swear you in.

Rajan - Cross/Larkin                                          62

1              MATHU RAJAN, SEECUBIC'S WITNESS, SWORN

2              THE COURT:  Okay.  Can you state your name and spell

3    your last name for our record?

4              THE WITNESS:  Yes.  It's Mathu Rajan.  M-A-T-H-U is

5    the first name; Rajan is R-A-J-A-N.  And that's my last name.

6              THE COURT:  Thank you so much.

7              THE WITNESS:  Okay.  Thank you, Your Honor, for

8    giving me a chance to present.

9              THE COURT:  Mr. Larkin, when you're ready.

10             MR. LARKIN:  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12   BY MR. LARKIN:

13   Q    Mr. Rajan, good morning.  We met at your deposition.

14   A    Good morning.

15   Q    And we meet again today.  How are you today, sir?

16   A    Nice.  Nice to see you again.  Good morning.

17   Q    Mr. Rajan, you and your family currently own majority

18   control of the shares of the debtor, correct?

19   A    Yes.  We are the majority shareholder, correct.

20   Q    Okay.  And you're also still the CEO of the debtor,

21   correct?

22   A    Yes.

23   Q    And you're the sole director of the debtor, correct?

24   A    Of Stream TV, correct.

25   Q    Correct.  And will you agree with me that as an officer

1 and director of the debtor, you have fiduciary duties including

2 a duty of loyalty to the debtor?

3 A    Yes, I do.

4 Q    Okay.  Sorry, I didn't -- that didn't come through.

5 A    Yes, I do.

6 Q    Thank you..

7 A    Can you hear me?

8 Q    Thank you.  Yeah, that was great.  Mr. Rajan, I want to

9 talk about VTI.  We've heard a lot about VTI already this

10 morning, and it's in the papers quite a bit.

11      So let's just level set on what VTI is and how it was

12 formed.  You formed VTI, right, you personally formed VTI in

13 late December, early January of this year shortly after the

14 preliminary injunction was entered against you by the court of

15 chancery, correct?

16 A    Yes.  Yes, we did.

17 Q    And Mr. Dan Rink, he is the -- he's an in-house lawyer for

18 the debtor, correct?

19 A    Was an in-house lawyer for the debtor, not -- not -- not

20 currently right now.  He was moved to VTI because there were

21 lawsuit litigations, threats against him and some of the Stream

22 TV employees.  So people went to VTI.  You know, they were

23 threatening them and threatening potential directors, so

24  -- and customers and vendors and people associated with Stream

25 TV.  We had no protection at that point, so people for their

Rajan - Cross/Larkin                    64

1  own safety went to VTI.

2  Q    So Mr. Rink when he went to VTI, he actually assisted you

3  with the incorporation of VTI in Nevada, correct?

4  A    Yeah.  That is correct.

5  Q    Okay.  And the corporate headquarters for VTI is your

6  parents' house at 1105 William Pennsylvania Drive in Bensalem,

7  PA; correct?

8  A    No.

9  Q    Okay.

10  A    That isn't correct.  No, we have an office in Nevada.  The

11  company is registered in Nevada.  VTI has an office in Nevada.

12  Stream TV has an office on Chestnut Street in Philadelphia, as

13  where the main headquarters are.  Then we have offices in other

14  parts of the world.

15  Q    Okay.  Let's go to your deposition, sir.

16          MR. LARKIN:  Todd, can we pull up 42, lines 2 through

17  9 of Mr. Rajan's deposition on April 28th?

18  BY MR. LARKIN:

19  Q    Mr. Rajan, you recall this?  I asked you at your

20  deposition and we'll wait for Mr. Fragg (phonetic) to pull this

21  up.

22  A    Mr. Larkin --

23          MR. FRAGG:  I'm sorry, what were the pages you wanted

24  from me?

25          MR. LARKIN:  It's page 42 of Mr. Rajan's deposition,

1  line 2.  Line 2 through 9.

2   (Audio played in court of Page 42, Lines 2 through 9 of Mathu

3                    Rajan's deposition)

4           MR. LARKIN:  Okay, thank you.

5  BY MR. LARKIN:

6  Q    Mr. Rajan, did I ask you that question at your deposition

7  and did you give me that answer?

8  A    You did ask that question.  If you went to the earlier

9  part of the deposition, you were being very aggressive with me

10 at that point.  And what I was trying to say but not

11 articulating well at that time was we did use 1105 William

12 Pennsylvania Drive to register the company, but we do have

13 corporate offices in Nevada and for VTI in the U.S.  Stream

14 TV's at 209 Chestnut.  We have offices outside the United

15 States.

16      So, yes, we do sometimes use convenient addresses when

17 we're registering companies, but what really matters is the

18 physical addresses.  So that's what we're doing.

19 Q    Mr. Rajan, did I ask you that question and did you give me

20 that answer at your deposition?

21 A    You did.

22 Q    Yes or no?

23 A    Yes.

24 Q    Thank you.  You're also the majority stockholder of VTI,

25 correct, sir?

Rajan - Cross/Larkin                          66

1  A    Yes, I am.

2  Q    Okay.  And that's been the case since VTI's formation in

3  January, correct?

4  A    Yes.

5  Q    Okay.  And you're the president of VTI, right?

6  A    Temporarily I am the president.  New folks have joined the

7  management team, and as I have told you, contrary to your

8  opening statement, the majority -- the vast majority of the

9  board is other independent people.  Other people have joined

10 the -- the management.  You know, I'm winding down here at VTI,

11 so somebody else is present designee and is on the verge of

12 being president so which I -- and I clearly told you at my

13 deposition I am not the only director of VTI even though you

14 stated that in your opening statement.

15 Q    Okay.  Mr. Rajan, I asked you at your deposition:

16 "Q   Are you the current president of VTI or not?

17 "A   Yes, I'm the current president of VTI."

18      Do you stand by that testimony?  Whether you're the

19 outgoing president or not, you're currently the president,

20 right?

21 A    I believe so, yes.

22 Q    Thank you.  And you're also a director of VTI, correct?

23 A    One of many directors at VTI.

24 Q    Okay.  You just testified a moment ago that VTI has

25 offices outside of the United States; is that right?

1  A    Correct.

2  Q    Okay.  Are you aware that when I deposed Mr. Robertson

3  shortly after your deposition he told me that VTI in fact

4  doesn't have any other offices outside the United States other

5  than the office at your parents' house in Bensalem, PA?

6  A    He may have said that.  I -- I don't know.

7  Q    Okay.

8  A    You can ask him again today, I guess.

9  Q    We will.  We will.  And, in fact, you mentioned that VTI

10 has an office in Henderson, Nevada; is that right?

11 A    Yes.

12 Q    Okay.  And that's actually a very recent change, right?

13 Since Mr. Robertson and yourself were deposed, you made sure to

14 get another address in Henderson, Nevada that wasn't in

15 Bensalem, right?

16 A    We have changes every day in the company.  It wasn't as a

17 result of your deposition.  There is an office in Nevada which

18 we are -- VTI has.  And we're using that office to do work.

19 Q    Okay.  Let's take a look at -- I want to show you a

20 document that was produced to us the other day.

21        MR. LARKIN:  Todd, could we pull up TX-289?

22 BY MR. LARKIN:

23 Q    This is an April 30th, 2021 email from Bud Robertson to

24 yourself and some other folks at VTI.  Mr. Rajan, this is an

25 email -- I'll represent to you I took your deposition on April

1  28th, and we took Mr. Robertson just for the record on April

2  29th.  So this is an email the day after you two were deposed.

3  And Mr. Robertson writes to you and Dan Rink and your other,

4  Raja Rajan, Amanda von Ahnen, Nicole Maneen, and Suby Joseph.

5      It's true, sir, that all of the people copied on this

6  email are former employees of Stream, right?

7  A    Yes.

8  Q    Okay.  And I don't see any other independent directors or

9  anybody else who's not affiliated or formerly affiliated with

10 Stream on this email, right?

11 A    No, you see it right there.

12 Q    Yeah, okay.

13 A    But, no, it says it right there --

14 Q    So the subject --

15 A    -- on number one, do you see it says right there "draft

16 board services agreement for current directors, Tracy, Cliff

17 Morton, Glenn Hasen, Tim McCarthy, Sofia.  So I don't know why

18 you keep saying we don't have directors when it says right

19 there the word "current."

20 Q    Mr. Rajan, I'm going to ask the questions, okay, and your

21 counsel will have a chance to redirect and ask you whatever

22 questions they want to ask you.  I'm going to ask the questions

23 right now.

24     The subject of the email's "VTI corporate governance

25 issues."  Do you see that?

1  A     Yes.

2  Q     And if you go down the page, it says number I or letter I,

3  little I, "vote to adopt Henderson, Nevada address, the

4  Robertson office as formal interim business address."  Do you

5  see that?

6  A     Yes.

7  Q     Okay.  So that was a change -- you just testified a moment

8  ago that was a change you made the day after Mr. Robertson's

9  deposition and two days after your deposition, right?

10 A     Correct, but it wasn't in response to your deposition.  We

11 make changes all the time.

12 Q     Okay.  Well, let's go down --

13 A     (Indiscernible).

14 Q     -- to the next paragraph, the one that's in asterisks here

15 where Mr. Robertson writes to you -- this is, again, after you

16 both were deposed.

17       It says, "I think having the new board ratify the

18 documents previously executed unilaterally by Mathu, especially

19 the VTI-Stream support agreement, is important to rebut the

20 allegations.  But Mathu isn't negotiating in the best interest

21 of VTI, which is a direction that Skadden seemed to focus on

22 during some of my deposition."

23       Do you see that?

24 A     Yeah.

25 Q     Okay.

Rajan - Cross/Larkin                              70

1  A    That's correct.

2  Q    Okay.  And do you see that he writes that the allegations

3  that Mathu isn't negotiating in the best interest of VTI?  Do

4  you see that?

5  A    Yes.

6  Q    Okay.  So Mr. Robertson's concern is that you weren't

7  negotiating in the best interest of VTI, not the debtor?

8  A    No.  He didn't say he had a concern.  He was concerned

9  that you were going to exaggerate it just like you're

10 exaggerating the directors and making up stories like you

11 continuously do.

12 Q    Let's talk about Mr. Robertson.  He's currently an

13 employee of VTI, correct?

14 A    That is correct.

15 Q    Okay.  And he's serving a senior executive of VTI, right?

16 A    Yes, he is.

17 Q    And he's been serving as a senior executive of VTI since

18 VTI was formed in January, right?

19 A    Yes.

20 Q    All right.  And Mr. Robertson's receiving a salary from

21 VTI, correct?

22 A    Yes, he is.

23 Q    I think he testified about $150,000 a year, right?

24 A    That is correct.

25 Q    Okay.  And but he's also the debtor's first-day declarant,

1  right?

2  A    Yes.

3  Q    Okay.  And if I understand it, VTI is the proposed DIP

4  lender to the debtor, correct?

5  A    Yes, he is.

6  Q    And VTI is also the proposed sponsor for a, you know, a

7  plan of reorganization that you claim the debtor will be

8  putting forward at some point, right?

9  A    Yes, that is correct.

10  Q    Okay.  And so if I understand the record from the

11  depositions, with respect to the negotiations for DIP and also

12  this plan sponsor agreement, you've been negotiating on behalf

13  of the debtor, right, with respect to VTI's plan sponsorship,

14  right?

15  A    Correct.

16  Q    Okay.  And Mr. Robertson has been negotiating on behalf of

17  VTI, correct?

18  A    No.

19  Q    Okay.  Let's go to your deposition.

20          MR. LARKIN:  Todd, can we go to 110?

21   (Audio played in court of Line 110 Mathu Rajan's deposition)

22          MR. LARKIN:  Thank you.  We played the wrong clip

23  there, but we'll get to that.

24  BY MR. LARKIN:

25  Q    So, Mr. Rajan, your testimony is that Mr. Robertson has

1  not been negotiating on behalf of VTI with respect to the plan

2  sponsor agreement?

3  A    You're mischaracterizing what I said, the context of what

4  I said.  You are talking in the context of business deals

5  regarding Stream TV and VTI.

6       Stream TV and VTI have assets outside the omnibus such as

7  stitching and titling, such as modified light field, that

8  they're working on together so Stream TV can get cash flow and

9  some of the other employees that are on furlough can come back

10 and some of the other employees that are on standby so they can

11 join at Stream TV if we can get past this motion to dismiss.

12 And we were talking on a business context.

13      And later when you asked me at the deposition, which

14 you're fully aware of, I said in terms of the DIP motions and

15 the reorganization plan and paying off the secured creditors

16 and the unsecured creditors, I said the investors are heavily

17 involved because it's their money.  So in the context of the

18 reorganization plan and also now paying off the SLS and Hawk

19 and the unsecured, it is the gentlemen who you're talking to

20 later, Tim McCarthy.

21      So you took -- again, you're misrepresenting what I said

22 in the deposition.  We were talking about business deals.

23 That's day-to-day operations, so Bud Robertson is involved.

24 When it comes to money on paying off the loans and making

25 everybody whole, you know, hundred cents on the dollar, that's

Rajan - Cross/Larkin                    73

1    Tim McCarthy.

2         Now is Bud aware of what's happening?  Sure.  He's aware

3    of it.  But he's not the one writing the check.

4    Q    All right.  Mr. Rajan --

5              THE COURT:  I'm sorry.  I have to -- I'm sorry, I

6    have to interrupt because I want to understand your answer.  So

7    who is representing VTI in connection with this bankruptcy case

8    and the negotiations surrounding this bankruptcy case?  Mr.

9    McCarthy?

10             THE WITNESS:  It is for sales, operations, like the

11   two technologies which was the question they were asking at my

12   deposition.  That would be predominantly Bud Robertson.  When

13   it comes to money for investment into Stream TV, it's Tim

14   McCarthy.

15             Bud Robertson isn't --

16             THE COURT:  Okay.

17             THE WITNESS:  -- (indiscernible) the reorganization

18   plan.  He didn't -- he didn't decide to go pay SLS a lump-sum

19   payment.  And I told him that in the deposition.  He knows

20   that.

21             THE COURT:  Okay.  And I'm not trying to get to the

22   bottom of what happened during your deposition at the moment.

23   I'm just trying to understand.  So when it comes to negotiating

24   with the debtor and the debtor's creditors in this bankruptcy

25   case, Mr. McCarthy is the one that's negotiating with those

1  entities on behalf of VTI?

2           THE WITNESS:  No.  No, no; I'm sorry.  I'm sorry, no.

3  Let me be clear.  Okay, so there's -- there's two parts here.

4  There's money that VTI is going to give to Stream TV that can

5  be used to disburse to, we'll say the two big buckets, secured

6  and unsecured, okay?

7           Then in terms of going to the individual vendors and

8  working out their deals, Stream TV's doing that and I'm doing

9  that.  We are bringing in a chief restructuring officer

10 hopefully this week, early part of this week, and that chief

11 restructuring officer will take over the duties of the vendors.

12          But Mr. McCarthy is not involved with the individual

13 vendors.  He just approved the amount of money that will be

14 going from VTI to Stream TV to settle the debts and to

15 reorganize Stream TV.  But the disbursement of the funds from

16 Stream TV to those vendors and to the secured lenders

17 temporarily I'm handling it, but a chief restructuring

18 officer's going to take that over.

19          THE COURT:  Okay.  Thank you for --

20          THE WITNESS:  Does that answer your question?

21          THE COURT:  That does, and thank you very much for

22 clarifying.  And I apologize for interrupting, Mr. Larkin.

23          THE WITNESS:  You can interrupt and ask any question

24 you want.  I'm sorry if I wasn't clear.

25          MR. LARKIN:  Your Honor, I'll cover this in Mr.

1  Robertson's deposition, as well -- or, I'm sorry, Mr.

2  Robertson's cross-examination.  I'm happy to cover that point

3  with him as to what his view is about who he's negotiating for

4  and what agreements he's negotiating.

5  BY MR. LARKIN:

6  Q    Mr. Rajan, you agree that you're a fiduciary of VTI and

7  the debtor, correct?

8  A    I am a fiduciary of both.  Yes, I am.

9  Q    Fiduciary of both, right?  And you're represented by both

10  VTI's counsel at Armstrong Teasdale and debtor's counsel at

11  Dilworth Paxson, correct?

12  A    Stream TV is --

13            UNIDENTIFIED SPEAKER:  Objection.

14            THE WITNESS:  -- is represented by Dilworth.  VTI is

15  represented by Armstrong.  They're not representing me as an

16  individual, no.  Right now I am here for Stream TV.

17  BY MR. LARKIN:

18  Q    So you're wearing your Stream TV hat on -- your Stream TV

19  hat on today?

20  A    Yes.

21  Q    Okay.  All right.  We covered this a minute ago, but you

22  told me at your deposition that when Stream TV and VTI are

23  negotiating an agreement, you put your Stream TV hat on and

24  then Mr. Robertson or other members of the executive team at

25  VTI, they wear their VTI hats for those negotiations, right?

1  A     Yeah.  For business negotiations, yes.

2  Q     Okay.  And principally, Mr. Robertson would be your

3  counterparty to those negotiations, right?

4  A     Right.  So as an example, for like the stitching and

5  titling and the modified light field, Steam TV is going to be

6  getting a royalty.  And Bud Robertson was representing VTI in

7  those negotiations; I was representing Stream TV.  And those

8  are assets outside the omnibus.

9  Q     Okay.  We'll get to that in a minute.  And if I understand

10 your testimony correctly, sir, when you have -- when you're

11 negotiating for Stream TV, the way that you determine that the

12 decisions that you're making on behalf of Stream TV are fair to

13 the stakeholders of Stream TV and not VTI is you just take your

14 VTI hat off, right, and you put your Stream TV hat on, right?

15 A     Yeah, I'm trying to get a good deal for Stream TV.

16 Q     Okay.  But you're also a fiduciary for VTI in that same

17 negotiation, right?

18 A     No, I'm not.  I take my hat off and I'm, in essence,

19 stepping out of it.  You can call it abstaining or whatever you

20 want to call it.  I mean --

21 Q     But the way that you abstain is you just take that hat

22 off, proverbial hat, and then you have Mr. Robertson who works

23 for you at VTI handle the negotiations for VTI, right?

24 A     Yes.  And we -- we do try to include other people if

25 needed.  And, yes, that is how we're handling it at this time.

1  Q    But, principally, Mr. Robertson, right?

2  A    Yes.  For (indiscernible) negotiations.

3  Q    Okay.  And sometimes Mr. Rink who you said is now employed

4  by VTI is involved in those negotiations too, right?

5  A    Correct.

6  Q    Okay.  And so he's an in-house attorney for VTI, but he's

7  on loan to Stream TV when Stream TV needs in-house legal

8  services too, right?

9  A    Correct.

10  Q    All right.  And you told me that in your deposition that

11  when Stream and VTI are negotiating across the table from each

12  other and Mr. Rink is your counterparty to those negotiations,

13  you consider those discussions to be privileged, right?

14  A    Yes.

15  Q    Okay.  So you're having an across-the-table negotiation

16  with VTI and you consider those communications with your

17  counterparty to be privileged.  Right?  Okay.

18  A    Uh-huh.

19  Q    But you still think it's fair to both Stream and VTI, even

20  though you're claiming a common privilege over those

21  discussions, right?

22  A    Correct.

23  Q    Okay.  And it's also true that there was no -- there was

24  certainly no effort with respect to those negotiations to have

25  an independent director handle the negotiations for VTI, right?

1  You had either Mr. Rink or Mr. Robertson handle the

2  negotiations, correct?

3  A    For the day-to-day things that is true.  We have now

4  appointed a board, so now we're having discussions with the

5  board of VTI on a number of these items.

6  Q    Okay.

7  A    So we are trying to move quickly.  There isn't a lot of

8  time.  We started in January and February, and we're now adding

9  additional people and we're including those people in those

10 conversations and to broaden it out and to cause separation.

11 That's why we're bringing chief restructuring officer and we're

12 doing other things at VTI, bring somebody else in to be

13 president, and we're causing the separation.  We're doing all

14 that.

15 Q    But you are the current president, right?  There's no new

16 president yet, right?

17 A    Not yet.

18 Q    Okay.  And there's no chief restructuring officer yet,

19 right?

20 A    No, not --

21 Q    As you sit here today, right?

22 A    Not yet.

23 Q    Mr. Rajan, you've claimed -- the debtor has claimed, and

24 VTI as well, in a number of filings to the Court that

25 bankruptcy will enable the debtor to successfully and quickly

1 reorganize for the benefit of all stakeholders, correct?

2 A    That is correct.  Our purpose here is to reorganize.

3 That's why we're here.  Want to reorganize the debts and the

4 operations and get it moving.

5 Q    And that group of stakeholders would include the debtor's

6 unsecured creditors, right?

7 A    The unsecured creditors and secured creditors and -- both

8 groups.

9 Q    Okay.  And you're aware that the unsecured creditors

10 committee supports dismissal of the bankruptcy, right?

11 A    I'm fully aware.

12 Q    Okay.  As does the U.S. Trustee, correct?

13 A    Yes, I'm aware of it.

14 Q    Okay.  And it's also true that prior to the filing of the

15 bankruptcy you had communications with a number of investors in

16 both Stream and VTI about the Delaware Chancery Court

17 litigation and the steps that you may take post-injunction with

18 respect to the company, right?

19 A    That is correct.

20 Q    Okay.  But you didn't actually tell some of the investors

21 who you were soliciting for money in your new venture that

22 their money would be used to fund a bankruptcy, right?

23 A    That is incorrect.  People whose money was used for the

24 bankruptcy were told.  People whose money was not used for the

25 bankruptcy we did not.  And there was one investor who we had

1  suspicions on he was helping the other side, and now you gave

2  me evidence that he was, and his money was not used for the

3  bankruptcy.

4      And as I told you in my deposition, in the abundance of

5  caution Dilworth listed him on the list, but his money was not

6  used for the bankruptcy, and he was, in fact, sharing

7  information with the other side.  Whether he was a plant or not

8  I don't know, but that was unfortunate.  But the people whose

9  money was used for the bankruptcy were told.  Many of them gave

10 their money directly to counsel in some cases, and they were

11 told about it.

12 Q    Well, let's take a look at that, a communication you had

13 with one of your investors the day after the bankruptcy was

14 filed.  Could we go to TX 181?  I think this is the email

15 you're referring to, Mr. Rajan, but I just want to make clear.

16     You said that Mr. Tavill (phonetic) is one of the

17 investors you were concerned about; is that right?  This is an

18 email from Mark Tavill to --

19 A    Money was not used for the bankruptcy.  In an abundance of

20 caution Dilworth listed him.  His money was not used for the

21 bankruptcy, but clearly he was giving information to the other

22 side, which, you know, is disappointing, to put it mildly, and

23 he said a number of things on the phone that was derogatory

24 towards the other side, so I think he did that to win my

25 confidence so he could go give information to the other side.

1  Q    Okay.  Well, let's take a look at what Mr. Tavill --

2  Mr. Tavill is one of your investors in Stream, correct?

3  A    Yes, he is.

4  Q    And you also solicited him for money for your new venture

5  VTI in January, correct?

6  A    Yes, I believe so.

7  Q    All right.  And Mr. Tavill after receiving notice that the

8  Chapter 11 case had been filed he writes to you:

9       Mathu, WTF.  It's not even a week since you extracted more

10 money from me after assuring me all that was good with a new

11 30-million-dollar investor already on board, a win in Superior

12 Court, et cetera.  Are all my shares, warrants, grants, loans,

13 et cetera, essentially worthless now?  I appreciate that my

14 investment numbers may be small to you, but they're significant

15 and meaningful to me.

16      Do you see that?

17 A    Yes.

18 Q    Okay.  You never responded to Mr. Tavill's email in

19 writing, correct?

20 A    I don't remember responding to him in writing.  I called

21 him.

22 Q    Uh-huh.  Okay.  And, in fact, you told Mr. Tavill in

23 January before the filing of the bankruptcy that given Vice

24 Chancellor Laster's preliminary injunction order against you

25 and Stream, that you were looking to move the case out of the

Rajan - Cross/Larkin                    82

1   Chancery Court into Federal Court, right?

2   A    Correct.

3   Q    Okay.  And that's exactly what you did when you filed for

4   bankruptcy, right?

5   A    Yeah, we filed for bankruptcy.

6   Q    Correct.  And you told Mr. Tavill January 22nd over the

7   phone that you were looking to move the case out of

8   bankruptcy -- or, I'm sorry, out of the Chancery Court to get

9   out from under the preliminary injunction, and that's what you

10  did when you filed for bankruptcy, right?

11  A    I didn't say to get out from under the preliminary

12  injunction.  I did not say that.  I said we are maxed out for

13  the company, because everybody wanted to know what's going to

14  happen with Stream TV, because he claimed that back then he was

15  very worried about the other side.  He felt like they were just

16  going to do a quick flip job and basically the opportunity was

17  going to be lost.  He wanted to know what Stream TV was going

18  to do.  It was --

19  Q    Right.

20  A    -- not to get out of the PI.  It is to reorganize the

21  company.  So they wanted to know what's next for Stream TV.

22  Q    You told me -- you just said that Mr. Tavill was very

23  derogatory about the other side, and I think you're referring

24  to Mr. Stastney.  So let's take a look at that email.

25       It's TX 44, Todd, if you could pull that up.

1    So, Mr. Rajan, this is the email -- we looked at this in
2  your deposition, but this is the email from Mr. Tavill to
3  Mr. Stastney on January 22nd.  And you see in the email
4  Mr. Tavill actually writes to Mr. Stastney in the first
5  paragraph in response to a conversation he had just had with
6  you the day before, but with respect to my clients he writes:
7    It's been a hard, busy couple weeks for me, Shad.  If not
8  fully subscribed, I'd still like to make a very small add-on
9  investment into the new company as a gesture of confidence in
10  you and goodwill.  If unavailable, that's okay, too.
11    So that's the investor in VTI and Stream who you're -- you
12  said was saying derogatory things about my client, right?
13  He's offering Mr. Stastney to invest further in SeeCubic,
14  right?
15  A    Right.  And if you look closely at the date, it says
16  January 22.  The other earlier email you pulled up is in mid
17  February, so he invests in VTI after he's invested in with
18  Mr. Stastney, so clearly he's somebody who likes to play both
19  sides.
20  Q    Okay.  Mr. Rajan, talked about it in the openings and I
21  certainly have it in my opening slides, but I just want to get
22  something clear, you know, right off the bat here in your
23  cross-examination.  The debtor, Stream TV, is not contesting
24  the validity of the omnibus agreement, correct?
25  A    In this court we are not contesting the validity of the

1  omnibus.  We're not here to contest the validity of the

2  omnibus.  We're here to reorganize.  I'm not going to get into

3  my views on the omnibus.

4       We had already stated in my affidavit that the information

5  regarding the letter agreement was hidden from the majority

6  shareholder by Mr. Stastney and Gollop and Gola, which would

7  have converted that transaction to an acquisition, not a

8  friendly foreclosure.  Wasn't brought up in the Chancery Court,

9  but that's a problem for the Chancery Court.

10      So we're here today to talk about reorganization, bring

11 money in, making all the debtholders whole.  We have assets

12 outside of the omnibus, and we'd like to go forward.  We're not

13 here to talk about the omnibus.

14 Q   Okay, so all of the facts that Mr. Sten talked about in

15 his opening about my clients, about all of the things that he

16 claims occurred prior to the execution of the omnibus agreement

17 by independent directors, they don't mean anything for purposes

18 of today, correct, based on the answer you just gave.  Because

19 that's not what we're here to talk about.

20 A   Mr. Sten is responding to your statements because you keep

21 bringing up the omnibus, and we're in federal court, we're in

22 bankruptcy.  Like Larry McMichael said, local courts enforce

23 documents all the time, whether it's -- and people go to

24 federal court through bankruptcy, there's hundreds of companies

25 that have done it, and franchise companies at Texaco.  We're

1  here to talk about reorganization and basically paying off the

2  debtors and basically reorganizing the company.  That's why

3  we're here.

4  Q    You would agree with me that as of December 8th, 2020 both

5  you in your individual capacity and Stream as the debtor, of

6  which you're the CEO, were enjoined from disputing the validity

7  of the omnibus agreement, including asserting control over the

8  assets that had been transferred to SeeCubic and the

9  subsidiaries of Stream that had been transferred to SeeCubic,

10 correct?

11 A    Yes.

12 Q    Okay.  And you testified in your deposition that you

13 believed that Stream's assets which were transferred to

14 SeeCubic pursuant to the omnibus agreement are worth between

15 200 and $600 million, correct?

16 A    The -- okay.  Again, the Ultra-D assets are worth between

17 200 to 600 million.  Stream TV has assets that have nothing to

18 do with the omnibus.  Then there is Ultra-D assets still

19 sitting in Stream TV.  So you've got to be very careful when

20 you say the 200 to 600 million.  We are only referring to

21 Ultra-D.  There's things that have nothing to do with Ultra-D.

22       You have to be very careful when you say all assets,

23 because everybody has acknowledged that even the Ultra-D

24 assets, a big chunk of them are still sitting in Stream TV, and

25 the ones that are in dispute weren't handled properly.  So

1  please don't say all assets are transferred.  They may have had

2  the right to transfer them, but they didn't follow the omnibus

3  properly and they didn't follow the local jurisdictions

4  properly.

5  Q    Okay.

6  A    You have to be more precise.

7  Q    Fair enough.  I'll take the 200 to 600 on the Ultra-D

8  technology that was -- that were transferred to SeeCubic,

9  Mr. Rajan.  So just taking that midpoint, it's your position

10 that the Ultra-D technology assets that were transferred to

11 SeeCubic are worth two -- between 200 and $600 million, right?

12 A    The Ultra-D assets were valued at 200 to 600.  They -- I

13 do not believe they were transferred to SeeCubic as of this

14 moment.

15 Q    Okay.  And shortly after you formed VTI you started

16 contacting a firm called Knight Davis wearing your VTI hat to

17 solicit investors in your new entity VTI, correct?

18 A    Correct.

19 Q    Okay.  And what you were pitching and what you and Knight

20 Davis were pitching with respect to those assets was that VTI

21 would be in a position to reacquire those assets for a fraction

22 of their value, correct?

23 A    Incorrect.

24 Q    Okay.

25 A    VTI was approaching investors.  A number of investors had

1   asked about including Stream TV, because I had to tell them

2   about what happened at Stream TV, that, you know, it was a

3   company I'd started.  Most investors who would like to invest

4   in a company who is including a Chapter 11 assets or company,

5   whatever you want to call it, are used to getting the equity at

6   a substantially lower discount.

7        So, yes, we received inquiries from investors at a

8   substantially lower discount, but as I told you in my

9   deposition, the valuation that VTI will be coming in now for

10  Stream TV is 293 million, and we are making all the creditors

11  whole.  The unsecured, hundred cents on the dollar, and the

12  secured, hundred cents on the dollar, and we're paying a pretty

13  good price.  You know, VTI would be 293 million pre-money.

14       So did we get phone calls from people and did we talk to

15  people who wanted a lower valuation, were bankers pushing me

16  for a lower valuation, were other people pushing me, yes, they

17  were.  But the moment Stream TV filed that bankruptcy I have a

18  responsibility to get top dollar for Stream TV, and that is

19  what we're doing.

20  Q    Mr. Rajan, let's take a look at an email between you and

21  Knight Davis on January 2nd.  This is -- you're wearing a

22  glasses-free hat here, which was a -- another entity that you

23  had formed.  This is TX 268.  And, Mr. Rajan, this is an email

24  from you to Glen Davis at Knight Davis, copying the same group,

25  Suby Joseph, Nicole Maneen, and it has a -- it's for a proposed

1 private placement investing in debt.  And you were subject to

2 the preliminary injunction order at this time, correct, sir?

3 A     Yes.

4 Q     Okay.  And you had been working with Knight Davis on a

5 backstory for the private placement investment in debt for your

6 new venture VTI, correct?

7 A     Correct.

8 Q     Okay.  So let's take a look at your backstory, and we

9 looked at this in your deposition.  Can you go to the last page

10 of the backstory?  And I want to ask you about the first

11 characterization of Vice Chancellor Laster's decision in

12 that -- the first full paragraph there that you and Knight

13 Davis had been working on.  Vice Chancellor Laster, he

14 considered the motion for preliminary injunction.  He had seven

15 depositions, 12 declarations, hundreds of exhibits in front of

16 him.  I understand you're not contesting any of the factual

17 findings.

18       And you -- the backstory that you were going to sell to

19 the investors in VTI is that in a shocked decision the judge

20 gave a hasty preliminary ruling in favor of the other party

21 based on the validity of the omnibus agreement, giving them a

22 right to take over the assets of Stream TV, correct?  Did I

23 read that correctly, sir?

24 A     You read it correctly, and as I stated in my deposition,

25 that basically I had asked the banker repeatedly not to

1  characterize Vice Chancellor Laster's decision -- we're not

2  here to debate the omnibus, but as I had told you in my

3  deposition, it was a preliminary decision.  The people on the

4  other side were not even deposed.  There is mass amounts of

5  information such as that letter agreement which was hid from

6  the majority shareholder, which would have required a

7  shareholder vote to change the charter, which would have made

8  it not a friendly foreclosure, which Vice Chancellor Laster was

9  never brought to his attention.

10      We had a long ways to go in the Chancery Court, but it

11  doesn't matter.  We're not here to talk about the omnibus.

12  Q    Okay.

13  A    And I told you in the deposition I had asked the banker

14  repeatedly not to characterize it this way, because we don't

15  want to be disrespectful to Vice Chancellor Laster and he

16  shouldn't be characterizing it this way.

17  Q    All right.  Mr. Rajan, just to keep this moving forward,

18  you would agree with me that we looked at another draft of this

19  backstory a few weeks later that was sent to you, but had the

20  same language in it about Vice Chancellor Laster --

21  A    Yeah, and I told --

22  Q    -- correct?

23  A    Yes, and I told him not to characterize that way.  I even

24  told him to stop handing it out --

25  Q    Okay.

1  A    -- because they didn't like the decision, the bankers and

2  a number of people didn't agree with the decision and they

3  thought that it shouldn't -- you know, it should have been

4  handled differently, and that is -- they're entitled to their

5  opinion --

6  Q    Okay.

7  A    -- but I told them to tone it down and stop talking that

8  way.

9  Q    I haven't seen any emails where you tell anybody to tone

10  it down or take a different view on it.

11  A    I told them that over the phone, and, yes, I did tell them

12  people that.

13  Q    All right.  So you go on, the -- your backstory goes on to

14  say in the last paragraph:

15      While VTI is able to press ahead with or without a court

16  decision in its favor, once Mathu has the assets of Stream TV

17  returned to the company, because they had been transferred, he

18  will then be able to cherry-pick from those assets, which will

19  assist in certain areas of development and production, but this

20  is not critical.

21      Did I read that correctly, sir?

22  A    Yes, you did read that correctly, because we do have

23  bankers and investors who hear about a Chapter 11 opportunity

24  who would like to get it at a lower price.  And so it does

25  happen all the time, but thankfully we now, as I outlined in my

1  affidavit, have a plan where we're giving a very good valuation

2  and we're making all the creditors whole.

3  Q    Okay.  Let's take a look at a document that we looked at

4  in my opening.  This is about five weeks later on February --

5  Mr. McCarthy.  In fact, so the plan was, based on the email

6  that we just looked at, you formed VTI and you were looking for

7  ways to reacquire the assets that had been transferred from

8  Stream TV to SeeCubic, correct?  Correct, sir, at the time?

9  A    We were not looking to reacquire the assets.  We were

10 looking to basically have Stream TV merged with VTI and

11 basically have Stream TV as an entity merged with VTI.  It was

12 not to reacquire assets.  First of all, there's many assets in

13 Stream TV and there's employees and personnel and other things.

14 We wanted to consolidate all of it.  Stream TV is not the only

15 thing that's a part of VTI.  There's other things in it, too.

16 Q    Will you go to TX 179, please?  Mr. Rajan, this is an

17 email.  We looked at this in your deposition.  It's from you to

18 Mr. McCarthy on February 8th, correct?

19 A    Correct.

20 Q    And you say:  Please find enclosed a PowerPoint on Stream

21 TV.  So this is February 8th, a couple of weeks before the

22 debtor filed for bankruptcy.  You were subject to a preliminary

23 injunction.  You're still subject to a preliminary injunction.

24 But you would agree with me that you were still subject to the

25 preliminary injunction order that enjoined you from asserting

1  control over the assets of Stream TV, including the

2  subsidiaries, correct?

3  A    Hang on a second here.  We are not asserting control over

4  the assets.  We do have a fiduciary responsibility as the -- as

5  an officer of Stream TV to declare bankruptcy to protect the

6  estate, and raising funds is a part of that.

7  Q    Mr. Rajan, I would just ask you to --

8  A    So you're taking a --

9  Q    -- (indiscernible).

10 A    -- completely different interpretation of the PI.

11 Q    Okay.  Well, we can look at the PI or whatever.  I'm not

12 going to waste time reading it.  I think the language of it is

13 pretty clear about what you were permitted to do or not do, but

14 let's take a look at this email that you sent to Mr. McCarthy

15 on February 8.  So you have a presentation on opportunity --

16 let's go to the next page -- where you say VTI -- on

17 February 8th:

18     VTI, of which you were the controlling stockholder and the

19 president at the time and the sole director, has the exclusive

20 right to acquire Stream TV Networks, another glasses-free 3D

21 company.  Stream has been valued between 200 and $600 million.

22     That was the Ultra-D technology that you were talking

23 about, correct?

24 A    Yes.

25 Q    Okay.  And that had been transferred to SeeCubic pursuant

1  to the omnibus agreement at the time, correct?  And you --

2  A    Incorrect.

3  Q    -- were telling Mr. McCarthy, right, that Stream has been

4  valued between US 200 million and 600 million based on those

5  assets that had been transferred, correct?

6  A    The assets have not been transferred at that time, nor at

7  this time.  They had the right to take the assets.  They have

8  not done it.  Transfers were not done properly in the

9  jurisdiction.  They didn't even follow the omnibus.  At that

10 point it was very clear, and now we know it wasn't even a

11 friendly foreclosure, which was not consistent with Vice

12 Chancellor Laster's position.  And, again, investors do want

13 when they hear Chapter 11 a substantially lower valuation.

14 Q    Okay.

15 A    Thankfully, Mr. McCarthy has agreed to a higher valuation

16 over time since we've done the filing because now there's been

17 a filing that has given Stream TV breathing space and we have

18 been able to explain more, where he is, thankfully, willing to

19 pay a higher valuation and pay all the creditors over time.  It

20 does --

21 Q    Mr. Rajan, can I interrupt you?

22 A    -- take time to explain things to investors and to educate

23 them and for them to understand the full value, so we're very

24 fortunate to have him where he's willing to pay all the

25 creditors off, a hundred cents on the dollar, and pay a 293

1  million pre-money valuation.  That's a lot higher than 25
2  million.
3  Q    Mr. Rajan, I don't know what question you're answering.
4  Your counsel will have a chance --
5              THE COURT:  Can I just inter --
6              MR. LARKIN:  -- to inquire.
7              THE COURT:  I just want to interject, all right,
8  because this has been going on long enough.
9              Mr. Rajan, when counsel asks you a question you have
10 to answer his question.
11             THE WITNESS:  Okay.
12             THE COURT:  Okay?  You may elaborate if you so wish
13 or your counsel can follow up on redirect, but we have very
14 limited time.  So I need you to answer the question that
15 Mr. Larkin poses.
16             THE WITNESS:  Okay.
17             THE COURT:  Your counsel is able to rehabilitate you
18 or ask follow-up questions during his time or her time on
19 redirect, okay?  But this is Mr. Larkin's time right now, so
20 you need to answer his questions.
21             THE WITNESS:  Okay, I --
22             THE COURT:  Okay.  And, also, because we're virtual
23 it's very difficult to interrupt or get more -- interrupt when
24 everyone is speaking.  So just listen very carefully to the
25 question that Mr. Larkin asks you and answer the question.

1              THE WITNESS:  Okay.

2              MR. LARKIN:  Thank you, Your Honor.

3              THE WITNESS:  Thank you.

4    BY MR. LARKIN:

5    Q    So, Mr. Rajan, you go on to write to Mr. McCarthy:  We can

6    acquire the company for a fraction of the value, approximately

7    US $25 million.  And that was your plan, correct, on

8    February 8, right?

9    A    That is the discussion we're having at that time.

10   Q    Okay.  Let's take a look at your deposition.  Let's take a

11   look at your deposition at 267, 18 to 22.  And that was your

12   plan, right?  That VTI -- you're now wearing your VTI hat --

13   that VTI would acquire Stream for a fraction of its value,

14   approximately US 25 million, correct?

15   A    Yes.

16   Q    Mr. Rajan, did you give me that testimony in your

17   deposition a couple weeks ago?

18   A    Yes.

19   Q    Okay.  And let's just take a look quickly at the debt that

20   you attached to Mr. McCarthy and the assets that you were

21   claiming at the time Stream TV owned.

22        Todd, could we go to VTI 1030 at slide 4 of the dec?

23   Slide 4 of the document, of Exhibit 179.  I think it's page --

24   there we go.  Next slide.  Next slide.  I think it's slide 7.

25        Sorry, Your Honor.  There we go.  Go back to that basic

1  company information.

2  BY MR. LARKIN:

3  Q    So, Mr. Rajan, on February 8 -- last slide, please.  Basic

4  company information.  Yeah.  So the investor pitch that you

5  were making to Mr. McCarthy on February 8, you're telling him

6  Stream TV Networks, right, utilizes an intel inside model, and

7  it's the world's leading glasses-free 3D system, correct?

8  A    Correct.

9  Q    Deriving its revenues from both sale of 3D kits for

10 inclusion in their devices and revenue from Ultra-D-enabled

11 content.  Stream TV's development efforts are based in the

12 Netherlands with a core group that began developing glasses-

13 free 3D technology for Phillips.  Ultra-D is fully patent

14 protected with all IB owned -- all IP owned by Stream TV

15 Networks.

16     Do you see that, sir?

17 A    Correct.

18 Q    Okay.  You understand that it's my client's position that

19 everything that's described in that box was transferred to

20 SeeCubic pursuant to the omnibus agreement?

21 A    Yes, and your client's incorrect.

22 Q    Okay.  But you knew on February 8 that you were subject to

23 a preliminary injunction order, right, that enjoined you from

24 asserting control over the assets and the subsidiaries of

25 Stream TV, right?

1  A    I'm not --

2  Q    You're telling Mr. McCarthy --

3  A    -- asserting control.

4  Q    Let me finish.  You're telling Mr. McCarthy that he's

5  got -- he has the right, the exclusive right if he invests in

6  VTI to acquire those assets, correct?

7  A    I'm not asserting control.  Asserting control would mean I

8  went in to the subsidiary and started making changes.  That is

9  assertion.  What I'm stating here is basically explaining to

10 him, which is my current position, is they didn't follow the

11 omnibus.  They didn't follow the rules for the local markets in

12 terms of transferring assets.

13      In fact, The Honor (phonetic) has written case study.  If

14 you look at it, if you don't do your UCC things properly in

15 terms of transferring your lender, you're out of luck.  They

16 didn't follow it.  And that's not for the purposes of today.

17 We're just trying to go through the bankruptcy, but when we get

18 to the turnover actions and the fraudulent conveyance we can

19 study it then.  But they didn't do procedures properly.

20 Q    Mr. Rajan, you didn't tell Mr. McCarthy any of that in the

21 presentation that you sent.

22 A    Yes, I did.  I did on the phone.

23 Q    Okay.

24 A    You weren't on the phone.

25 Q    You also -- according to Mr. McCarthy's testimony on

1  Friday, you didn't tell Mr. McCarthy that you and Stream were

2  enjoined from asserting ownership over the assets that were

3  transferred to SeeCubic, right?

4  A    I did tell him.  That was early in the bankruptcy.

5  Whether he remembered or not, whether he cares or not, that's a

6  whole another issue.

7  Q    Okay.  And you didn't tell Mr. McCarthy about the

8  existence of the omnibus agreement, correct?

9  A    No, I told him.

10  Q    Okay.  Well, we'll talk to Mr. McCarthy and --

11  A    You can talk to him.

12  Q    -- see what he has to say about it.  Mr. Rajan, let's turn

13  to a different topic.  My understanding from your first day

14  declaration is that if no substantial investments were made in

15  support of the debtor within 30 days after the petition being

16  filed the debtor would pursue a 363 sale, correct?

17  A    You mean when we filed -- when we did the filing in the

18  beginning for the bankruptcy?

19  Q    That's right.

20  A    Yeah, yeah, we did write that.  That is correct.

21  Q    Okay.  And you never intended to actually pursue a 363

22  sale, correct?

23  A    No.  We were looking at a 363 sale.  The problem with 363

24  sale is Mr. McCarthy is a person of considerable, you know,

25  means and contacts and investment.  If you do a 363 sale, as I

1  understand the mechanism some of the secured lenders could end

2  up getting paid, but then a number of other people may not get

3  paid, whereas if you do reorganization, which he has agreed to,

4  he -- you know, he could have pressed Stream TV, forced us into

5  363, but it's better for all the lenders, you know, secured,

6  unsecured, that they can get paid through reorganization and it

7  would be better, so -- for those people.

8       So putting on my Stream TV hat, we are going down

9  reorganization.  So the plan we are proposing is reorganization

10 to reorganize the company and pay off all the creditors and

11 those things.

12 Q    Okay.  So -- and with respect to this plan of

13 reorganization Dilworth is negotiating on behalf of the debtor

14 and Armstrong Teasdale is negotiating on behalf of VTI,

15 correct?

16 A    Yeah, they're going back and forth on a plan.

17 Q    Right.  And you control -- you still control those

18 entities, correct?

19 A    I -- but I basically abstain on VTI side.  Other people

20 are doing the VTI side.  I'm on the Stream TV side.  That's why

21 I was able to get the valuation up higher and I was able to get

22 Mr. McCarthy to agree to paying a hundred cents on the dollar.

23 Q    Okay.  There's no independent --

24 A    Less cost --

25 Q    -- committee --

1  A    -- and less time to do reorganization.

2  Q    Mr. Rajan, there's no independent committee of directors

3  of VTI who's negotiating with you, right?

4  A    The independent director is the investor himself, but

5  other people at VTI, the directors and the employees, know

6  about it, but the investor's doing his own negotiation.  You

7  know, he's not -- you know, he's leading his own negotiation.

8  Q    Okay.

9  A    We're not negotiating for him.

10  Q    Let's talk about the debtor's current assets, employees,

11  or revenues or the lack thereof.  We talked about this earlier,

12  but the debtor currently has no employees, right?

13  A    The debtor has people who are on furlough who could be

14  brought back, and it has people who are ready to join, ready,

15  willing and able to join Stream TV.  We were hoping for our DIP

16  motion when we first filed that didn't get approved yet, if

17  they can, then there is a number of engineers and other

18  personnel that will be joining Stream TV if we can get our DIP

19  motion passed, and there'll be people even joining the Stream

20  TV board again if we can get, you know, protection in the

21  bankruptcy court.

22  Q    Mr. Rajan, yes or no.  Does the debtor currently have any

23  employees on its payroll?

24  A    Right now, currently, Stream TV does not have

25  employees other --

1   Q    Thank you.

2   A    -- than me.

3   Q    Thank you.  And the debtor currently has -- is generating

4   no revenue, correct?

5   A    Stream TV does not have revenue.  It does have a deal for

6   stitching and tiling in the modified light field.

7   Q    Okay.  Well, we'll talk to Mr. McCarthy about that.  I'm

8   sorry, Mr. Robertson about that, that deal that you say you

9   have.  The debtor currently has no current ongoing operations,

10  correct, according to your first day declaration?

11  A    Not at this time, no.

12  Q    Okay.  And the current -- the debtor currently has no

13  cash, correct?

14  A    I believe we have some cash.  We were waiting for the DIP

15  motion.

16  Q    Okay.  Putting aside this DIP motion, the debtor currently

17  has no cash, correct?

18  A    Correct.

19  Q    Okay.  Isn't it true, sir, the -- your first day

20  declaration and Mr. Robertson's first day declaration you talk

21  about three platforms.  You talk about Ultra-D technology, two-

22  view products, which includes stitching and tiling, and then

23  multi-view products, right?  Those are the three platforms,

24  correct?

25  A    No.  It's modified light field, not multi-view.

1  Q    Okay.  Mr. Robertson calls it multi-view in his

2  declaration, but modified light.  Isn't it true that the debtor

3  currently has generated zero revenue for any existing contracts

4  for its two-view products or multi-view products?

5  A    For the new ones, no, it has not generated revenues for

6  that yet.  It's -- we were waiting for the DIP motion so the

7  engineers can rejoin, though, basically we can't bring the

8  revenue in because we assumed we were going to have the DIP

9  motion.

10  Q    Okay.  And with respect to the Ultra-D technology, Stream

11  actually acknowledged to a number of third parties in December

12  that the Ultra-D assets were transferred to SeeCubic, correct?

13  A    Stream did not officially make that declaration.

14  Q    All right.  Let's go to --

15  A    We had assumed that the foreclosure process would be done

16  properly, which it wasn't.

17  Q    Mr. Rajan, I don't know what question you're answering

18  right now, but we'll take a look at a document here.  TX 261,

19  please.  Mr. Rajan, we looked at this -- this is an email from

20  your brother, Raja, who at the time was the general counsel of

21  Stream TV, correct?

22  A    Correct.

23  Q    And your brother on behalf of Stream TV, about a week

24  after the preliminary injunction had been entered he writes to

25  one of your third-party vendors:

1    Dear David and Mr. Shen (phonetic).  We are writing to you

2  through our temporary gmail address as the Stream TV Network's

3  email system has been shut down.  The assets of Stream TV and

4  its subsidiaries have all been transferred to a Delaware USA

5  corporation named SeeCubic.

6    Skip to the next paragraph:  Assets not only include

7  tangible property like equipment, but may also include things

8  like papers, plans strategies, and other documentation.  Do you

9  see that?

10  A    Yes, I do.

11  Q    Okay.  And you don't have any reason to believe, as you

12  told me in your deposition, that your brother was being

13  dishonest or misleading third parties, correct?

14  A    I do not believe my brother was trying to be dishonest.

15  What I said was I believe it was an aspirational goal.  He

16  should have said should be transferred, but he, along with I,

17  we were assuming that the foreclosure process would be run

18  properly, which it wasn't.  And that is why when we went

19  forward we were astonished in January how poorly the process of

20  the foreclosure was handled, both through the omnibus and in

21  the local jurisdictions.  That's why even Mr. Stastney

22  testified there are Ultra-D assets still sitting in Stream TV.

23  Q    Mr. Rajan, your brother never retracted this email.  He

24  never sent a follow-up email, right?  Saying that, in fact --

25  A    He wasn't involved after this.

Rajan - Court                                    104

1  Q    Let me finish -- saying that the assets of Stream hadn't,

2  in fact, been transferred to SeeCubic, correct?

3  A    He wasn't -- he did not send an email.  He wasn't involved

4  at that point post this email.  You can ask him if you like and

5  talk to him, and he is a lawyer, so he can probably give you

6  his opinion.  The last time I spoke to him he said he is

7  astonished that both through the omnibus and even in the local

8  jurisdictions they haven't followed the procedures at all.

9          MR. LARKIN:  Mr. Rajan, I don't have any further

10  questions.  Thank you.

11          THE COURT:  Okay.  Well, I have a couple questions of

12  clarification, and then I will allow any recross or redirect.

13  Well, actually, I'll allow redirect, and then if Mr. Larkin has

14  any recross on the scope of my questions or the scope of the

15  further redirect to this, he may do so.

16          So, Mr. Rajan, I'm just -- I'm -- quite frankly, I'm

17  a little confused, and it's not meant to imply something

18  negative on behalf of any of the parties here, but I want some

19  clarity from the debtor's perspective on what the scope of the

20  debtor's assets were before the omnibus agreement and what the

21  scope of the assets were that are subject to the omnibus

22  agreement, and what the debtor currently thinks and claim that

23  there's assets that are outside the scope of the omnibus

24  agreement.

25          So let me just flesh that out so I fully understand

1   what the debtor's position is here.  What assets did Stream own

2   prior to the omnibus agreement?

3          THE WITNESS:  Prior to the omnibus agreement Stream

4   predominantly owned and did own at that time what they call the

5   Ultra-D assets.  That included patents that were held in the

6   Netherlands.  It included algorithms that were held in both the

7   United States and the -- the United States and in the

8   Netherlands.  Then there were optical technology that was held

9   in the Netherlands and at various points in Asia.  Then there

10  was manufacturing technology that was held in -- both in

11  the -- in Asia and in the -- it was held predominantly in Asia

12  and in the United States, manufacturing technology.  There was

13  a small piece of it in the Netherlands.  There was also

14  electronics technology that was held in the United States.

15         Then there were things like plan strategies,

16  documentations, other things that were held, you know, pretty

17  much in the United States, and then there were samples in

18  various parts of the world.  That was what Stream TV held prior

19  to the omnibus.  Then -- did I --

20         THE COURT:  Okay, and so --

21         THE WITNESS:  -- answer your question there?  Let's

22  stick with that one first.

23         THE COURT:  Okay, let's stick with that one.  So you

24  said they -- you said that they substantially owned the Ultra-D

25  assets, and then that list that you just gave me, is that part

1  of the Ultra-D assets --

2            THE WITNESS:  That was all Ultra-D.

3            THE COURT:  -- everything you just set forth?

4            THE WITNESS:  That was Ultra-D.  So there -- if you

5  were to look at it completely on a holistic level, there's

6  anywhere from like 12 to 15 different, we'll call them

7  components, okay, of Ultra-D in various points around the

8  globe.

9            THE COURT:  Okay.  And was that -- everything you

10  just listed, was that included in the scope of the omnibus

11  agreement?  Putting aside your position of whether the assets

12  were or were not transferred to SeeCubic, is that the -- are

13  all the things you just listed to me part of the omnibus

14  agreement?

15            THE WITNESS:  They had the right to acquire the 12 to

16  15 components; that is correct.  They did have the right --

17            THE COURT:  Okay.

18            THE WITNESS:  -- with the omnibus agreement to take

19  the 12 to 15 components.

20            THE COURT:  Okay.  So that's very helpful.  So what

21  else -- so you just described the Ultra-D components.  What

22  else beyond the Ultra-D components did the debtor own?

23            THE WITNESS:  No, the 12 to 15 I mentioned is the

24  complete Ultra-D.  It is a hundred percent of Ultra-D.

25            THE COURT:  Okay.

1          THE WITNESS:  There was nothing of Ultra-D outside --

2          THE COURT:  Okay.

3          THE WITNESS:  -- of Stream TV.  Stream TV --

4          THE COURT:  Okay, and did --

5          THE WITNESS:  -- or Stream TV subsidiaries.  But at

6    that time of the omnibus, we'll say the day before the omnibus,

7    as a point of reference we'll say day before omnibus, all of

8    the assets were owned by Stream TV through either subsidiaries

9    or in the parent company.  So the drop-off point is the day

10   before the omnibus.  You know, Stream TV owns a hundred

11   percent.  It's not like there was a piece of Ultra-D outside of

12   Stream TV or Stream TV subsidiaries.

13         THE COURT:  Okay, that's very helpful.  So you

14   mentioned a few times on your cross-examination that there were

15   assets that are, quote, outside the omnibus agreement.  So my

16   next question is, please describe what those assets are.

17         THE WITNESS:  Okay.  I want to be respectful of your

18   question.  That's sort of step three.  Just a suggestion.  I

19   think you wanted to ask me, just my suggestion, what parts of

20   the 12 to 15 did they not take of the Ultra-D, before we go to

21   the non-Ultra-D assets.

22         THE COURT:  No.  I'm not interested --

23         THE WITNESS:  (Indiscernible).

24         THE COURT:  -- in answering that question.  I want to

25   know --

1          THE WITNESS:  Okay, that's --

2          THE COURT:  I want to know what assets Stream has,

3    okay, that are non-Ultra-D assets, okay, that are -- let's just

4    start there.  What assets does Stream own that are not part of

5    the 12 to 15 components that comprise the Ultra-D assets?

6    Anything?

7          THE WITNESS:  Yeah.  They have the -- they have

8    rights on the stitching and tiling, and they have the modified

9    light field, which is not Ultra-D, which is brought into Stream

10   TV, and they're working with VTI on the stitching and tiling

11   which is outside the omnibus that was brought in post-omnibus,

12   because, obviously, Stream TV was damaged badly by the omnibus

13   and by what happened in Delaware.  We have all these people

14   that are owed money, so we had to figure out a way -- you know,

15   how do we start generating revenue here and start keeping the

16   company alive.  So assets were brought in such as stitching and

17   tiling, which it's sharing with VTI, and modified light field,

18   which is a competitor to the Ultra-D technology, we brought

19   that into Stream TV.  So we can --

20         THE COURT:  Okay, this is very --

21         THE WITNESS:  -- replicate the Ultra-D without using

22   Ultra-D and create a -- you know, hate to do it, breaks our

23   heart, but a competitor to the Ultra-D technology.  Stream TV

24   would have sort of version number two.

25         THE COURT:  Okay.  So I just want to be clear, I

Rajan - Court                                          109

1  understand.  So the other assets that Stream currently

2  possesses are just assets that were brought in post-filing.  Is

3  that correct?

4          THE WITNESS:  The non-Ultra-D assets were brought in

5  post-filing, because, you know, thank god, we have the stay

6  order and protection.  So that was done post-filing.  Stream

7  TV, though, does have a number of the Ultra-D in its

8  possession.  That's separate.

9          THE COURT:  Okay, and I certainly understand that.

10 Okay.  So when you describe -- I want to flesh this out because

11 I want to be very clear.  When you describe rights under

12 stitching and tiling, can you explain, what is that?

13         THE WITNESS:  So VTI has some products that are based

14 on stitching and tiling technology.  It's a 250-inch unit, and

15 it's also a tablet.  It's also adding some additional products,

16 like a PC monitor and a laptop.  Stream TV engineers are going

17 to be helping the VTI engineers to improve the products and

18 improve performance, and in exchange for that they get a

19 royalty on the sales of those products, so it would bring

20 immediate cash flow into Stream TV so Stream TV can use that to

21 pay off some of the -- you know, the lenders and also

22 operations.

23         So that's why we wanted that DIP motion so we can get

24 those people back on the payroll, and then Stream TV can have

25 revenue share on those products.  Those are non-Ultra-D

1  products.

2          THE COURT:  Okay.  Again, very -- this is very

3  helpful, because I was confused in reading all of the various

4  submissions.  So VTI has the product and Stream has

5  essentially, I would say the know-how, the engineers that are

6  capable of helping VTI improve their products?

7          THE WITNESS:  That's right, because if you remember

8  the depositions, the stitching and tiling products don't look

9  quite as good as Ultra-D.  We have people who can help VTI make

10 it look better, so to close the gap with Ultra-D, Ultra-D is

11 the gold standard, and close the gap.  So that's one of the

12 opportunities for Stream TV to generate immediate cash flow to

13 help the operations.

14         THE COURT:  Got it.  Is there a contract that's

15 governing this --

16         THE WITNESS:  Yes.

17         THE COURT:  -- relationship?

18         THE WITNESS:  Yes.

19         THE COURT:  Yes, there is a contract?  Okay.

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.  So walk me through the modified

22 light deal --

23         THE WITNESS:  Light field.

24         THE COURT:  -- which is not the Ultra-D.  Right.

25 Walk me through what that is.

1            THE WITNESS:  That is a competitor to Ultra-D.  There

2   were companies in the industry who reached out to myself and --

3   when we did the filing, and they came to us and said, look,

4   you're the ones who brought the team together for Ultra-D, you

5   went out and got the best technology.  We have technology, but

6   we need you to bring -- find the right engineers and put a team

7   together and help create a competitor to Ultra-D, because they

8   didn't want to go work with SeeCubic.  They would like to keep

9   the relationship with Stream TV.

10           So this is a code base that has algorithms for

11  realtime conversion and has it for rendering.  It has lens

12  technology.  VTI, you know, a number of the people have

13  tremendous amount of manufacturing experience, so we understand

14  manufacturing really well.  In fact, most of the bulk of the

15  manufacturing technology stayed inside Stream TV, so we know

16  how to go to mass production.  We got the yield rate at Stream

17  TV to 96 percent, so we know that in and out.

18           And so we are now working on a -- we needed the DIP

19  motion, but we are working on a competitor to the Ultra-D and

20  we have a number of ideas of how we want to improve the

21  technology to make it better than Ultra-D.  And we have

22  engineers on standby, so as soon as a DIP is approved they'll

23  be on the payroll in a matter of days and off we go.  We'll be

24  starting with a TV and a PC monitor, and then we'll be working

25  on smaller-scale devices, but the smaller scale is covered by

Rajan - Court                                           112

1  the stitching and tiling, so it's not going to be as big of a

2  priority.

3            And we are --

4            THE COURT:  Okay, again, very helpful.

5            THE WITNESS:  -- and we have companies, too, who are

6  going to give us orders for the modified light field, and if

7  you remember, that bonding equipment is still in Stream TV

8  USA's name, so we could use that to get the production up, and

9  that equipment can be used not only for Ultra-D, we can use it

10 for the modified light field.  We can even use it for the

11 stitching and the tiling.  So that is also -- but we also have

12 some other equipments that are already installed and

13 operational with some of the companies we work with, so we're

14 going to use that equipment until the equipment, you know, that

15 was so controversial, is up and running.

16           THE COURT:  Okay.  And so again, just so I fully

17 understand, the asset that Stream would bring to the table from

18 this competitive product is the essential know-how and

19 experience of the engineers that you will rehire when you get

20 the DIP financing.

21           THE WITNESS:  Correct.  That is absolutely correct.

22           THE COURT:  Okay.  Are there any -- well, okay,

23 that's very helpful.  Thank you so much.  And I guess my

24 next -- my last set of questions, really, there -- just some

25 confusion I want to clarify.

Rajan - Court                    113

1          There was some discussion that you had on the record,

2    I think with Mr. Larkin, regarding the appointment of a CRO,

3    and at one point I think you said that it was VTI that was

4    looking to hire the CEO -- CRO.  Is that correct, or is it

5    Stream that's looking -- that intends to hire the CRO?

6          THE WITNESS:  The CRO is a Stream TV employee.  It'll

7    be named no later than Wednesday.  VTI has to sign off on it

8    because the CRO is going to be spending VTI's money, so, you

9    know, we have to get Mr. McCarthy to feel comfortable.  That's

10   the short story.

11         THE COURT:  And who is this supposed CRO?

12         THE WITNESS:  We have a candidate in California.  His

13   name is Greg Yorkson (phonetic).  Then before we go final --

14   he's most of the way there.  He's done a number of

15   restructurings.  He has tons of finance contacts, and he's led

16   restructuring.  We're 89 percent of the way there.  But before

17   we go final final Larry McMichael, who's debtor's counsel, had

18   four candidates that he sent over the weekend.

19         We can't interview them today.  We're hoping to do

20   that tomorrow if I don't have to do depositions tomorrow, and

21   then Mr. McCarthy's free, he will do it, and so will some of

22   the other people on the VTI board.  Some of the former Stream

23   TV employees want to talk to them, too, because they'll be

24   rejoining, and we will have that in place by no later than

25   Wednesday.

1         THE COURT:  Okay.  Thank you very much.  And just one

2   final question to double back to the modified light deal.  Do

3   you have any contracts or other agreements in place --

4         THE WITNESS:  We have a contract --

5         THE COURT:  -- with respect to today?

6         THE WITNESS:  We have the draft.  The issue with the

7   modified light field, that person, the company, is paying for

8   the production, it's like three million bucks, the production

9   setups.  So that was a DIP motion which we didn't submit.  We

10  have most of it written.  I can -- we can submit it, you know,

11  as soon as humanly possible.  These motions take a lot of work,

12  but we can -- we're anxious to get up and running.  I did a

13  call with them last night and they're pressing me to hurry up

14  because they -- they're also giving us a PO for -- I want to

15  say 8,000 units, I -- I'm sorry, 10,000 units.  They're also a

16  customer, too, so they're pressing us hard.  We will try to get

17  that to you as soon as humanly possible, and that will

18  consummate.  But we have it in draft.

19        THE COURT:  Okay.

20        THE WITNESS:  And so that --

21        THE COURT:  Thank you very much.

22        THE WITNESS:  -- because that is Stream TV's.  Yeah.

23        THE COURT:  Okay.  That's very helpful.  Thank you so

24  much for walking me through the scope of the assets that we're

25  talking about.  Again, it was very confusing when reading the

1  various documents.

2          So, Mr. McMichael, with that why don't I turn the

3  podium over to you.  Is that right?

4          MR. McMICHAEL:  Thank you, Your Honor.  And I just

5  have a very few questions for Mr. Rajan.

6                  REDIRECT EXAMINATION

7  BY MR. McMICHAEL:

8  Q    Mr. Rajan, I want to follow up on something the Court

9  asked, just to be sure that it's completely clear.  You

10 referenced some production equipment.  Do you remember that?

11 A    Yes.

12 Q    Okay.  Is that the equipment that's in Suzhou, China?

13 A    Yes.  There's production equipment in China, in Suzhou,

14 China, and then there's some other equipments that's also in

15 Asia, but they're minor equipments, as well.

16 Q    Okay.  Who bought the construction equipment in Suzhou,

17 China?

18 A    Stream TV USA bought it.

19 Q    Does Stream TV still have it?

20 A    Yes.

21 Q    And how much is that equipment worth, approximately?

22 A    The whole equipment, I think we paid -- the total bill

23 was -- on the invoices, I believe it was 15 million or 12

24 million.  We paid a couple million on it.  I think there's

25 7-1/2 still owed.  The value of the equipment, though, is very

Rajan - Redirect/McMichael                    116

1  high, which is a whole another issue.  But, yeah, 7-1/2 I think

2  is still owed.

3  Q    All right.  Is this equipment capable of producing things

4  other than Ultra-D screens?

5  A    Absolutely.

6  Q    All right.  So you can use it for the modified light field

7  or the stitching and tiling.

8  A    Yes, you can.

9  Q    All right.  Couple more questions.  VTI, and they may ask

10 you some questions as well because they're here, but just for

11 my purposes, as money comes into VTI is your ownership being

12 diluted?

13 A    Yes.

14 Q    All right.  And it presently has six directors of VTI?

15 A    One, two -- I think it's either six or seven.

16 Q    All right.  And that -- and only one of them is you.

17 A    Yeah, only one of them is me.

18 Q    All right.

19 A    Yes, that's --

20 Q    And I think you covered the CRO adequately.  Obviously,

21 are you waiting for the Court to rule on this motion before

22 hiring a CRO?

23 A    Yeah, that would be helpful.  Yeah, I think we need that

24 because he's got to get paid through the DIP.

25           MR. McMICHAEL:  Right.  Okay.  I have nothing

1  further, Your Honor.

2          THE COURT:  Okay.  Mr. Stemerman, did you want to

3  have any redirect?

4          MR. McMICHAEL:  Oh, excuse me.

5          THE COURT:  Or any --

6          MR. McMICHAEL:  I'm sorry.

7          THE COURT:  -- questioning of this witness?  I

8  apologize.  Did you guys -- did any -- was there an agreement

9  of whether VTI will be questioning any of the witnesses today?

10          MR. McMICHAEL:  VTI may have questions, Your Honor,

11  but I neglected to ask one question.  May I just go back and

12  ask one more?

13          THE COURT:  Yes.

14          MR. McMICHAEL:  Yes.  Okay.

15  BY MR. McMICHAEL:

16  Q    Mr. Rajan, you were asked by Mr. Larkin whether you were,

17  quote, challenging the omnibus agreement.  You said no, right?

18  You remember that?

19  A    No, we're not challenging.

20  Q    Okay.  But you understand that the debtor has a strategy

21  to avoid it under bankruptcy laws.

22  A    Yeah.  I mean, we view it as an executory contract.  Yeah,

23  I mean, it's an executory contract.  It's not yet completed.

24  The debt's still there.

25  Q    My point is that you're not challenging it under state

Rajan - Cross/Stemerman                               118

1  law.  You're not challenging Vice Chancellor Laster's ruling.

2  You're looking at it with a new lens, right, under

3  bankruptcy --

4  A    Yeah.

5  Q    -- law.

6  A    We're -- yeah, we're just going to do an executory

7  contract, and then we have to deal with it with, you know,

8  turnover actions and all those things.

9        MR. LARKIN:  Your Honor, I have to object.  I realize

10 it's belated because I was on mute.  I didn't want to interrupt

11 Mr. McMichael.  But it's hard to tell who's testifying here,

12 Mr. McMichael or Mr. Rajan.  I would ask him not to lead the

13 witness, as it is his witness.

14        THE COURT:  Okay.  Try not to lead the witness, but

15 we'll keep the testimony as it stands.  I think I understand it

16 very clearly.

17        MR. McMICHAEL:  That's all I have, Your Honor.  Thank

18 you.

19        THE COURT:  Okay.  Mr. Stemerman, I apologize.  I

20 probably should have gone to you next since you're -- you

21 should have -- we should allow the -- we should have allowed

22 Mr. McMichael to be cleanup hitter, I think.  So did you have

23 any questions for Mr. Rajan?

24        MR. STEMERMAN:  Just very briefly, Your Honor.

25                    CROSS-EXAMINATION

1  BY MR. STEMERMAN:

2  Q    Mr. Rajan, with respect to the directors at VTI, are --

3  you're a director yourself, correct?

4  A    Yes.

5  Q    Are any of the other directors family members of yours?

6  A    No.

7  Q    Are any of the other directors affiliated with Stream TV

8  in any way?

9  A    Are any of the directors affiliated with Stream TV?  A

10  number of them were never involved in Stream TV.

11  Q    And approx -- how many were never involved with Stream TV?

12  A    Three of them were never involved in Stream TV.  Two of

13  them led a company that made an investment in Stream TV, but

14  they left that company, and that company still has an

15  investment in Stream TV.  They worked at Qualcomm's engineering

16  arm.  They left that company and -- left that company because

17  it got acquired.

18       That company, Qualcomm's engineering arm, is still a

19  shareholder in Stream TV.  They used to be a debtholder, and

20  they followed the conversion agreement and converted their

21  debt.  They signed at the same time as SLS and Hawk and those

22  things, but they left and they're on their own right now.  They

23  didn't --

24  Q    Okay.

25  A    -- make an investment on their own as an individual

Rajan - Court                           120

1  personally.

2  Q    And I just want to clarify.  Besides yourself are any of

3  the other directors of VTI currently affiliated with Stream TV,

4  the debtor?

5  A    Yeah, there is people.  Yeah.  There -- there's four of

6  them.  Were -- nothing to do with Stream TV.

7            MR. STEMERMAN:  Okay.  Thank you.  No further

8  questions.

9            THE COURT:  I apologize.  I'm confused there with

10 that testimony.  So, Mr. Rajan, so there's six directors, one

11 of which is -- are -- is you, so there's five left.  Is that

12 correct?

13           THE WITNESS:  Correct.

14           THE COURT:  Okay.  Okay, so of that five I thought I

15 heard you say that at least -- that two are equity holders in

16 Stream.

17           THE WITNESS:  No, no.  Yeah, let me explain it

18 better.  I'm sorry.  Okay, so let me put it this way.  So Tim

19 McCarthy is on the board.  He was never involved in Stream TV,

20 okay?  Sophia -- don't ask me to pronounce her last name,

21 hopefully she's not listening -- she was never an investor in

22 Stream TV, okay?  Then Glenn Hasen was never an investor in

23 Stream TV.  Tracy Rees and Cliff Morton worked at a company

24 called Intrinsyc, which was Qualcomm's engineering arm.

25 Intrinsyc made an investment into Stream TV, so Intrinsyc was a

Rajan - Recross/Larkin                    121

1  debtholder.  Actually, they weren't even an equity holder.

2          They -- Intrinsyc converted their debt under the

3  conversion agreement to equity, and Tracy and Cliff did work at

4  Intrinsyc so they were involved with Stream TV, but in another

5  company.  They left Intrinsyc.  They're on their own right now

6  and they've joined the VTI board, but they didn't make a

7  personal investment.  Intrinsyc made it.  Intrinsyc is still

8  holding those shares, which was debt.  Okay?

9          THE COURT:  Okay.  Very helpful.  Thank you.

10          THE WITNESS:  Okay.

11          THE COURT:  Very helpful.  Okay.  Mr. Larkin, did you

12  have anything to follow up on the scope of my cross?  Or my not

13  really cross.  My clarifying questions.

14          MR. LARKIN:  I think just a couple of questions, Your

15  Honor.

16                      RECROSS-EXAMINATION

17  BY MR. LARKIN:

18  Q    Mr. Rajan, you testified that -- about the know-how of

19  certain engineers and employees of Stream TV.  I just want to

20  make sure I understand your testimony.  Stream TV currently has

21  no employees, correct?  As we sit here today.  I know that

22  there's people on furlough.  I know there's people working at

23  VTI.  Stream TV currently has no employees, correct?

24  A    Correct.  We didn't get our DIP motion, yes, so they

25  haven't joined the payroll.

Rajan - Recross/Larkin                    122

1  Q    Okay.

2  A    They're not on the payroll.

3  Q    Correct.

4  A    Not yet.

5  Q    And it's also true that a number of the engineers and, if

6  you will, the brain power of Stream TV, has been transferred

7  pursuant to the omnibus agreement because of the -- let me

8  rephrase.  The -- a number of the employees that you're

9  referring to, they work at the subsidiaries of Stream TV that

10 were transferred to SeeCubic pursuant to the omnibus agreement,

11 correct?

12 A    Absolutely not.

13 Q    Okay.

14 A    That is incorrect.  Right now -- okay, let me be clear.

15 There are a number of 3D experts who are absolute geniuses

16 working in SeeCubic of the Netherlands, which is a Stream TV

17 subsidiary.  There is a dispute over the board, some people

18 think I'm still a board member, and those things in the

19 Netherlands are still under our control.  Some people would say

20 it's under SeeCubic of Delaware's control.

21     The employees who I'd mentioned are joining the payroll

22 through the DIP have nothing to do with those engineers in the

23 Netherlands.  We have different engineers in the Netherlands

24 that are not associated with SeeCubic of Delaware.  We have

25 other engineers in other parts of Europe, nothing to do with

Rajan - Recross/Larkin                    123

1   SeeCubic of Delaware.  We have engineers in Asia that have

2   nothing to do with SeeCubic of Delaware or SeeCubic of the

3   Netherlands.  These are independent people that are -- and also

4   people in California -- who will go back on the payroll if our

5   DIP motion gets approved.

6   Q    Okay.  None of those people are currently --

7   A    The Netherlands people has to get sorted out in a separate

8   action, you know, that has nothing to do with that, has nothing

9   to do with today.

10          THE COURT:  But -- just to clarify.  But those are

11   the people that are going to -- that you hope will rejoin the

12   debtor?

13          THE WITNESS:  There is a --

14          THE COURT:  Employees that are currently --

15          THE WITNESS:  -- second (indiscernible) --

16          THE COURT:  -- employed?

17          THE WITNESS:  Their second team event -- okay, so let

18   me be more clear.  I should probably make a PowerPoint for you.

19   Okay.  There is engineers who are not associated with SeeCubic

20   of Delaware or SeeCubic of the Netherlands that will join

21   Stream TV's payroll once the DIP motion is approved.  Has

22   nothing to do with SeeCubic of Delaware.  Nothing to do with

23   SeeCubic of the Netherlands.

24          As far as the engineers in SeeCubic of the

25   Netherlands, we would love to get those people on our payroll.

1  That is independent of the DIP motion, okay, that was filed,

2  and that is in a later discussion regarding executory contract

3  and the omnibus.  And also there's an issue you're going to

4  hear from other witnesses regarding the board and all those

5  things, and that's something the lawyers have to explain to

6  you.

7           But what Mr. Larkin asked me was, was I referring

8  that the people in the Netherlands who are at SeeCubic of the

9  Netherlands, am I putting them back on the payroll at Stream TV

10 USA and using them for the stitching and tiling, and the answer

11 is no.  I have other -- we have other engineers.

12           THE COURT:  Okay.  Thank you very much for clarifying

13 that for me.

14           MR. LARKIN:  Your Honor, I have no further questions.

15 Thank you, and we thank the witness.

16           MS. SIERRA:  Your Honor --

17           THE COURT:  Okay.

18           MS. SIERRA:  -- Rosa Sierra --

19           THE COURT:  Thank you.

20           MS. SIERRA:  -- for the U.S. Trustee.  Sorry.

21           THE COURT:  I apologize.  I should have asked you if

22 you had any questions for this witness.  Go ahead.

23           MS. SIERRA:  No, I should have spoken up sooner.  May

24 I ask a few questions?

25           THE WITNESS:  Hi, Rosa.

1          THE COURT:  Sure.

2                         CROSS-EXAMINATION

3  BY MS. SIERRA:

4  Q    Hi, Mr. Rajan.  I have a few questions just following up

5  on some of Judge Owens' questions to you about the assets that

6  fall outside of the omnibus agreement.  So did you tes -- did I

7  hear you correctly and did you testify that those assets were

8  brought in post-filing?

9  A    Yes.

10 Q    Okay, those assets were not brought in pre-filing, but

11 after the omnibus agreement decision by the Chancery Court?

12 A    The stitching and tiling and VTI was there, but VTI

13 isn't -- didn't file bankruptcy.  Stream TV only signed its

14 agreement for VTI after the filing, because Stream TV's not

15 allowed to sign at that point.  And then once we filed we

16 signed it, and then the modified light field's going straight

17 into Stream TV.  That's not VTI.  VTI is paying for it, it'll

18 finance it, but it's not theirs.

19 Q    Okay, so just to -- like to redirect you back to my

20 question.

21 A    Okay.

22 Q    Let's start with the stitching and tiling.

23 A    Yeah.

24 Q    When did Stream acquire the stitching and tiling rights?

25 A    That's after filing.

1  Q    After filing.  Okay.  The modified light field --

2  A    Yeah.

3  Q    -- when did Stream TV acquire the rights to that?

4  A    That's after filing.

5  Q    Okay.  Beyond those two buckets of assets what other

6  assets fall outside of the Ultra-D technology?

7  A    Outside of the Ultra-D those are the only two.

8  Q    Those are the only two, and they were both --

9  A    At the time.

10 Q    -- acquired post-filing?

11 A    Yeah.

12 Q    Okay.  Now, you also testified about the engineers that

13 have nothing to do with SeeCubic of Delaware and SeeCubic of

14 the Netherlands, correct?

15 A    Correct.

16 Q    Those engineers, then, are just new engineers that are

17 going to be brought into Stream if the DIP motion is approved?

18 A    They're new engineers or they're people who used to work

19 with us many -- you know, awhile ago, who left, who are

20 rejoining, and they're also people who were consultants or were

21 not -- you know, and people we knew, but they were not on the

22 Stream TV payroll, but they're joining the Stream TV payroll.

23      And some of them are engineers in California who work for

24 vendors, and we have some people who work for vendors who are

25 going -- you know, they're big supporters of ours, these

1 particular companies, so they're going to sort of jump ship and

2 join our payroll, but with the permission of their current

3 employer.  They're trying to help us get the technology moving.

4 So some companies are going to let us take their employees,

5 with their permission.

6 Q    Okay, so how many engineers is that?

7 A    Will be up to about 50 people.  That doesn't include

8 SeeCubic of the Netherlands.

9 Q    Okay.  So there's 50 people currently waiting for the DIP

10 motion to get approved so they can come work at Stream TV?

11 A    Yeah.  Approximately, yes.

12 Q    Okay, and what is -- why couldn't they be -- why weren't

13 they hired before the filing of the bankruptcy?  What in your

14 view prevented that?

15 A    The -- what prevented hiring them prior to the bankruptcy

16 was at that time, you know, we -- you know, at that time we had

17 to then go bring money into Stream TV.  We didn't think it was

18 a good idea to bring money into Stream TV, because at that

19 point SeeCubic of Delaware was -- and Skadden -- were sending

20 us threatening letters every -- you know, three times a week,

21 you know, threatening our employees, threatening customers,

22 threatening vendors, and even threatening investors.  So we

23 didn't want to go bring money into Stream TV without protection

24 on Stream TV.

25        That's why a number of the Stream TV people went to VTI,

1 because they were even threatening the secretaries, so they

2 were threatening customers and vendors.  So it was a scary time

3 at that -- you know, at that point for those people.  So we

4 needed the protection of the bankruptcy.  That's why we're

5 here.  The reason why we're getting, you know, the investors

6 and everything now is because we have the protection of the

7 bankruptcy.

8 Q    So in your view you couldn't hire those employees because

9 you needed bankruptcy protection to employ them, even though

10 they would be working on assets that had nothing to do with the

11 omnibus agreement?

12 A    Yeah, because they -- the -- you haven't seen the letters

13 that we got.  They were very aggressive, so --

14 Q    So the answer to my question was yes?

15 A    Yeah, I didn't think it was a good idea legally to put

16 those people in jeopardy.

17         MS. SIERRA:  All right.  Your Honor, no further

18 questions.

19         THE COURT:  Okay.  Thank you.  Okay.  Well, we're

20 bouncing around back and forth, so let me -- probably a

21 little -- we'll be a little bit more orderly next time.

22         So, Mr. Michael -- McMichael, you always have the

23 last redirect in terms of the scope of the testimony, and so

24 I'd ask you do you have any follow-up questions based on

25 Ms. Sierra's questioning of Mr. Rajan?

1            MR. McMICHAEL:  Thank you, Your Honor.  I have no

2  questions.

3            THE COURT:  Okay.  Thank you.  Mr. Rajan, thank you

4  so much for your time and attention today to this matter.  It

5  was very helpful, and I appreciate you indulging me in my

6  questions.  Again, very, very helpful to -- for me to

7  understand the scope of the assets and the operations and

8  future hopeful operations of the debtor.  So with that, let me

9  tell you that you are released from the witness stand and you

10  may go about your day or stay on the line.

11            THE WITNESS:  Okay.  Well, thank you so much for your

12  time, Your Honor, and allowing me a chance to present.  And

13  I'll talk to counsel, if it help -- I can draw a PowerPoint for

14  you or something.  Okay.  All right.

15            THE COURT:  Okay.  That -- that's not necessary, but

16  thank you.  Bye bye.

17            MR. McMICHAEL:  Your Honor, may I just address --

18            THE COURT:  Okay.

19            MR. McMICHAEL:  -- a quick scheduling question?

20            THE COURT:  Yes.  I was actually going to ask you the

21  same thing.

22            MR. McMICHAEL:  Great.  So the next witness that

23  we've agreed to is Mr. McCarthy.  My understanding is that

24  Mr. McCarthy has a call at 1:00 on another matter and that -- I

25  mean, we could break now and reconvene at 1:30 or we could -- I

1  mean, I don't know what other parties want to do, but

2  Mr. McCarthy I think won't be available much before 1:30.

3           THE COURT:  Okay.  Mr. Larkin, does it make sense to

4  start Mr. McCarthy and then break for lunch during his call?

5           MR. LARKIN:  Yeah, I think that makes sense.  I --

6  you know, we have 45 minutes to -- my partner, Mr. Colby, will

7  actually be handling the examination, but I think we should go

8  until 1:00 and then we can break for however long Your Honor

9  wants, and we'll come back.

10          THE COURT:  Okay.  Well, we have a lot of ground to

11 cover I think today, so I'm amenable to a half-hour lunch

12 break.

13          MR. LARKIN:  Okay.

14          THE COURT:  Or whenever Mr. McCarthy can rejoin us.

15 So with that, let's call Mr. McCarthy to the stand.

16          Oh, there you are, Mr. McCarthy.  Nice to see you.

17          MR. McCARTHY:  Hi, there.  How are you?

18          THE COURT:  I'm doing well, thank you.  All right.

19 Let me swear you in before the testimony begins.

20               TIMOTHY McCARTHY, WITNESS, SWORN

21                      CROSS EXAMINATION

22          THE COURT:  Okay, can you please state your name and

23 spell your last name for the record?

24          THE WITNESS:  Timothy McCarthy, and my last name is

25 M-c-C-a-r-t-h-y.

McCarthy - Cross/Colby                    131

1          THE COURT:  Okay, thank you.  All right.  Let's begin
2  cross.
3          MR. COLBY:  Good afternoon, Your Honor.
4  BY MR. COLBY:
5  Q    Good afternoon, Mr. McCarthy.  Nice to see you again.
6  A    Nice to see you.
7  Q    Mr. McCarthy, in your deposition when we started I asked
8  you if you were testifying on behalf of Burlington, and you
9  said yes.  And then Mr. Sten corrected you and said you were
10  testifying as a director of VTI, and then you said I'm
11  testifying as a director of VTI.  Do you recall that exchange?
12  A    I do.
13  Q    Okay.  And you -- you've been a director of VTI since
14  April 28th?
15  A    That is correct.
16  Q    And the board of directors of VTI at least as of Friday
17  had had one meeting, correct?
18  A    That is correct.
19  Q    And Mr. Rajan is the controlling shareholder of VTI, is he
20  not?
21  A    That is correct.
22  Q    And not just because he currently owns the majority of
23  shares, but also because he has a class of shares that have 10
24  times voting right, correct?
25  A    That is correct.

1  Q    Now, going back to your deposition, you also said in that

2  deposition that VTI's lawyers were representing you there,

3  correct?

4  A    That is correct.

5  Q    All right.  Now, the reason why you were giving a

6  deposition is because you had submitted a declaration in this

7  case, correct?

8  A    Yes.

9  Q    And that declaration was submitted on behalf of Burlington

10 Resources Asia Limited, your company, wasn't it?

11 A    Correct.  That is correct.

12 Q    And you also testified that your declaration on behalf of

13 Burlington was absolutely the only reason why you were there

14 testifying.  Do you recall that?

15 A    Yes.

16 Q    Okay.  So sitting here today who are you testifying on

17 behalf of?

18 A    Well, you know, I suppose you could see it in terms of the

19 fact that I am an investor and Burlington is an investor in

20 VTI, and a very big investor, and, therefore, if you want to

21 talk about hats, there are two hats.  There's a Burlington hat

22 and there's a VTI hat.  Now, I happen to be -- at the same time

23 as an investor in Burlington, I happen to be a director of VTI,

24 recently appointed, but that represents the culmination of

25 months of discussion, negotiation, et cetera, and eventually

1  agreeing and finalizing an investment agreement.  So the two

2  run hand in hand, but when I was referring to being represented

3  by counsel, I am being represented by counsel here of VTI as a

4  VTI director.

5  Q    Okay.

6  A    Because I am on the board of VTI.

7  Q    Okay.  I'm going to go back to my question, which is

8  sitting here today testifying to the Court on whose behalf are

9  you testifying, Burlington or VTI?

10 A    VTI.

11 Q    Okay.  Even though you submitted your declaration to the

12 Court on behalf of Burlington Resources.

13 A    Well, as I said, the two run together.  That is my

14 opinion.

15 Q    All right.  Now, you also told me that you spoke to

16 Mr. Rajan about your deposition before you gave a deposition,

17 correct?

18 A    Yes.

19 Q    Okay.  You told me that Mr. Rajan was very encouraging

20 about the position you were going to present and said that you

21 would make the case.  Correct?

22 A    Correct.

23 Q    Now, let's take a look at Exhibit SeeCubic TX 285.

24 Mr. McCarthy, Exhibit 285 is the declaration that you submitted

25 to this Court, correct?

McCarthy - Cross/Colby                    134

1  A    Yes.

2  Q    And Mr. Rajan also requested that you provide this

3  declaration, did he not?

4  A    He did.

5  Q    And you requested through Mr. Rajan to be provided with a

6  draft of it, correct?

7  A    I base -- yes, that is correct.  Yes.

8  Q    And VTI provided the draft to you, correct?

9  A    They provided a draft, which I had originated.

10 Q    Now, the declaration that you submitted to this Court is

11 titled and is in fact a response to a statement of the Official

12 Committee of Unsecured Creditors, correct?

13 A    Correct.

14 Q    But until I showed it to you on Friday you had never even

15 seen the statement of the unsecured creditors committee,

16 correct?

17 A    That is correct, but I was aware of it.

18 Q    Right --

19 A    And I --

20 Q    -- and you had --

21 A    -- was aware --

22 Q    You had never laid your own eyes on it, correct?

23 A    Correct.

24 Q    And the way you were aware of it is you relied on Mathu

25 Rajan's description of it, correct?

McCarthy - Cross/Colby                                135

1  A    And others, but definitely Mathu's, yes.

2  Q    All right.  But after reviewing it yourself -- let me back

3  up.  We sat there in your deposition as you read, correct?

4  A    Correct.

5  Q    And you asked Mr. Frank, you told him when you had

6  finished reading a page and you asked him to roll onto the next

7  one, correct?

8  A    Correct.

9  Q    All right.  And after reviewing it you stated that you had

10 no obvious disagreement with any assertion by the unsecured

11 creditors committee, correct?

12 A    I had no basic disagreement in terms of their right to

13 present their case.  That is correct.

14 Q    Okay.  But you read it -- you testified that you read it

15 in detail and you had no disagreement with any of its

16 assertions, correct?

17 A    Correct.

18 Q    Now, let's take a look at paragraph 7 of your declaration,

19 please.

20 A    Yeah.

21 Q    And in paragraph 7 you state that Burlington and its

22 associates are providing VTI with USD 180 million, with an

23 option to go to 230 million, and have executed agreements with

24 VTI on Monday, May 3rd, 2021.  Correct?

25 A    Correct.

1  Q    Now, your statement is that VTI and Burlington have
2  executed agreements on May 3rd, but you executed your
3  declaration on May 2nd.
4  A    I actually signed the agreement that I refer to on the
5  2nd, but it wasn't signed by Mathu, I think, until the 3rd.
6  There was basically the time align or the time difference
7  between Europe and the UK -- and the U.S., and also the
8  logistics of just getting it signed by both sides.
9  Q    Two things.  First of all, you would agree with me that
10 Europe is ahead of the U.S. in terms of time, correct?
11 A    I would.
12 Q    Okay.  And so it's not possible that Mr. Rajan signed the
13 declaration or the agreement a day ahead of you.
14 A    No, no.  I'm saying I signed it ahead of.
15 Q    Right.  So you signed it on May 2nd, and so my question to
16 you is, you say Burlington and VTI have executed agreements on
17 May 3rd.
18 A    Uh-huh.
19 Q    But that statement, you agreed with me on Friday that
20 statement was inaccurate, correct?
21 A    I mean, I think it's accurate because I would say that I
22 had committed to it and I had a verbal understanding that it
23 would be countersigned on the basis of an agreed negotiation.
24 Q    Okay.  But it hadn't yet been executed at the time you
25 signed your declaration, correct?

McCarthy - Cross/Colby                    137

1  A    It hadn't been executed on the other side.  I had executed

2  it.

3  Q    Okay.  Now, your declaration also states that Burlington

4  is providing up to $230 million, but the May 3rd agreement that

5  you actually signed is an option for up to $300 million,

6  correct?

7  A    That is correct.  It's a bigger amount.

8  Q    Right.  So the statement in your declaration that the

9  amount was 230 million, that was inaccurate, correct?

10  A    It was understated.

11  Q    It was inaccurate, correct?

12  A    Inaccurate and understated.

13  Q    Now, in the sentence we just read there in paragraph 7, in

14  fact twice in paragraph 7, you make reference to Burlington's

15  partners and Burlington's institutional investors.  Do you see

16  that?

17  A    Yes.

18  Q    And some of the money that these investors are going to be

19  providing to VTI is going to be used to support Stream TV in

20  its bankruptcy restructuring, correct?

21  A    Logically that is correct.

22  Q    Right.  On Friday I asked you who were -- who are these

23  associates and institutional investors, and you refused to

24  answer that question, correct?

25  A    Correct.

1  Q    Even though I advised you that there are confidentiality

2  protections in place in this case that could maintain the

3  confidentiality of that information.  I advised you of that,

4  correct?

5  A    You did.

6  Q    Okay.  Now, you're the sole shareholder of Burlington?

7  A    I am.

8  Q    And you're the sole director?

9  A    I am.

10 Q    And you've been engaged with Mr. Rajan about investing in

11 VTI since late 2020, correct?

12 A    Yes.  I would say the beginning of the fourth quarter of

13 2020.

14 Q    And despite submitting your declaration about providing

15 assets to VTI, Burlington in all of that time -- well, let me

16 back up.  Since early February, so you've been talking to

17 Mr. Rajan since early February about -- in -- since late 2020

18 about investing, and since early February you've had at least

19 some sort of funding agreement in place with VTI, correct?

20 A    Correct.

21 Q    All right.  And in that period of time Burlington has not

22 actually delivered any cash to VTI, correct?

23 A    That is correct.

24 Q    Now, looking at your declaration in paragraph 7, you say

25 that the funds you're providing because they're coming from

1  overseas take some matter of days.  Correct?

2  A    Correct.

3  Q    All right.  And then in the second to last -- the third

4  line up, it's the second to last paragraph and it begins, but

5  this process?

6  A    Uh-huh.

7  Q    You say but this process is being initiated on the opening

8  of business Monday, May 3rd, 2021, and has been closed.  You

9  see that?

10  A    I do.

11  Q    Okay.  And when we spoke on Friday Burlington had not

12  actually initiated the transfer of any funds to VTI, correct?

13  A    That is correct.

14  Q    Notwithstanding the fact that you said in your declaration

15  that it would be initiated on Monday morning.  Right?

16  A    Basically, the agreement and the commitment has been

17  established and was established on the 3rd.  Funds will follow,

18  but they have not followed yet.

19  Q    And you have not -- sitting here today you have not yet

20  initiated the process of transferring cash to VTI's account.

21  Correct?

22  A    Correct.

23  Q    Okay.  So -- okay.  So let's take a look.  We talked about

24  the fact that you've had some sort of funding agreement with

25  VTI since early February.  Let's take a look at Exhibit 193,

McCarthy - Cross/Colby                    140

1  SeeCubic TX 193.  So this is a stock purchase agreement dated

2  February 10th, 2021.  You see that?

3  A    I do.

4  Q    Recognize this document?

5  A    I do.

6  Q    Now, this document that you -- this February 10th stock

7  purchase agreement with VTI, between Burlington and VTI, it

8  contemplates a potential 30-million-dollar investment, correct?

9  A    That is correct.

10 Q    And if you take a look at paragraph 4 --

11 A    Uh-huh.

12 Q    So under paragraph 4 the way it works is that the company,

13 which is VTI, will present to the investor, which is

14 Burlington, opportunities, investment opportunities that

15 Burlington can either accept or decline.  Correct?

16 A    Correct.

17 Q    And let's take a look at paragraph 8.  Pursuant to

18 paragraph 8, just for signing this agreement Burlington was to

19 receive 987,839 shares of VTI, correct?

20 A    Correct.

21 Q    And Burlington would receive and keep those shares even if

22 it never invests anything in any of the opportunities presented

23 by VTI.  Correct?

24 A    That was the commercial term of the agreement, correct.

25 Q    All right.  And then if we look at paragraph 9, even

McCarthy - Cross/Colby                    141

1  though the agreement contemplated a potential 30-million-dollar

2  investment, if Burlington invests only one million dollars it

3  would still get an extra 1.1 million shares of VTI as a bonus,

4  correct?

5  A    Correct.

6  Q    And that's -- is that in addition to the shares you would

7  actually receive in exchange for the million dollars?

8  A    Correct.

9  Q    Okay.  So let's take a look at 179.  This is an email from

10 Mathu Rajan to you on February 8th, 2021.  Do you recognize

11 this?

12 A    I do.

13 Q    And so around the same time as you were executing the

14 stock purchase agreement Mr. Rajan had presented you with an

15 investment opportunity as contemplated by that stock purchase

16 agreement, correct?

17 A    Correct.

18 Q    And that investment opportunity was for Burlington to

19 either accept or decline.  True?

20 A    Absolutely.

21 Q    And let's take a look at the next page of this exhibit,

22 which we've seen already today.

23 A    Uh-huh.

24 Q    This is the presentment of the investment opportunity

25 contemplated by the February 10th agreement, correct?

1  A    Correct.

2  Q    And it's described as VTI having the exclusive right to

3  acquire Stream TV Networks.  Do you see that?

4  A    I do.

5  Q    And that exclusive right to acquire Stream TV was the

6  basis of your initial contemplated 30-million-dollar investment

7  in VTI, correct?

8  A    Correct.

9  Q    Mr. Rajan tells you in this presentment that Stream was

10  worth between 200 and $600 million, but that VTI's exclusive

11  right to acquire it was for a fraction of that value, $25

12  million.  Correct?

13  A    Correct.

14  Q    That was the plan at the time you elected to invest in the

15  Stream TV opportunity, correct?

16  A    Yes.

17  Q    Okay.  Let's take a look at 197, Exhibit 197.

18  Mr. McCarthy, Exhibit 197 is titled Exercise of Drawdown

19  Rights.  Do you recognize this document?

20  A    I do.

21  Q    So this is a drawdown notice on the $30 million

22  invested -- I'm sorry, contemplated by the February 10th

23  agreement, correct?

24  A    Correct.

25  Q    And this is the form that you executed in order to take

1  advantage of the opportunity that Mr. Rajan had presented to

2  you to acquire Stream TV for a fraction of its value, correct?

3  A    Correct.  But I would add, if I may, that I was investing

4  in VTI based on my belief in VTI and everything that was within

5  VTI, separate and apart from Stream that Mathu Rajan had

6  presented to me and other members of VTI as well.  So it was,

7  yes, obviously connected to Stream, but it was connected to a

8  general, if you like, acquisition investment into VTI as a

9  whole.

10 Q    Okay.  Well, let's take a look at the document and see

11 what it says, Mr. McCarthy.  The very last line --

12 A    Uh-huh.

13 Q    -- says purpose.  Do you see that?

14 A    Sorry?

15 Q    Purpose.

16 A    Oh, yes.

17 Q    Purpose.  And it says the purpose of this exercise of

18 drawdown rights is to begin the takeover process of the Ultra-D

19 technology and kick-start stalled projects.  That was the

20 purpose of your exercising this option, correct?

21 A    Well, I would say that I was aware of other technologies

22 that were in VTI, and my view was that it was all three

23 technologies.  Yes, of course Ultra-D, which was in Stream, but

24 I was also very interested in stitch and tiling, and I was also

25 interested in modified light fields.

1  Q    Okay, well --

2  A    So --

3  Q    -- let's look --

4  A    -- it would -- okay, go ahead.

5  Q    Please, by all means.  I didn't mean to interrupt.

6  A    All right.  So I'm just making the point that I was

7  looking at it in a totality.

8  Q    Uh-huh.  Now, have you -- did you listen to Mr. Rajan's

9  testimony a few minutes ago?

10 A    Of course.

11 Q    Okay.  And so the modified light field and the stitching

12 and tiling, did you hear him testify that those projects are

13 ones that had commenced after the bankruptcy filing?

14 A    Yes, I did.

15 Q    Okay.  And that those are new projects and new technology

16 for Stream TV, correct?

17 A    Correct.

18 Q    Okay.  And this says begin the takeover process of the

19 Ultra-D technology and kick-start stalled projects, doesn't it?

20 A    It does.

21 Q    Okay.  Do you deny that that was the purpose of the

22 exercise of this drawdown?

23 A    No, I -- I'm not denying it.  I'm just presenting it in

24 terms of a broader investment strategy.  But, yes, obviously,

25 Ultra-D was a core part of the investment and Ultra-D was a

McCarthy - Cross/Colby                    145

1  technology that I was sold on as, you know, the star, if you

2  like, of the endeavor within VTI, Stream.

3  Q    Okay.  Now, I just have a couple more questions and then

4  release to your other business obligation.

5  A    You're kind.

6  Q    The drawdown gives you the option to provide cash or a

7  standby letter of credit to fulfill the 30-million-dollar

8  investment, correct?

9  A    Correct.

10 Q    And you did neither of those, correct?

11 A    That is correct.

12 Q    Because you renegotiated the stock purchase agreement into

13 a new agreement, correct?

14 A    Correct.

15 Q    Now, you acknowledge -- sitting here today you acknowledge

16 as an absolute fact that Stream's assets have left Stream and

17 are with SeeCubic, correct?

18 A    I do.

19 Q    Okay.  But part of the plan that you started here with

20 Mr. Rajan, part of the plan is getting those assets returned to

21 Stream, correct?

22 A    Absolutely, and within VTI.

23 Q    Okay.  But that's -- getting those assets is part of --

24 your understanding, part of the bankruptcy plan here, correct?

25 A    Correct.

McCarthy - Cross/Colby                    146

1  Q    Okay.  You describe Ultra-D as a world leader, correct?

2  A    Yes.  Absolutely.

3  Q    Okay.  And so --

4  A    I'm very excited about Ultra-D and I'm very excited about

5  the group.  That's why I'm investing 500 million in it.  And,

6  you know, I think that's the point that I want to make.

7  Apologies, and I know you have your case to make, but I am

8  actually a white knight here coming in, investing 500 million

9  into this group to restructure, to reorganize, to get it back

10  to work, and to make all the creditors historically that have

11  been disadvantaged by this group whole.  What can possibly be

12  bad about that or negative?

13  Q    Okay.  But getting the Ultra-D technology back into

14  Stream, getting it returned to Stream is a central part of that

15  plan you just described, correct?

16  A    Of course.

17  Q    And it's central to the acquisition of Stream that VTI

18  wants to make, correct?

19  A    Correct.

20  Q    Okay.  Let's -- if it's okay with the Court, pause now for

21  your other obligation, and we can resume -- do you -- I think

22  as -- on my client's behalf we're fine with a half-an-hour

23  lunch break.

24  A    Yes.

25  Q    Mr. McCarthy, how long do you need -- your thoughts and

McCarthy - Cross/Colby                    147

1  others with their views on how long a break we should take.

2  A     Thank you.

3            THE COURT:  Mr. McCarthy, let me just ask you, how

4  long do you think your call will last?

5            THE WITNESS:  No more than half an hour.

6            THE COURT:  Okay.  So why don't we adjourn until

7  1:35.  That'll give Mr. McCarthy at least five minutes to

8  regroup after his call.  If you think you would like a -- you

9  know, why don't we rejoin, actually, at 1:40, okay?  That'll

10 give Mr. McCarthy --

11           THE WITNESS:  You're very kind, Your Honor.

12           THE COURT:  -- like 10 minutes to maybe eat some

13 lunch.  Okay.

14           THE WITNESS:  You're very kind.

15           THE COURT:  I would normally be more kind to you, but

16 we have a whole lot of ground to cover today and I don't

17 want --

18           THE WITNESS:  I understand.

19           THE COURT:  -- to waste time.

20           THE WITNESS:  I absolutely understand.

21           THE COURT:  Okay.

22           THE WITNESS:  Thank you.

23           THE COURT:  Okay, thank you.  And so before we

24 adjourn let me caution, sir, you're under -- you will remain

25 under oath during our break.  So you're not permitted to talk

McCarthy - Cross/Colby                    148

1  to anyone about the substance of your testimony.  Do you

2  understand?

3            THE WITNESS:  Totally understood.

4            THE COURT:  Okay, great.  All right.  Well, have fun

5  on your call.  We'll adjourn until 1:40.  Thank you, all.

6            THE WITNESS:  All the best.

7            THE COURT:  Okay, bye bye.

8                 (Recess from 1:00 p.m. to 1:48 p.m.)

9            THE COURT:  Good afternoon, parties.  I apologize for

10 my delay, my tardiness.  I've had a meeting that overran this

11 hearing, but it seems as if we're all ready to continue.  I see

12 that we have Mr. McCarthy.  Thank you, very much.

13           And Mr. Colby, when you're ready.

14           MR. COLBY:  Good afternoon.  Thank you, Your Honor.

15                 CROSS-EXAMINATION CONTINUED

16 BY MR. COLBY:

17 Q    And good afternoon, again, Mr. McCarthy.

18     Mr. McCarthy, I want to get back to the various stock

19 purchase agreements that you signed, but I want to pause and

20 digress for just a minute on another issue that came up this

21 morning.

22     Part of the reason why you entered into these various

23 stock purchase agreements is to support -- at least part of the

24 reason is to support financially Stream's bankruptcy

25 reorganization, correct?

1   A    Correct.

2   Q    And this morning, Mr. Rajan told us that you were the

3   negotiator for VTI regarding VTI's support of Stream's

4   restructuring, facing off across the table with somebody from

5   Stream.  Did you hear that this morning?

6   A    I did.  That's not actually correct.

7   Q    Okay.  Give me your understanding of then -- so let me

8   just back up.

9        You didn't have that role?

10  A    No, I don't have that role.  I think he corrected himself

11  later in the discussion.  Because essentially, I wouldn't have

12  the history yet in terms of understanding all of the facets and

13  assets of Stream to have that role.  What I am is a newly

14  appointed director who has basically committed a huge amount of

15  money to the group and I've increased that commitment today and

16  that is a substantial investment into the group which allows

17  VTI and VTI's management to essentially do what is necessary.

18  Q    Okay.  Great.  Thank you.

19       Now, let's get back to the terms of those investments and

20  take a look at TX 29.

21       Let us know when you're ready.  It sounds like you're

22  receiving some texts.  Let us know when you're ready.

23  A    Yes, of course.  Apologies.

24       Go ahead.

25  Q    Okay.

1          MR. COLBY:  So we're going to go to Exhibit 291,

2    Mr. Frank, which is the May 3rd stock purchase agreement.

3    BY MR. COLBY:

4    Q    Okay.

5          So where we left off before lunch was you had executed a

6    draw down on the February 10th stock purchase agreement which

7    contemplated a potential investment of $30 million, correct?

8    A    Correct.

9    Q    Okay.  But you never actually transferred any cash or gave

10   VTI a standby letter of credit.

11   A    Correct.

12   Q    Okay.  And that's because you renegotiated into this

13   May 3rd amended stock purchase agreement, correct?

14   A    That is correct.

15   Q    And this is the amended stock purchase agreement that is

16   the actual subject of the declaration that you've submitted to

17   the Court, correct?

18   A    Correct.

19   Q    Now, VTI drafted this document, correct?

20   A    They did.

21   Q    And the document represents an option to invest up to $300

22   million by Burlington, correct?

23   A    Correct.

24   Q    That's what you said.

25         You didn't consult with Burlington's in-house lawyers for

McCarthy - Cross/Colby                    151

1   this potential $300 million investment, did you?

2   A    I made that investment decision myself.

3   Q    Right.  So you didn't consult with any lawyers about the

4   terms of a potentially $300 million investment?

5   A    I have in-house lawyers, but the investment decision, the

6   commercial decision, is my decision.

7   Q    Right.  And you didn't run this agreement by them, did

8   you?

9   A    No.

10  Q    Okay.  And in fact, you told me on Friday that VTI sent

11  you one copy of this agreement and you signed it, correct?

12  A    I had negotiated the commercial terms, but that is correct

13  (indiscernible) on the telephone.

14  Q    But you signed the first copy of this agreement that VTI

15  sent you.

16  A    Correct.

17  Q    Now, let's take a look at Paragraph 3 which breaks across

18  the page, so Mr. Frank is going to work some magic so we can

19  see it all at once.

20       This May 3rd agreement contemplates investment in three

21  traunches, correct?

22  A    Correct.

23  Q    And the deadline to close on the first $60 million traunch

24  is May 24th, correct?

25  A    Correct.

McCarthy - Cross/Colby                    152

1  Q    And if Burlington doesn't close by then, then it loses the

2  option to invest that amount, right?

3  A    That is correct.  It actually commits to that investment

4  and it has to do that.  There is a grace period of seven days.

5  Q    Right.  And if --

6  A    (Indiscernible) that investment, just so you know.

7  Q    Right.  But if Burlington doesn't close -- we'll get to

8  what that means, but if Burlington doesn't close, the

9  opportunity to investors goes away, correct?

10 A    As that reads.

11 Q    Yeah.  Now, there are two more traunches contemplated by

12 this agreement on each subsequent year, correct?

13 A    Correct.

14 Q    And they work the same way, yes?

15 A    Correct.

16 Q    All right.  And if Burlington doesn't close each of those

17 traunches by their deadlines, then those opportunities to

18 invest also expire, right?

19 A    Correct.

20 Q    Okay.  Now, let's look at what it means to close one of

21 those investments.  Let's look at Paragraph 8.

22      It says that the investor shall pay to the company in

23 immediately available funds a payment equal to the investment

24 amount for each closing to the company's bank account by

25 executing the exercised form reflected to at Exhibit A hereto,

McCarthy - Cross/Colby                        153

1  right?

2  A    Correct.

3  Q    And so that language describes what Burlington would need

4  to do in order --

5  A    Yes.

6  Q    -- to exercise its right to make the stock purchase

7  agreements that are described in Paragraph 3, right?

8  A    Correct.

9  Q    And so Burlington would need to execute that form that's

10 attached as Exhibit A, right?

11 A    That is right.

12 Q    And that's the step that would obligate Burlington to

13 transfer the money in immediately available funds and in

14 exchange, Burlington would receive its VTI stock, right?

15 A    Correct.

16 Q    So the options that we've described, those are exercised

17 by the execution of this Exhibit A, right?

18 A    This is not an option.  This is an --

19 Q    Well, I meant --

20 A    And the document that you're referring to establishes my

21 ability to get shares for my commitment.  That is the main

22 object of that (indiscernible).  As far as I'm concerned, this

23 is a commitment and I will fulfill it.  But I understand what

24 you're getting at.  You're trying to describe this as an option

25 rather than a commitment.

McCarthy - Cross/Colby                    154

1    This is a commitment as far as I'm concerned.  I'm doing

2    this investment.  And I don't know if you're aware of it, I've

3    actually increased the amount that I'm investing to 500 and

4    that is an absolute firm commitment.

5    Q    Yeah.  I would -- I'll get to the most --

6    A    Apologies --

7    Q    -- this today.

8    A    -- for jumping the gun.

9    Q    Yeah.  We'll get there.  I know you're anxious to make the

10   case to the Court, but we'll get there.

11        And I understand you're saying that you're -- you,

12   Mr. McCarthy, are committed to this investment.  I want to get

13   at what the legal obligations are pursuant to the document.  I

14   just want to make sure that we and the Court understand how the

15   documents that you signed work (indiscernible).

16   A    Of course.

17   Q    Okay.  So putting aside your personal convictions, the

18   commitment that you just described, the way that you'll

19   manifest that commitment is by executing Exhibit A, correct?

20   A    That is correct.

21   Q    All right.

22        So let's take a look at Exhibit A.

23        And that's -- yeah, Page 17.  Thank you.

24        Exhibit A says, and I'm looking at Paragraph 1.  Exhibit A

25   says, "The undersigned hereby elects to purchase shares of

McCarthy - Cross/Colby                          155

1  Visual Technology Innovations, Inc."  Do you see that?

2  A    I do.

3  Q    All right.  So that's the form you would sign in order to

4  commit the purchase of shares and the investment that is

5  described in the main body of the agreement, correct?

6  A    Correct.

7  Q    All right.

8       So we're going to go one step closer to the one you want

9  to talk about.  We're going to May 6th, fair enough?

10  A    (No audible response)

11  Q    All right.

12      So let's take a look at Exhibit 293.

13      So this is a couple of days after you submitted your

14  declaration to the Court.  This is yet another amended stock

15  purchase agreement dated May 6th.  Do you see that?

16  A    I do.

17  Q    All right.

18      And the way this came about is that within a day of

19  signing the May 3rd agreement that we just looked at, Mr. Rajan

20  approached you about executing another SPA, correct?

21  A    Yes.

22  Q    And he told you that VTI needed to tighten up the language

23  but that the commercial terms were exactly the same, correct?

24  A    Yes.

25  Q    And Mr. Rajan told you that his in-house lawyers had taken

1  a closer look and it needed some tightening of the language,

2  correct?

3  A    Correct.

4  Q    And he also told you that the commercial terms would be

5  exactly the same, right?

6  A    Correct.

7  Q    And yet again, he sent you one copy -- somebody sent you

8  one copy of the document, somebody from VTI, one copy of the

9  document and you signed it, right?

10  A    I did.

11  Q    All right.

12       But as an astute business person with, as you've pointed

13  out, 40 years of experience in matters like this, had you seen

14  any change in the commercial terms, you would have noticed

15  that, right?

16  A    Of course.

17  Q    Yeah, of course.

18       Now, did Mr. Rajan actually tell you that -- let's take a

19  look.  Let's take a look at Exhibit 290.

20       And I appreciate that you haven't seen this document

21  before.

22            MR. COLBY:  No, we're looking at 298, SeeCubic

23  TX 298.

24            THE WITNESS:  Right.

25            MR. COLBY:  Yeah, not this one.

McCarthy - Cross/Colby                    157

1              There you go, this one.

2  BY MR. COLBY:

3  Q    So I appreciate that you haven't seen this one before.

4  This is an example of some of the exceedingly and generally dry

5  and uninteresting correspondence that lawyers exchange amongst

6  each other by email.  But let's take a look.  This is an email

7  from debtor's counsel on Saturday, May 8th.  And in responding

8  to SeeCubic's request for documents that seem to have been

9  withheld on the basis of privilege, which we didn't agree with,

10 Mr. Weis said the following.

11             I'm going down to Paragraph 4, and it says, "With regard

12 to the recent agreement in principle, the only documents that

13 I'm aware of for which a privilege will be claimed are emails

14 among John Sten, Suby Joseph, and a bunch of other folks from

15 either VTI, Dilworth Paxson, or Armstrong Teasdale, okay?

16 A    Yeah.

17 Q    And then it says, these emails were sent on Thursday, 5/6,

18 which is the date that you executed that new agreement between

19 10:00 a.m. and 11:31 a.m. and reflect Mr. Sten's comments on

20 the revised VTI stock purchase agreement.  Do you see that?

21 A    I do.

22 Q    Did Mr. Rajan tell you that it was actually VTI's outside

23 litigation lawyers that were making changes to your financing

24 agreement with VTI?

25 A    I don't recall.

McCarthy - Cross/Colby                                      158

1  Q    He told you it was the in-house lawyers who wanted to

2  "tighten some language," right?

3  A    That was my recollection, but I didn't dwell on the point.

4  Q    Okay.  All right.

5       So let's go back to the May 6th version of the document,

6  which is 293.

7       And regardless of who was making edits to this document,

8  in the new May 6th version, the money, the timing, and the

9  obligations that you were agreeing to remained exactly the same

10  as the May 3rd agreement.  That's what you testified on Friday,

11  correct?

12  A    Yeah.

13  Q    All right.

14       And Paragraph 7 of the May 6th agreement discusses the

15  form of exercise that we saw, I believe it was Paragraph 8 in

16  the earlier version.

17  A    Right.

18  Q    And it references the form of exercise at Exhibit A that

19  Burlington would need to execute in order to obligate itself to

20  make the investment described in each traunch, correct?

21  A    Correct.

22  Q    And Exhibit A -- let's go to Exhibit A.  I think it's also

23  Page 17.

24       Exhibit A is exactly the same as the May 3rd Exhibit A,

25  correct?

McCarthy - Cross/Colby                    159

1  A     Uh-huh.

2  Q     All right.

3        Now, at last, since May 6th, right, you have renegotiated

4  again this stock purchase agreement, correct?

5  A     That is correct.

6  Q     Okay.  Since your deposition.  And so, since we spoke in

7  your deposition last Friday, you've executed another amendment

8  and that changes the purported investment amount to $500

9  million.  That's what you said, right?

10 A     That is correct.

11 Q     Okay.  And let's take a look at it just for the completion

12 of the record.  It's Exhibit 159, VTI -- VTI Exhibit 159.

13 Thank you.

14       So this is the agreement that you were just referring to.

15 It's an amendment to the May 6th stock purchase agreement,

16 correct?

17 A     Correct.

18 Q     All right.

19       And this agreement contemplates that the amount that you

20 have the option to invest could go up to $500 million split

21 into four traunches, right?

22 A     Correct.

23 Q     And it has just a few changes to the one we just looked

24 at.

25 A     That is correct.

1  Q    Right.   Paragraph 1 says all the terms of the agreement we

2  just looked at are the same, correct?

3  A    Yes.

4  Q    Okay.  Paragraph 2 is the increase of the total amount

5  contemplated by the agreement to 500 million, correct?

6  A    Correct.

7  Q    And --

8  A    (indiscernible) traunches.

9  Q    Yeah.  And yeah.  Paragraph 3 describes the four

10 traunches, correct?

11 A    Correct.

12 Q    All right.

13     Paragraph 4 was voided.  Paragraph 4 in the old agreement,

14 we didn't look at it.  That was an option to accelerate your

15 investment, correct?

16 A    Right.

17 Q    All right.

18     And then Paragraph 5 says, "Except as expressly amended by

19 this agreement, the provisions of the May 6th agreement shall

20 remain in full force and effect," correct?

21 A    Correct.

22 Q    All right.

23     So this May 10th agreement that you sent over this

24 morning, that doesn't change the process by which you execute

25 the form of exercise, commit to send the immediately payable

McCarthy - Cross/Colby                           161

1  funds to VTI, and receive shares of stock in exchange.  It

2  doesn't change any of that, does it?

3  A      No.

4  Q      Okay.

5         And sitting here today, Mr. McCarthy, have you executed

6  one of those four Exhibit A exercise forms?

7  A      I have not as we speak.

8  Q      Thank you.

9         Now, just a couple of more questions about this.  The $500

10 million contemplated investment now, that amount contemplates

11 the return of Stream TV's former assets, like Ultra D, back to

12 Stream TV, correct?

13 A      It does.

14 Q      Okay.  And if those assets are not returned to Stream,

15 nothing stops you from renegotiating yet again, the May 6th or

16 the May 10th investment agreements, correct?

17 A      Any businessman would adjust his negotiation to reflect

18 the value of what he's actually investing in.  So yes, that is

19 absolutely right.

20 Q      Okay.  And more broadly, sitting here today, I mean,

21 you've renegotiated this agreement several times.  As we look,

22 sitting here today, there's nothing that prevents from

23 renegotiating the current May 6th, May 10 agreement again,

24 correct?

25 A      I'll think you'll have noticed that every time I've

McCarthy - Cross/Colby                    162

1  negotiated or renegotiated, I've committed more funds to the

2  group.  So actually, it's actually cost me more if you like,

3  rather than it going the other way.  I mean --

4  Q    Yes.

5  A    And why am I doing that?  I'm doing that because I believe

6  in this investment and because I believe in it so much that I

7  want to get greater value in it today ahead of what I perceive

8  to be much greater value tomorrow.  It's that good.  I found

9  more cash and I've made that commitment.

10 Q    Mr. McCarthy, you and I are just on the same page because

11 you have segued exactly into what I want to talk about next.

12     You have that belief in this investment because, and I

13 want to go back to your declaration.

14 A    Yeah.

15 Q    As you said in your declaration, you've conducted due

16 diligence on the debtor, correct?

17 A    Correct.

18 Q    And you said that you're generally familiar with the

19 debtor's day-to-day operations, organization, financial

20 affairs, and books and records.  That's what she told the

21 Court, correct?

22 A    Right.  Are you talking about Stream now or VTI and

23 Stream?

24 Q    Oh, I'm sorry.  I'm sorry.  I misstated that and I

25 apologize.  I'm talking about VTI.

1  A    Yes, absolute.

2  Q    You said you've conducted due diligence on the debtor and

3  VTI.

4  A    Correct.

5  Q    No.  I'm sorry.  I corrected myself unnecessarily and I

6  apologized unnecessarily.

7       Let's look at the language of your declaration just

8  because I've confused it and I want to make sure we're crystal

9  clear.

10  A    Okay.

11  Q    So let's take a look at Exhibit 285.  You're just such an

12  agreeable guy, I agreed with you Mr. McCarthy, and --

13  A    (Laughs)

14       It's because I'm an Irishman.

15  Q    So let's take a look at 285 and let's take a look at

16  Paragraph 3.

17       You say, "I have conducted due diligence on the debtor and

18  VTI and I am generally familiar with the debtor's day-to-day

19  operations, organization, financial affairs, and books and

20  records."  You said to the Court under oath, correct?

21  A    Right.

22  Q    All right.  So let's take a look at some of that

23  diligence.

24  A    Okay.

25  Q    Now, you testified also in your deposition that Mr. Rajan,

1  you felt, had dealt with you in the spirit of full disclosure.

2  Isn't that right?

3  A    I did.

4  Q    And you testified that your diligence included a whole

5  raft of different information or data that management provided

6  to you, right?

7  A    Correct.

8  Q    And you started that diligence, to some degree, even

9  before that February 10th stock purchase agreement that we

10 looked at earlier, right?

11 A    Correct.

12 Q    And before you were presented with that exclusive

13 opportunity to acquire Stream TV for a fraction of its value,

14 you started your diligence back prior to that, right?

15 A    Yes.

16 Q    Okay.  But when you started those negotiations with

17 Mr. Rajan, VTI's president and controlling shareholder, he

18 didn't tell you and you didn't know that he was also the CEO,

19 controlling shareholder, and sole director of Stream, right?

20 A    I didn't know exactly at that time, that is correct.

21 Q    You didn't learn that until some time in early March, two

22 or three weeks after you signed that February 10th stock

23 purchase agreement, right?

24 A    Correct.

25 Q    And you agree with me with the fact that Mr. Rajan

McCarthy - Cross/Colby                165

1  controlling both of these entities, that would be a materially

2  fact for you to know as an investor, right?

3  A    Yes, it would be important.

4  Q    Because, as you said on Friday, of course, that would be a

5  conflict of interest in a transaction where VTI is going to be

6  acquiring Stream, right?  Do you agree with that?

7  A    That could be a potential conflict of interest, yes.

8  Q    Well --

9  A    However, what I would say is that from an investment point

10 of view, I saw Mathu Rajan as someone who was deeply

11 knowledgeable of both companies.  Patently, he had founded VTI

12 most recently.  He was a founder of Stream in the beginning.

13 He was involved with the group essentially for many years in

14 its development and essentially, I put a lot of belief behind

15 the fact that this was a man who had, if you like, been the

16 rainmaker, the driving force of both groups.  And I think that

17 was my major thought in terms of backing him and backing both

18 investments.

19 Q    Okay.  I'm going to go back to the question I just asked

20 you now, which is substantially the same as the question I

21 asked you on Friday.

22       MR. COLBY:  And I wanted to take a look at, if we

23 could, Mr. Frank, Page -- of Mr. McCarthy's transcript -- 133,

24 Lines 6 through 10.  133, 6-10.

25       (Clip of videotape deposition played)

McCarthy - Cross/Colby                        166

1  BY MR. COLBY:

2  Q    That was your testimony on Friday, correct?

3  A    Of course.  Same word.

4       But what I would say in answer to that is, of course, as

5  you put it that plainly, yes.  There would be a conflict.  Of

6  course there would.  But, as I said to you, my considerations

7  were based on broader concepts and a broader, if you like,

8  consideration.

9  Q    Right.  In fact, the broader consideration that you

10  described on Friday was the rule of capitalism.  You said under

11  the rule of capitalism, we agree that each side would want to

12  maximize the benefit that it is going to receive from that

13  transaction.

14  A    Of course.

15  Q    Right?  Yeah.

16       And it would be impossible for Mr. Rajan to negotiate that

17  transaction on both sides because he would be conflicted in his

18  duties to the law of capitalism to maximize the return of the

19  transaction to each of those parties, right?

20  A    Yes.

21  Q    Now, as part of your diligence, you've familiarized with

22  what you believe to be VTI's technology, correct?

23  A    Yes.

24  Q    Okay.  But despite that extensive diligence that you

25  described to the Court in your declaration, and described that

McCarthy - Cross/Colby                    167

1  you signed paperwork contemplating an investment of $300

2  million in that technology, in your deposition on Friday, you

3  had to refer to your handwritten notes when describing the

4  technology that VTI has access to.  You repeatedly had to refer

5  to your handwritten notes, correct?

6  A    Well, I'm not -- you know, of course.  And my answer to

7  that is, I am not an IT specialist.  I am a financier.  And

8  essentially, nothing wrong with referring notes -- referring to

9  notes for different technologies that are relevant in this

10 instance.  I mean, what's wrong with that?  I don't see what

11 the issue is.

12 Q    Well, I'm simply highlighting, and I want to confirm that

13 it's right.

14 A    Okay.

15 Q    But --

16 A    Yes, I did refer to my notes.

17 Q    Right.  Despite your due diligence, despite your zeal to

18 spend $300 million on this, you had to refer to your notes in

19 order to remember the terms stitching and tiling and multi-

20 view, right?  Yes.

21 A    I referred to my notes.

22 Q    Repeatedly, right?

23 A    I referred to my notes.  I don't see that that is a big

24 issue.

25 Q    Okay.

McCarthy - Cross/Colby                    168

1  A    But, look, yes, I referred to my notes.  As I said to you,
2  even presidents do.
3  Q    Now, with regard to that technology, you also describe
4  seeing a demo of --
5  A    Yes.
6  Q    -- glasses-free 3D technology --
7  A    Yeah.
8  Q    -- right?
9       But you can't say whether or not that technology was
10 Ultra-D, or whether it was stitching or tiling, or whether it
11 was multi-view, or what it was, right?
12 A    Yeah.
13 Q    Okay.  So it very well could have been Ultra-D technology
14 that you were viewing.  You can't rule that out, right?
15 A    I can't rule that out.
16 Q    All right.
17      Now, I want to talk about contracts.  Mr. Rajan told you
18 that VTI had executed contracts with customers, correct?
19 A    Correct.
20 Q    Including one to put billboards in all the airports in the
21 United States, right?
22 A    Correct.
23 Q    Okay.  And you were surprised to learn when I told you
24 that Mr. Robertson, senior executive of VTI, who according to
25 Mathu Rajan this morning, was handling all the business

McCarthy - Cross/Colby                    169

1  negotiations with you, or with Mathu.  You were surprised when

2  I told you that Mr. Robertson testified under oath that VTI did

3  not have any executed contracts.  That was a surprise to you on

4  Friday, right?

5  A    (No audible response)

6  Q    Is that a yes?

7  A    (No audible response)

8  Q    Okay.  Thank you.  I didn't mean to talk over you.  I

9  didn't know if I had not heard your first answer.  But your

10  answer was "correct," right?

11  A    Correct.

12  Q    All right.

13       And you were surprised to hear that because Mr. Rajan had

14  told you the opposite, right?

15  A    Correct.

16  Q    Okay.

17       Now, you also testified that you looked at a valuation --

18  A    Yes, I did.

19  Q    -- of Stream TV that was done by a fellow by the name of

20  Richard Pinzer (phonetic).  Do you recall that?

21  A    I do.

22  Q    Okay.  Let's take a look at it.  It's SeeCubic TX 286.

23       And this is a little awkward.  I'm not going to ask you

24  about any specifics.  It's an email that we can look at in this

25  PDF format and then there are two Excel files attached.  Okay.

1          MR. COLBY:  And do the Excel files have the same

2    exhibit number?  They're just separate.

3          MR. FRANK:  (Indiscernible)

4          MR. COLBY:  Oh, I'm sorry.  There are two -- well,

5    I'm just going to flash them on the screen really quickly, and

6    then we'll keep moving.

7          So it's the two next exhibits.  It's 286, 287, and

8    288.

9    BY MR. COLBY:

10   Q    I just want to confirm, Mr. McCarthy, that this is the

11   valuation that you saw.

12   A    Yes.

13   Q    Okay.

14        And you can see there are some tabs across the bottom.

15   This tab happens to be DCF.  Do you know what that means?

16   A    Yes.  Discounted cash flow.

17   Q    Got you.  Okay.

18        All right.  And then, let's look at the next one.

19        Okay.  So this is the valuation that you saw from

20   Mr. Rajan, right?

21   A    Correct.

22   Q    And let's go back to 286 just so we can confirm the date,

23   but I believe this was in February, as well.  February 13th.

24   Okay.

25        So your understanding -- you testified on Friday, your

1  understanding was that that valuation, which ranged from a

2  potential low of 200 million to a high of 600 million, was

3  based on the fact that the company was going gangbusters,

4  right?

5  A    My understanding was that it was based on a number of

6  things, including the intrinsic value of the IP of the product

7  that had been developed.

8  Q    And by that, you mean the Ultra-D product, right?

9  A    Of course.

10 Q    Okay.

11      But you also told me your understanding was that the

12 valuation was based on -- well, actually, let's go back because

13 this intrinsic value of the IP is something we've heard for the

14 first time today.  So let's take an actual look at your actual

15 answer to that question on Friday.

16          MR. COLBY:  Mr. Frank, let's go to 159, Lines 2

17 through 5.

18          (Clip of videotape deposition played)

19 BY MR. COLBY:

20 Q    Okay.

21      And by gangbusters, you told me on Friday, among other

22 things, you understood that the company had a commercialized or

23 commercial ready product, right?

24 A    Commercialized, ready, or in process product is what I

25 would say.

McCarthy - Cross/Colby                    172

1  Q    Okay.

2  A    Obviously developed but still being refined and getting

3  better over time with more application and more investment.

4  Q    Okay.

5       Well, let's take a look at the next question and answer,

6  159, Line 6, through 159, Line 14.

7            MR. COLBY:  Actually, pause.  159, 6 through 159, 19.

8  Two questions and answers.

9            (Clip of videotape deposition played)

10 BY MR. COLBY:

11 Q    Okay.  So that was a correct at the end behind Mr. Sten's

12 objection, right?

13 A    Correct.

14 Q    Okay.  So on Friday when I told you that Stream has never

15 actually commercialized a product on any meaningful scale or

16 generating any meaningful revenue, you were surprised by that,

17 right?

18 A    I was surprised, yes.

19 Q    Yes.  And then, because that's not consistent with what

20 you had been told.  True?

21 A    Not totally.

22 Q    It was not totally consistent with what you had been told,

23 correct?

24 A    Correct.

25 Q    All right.

1  A    I will answer your question specifically, but --

2  Q    I appreciate --

3  A    -- my (indiscernible) is always that I take a bigger view.

4  Q    I see.  Okay.  So let's take a look at -- we've looked at

5  this already, but we're going to look at a different

6  attachment.  Let's take a look at Exhibit 179, TX 179, and this

7  is taking you back to that February 8th presentment of the

8  investment opportunity, the original investment opportunity?

9  A    Right.

10 Q    And we looked at the first attachment, which is the plan

11 to purchase at a fraction of value, but now, let's look at this

12 second attachment.

13 A    Um-hum.

14 Q    So this is a presentation about Stream TV and Ultra-D that

15 you received in connection with your decision to invest with

16 VTI, right?

17 A    Correct.

18 Q    Okay.  And we spent a lot of time on this before, but

19 let's just go to one slide.  It's Bates 1048.  And let's just

20 take a look at this.  This is a slide entitled, "Customer

21 Update."  Do you see that?

22 A    I do.

23 Q    Okay.  And let's go through this.  This was presented to

24 you in February.  When it was presented to you in February --

25 A    Um-hum.

McCarthy - Cross/Colby                    174

1   Q    -- you had not been told that the Bosch (phonetic) project

2   was actually being run by SeeCubic at that point in time,

3   Correct?

4   A    Correct.

5   Q    And --

6           MR. STEN:  Objection.

7           MR. COLBY:  -- in what is presented to you --

8           MR. STEN:  Objection.  Which SeeCubic?

9           THE COURT:  Oh, that's a very good point.  Which

10  SeeCubic?

11          MR. COLBY:  Yes.  So it was --

12          THE COURT:  Several.

13          MR. COLBY:  Yes.

14  BY MR. COLBY:

15  Q    It was being run by both of them, correct?

16  A    You're talking about Delaware or you're talking about

17  Netherlands?

18  Q    Yes.  I'm talking about both of them.

19  A    Yeah.

20  Q    That was yes, right?

21  A    Correct.

22  Q    Okay.  You hadn't been told that it was being run by those

23  entities.  Now, let's take a look at Google.  At the time of

24  your investment you hadn't been told that the Google project

25  was canceled, right?

McCarthy - Cross/Colby                          175

1  A     No, I wasn't; not that I can recall, anyway.

2  Q     Okay.  And you hadn't been told that the Google project

3  was a commitment for a demonstration unit, and that Stream TV

4  under the Rajan's management had been like 18 months late in

5  delay -- in delivering that demonstration unit.  You didn't

6  know that either?

7  A     No, I did not.

8  Q     Okay.  Now, we can go faster through the rest of them.

9  Wallway.  Were you told that Wallway had -- that Stream TV had

10 no contracts and no revenue from Wallway?

11 A     Nope.

12 Q     Were you told that Stream TV had no contracts and no

13 revenue from Skyworth?

14 A     Not that I recall.

15 Q     And were you told that Stream TV had no revenue and no

16 contracts with Lenovo?

17 A     Again, not that I recall.

18 Q     And were you told that Stream TV had no revenue and no

19 contracts with Chunghwa Telecom?

20 A     Again, same answer.

21 Q     Okay.  Now, you agreed with me on Friday that having --

22 without having sold any products to these entities, and without

23 having executed contracts, you agreed that that's not fairly --

24 that those entities are not fairly described as customers,

25 right?

1  A    Have you forgot the -- what I would say is that my

2  understanding is a lot of these contracts would have happened

3  but for what has gone on within the group.  There has been a

4  lot of division, basically, the splitting off of the chattel,

5  the base, and the secured base did a lot of damage to what --

6  to contracts that were happening and live and likely.

7  Q    Um-hum.

8  A    And it's very interesting that on this slide you've got

9  potential revenue rather than actual revenue.  And I'm a man

10 who invests in the future, not in the past, and I'm basically

11 looking at something from the point of view of where I see it

12 can go.

13      As I said to you on Friday, time and space and capital

14 will make the different, and if we can free up this group and

15 if I can be the adult in the room, which basically gets the

16 assets back into VTI's stream and where we are allowed to grow

17 this business from where it's got to, there is a fantastic

18 future.  And that's why I'm backing it and that's why I've

19 added the amount of investment that I'm going to make to it.

20 Q    Okay.

21 A    That can only be good.

22 Q    Mr. McCarthy, I know you've been looking forward to saying

23 that all morning.

24 A    You know what?  You've been holding me back.

25 Q    But I would actually just like you to answer my question.

McCarthy - Cross/Colby                    177

1  A    Okay.

2  Q    Which was, you agreed with me, you know, you agreed with

3  me that absent having sold any products to these entities and

4  absent having received any meaningful revenue from these

5  entities, and absent any sort of executed contract with one of

6  these entities that you wouldn't fairly describe them as a

7  customer, right?

8  A    Correct.

9  Q    Okay.  Now, we're almost done, and a couple of other quick

10 things.  In connection with your investment in VTI and then

11 into Stream, no one ever told you that Stream's secured

12 creditors had security interests in all of Stream's assets,

13 right?

14 A    That's correct.

15 Q    And until I told you on Friday, no one had ever told you

16 that Stream's independent directors had executed an agreement

17 to transfer all of Stream's assets to the secured creditors to

18 satisfy those security interests, right?

19 A    Correct.

20 Q    And to this day -- well, at least as of Friday, you still

21 haven't seen that, that agreement that's referred to as the

22 Omnibus Agreement.  You haven't seen that agreement, right?

23 A    That is true.

24 Q    Okay.  And have you seen it since Friday?

25 A    I have.

1  Q    Okay.   Now -- and that includes -- that includes a

2  board -- you've had one VTI board meeting, right?

3  A    Yes.

4  Q    And in the board meeting --

5  A    I was made the director on the 28th, by the way.

6  Q    Right.   Yeah, you became a director on the 28th, and you

7  had a board meeting almost right around then, right?

8  A    Correct.

9  Q    Okay.   And in the board meeting it never came up that

10  VTI's investment in Stream was premised on assets that had been

11  signed away by Stream's board to satisfy a secured debt?

12  A    It -- that was not discussed.

13  Q    Okay.

14  A    We were discussing a number of other things.   I mean, it's

15  early days.   I've only just very much actively come into the

16  business in the last few --

17  Q    Right.

18  A    -- months.

19  Q    Right.

20  A    But yes.

21  Q    But no so early that you haven't claims to put up $500

22  million, $1/2 billion, Mr. McCarthy.

23  A    Well --

24  Q    That's what you say.

25  A    It's a lot of money.

McCarthy - Cross/Colby                    179

1  Q    It is.  And it's a lot of money not to know -- it's a lot

2  of money not to know all this material information, right?

3  A    Well, I take a more positive view on things, and that is

4  that assets will be returned to the original founding company,

5  which is the Stream, and that we will have the opportunity to

6  do the right thing.

7  Q    Right.

8  A    Which is to reorganize, recapitalize and develop --

9  Q    But Mr. McCarthy, you're a smart and experienced

10 businessman.

11 A    I am.

12 Q    You are.  And you --

13 A    Yes.

14 Q    -- you are not sitting here today, you haven't executed

15 one of those Exhibit A's.  So you're not legally bound to pay

16 that $500 million, are you?

17            MR. STEN:  Objection.

18 BY MR. COLBY:

19 Q    What's your answer, Mr. McCarthy?

20 A    I am making the investment.

21 Q    No.  I understand you say that's your intent.  I'm asking

22 whether or not you are legally bound.  You have not signed one

23 of those Exhibit A exercise forms, correct?

24 A    I have not, but I will.

25 Q    Okay.

1          MR. STEN:  Your Honor, this is a legal argument about

2   the meaning of that term.

3          MR. COLBY:  It's not a legal argument, Mr. Sten.  I

4   have a couple more questions.

5          MR. STEN:  It's an absolutely legal argument and I

6   don't agree with your interpretation of that Exhibit A.

7          THE COURT:  I will overrule the objection.

8          MR. COLBY:  Thank you.

9   BY MR. COLBY:

10  Q    Okay.  Mr. McCarthy, one more subject matter, and that's

11  the preliminary injunction.  Do you know what I'm referring to

12  when I mention the preliminary injunction?

13  A    Not exactly.

14  Q    Okay.  Let's -- we looked at it on Friday.  Let's take a

15  look.  It is -- sorry -- Exhibit 1.

16         MR. COLBY:  Yeah.  Oh, it's in -- it's -- okay.

17  Sorry.  It's an attachment to Exhibit 1.  We have to scroll way

18  down.  Keep going.  So this is from the foreclosure action.

19  There -- so here.  So this is the opinion.

20  BY MR. COLBY:

21  Q    Sorry about this, Mr. McCarthy.  We'll get through it.

22  A    Don't worry.  Don't worry.

23  Q    Very good.

24         MR. COLBY:  Here's the opinion.  Keep going.  Keep

25  going.  I think it's all the way to the end.  Okay.  Todd, you

McCarthy - Cross/Colby                    181

1  can go all the way down -- okay.  Now, you go up one, one more.

2  Okay.  All right.

3  BY MR. COLBY:

4  Q    Order granting motion for preliminary injunction.  Sorry

5  about that.  We looked at that, right, Mr. McCarthy, on Friday?

6  A    Yes.

7  Q    Yes.  Okay.  And prior to my showing it to you on

8  Friday --

9  A    Um-hum.

10  Q    -- neither Mr. Rajan, nor anybody associated with VTI had

11  told you that Mr. Rajan and Stream were subject to this

12  injunction, correct?

13  A    Correct, but I think --

14  Q    And nobody told you that the Chancery Court in Delaware

15  had prohibited Mr. Rajan from exercising or asserting any

16  ownership rights over any of Stream TV's assets, right?

17  A    Right.

18  Q    And when I asked you on Friday you agreed with me that Mr.

19  Rajan had lied to you about this, right?

20  A    I wouldn't say -- I mean, my recollection is that he

21  didn't mention it to me.  Did he lie?  I mean, you know,

22  that -- that I couldn't claim at all.  I mean, he didn't

23  declare this, is my recollection.

24  Q    Well, you and I agreed on Friday, you agreed that it was a

25  lie by omission, right?

McCarthy - Cross/Colby                    182

1  A    That could be right.  He's Catholic.

2  Q    You agreed that it would have been material information

3  for you to know?

4  A    Of course.

5  Q    Of course, right.  And by not disclosing that material

6  information Mr. Rajan had lied to you at least by omission,

7  right?

8  A    Yes.

9  Q    Okay.  Thank you very much for your time.  I can't promise

10  I won't have more questions later, but I'm done for now.  Thank

11  you very much.

12        THE COURT:  Okay.  Who wishes to ask any questions of

13  Mr. McCarthy that's not VTI?  Ms. Sierra, do you want to ask

14  any questions of Mr. McCarthy?

15        MS. SIERRA:  Your Honor, Rosa Sierra, for the U.S.

16  Trustee.  I don't have any questions for Mr. McCarthy.

17        THE COURT:  Okay.  Mr. McMichael or one of your

18  colleagues, Mr. Weis.

19        MR. WEIS:  Your Honor, we'll ask questions, but we --

20  but I think we'd ask -- we talked to Mr. Sten and he would ask

21  them first.

22        THE COURT:  Oh, okay.  Is that correct --

23        MR. WEIS:  It's okay to --

24        THE COURT:  -- Mr. Sten?

25        MR. STEN:  Yeah.  I don't know if the unsecured

McCarthy - Cross/Sten                183

1  creditors' committee has any questions, though.

2          THE COURT:  Mr. Samis, do you have anything for the

3  witness?

4          MR. SAMIS:  The committee has no questions for this

5  witness, Your Honor.

6          THE COURT:  Okay.  Thank you for confirming.

7          Okay.  Mr. Sten, then, please go ahead.

8                      CROSS-EXAMINATION

9  BY MR. STEN:

10  Q    Good afternoon, Mr. McCarthy.  Actually, good evening your

11  time.

12  A    Good evening, John.

13  Q    That's unfortunately another long day for you.  I

14  apologize for that.

15  A    Oh.

16  Q    I'm just going to go through a few things we heard here.

17  So on cross you remember Mr. Colby called your statements to

18  fund VTI and Stream, he called it your personal convictions.

19  Do you recall that?

20  A    Yes.

21  Q    But taking that, is it -- the commitment to fund VTI and

22  Stream, is that a commitment of Burlington Resources?

23  A    Correct.

24  Q    And you speak for Burlington Resources, correct?

25  A    Correct.

1  Q    Who makes the investment decisions for Burlington

2  Resources?

3  A    I do.

4  Q    Do you have to consult with anyone else?

5  A    No.

6  Q    So that's more than just your personal conviction?

7  A    Completely.

8  Q    And so let me ask you, as you sit here today, is

9  Burlington Resources committed to funding its investment in VTI

10 and Stream?

11 A    You -- I lost the last bit of that sentence.

12 Q    Oh, I'm sorry.  I'm saying, as you sit here today --

13 A    Yeah.

14 Q    -- is Burlington Resources committing to funding its

15 investment in VTI and Stream?

16 A    Absolutely.

17 Q    Do you consider that a personal conviction?

18 A    I consider that a corporate commitment.

19 Q    Do you consider that a legal commitment?

20 A    Correct.

21 Q    So you would consider your -- Burlington Resources legally

22 bound to make the funding that's been discussed here today?

23 A    I do.

24 Q    Any outs, any contingencies, any weasel --

25 A    No.

1  Q    -- type things?

2  A    No.

3  Q    I'm going to keep my questions short, and I know my

4  brother's going to show you a couple documents, I think.  So

5  I'll let him do that part.

6  A    Right.

7  Q    But this is -- I can't let this part go.  Do you recall

8  during your direct you were asked about -- I'm going to talk

9  about me in the third person, Mr. Sten's comments?

10  A    Yes, I do.

11  Q    Do you remember Mr. Colby called me a litigation attorney?

12  A    Yes.

13  Q    Do you know that I'm also a corporate attorney?

14  A    That would -- I do, yes, I do, absolutely.

15  Q    You know I'm a corporate and securities attorney who

16  started his career at the SEC?

17  A    I actually didn't, but it wouldn't surprise me, John.

18  Q    Do you know I act as outside corporate counsel to a number

19  of other companies?

20  A    Again, I would -- that would seem totally logical to me.

21  Q    That's why I asked, because it's kind of logical.  So as

22  you sit here today, and as it was referred to, you went through

23  a very long deposition on Friday, correct?

24  A    It was exhausting.

25  Q    And that deposition occurred after you had executed a

1  number of purchase agreements and purchase agreement

2  amendments, correct?

3  A    Correct.

4  Q    And yet, after that -- or during that deposition you

5  learned a number of facts that maybe you weren't necessarily

6  fully aware of, correct?

7  A    Correct.

8  Q    Did that cause you to pull your investment?

9  A    No.  I actually increased it.

10            MR. STEN:  I have no further questions.

11            THE COURT:  Mr. Weis.

12            MR. WEIS:  Thank you, Your Honor.

13            MR. STEN:  Oh, I apologize.  I completely blanked on

14  one question, which is important.

15            THE WITNESS:  Go ahead, John.

16                    FURTHER CROSS-EXAMINATION

17  BY MR. STEN:

18  Q    What are the amount of assets under management for

19  Burlington Resources?

20  A    Billion.

21  Q    I'm sorry, what?

22  A    One billion.

23  Q    One billion.  And who controls those assets?

24  A    I do.

25  Q    And Burlington Resources, where is it located?

1  A    Hong Kong.

2  Q    And it's subject to the laws of Hong Kong, correct?

3  A    Correct.

4  Q    Including its banking privacy laws, correct?

5  A    Correct.

6  Q    And as you sit here today you're actually in Spain,

7  correct?

8  A    Correct.

9  Q    Which -- state the obvious -- is part of the European

10 Union?

11 A    Correct.

12 Q    Which means that you're also subject to the laws there, as

13 well?

14 A    Of course.

15 Q    Including the laws of banking privacy and other privacy

16 laws that are different from U.S. law, correct?

17 A    Absolutely right.

18 Q    So what would happen to you if you violated those laws?

19 A    I could face criminal and punitive consequences.

20 Q    Thank you.

21       MR. STEN:  Sorry for forgetting that.  It's always

22 the way.

23       THE WITNESS:  (Indiscernible).

24       THE COURT:  Mr. Weis, do you have any questions?

25       MR. WEIS:  I do, Your Honor.

1                         CROSS-EXAMINATION

2  BY MR. WEIS:

3  Q    Good afternoon, Mr. McCarthy.  My name is Martin Weis.

4  I'm here on behalf of Stream TV.

5  A    Hello.

6  Q    With regard to Burlington, what is the complete name of

7  the entity?

8  A    Burlington Resources Asia, Limited.

9  Q    And could you describe very briefly what it does?

10 A    It makes investments in businesses and companies in

11 organized nations globally.

12 Q    And --

13 A    Where there are opportunities for growth and development.

14 Q    Okay.  And with regard to the growth, development, was it

15 your testimony on Friday that you say it takes strategic stakes

16 in businesses that it likes?

17 A    Correct.

18 Q    Okay.  And it wants to take it -- take those businesses to

19 another level?

20 A    Correct.

21 Q    Okay.  Is VTI one of those instances?

22 A    Absolutely.

23 Q    All right.  And the one billion that it has under assets,

24 just to clarify the record, is that U.S. dollars?

25 A    Correct.

1  Q    And with regard to the size of the transaction with VTI,

2  you were describing it on Friday as small.  Is that correct?

3  A    Correct.

4  Q    And why do you say that?

5  A    Because historically, I've done bigger transactions, and

6  also, the fact that I see it as small relative to its potential

7  valuation.

8  Q    And does Burlington use its own money to make these

9  investments?

10  A    It uses money that it controls, its money and others'.

11  Q    Okay.  And was it your testimony on Friday that it uses

12  approximately 70 percent of its own money?

13  A    Correct.

14  Q    Okay.  Now, just to clarify, your testimony on Friday was

15  that the funding of the $180 million is not contingent or

16  conditional.  Is that correct?

17  A    Correct.

18  Q    All right.  And then with regard to the execution of the

19  subscription agreement to the amended asset purchase agreement,

20  you testified that that would be done imminently, correct?

21  A    Yes.

22  Q    And by imminently, what did you mean?

23  A    This month.

24  Q    All right.  And then you also testified that the funds

25  would be sent to VTI imminently, did you not?

McCarthy - Cross/Weis                    190

1  A    Correct.

2  Q    And by imminently, what did you mean?

3  A    This month.

4  Q    And was it also your testimony that Burlington would still

5  have an interest in VTI without the Ultra-D technology?

6  A    Yes.

7  Q    And that investment would still be substantial?

8  A    Correct.

9  Q    All right.  Now, in your -- if we could -- if I could ask

10 if it could be put up on the screen, the May 6th agreement.

11 A    Yes.

12        MR. WEIS:  I think someone's going to try to put that

13 on the screen, Your Honor.

14        MR. COLBY:  Yeah, Max, I think, is going to put that

15 up.

16        THE COURT:  Who is the party that's wishing to put an

17 item on the screen?

18        MR. WEIS:  Attorney Max Feit, F-e-i-t.

19        THE COURT:  Okay.  Can we make that person a co-host.

20 You said Maxwell Feit.  Is that correct?

21        MR. WEIS:  Correct.  Yes, Your Honor, that's him.

22        THE COURT:  Okay.  Okay.  He has co-hosting

23 responsibilities and can share his screen when ready.

24        MR. WEIS:  Thank you, Your Honor.

25 BY MR. WEIS:

McCarthy - Cross/Weis                               191

1  Q    Mr. McCarthy, do you see the document that's been placed

2  on the screen?

3  A    Yes, I do.

4  Q    Do you recognize that document?

5  A    I do.

6  Q    Can you tell the Court what it is, please?

7  A    It's an investment -- it's a stock purchase agreement

8  between Burlington and VTI.

9  Q    And is that an agreement that -- entered into?

10 A    I'm sorry.  You broke up there.  Could you say that again?

11 Q    Certainly.  Is that a --

12        MR. COLBY:  Could you get that full to Max, please.

13 I won't interrupt again, Marty.  I apologize.

14        THE WITNESS:  Yes.  Sorry.  I didn't hear your

15 question.

16 BY MR. WEIS:

17 Q    And that's an agreement that was entered into by

18 Burlington, correct?

19 A    Correct.

20 Q    Was your answer yes, sir?

21 A    Yes, it was yes.

22 Q    Okay.  All right.  I'm sorry.  Now, I'm having trouble

23 hearing.

24        MR. WEIS:  All right.  Max, if you could put the May

25 10 agreement up, please.

1  BY MR. WEIS:

2  Q    Mr. McCarthy, do you see an agreement that's now been

3  placed on the screen?

4  A    I do, yes.

5  Q    Can you -- do you recognize that document?

6  A    Yes.  This is the document of the 10th of May.

7  Q    Okay.  And is that -- and who are the parties to that

8  document?

9  A    Burlington and VTI.

10 Q    And did you execute that document on behalf of Burlington?

11 A    I did.

12 Q    Okay.  Thank you.  Now, is it fair to say that your deal,

13 meaning Burlington's, deal with VTI has evolved over time?

14 A    Yes.  It's been intricate.  That is a fair comment.

15 Q    Okay.  And we heard some talk earlier about board seats.

16 How many seats on the VTI board does Burlington have?

17 A    Burlington will have three out of six.

18 Q    Okay.  And there was also a question that was raised, Mr.

19 Colby in his --

20        MR. WEIS:  Max, we don't need that document anymore.

21 Thank you.

22 BY MR. WEIS:

23 Q    Mr. Colby in his examination of you asked you about the

24 unsecured creditors' committee statement.  Do you recall that

25 earlier today?

McCarthy - Cross/Weis                    193

1  A    I do.

2  Q    Okay.  And he asked you if you testified on Friday that

3  you agreed with it, did he not?

4  A    I did.

5  Q    Okay.  And on Friday wasn't your answer more qualified?

6  A    You know what?  I may have been a little more qualified,

7  but I must admit, I don't remember precisely.  It was a very

8  long hearing or --

9         MR. WEIS:  Max, if you could put up the deposition

10 exhibit page 53.

11        Mr. Colby, I'm going to be referring to lines 18

12 through 22.

13        MR. COLBY:  Um-hum.

14 BY MR. WEIS:

15 Q    So if you can -- do you see page 53 --

16 A    Yes.

17 Q    -- Mr. McCarthy?  All right.  And what I'm -- what I'd

18 like to draw your attention to is the question that was asked

19 you, the actual question that was asked you on Friday was, "In

20 reviewing the UCC" -- I'm starting on line 13 -- "In reviewing

21 the UCC statement, which you just read, did you see any

22 assertions by the UCC that you disagreed with?"

23 A    Um-hum.

24 Q    Do you see the question?

25 A    I do, yeah.

McCarthy - Examination by the Court          194

1   Q    And then can you read on -- starting on line 19 what your

2   answer was?

3   A    Now --

4   Q    If you could read it out loud, sir.

5   A    Is that where it's Mr. Colby or?

6   Q    No.  Your answer is on line 19.

7   A    The answer's on line 19.  "No.  No.  I mean, I've just

8   read it in detail.  I'd have to go away and look at it in a

9   little more detail, I have to say.  But on first assessment,

10  no, not obviously."

11  Q    Okay.  Since Friday, sir, have you looked at that document

12  at all?

13  A    I haven't.

14  Q    Okay.  And then finally, you heard a lot of negatives

15  today in the questioning from SeeCubic about the debtor?

16  A    Yes.

17  Q    Okay.  Did you hear anything today in terms of negatives

18  that you didn't hear on Friday?

19  A    No.

20          MR. WEIS:  I have nothing further, Your Honor.  Thank

21  you very much.

22          Thank you, Mr. McCarthy.

23          THE COURT:  Okay.  I actually have a question,

24  because again, I get confused very easily apparently.  So I

25  apologize.  I want to clear up some of the -- some testimony,

McCarthy - Examination by the Court                195

1  and follow up questions to the extent that they need to.  But

2  there was a lot of discussion about your commitment, Mr.

3  McCarthy, and I think you made it very clear that you're

4  excited about this venture and that you're committed.  That was

5  abundantly made clear to me.  But so far it appears you've made

6  a $500 commitment, correct?

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.  And was I correct in hearing that

9  you said that the funds will be transferred this month?

10         THE WITNESS:  The agreement anticipates tranche

11  payments, and the first payment is 60 million and that will be

12  made this month.

13         THE COURT:  Okay.  And then walk me through how the

14  next tranches are going to be made.

15         THE WITNESS:  So basically, on a monthly basis

16  thereafter there will be four tranches of 110 million.

17         THE COURT:  And so that's on a monthly basis.

18         THE WITNESS:  Correct.  There is a bit of a --

19         THE COURT:  Okay.

20         THE WITNESS:  -- grace period in between, but that's

21  not significant.

22         THE COURT:  Okay.  And so let me ask you this,

23  because you're so excited about the Ultra-D assets, and your --

24  it was made clear to you that those -- some of the assets are

25  comprised of the Ultra-D assets, 12 to 15 components, Mr Rajan

1    said.  Some may not be in the estate anymore, okay.

2                 THE WITNESS:  Yes.

3                 THE COURT:  And then some are subject to claims and

4    assertions by the secured lenders.  So what if those assets or

5    those components are never made available to the estate?

6                 THE WITNESS:  I --

7                 THE COURT:  What would happen to the $500 million

8    commitment?

9                 THE WITNESS:  My commitment is still there, because

10   my belief is that with the capital, the time and the space,

11   even if what I am buying into -- but I hope this isn't the case

12   -- isn't totally complete, with the capital we'll be able to

13   build on it and very quickly get past where it was before.

14                THE COURT:  So in other words, the I guess other

15   assets that Mr. Rajan discussed -- and forgive me, I want to go

16   back in my notes to make sure that I state them correct -- the

17   rights under the stitching and the tiling and the modified

18   light deal.  Is that what you're indicating that you are

19   committed to?

20                THE WITNESS:  Absolutely.

21                THE COURT:  Okay.  So even if the Ultra-Do assets

22   aren't made available to VTI in some form or capacity, you're

23   prepared to fund 500 million to VTI?

24                THE WITNESS:  Yes.  I mean, I'd be very disappointed,

25   however, if the Ultra-D wasn't available, as well.  I have to

1  tell you.  But that is correct.

2          THE COURT:  Okay.  And your commitment is to VTI,

3  correct, not Stream, necessarily?

4          THE WITNESS:  It is to VTI, although patently I see

5  Stream as part of VTI's greater plan at maximum achievement in

6  terms of --

7          THE COURT:  And why is that?

8          THE WITNESS:  Because Ultra-D, I think, is a world-

9  beating application.  Modified light field is very good, but it

10 is behind.  So Ultra-D I see as the launchpad and the core

11 asset of the group.  So I would like very much for that to come

12 within VTI's control.

13         THE COURT:  Okay.  Okay.  Thank you very much.  That

14 was very helpful.

15         Okay.  Does anyone have any followup questions of Mr.

16 McCarthy, based on my questioning before I turn the podium over

17 to Mr. Colby?  No.  Okay.

18         Okay.  Mr. Colby, did you have any recross on any of

19 the scope -- or any of the questioning by the parties?

20         MR. COLBY:  No, Your Honor.

21         THE COURT:  All right.

22         MR. COLBY:  Thank you very much.

23         THE COURT:  Okay.  Mr. McCarthy, thank you so much

24 for your time and attention to this matter, including staying

25 awake into the later hours of the evening where you are.  You

1    can consider yourself released from our virtual witness box.

2        (Witness excused)

3            THE WITNESS:  You're very kind.

4            THE COURT:  Take care.

5            THE WITNESS:  All the best.  Bye-bye.

6            THE COURT:  Bye-bye.  Okay.

7            MR. LARKIN:  Good afternoon, Your Honor.  The movants

8    call Bud Robertson as their next witness.

9            THE COURT:  Okay.  Mr. Robertson, are you with us?

10   Oh, there you are, sir.  Nice to see you.

11           MR. ROBERTSON:  You, too.  Thank you.

12           THE COURT:  Okay.  I'm going to swear you in, sir,

13   and then I will tender you to Mr. Larkin.

14           CHARLES M. ROBERTSON, MOVANTS' WITNESS, SWORN

15           THE COURT:  Can you state your name for the record

16   and spell your last name?

17           THE WITNESS:  Yes.  It's Charles M. Robertson.

18   C-h-a-r-l-e-s, M. like Michael, Robertson, R-o-b-e-r-t-s-o-n.

19           THE COURT:  Thank you very much.

20           Mr. Larkin, when you're ready.

21                        CROSS-EXAMINATION

22   BY MR. COLBY:

23   Q    Mr. Robertson, we met at your deposition and we meet again

24   today.  Welcome back, sir.

25   A    Thank you.

Robertson - Cross/Colby                    199

1              MR. COLBY:  We covered a lot of ground already this

2    morning, Your Honor, and I have some topics that I was going to

3    cover with Mr. Robertson that I think we've plowed aplenty

4    here.  So I'm going to try and move efficiently here.

5    BY MR. COLBY:

6    Q    Mr. Robertson, you're currently the executive vice

7    president of Stream, correct?

8    A    That's correct.

9    Q    Okay.  And you're also currently employed by VTI, right?

10   A    Yes.

11   Q    All right.  And you're being paid an annual salary of

12   $150,000 per year by VTI, right?

13   A    That's correct.

14   Q    Okay.  And you've been employed by VTI since early January

15   of this year, right?

16   A    Correct.  I'm a consultant, but essentially, yes.

17   Q    Okay.  And you worked with Mr. Rajan to help form VTI,

18   correct, in January?

19   A    I wasn't involved in the formation process, but I have

20   been involved with him subsequent to that process.

21   Q    Okay.  And you're also the first day declarant of Stream

22   TV, correct?

23   A    Yes.

24   Q    That you've now submitted three declarations to Her Honor

25   so far in the case, right?

1  A    I have.

2  Q    And in your current position in VTI you don't have a

3  title, but you told me in your deposition you're functioning as

4  a senior executive, right?

5  A    I'd say that's fair, yes.

6  Q    Okay.  And you're currently being loaned out, if you will,

7  from VTI to Stream to provide similar services to the debtor,

8  correct?

9  A    Technically correct, yes.

10 Q    All right.  So you're wearing two hats, if you will.  You

11 have a Stream hat and you have a VTI hat, right?

12 A    That's correct.

13 Q    And you told me that -- at your deposition that regardless

14 of what hat you might be wearing at a particular moment, you

15 always have an obligation to act in the best interest of the

16 debtor, correct?

17 A    That's correct.

18 Q    Okay.  I'm correct that since VTI was formed in January

19 there have been negotiations between VTI and Stream with

20 respect to certain agreements, right?

21 A    Yes.

22 Q    Okay.  And for example, in your deposition you told me

23 about a sales and support agreement that was being negotiated

24 between Stream and VTI, right?

25 A    That's correct.

1  Q    Okay.  And Mr. Rajan led the negotiations for Stream of

2  that agreement, correct?

3  A    Yes.

4  Q    Okay.  And you lead the negotiations for VTI, correct?

5  A    Essentially, yes.

6  Q    All right.  So in that negotiation you have your VTI hat

7  on and Mr. Rajan has his Stream hat on, right?

8  A    Yes.

9  Q    Okay.  And Mr. Rajan, who you worked for, for years at

10 Stream TV and was also the controlling stockholder of VTI, he

11 decided that you would handle the negotiations for VTI,

12 correct?

13 A    I don't know that I would say that it was his decision.

14 There was a discussion about the need to have both sides

15 represented and what that deal could look like.

16 Q    Okay.  Well, let's take a look at what you told me at your

17 deposition.

18        MR. COLBY:  Mr. Frank, could you go to Mr.

19 Robertson's deposition at page 60, lines 4 through 10?  And I

20 can just read this.  We don't need to play the video, if you'd

21 just pull the page up for page 60 of Mr. Robertson's

22 deposition.  Try to save us some time here, Your Honor, on the

23 videos.

24        MR. FRANK:  Sorry.  It's actually easier for me to

25 pull up the video, if it's okay.

Robertson - Cross/Colby                    202

1          MR. COLBY:  That's fine.  All right.  Let's play it.

2   Thanks.

3          (Excerpt of Mr. Robertson's video deposition, page 60,

4   lines 4-10, played into the record.)

5   BY MR. COLBY:

6   Q    Mr. Robertson, did I ask you that question; did you give

7   me that answer in your deposition on April 29th?

8   A    I did.

9   Q    Okay.  Thank you.  And it's also true, sir, we've heard

10  today that there are some new members of the VTI board that

11  have come aboard, if you will, in the last few days leading up

12  to today's trial.  The new members of the VTI board didn't

13  decide who would handle the negotiations for VTI, right?  It

14  was Mr. Rajan?

15  A    Yeah, that's correct.  They were not involved.

16  Q    Okay.  And at least as of your deposition Mr. Rajan was

17  still the controlling stockholder of VTI, right?

18  A    That's my understanding, yes.

19  Q    Yeah.  And as the controlling stockholder of VTI, he has

20  the power to remove all of the directors of VTI if he wants to,

21  right?

22  A    There's been no indication of that desire, but I suppose

23  that's effectively correct.

24  Q    And with -- we heard a little bit about some negotiations

25  for the DIP loan earlier today from Mr. Rajan.  Mr. Rajan was

Robertson - Cross/Colby                    203

1  negotiating for the debtor with respect to that DIP loan,

2  correct?

3  A    Correct.

4  Q    Okay.  And you were involved on behalf of VTI, right?

5  A    I was not involved in any of the financial negotiations.

6  As Mr. Rajan said, I'm primarily an operations guy.

7  Q    And you don't recall telling me in your deposition that

8  you were involved on behalf of VTI and Mr. Rajan was involved

9  for the debtor in negotiating the terms of the DIP loan?

10 A    I don't recall saying that, no.  I probably said that I

11 was involved somehow in the paperwork and the preparation of

12 the filings.

13 Q    You don't recall telling me that you were involved in

14 those discussions, those negotiations with Mr. Rajan?

15 A    I don't recall that --

16 Q    And you would be --

17 A    -- I don't recall saying that.

18 Q    -- involved in some drafting of the documentation, right?

19 A    I don't recall saying that.

20 Q    Mr. Robertson, as the debtor's first day declarant --

21 we've heard about VTI.  Let's focus on the debtor, okay.

22 You're still the senior vice president of the debtor, correct?

23 A    Yes.

24 Q    All right.  And you're the debtor's first day declarant,

25 right?

1  A    Yes.

2  Q    And you swore to the Court that you were familiar with the

3  day-to-day business operations of Stream, correct?

4  A    Correct.

5  Q    Right.  You've worked in Stream for many years, right?

6  A    That's correct.

7  Q    Okay.  And as the debtor's first day declarant and the

8  senior vice president, you don't know what process the debtor

9  ran to seek out the most favorable financing for its DIP loan,

10 right?

11 A    That's correct.  Finance is not my area.

12 Q    Okay.  And you also have no idea as the debtor's first day

13 declarant and senior vice president of Stream whether Mr. Rajan

14 received any other indications of interest or DIP proposals,

15 other than VTI, right, from anyone other than VTI, right?

16 A    I know that he was exploring a number of options.  I don't

17 know which of those discussions resulted in an offer for

18 financing.  That's correct.

19 Q    Okay.  So let's turn in your declaration, Mr. Robertson.

20 I want to ask you some questions about some of the statements

21 that are made in there.  Let's talk about the debtor's

22 business, or the lack of a business, if you will.  The

23 debtor -- as of the petition date in February the debtor had no

24 day-to-day or regular course of business operations, correct?

25 A    It lacked the funding to do so, correct.

1  Q    Mr. Robertson, yes or no?  As of the petition date did the

2  debtor have any regular course of business operations?

3  A    I said correct.

4  Q    Okay.  And as of the petition date the debtor had no

5  employees, correct?

6  A    That's correct.

7  Q    Okay.  And as of the petition date it had no payroll,

8  correct?

9  A    That's correct.

10 Q    And even as of last week, or two weeks ago, I guess, now,

11 when I took your deposition, the answers to all of those

12 questions was the same, right?

13 A    The debtor was under a status quo order that prevented it

14 from obtaining any financing from mid-September.  So it ran out

15 of resources by the time that the petition was filed, and it

16 has not been allowed to obtain the DIP financing requested.  So

17 it doesn't have the cash resources in hand and has been

18 prevented from accepting any.  So the answer is, no, not at

19 this time.

20 Q    Let me ask you about the three platforms that you talk

21 about in your first day declaration, the three platforms for

22 Stream's business going forward.  In your first day dec, Mr.

23 Robertson, you testified that the debtor's business model

24 currently contemplates multiple paths to market, and there's

25 three separate product platforms.  There's two-view products,

1  multi-view products and Ultra-D products, right?

2  A    That's correct.  And for clarification for the Court, I

3  use the phrase "multi-view."  That's the same modified light

4  field that Mr. Rajan uses a different term.  We're talking

5  about the same thing.

6  Q    I really appreciate that clarification, Mr. Robertson.

7  A    And sorry to interrupt, but the stitching and tiling in

8  two-view also same thing, just different terms for the same

9  bucket of technology.

10 Q    Well, let's talk about those.  Let's take them one at a

11 time.  With respect to two-view products, which you've also

12 called the stitching and tiling products, right?

13 A    Correct.

14 Q    You talked about those a lot in your deposition.  And the

15 debtor, as of your deposition, did not have any contracts or

16 purchase orders for the sale of the two-view or the stitching

17 and tiling products, right?

18 A    It didn't have the funding to execute any agreements that

19 it could deliver on, no.

20 Q    The answer's no, right, Mr. Robertson?

21 A    That's correct.

22 Q    Thank you.  And in fact, in paragraph 9 of your

23 declaration --

24        MR. COLBY:  Can we go there, Todd, to paragraph 9 of

25 Mr. Robertson's first day declaration?  It's the TX-263.  Thank

1  you.

2  BY MR. COLBY:

3  Q    You'll see in paragraph 9 of your first day dec you state

4  that, "Stream has identified a developer/manufacturer of a two-

5  view, Glasses-Free 3D tablet, and has begun negotiations for

6  global distribution of its products, which currently has a

7  limited distribution."  Do you see that?

8  A    I do.

9  Q    Okay.  And you included that in your first day

10 declaration, because you wanted Judge Owens to believe that

11 Stream had this other buyable platform in the form of two-view

12 products, right?

13 A    That's correct.  It does.

14 Q    Okay.  You're not -- even though you reference in here,

15 you haven't been personally involved in any of the negotiations

16 with respect to two-view products that are referenced in your

17 first day dec, right?

18 A    I have been involved with -- this is -- this particular

19 manufacturer comes to us through a third party.  I have had

20 discussions.  I have received communication from that third

21 party on the product specifications, and this is a deal that

22 the debtor would bring into the company, if and when we're able

23 to consummate a deal.  Did I -- was I involved in negotiations

24 with that manufacturer directly?  No, I was not.

25 Q    Okay.  In fact, everything you've learned about that

Robertson - Cross/Colby                                   208

1  unnamed manufacturer and the status of those negotiations came

2  directly from Mr. Rajan, right?

3  A     That's incorrect.

4  Q     Okay.  Mr. Robertson, as of your deposition last week you

5  didn't even know the name of that manufacturer, right, that

6  you're referencing in your first day declarations?

7  A     That's correct.  And the reason I don't know the name of

8  that is that the person -- the company that we're -- have been

9  discussing with bringing that product in had kept that fairly

10 close to the vest with me.  So I was -- I did not need to know

11 the name of that manufacturer when we were discussing how and

12 if that sales agreement or product could be brought into the

13 company.

14 Q     Okay.  And you don't know the status of those discussions,

15 right?

16 A     They're on hold as far as I know, pending Stream's ability

17 to, you know, close the deal.

18 Q     Okay.  And there's no executed contract with that unnamed

19 manufacturer, right?

20 A     I don't know the status of that.

21 Q     Okay.  The debtor hasn't received any revenue from this

22 unnamed developer, manufacturer, right?

23 A     As I've stated, we haven't executed an agreement yet, no.

24 Q     Let's talk about the tiling technology that you talk about

25 in your first day declaration.

1          MR. COLBY:  Todd, can you go to paragraph 11 of Mr.

2    Robertson's declaration?  It's page 3 of the dec.

3    BY MR. COLBY:

4    Q    Mr. Robertson, again, with respect to the tiling

5    technology that's referenced here you say, as of your first day

6    dec, Stream has identified a developer, manufacturer of a two-

7    view, Glasses-Free 3D video wall product and has begun

8    negotiations for global distribution of its product, which

9    currently has limited distribution in China."  Do you see that,

10   sir?

11   A    I do.

12   Q    Okay.  You haven't been involved in any discussions with

13   that manufacturer, either, right?

14   A    I personally have not, no.

15   Q    Okay.  And there haven't actually been -- so far as you're

16   aware, as the debtor's first day declarant, there haven't been

17   any discussions or negotiations with respect to any agreement

18   with any customer for this product, right?

19   A    As far as I'm aware, there have been discussions and

20   negotiations.  Again, this comes to us through a third party

21   that has indicated to us that it has customers ready and

22   waiting to take delivery, and they were looking for a partner

23   that could provide purchase order financing, as well as

24   potentially some 3D expertise for improvement of the product

25   over time.

1    So there were absolutely discussions between end user

2 customers and the third party that Stream is looking to engage

3 with directly.  And that engagement includes actually bringing

4 one or more of the individuals involved in that discussion

5 directly on board as employees.

6    And all that is anticipated in a nonexecuted but

7 negotiated -- fully negotiated agreement that, again, we're

8 trying to put things in queue, because we lack the financial

9 resources at this time to implement anything.

10 Q    Mr. Robertson, I asked you this last week in your

11 deposition, has the debtor had any direct contract discussions

12 with those customers that are referenced in your declaration

13 there?

14 A    The debtor has not, no.

15 Q    Thank you.  Let's go to paragraph 13.  You go on to state

16 here, and this is with respect to the tiling technology,

17 "Initial customers in the United States, Germany and Turkey,

18 have been identified for the Glasses-Free 3D video wall

19 products for placement in shopping malls and airports.

20 Contracts with these entities are expected once Stream is

21 permitted to proceed with its Chapter 11."

22    Do you see that?

23 A    I do.

24 Q    Okay.  As of your deposition you could only identify one

25 of those potential names, correct?

Robertson - Cross/Colby                    211

1  A    I believe that I identified three of them once I took a

2  moment to think, although I was not positive about the airport

3  in Germany being Frankfurt.  I thought that was the case and

4  later confirmed that it was.  I did confirm the Istanbul

5  Airport in Turkey, and I believe I identified the Mall of

6  America in Minnesota.

7  Q    All right.  And you produced a document to us subsequent

8  to your deposition.  It was just a list of names, right, list

9  of about 10 names that could potentially be customers for this

10 product at some point in the future, right?

11 A    Those were -- that was the list that was provided to me,

12 maybe not in exactly that form, by IQH3D, which is the third

13 party that we were having discussions about working within a

14 strategic relationship.

15 Q    Okay.  You're not aware of any discussions that the debtor

16 has had with any of these customers with the Glasses-Free 3D

17 video wall products that are referenced in your declaration,

18 right?

19 A    I am not aware of any direct discussions, no.

20 Q    Okay.  Are you aware that Mr. Rajan told potential

21 investors that he had a signed contract for that 3D video wall

22 product for every airport in the United States?

23 A    I'm not aware of that.

24 Q    Okay.  You'd certainly be aware of a contract that the

25 debtor had to sell its 3D video wall products to every airport

1  in the United States, right, if that contract existed?

2  A    I would think so, yes.

3  Q    All right.  Let's talk about the multi-view products that

4  you talk about in your declaration, Mr. Robertson, in paragraph

5  16.  You testified in your declaration in paragraph 16 that

6  Stream was interested in pursuing development, sales and

7  distribution of products utilizing technology developed by

8  Philips prior to 2009, correct?

9  A    I did.

10 Q    Okay.  It's also true, sir, that Stream was not currently

11 pursuing development, sales and distribution of these products,

12 correct?

13 A    It's pursuing the potential of developing products.  It is

14 not actively engaged, because it's not currently able to

15 conduct any active operations due to its funding at the moment.

16 Q    Okay.  So it's currently pursuing the possibility of

17 developing that product line.  Is that right?

18 A    Yes.  And this is what we got into in my deposition.  If

19 you remember, the word about does the company have any

20 operations, and my definition of the word "operations" and my

21 take on where we are is that we absolutely do have some

22 operations.  We don't have employees.  We are unable to spend

23 money like we need to, but we are doing what we can in this

24 pre-reorganization period to put things in queue with potential

25 customers, with potential partners.

1    And so those explorations are going on so that we won't be

2    starting at square zero when we get the okay to finally get

3    moving in Chapter 11.

4    Q    Okay.  Stream's not currently generating any revenue from

5    the multi-view products that are discussed as one of the three

6    platforms in your declaration, right?

7    A    That is correct.  That's why I said we're interested in

8    pursuing it.

9    Q    Got it.  And in fact, it's true, sir, that the multi-view

10   products that are discussed in your declaration, you view that

11   as an inferior technology to the Ultra-D technology, correct?

12   A    Well, what I would say, and this is for purposes of

13   clarification for the Court, is that back in 2009 Philips had a

14   technology that they were calling WOWvx, and that was the

15   starting point for Ultra-D.  And that technology was licensed

16   as modified light field or multi-view, whatever you want to

17   call it, was licensed to a number of companies.

18       Stream TV over a period of 10 years built on top of that

19   base technology and made certain improvements that, to use my

20   analogy of the automotive industry, we built a Rolls Royce.

21   But I do believe that there's a market for Toyotas and our

22   intention is to go back to that core technology and to continue

23   to build on it with lesser quality, but certainly sellable

24   quality, in my opinion.

25   Q    Got it.  So just so we're clear, the record's clear,

1  Ultra-D is the Rolls Royce of technologies, and the multi-view

2  is the Toyota in that analogy, correct?

3  A    As of this date it is, yes.

4  Q    All right.  And it's also true that while Stream was

5  pursuing the Rolls Royce of technologies, it wasn't also

6  simultaneously pursuing the development of Toyotas, right?

7  A    That's correct.  No need to.

8  Q    Yep.  And you haven't had any discussions with any

9  potential customer about the development, sale or distribution

10 of these multi-view solutions discussed in paragraph 16, right?

11 A    Those conversations are had by Matt Lowe, who is primarily

12 a sales guy.  Sales is not my area, so I have not personally,

13 no.

14 Q    Okay.  There's no agreements that have been signed by the

15 debtor, right?

16 A    There is a -- there's an agreement that's been negotiated

17 that we would intend to submit for approval by the Court,

18 assuming we get past the motion to dismiss, for a strategic

19 relationship with one of our existing customers for Ultra-D,

20 who's also been successfully selling multi-view, modified light

21 field Toyotas, if you want, for quite some time.  And he's

22 looking to the debtor to help continue that business.

23 Q    As of the petition date there were no -- there was no

24 signed contract.  In fact, there was no negotiated contract

25 subject to signature or court approval as of the petition date

1  with respect to the multi-view, Glasses-Free 3D technology,

2  correct?

3  A    There is a negotiated contract.  It has not yet been

4  signed.

5  Q    As of the petition date, sir?

6  A    As of the petition date, correct.  I had been negotiated.

7  Q    You didn't explain to the Court in your declaration that

8  the multi-view technology was the Toyota of technology relative

9  to the Ultra-D technology, correct?

10 A    That's irrelevant, but correct.

11 Q    And in fact --

12 A    The point -- the point here is whether or not the company

13 can reorganize around a product for market.  And I think you

14 can hardly argue that there isn't a market for Toyotas.  So the

15 purpose of that is to say that just because you're not selling

16 a Rolls Royce doesn't mean that you can't have a very

17 successful automotive business.

18 Q    Okay.  In fact, Mr. Robertson, you told me you're an

19 operations guy, right?  That's your --

20 A    Essentially, yes.

21 Q    Okay.  As of your deposition you had not put pen to paper

22 on how much it would actually cost the debtor going forward to

23 develop a network of development, sales and distribution of

24 multi-view Glasses-Free 3D solutions, correct?

25 A    We didn't intend to develop a network, as you say.  Our

1 intention is to initially service one or two key customers in

2 our early stage of reorganization, and grow from there.

3 Q    Yeah.  You hadn't put pen to paper on how much it would

4 actually cost to develop or sell or distribute multi-view

5 Glasses-Free 3D solutions, correct?

6 A    That's correct.

7 Q    And you didn't explain that to the Court in your

8 declaration, either, right, that this is so early stage that we

9 haven't even put pencil to paper to understand how much it

10 would cost to develop this inferior technology over the next,

11 you know, days, months, years, correct?

12 A    That's incorrect.

13 Q    You didn't --

14 A    Because --

15 Q    -- you didn't --

16 A    -- because --

17 Q    -- Mr. Robertson, you didn't tell the Court that in your

18 declaration, right?

19 A    I did not tell the Court that because that is not the

20 relevant factor here.  We've identified a partner that's

21 already successfully selling multi-view products that has

22 approached us to help them continue in that effort.  And if

23 they've got a successful business model for sell -- producing

24 and selling those kinds of products, obviously, there's a model

25 to be had.

1    Had we put pen to paper, as you say, and worked out all

2  those details, no, not yet, but we have the support and

3  enthusiasm of a strategic partner that wants us to work in that

4  area, which we were never willing to do before, because we

5  didn't deal in multi-view products.

6  Q    Right.  I just want to clarify something for the record.

7  We heard some testimony earlier today from Mr. Rajan that

8  Stream's two principal assets that had been acquired since the

9  petition was filed is a stitching and tiling contract with VTI,

10  and another agreement for modified light kit.  Do you

11  understand that testimony, sir?

12  A    I do.

13  Q    Okay.  And those -- these assets were acquired post

14  petition, right?

15  A    They were.  These are discussions that had been going on

16  for many months on how an arrangement could work, but until we

17  had the potential for funding on VTI, VTI was unable to really

18  follow through on the acquisition, as it were, in memorializing

19  it in any agreement.

20  Q    Okay.  So those assets that Mr. Rajan told the Court about

21  haven't actually been acquired yet by the debtor.  Is that

22  right?

23  A    Well, the assets are agreements in principle to do

24  business, right.

25  Q    Mister --

Robertson - Cross/Colby                    218

1  A    So they're not physical assets.

2  Q    I got it, right.  You -- we've certainly been hearing

3  about this a lot in this case.  You either own an asset or you

4  don't.  So you have an agreement in principle to acquire the

5  two-view technology, the stitching technology or the modified

6  light field technology, but as you sit here today the debtor

7  has not actually acquired those assets that Mr. Rajan testified

8  about earlier today, correct?

9  A    As far as I know, there's only one executed agreement for

10  funding distribution funding with a partner based on those

11  technologies.

12  Q    Okay.  How much did it cost?  How much did that asset cost

13  the debtor post-petition to acquire?

14  A    Well, these are strategic relationships.  They're -- it's

15  not an acquisition in the sense of something was paid.  This is

16  a distribution arrangement whereby there's revenue share to us

17  for the -- to the debtor for its provision of 3D expertise and

18  support.  So it's a sales and distribution support agreement

19  that will bring revenue into the debtor.

20  Q    I got it.  So this morning we heard about two platforms

21  that the debtor had acquired, and now, I'm hearing that it's a

22  strategic relationship, but -- that it's the function of an

23  agreement in principle?

24  A    Well, that's my -- that's why I was trying to earlier

25  define what an asset is.

1  Q    Um-hum.

2  A    So a contractual arrangement is an asset.  It's not a

3  tangible asset, but we've acquired the rights to serve as a

4  distributor through a support agreement with VTI to provide 3D

5  expertise and generate some revenue on product that we don't

6  have to develop from scratch.

7  Q    Yeah.

8  A    So that's the short-term path for us.

9  Q    Okay.  And that's the support agreement that Mr. Rajan

10  negotiated on behalf of Stream and you negotiated on behalf of

11  VTI, right?

12  A    Correct.

13  Q    Okay.  And there wasn't any independent committee of VTI

14  or an independent committee of the debtor, right, to negotiate

15  on behalf of the stakeholders of the debtor to make sure that

16  the terms of that contract were fair to the debtor, right?

17  A    Well, ultimately, any agreement on the debtor's side is

18  going to have to be approved by this Court, and any agreement

19  on the VTI side is going to have to be approved by the overall

20  board.

21  Q    Got it.  You've anticipated my next question.  So you

22  haven't sought bankruptcy approval -- you haven't -- excuse me.

23  Strike that.  You haven't sought approval from Judge Owens yet

24  of these contracts that Mr. Rajan testified about earlier today

25  are already assets of the debtor, correct?

1  A    That's correct, because Judge Owens said she wouldn't hear

2  any other motion until after we get past today.  So we tried to

3  put things in queue, but we haven't clogged up the docket yet.

4  Q    Mr. Robertson, I appreciate it.  I just wanted to clarify

5  the testimony that was provided earlier today by Mr. Rajan that

6  these were assets that have already been acquired by the debtor

7  post-petition, and I appreciate that clarification.

8  Q    Let me turn to Ultra-D, which is the third platform that

9  you talk about in your first day declaration.  Mr. Robertson, I

10 want to be very clear about the discussion of Ultra-D that's in

11 your declaration.  This entire discussion that's in your first

12 day declaration about Ultra-D involves intellectual property

13 and assets that were transferred to my client, SeeCubic,

14 pursuant to the Omnibus Agreement, right?

15 A    That would be eligible for transfer, yes.

16 Q    Okay.  I understand your position on it and I won't parry

17 with you on it now.  But my point is, sir, that for Judge Owens

18 to believe that the Ultra-D products that are discussed in your

19 declaration is a viable platform for the debtor going forward,

20 right, she would have to find that those assets actually are

21 property of the debtor and not SeeCubic, correct?

22 A    I believe that I stated in my declaration that if Stream

23 is able to reclaim the technology, it has some opportunities,

24 and there were some specific assets that I outlined that I

25 believed were still in the possession or control, or within

1  reach of Stream TV to support its position that not all assets

2  had been transferred simply because a claim was made.

3  Q    Okay.  And as you told me in your deposition, Mr.

4  Robertson, you're not -- you're not challenging the validity of

5  the omnibus agreement, correct?

6  A    That's correct.

7  Q    And you're not challenging any of the findings that were

8  made by Vice Chancellor last year's December 8th opinion,

9  correct?

10 A    No, I'm not.

11 Q    Okay.  Mr. Robertson, I don't have any further questions,

12 I thank you for your time.

13         MR. COLBY:  Pass the witness.

14         THE COURT:  Before I tender the witness, I just want

15 some -- in my continuing theme of trying to get clarity, I want

16 to ask a follow-up question, again, back to the multi-view and

17 the two-view.  As I understood the testimony of Mr. Rajan this

18 morning, the part that Stream intends to play in those

19 relationships is based on the know-how of people that are yet

20 to be hired by the debtor, is that correct?

21         THE WITNESS:  Since the debtor has no employees,

22 correct.  Everybody to support that -- but I wouldn't limit it

23 only to -- well, I guess if you broaden know-how to include

24 technical, as well as sales support, then, yes.

25         THE COURT:  Okay.

Robertson - Court                    222

1          THE WITNESS:  And that technical would go beyond

2    engineering.  It's also -- we have content creation specialists

3    that really understand how to make unique content into the way

4    that even in non-Ultra-D products can make them look better

5    because of their expertise.

6          THE COURT:  Okay.  So why doesn't VTI just hire those

7    employees now and continue and start up those relationships?

8          THE WITNESS:  Well --

9          THE COURT:  What does Stream -- what is -- and I

10   guess to put a finer point on it, you know, what makes Stream

11   so special and necessary in these continued relationships or

12   businesses?

13         THE WITNESS:  Well, I think the bottom line is that

14   we spent, you know, eight or none years developing a Rolls-

15   Royce, and we spent a lot of time developing a customer base.

16   It's more than just a product, we -- and I think we

17   underestimated the extent of the effort that was going to be

18   involved.  Because it's like saying, "Hey, let's move from

19   black and white to color TV."  It's not just can you sell a TV,

20   it's, well, who's going to produce color programming?  How will

21   that content be made?   How will it be distributed?

22         There's a very large business plan that took much

23   longer than we anticipated.  But over the years, we found some

24   diehard big brands which maybe are not well-known here in

25   America, but Skyworth, Huawei, and Chunghwa Telecom that said -

1  - and Lenovo, we've seen a lot of things, you keep coming back

2  with newer and better demos, we're finally read, and we had to

3  wait for the panel industry to be able to make high quality

4  enough video panels that we could build on.  And so we finally

5  reached that point to be able to make a Rolls-Royce, and to

6  have some company say we'd like to start working with you to

7  develop real product for rollout, and that's -- that's the

8  timing that coincided with this.

9          So is there anything that prevents VTI from just

10  starting with Toyotas instead of the Rolls-Royce?  There isn't,

11  but we'd like to see -- and Mr. McCarthy said he would really

12  like to see whether there's a possibility that that technology

13  could somehow remain with the debtor or return to the debtor if

14  it's left.

15          THE COURT:  Okay.  And so just last question:  The

16  Rolls-Royce technology that you wish to continue with and

17  pursue, just for sake of clarity, that's the Ultra-D?

18          THE WITNESS:  That's correct.

19          THE COURT:  Okay.  And I like the car analogy, that

20  really helped me --

21          THE WITNESS:  Good.

22          THE COURT:  -- grasp the concepts that we're talking

23  about.  So thank you very much, I appreciate that.

24          THE WITNESS:  Good.

25          THE WITNESS:  All right, thank you so much, that's

Robertson - Cross/Sierra                        224

1  been very helpful.

2          Ms. Sierra, did you have any questions for this

3  witness?

4          MS. SIERRA:  Yes, Your Honor, I have a few questions

5  on behalf of the U.S. Trustee.

6          THE COURT:  Okay; please go ahead.

7          MS. SIERRA:  Okay.

8                        CROSS-EXAMINATION

9  BY MS. SIERRA:

10  Q    Hi, Mr. Robertson.  Rosa Sierra on behalf of the U.S.

11  Trustee, I'm going to ask you a few questions today.

12  A    Okay, Ms. Sierra; good to see you.

13  Q    Good to see you, too.

14          So I think you testified on cross-examination that

15  you work for Stream, correct?

16  A    That's correct; I provide some services for Stream.  I'm

17  technically employed by VTI, but, yes.

18  Q    Okay.  So -- and -- so you answered my next question.

19  You're also employed by VTI.

20  A    Yes, that's correct.

21  Q    Okay.  And when you provide some services to Stream, to

22  whom do you report?

23  A    Primarily to Mathu Rajan as the CEO.

24  Q    And when you are employed by VTI, to whom do you report?

25  A    It depends.  Often, it's to Mathu Rajan as the President.

1  More recently, it's been responsive to requests coming from,

2  frankly, counsel for both VTI and the debtor, you know,

3  providing documents, reviewing things, that sort of thing.  So

4  I haven't been able to do very much on the operations front at

5  VTI since the motion to dismiss was filed.

6  Q    Okay.  But once you get to start -- assuming at one point,

7  you will get to start doing operations things for VTI, you will

8  be reporting to Mr. Rajan, correct?

9  A    I expect that, as Mr. Rajan said, that he'll be stepping

10 aside in a meaningful way, that Tracy Rees, who is one of the

11 board members now, and has been intended as a prospective

12 president, that when the funding comes through, we can finalize

13 his employment agreement, he would become the president.  Most

14 likely, I'd be reporting to him.

15 Q    Okay.  As of right now, Mr. Rajan is the President --

16 A    As of now, he is, yeah.

17 Q    -- of VTI?

18 A    Yes, he is; correct.

19 Q    Okay.  Okay.  So let's talk about the board membership at

20 VTI.  As of today's date, can you tell me the names of the

21 board members at VTI?

22 A    I can.  They are Mathu Rajan, was the first director.

23 And then in early April, somewhere I think around April 7th,

24 three more directors were added, and those were Cliff Morton,

25 Tracy Rees, and Glenn -- I'm going to say Hasen, H A S E N,

1   maybe it's Hasen, so those three were added in early April.

2           And then based on the status of the negotiations with

3   Burlington, who would be entitled to three seats when his

4   investment is fully consummated, he was provided with two seats

5   now for himself, and for Sofia Gadusi (phonetic).

6   Q   Okay.  So on March 17th, 2000 -- 2021, sorry, I got

7   confused there -- on March 17, 2021, VTI did not have six

8   directors?

9   A   Mathu was the sole director at that time.  However, on

10  March 5th, the articles of incorporation for Nevada and the

11  bylaws were amended and adopted to include an expansion of the

12  board to six seats in anticipation of the seats that Mr.

13  McCarthy would be obtaining whereby he would have three out of

14  six available seats.

15  Q   Okay.  So let me make sure I understood the testimony.  On

16  March 5th, the articles of incorporation of VTI were amended to

17  include an expansion of the board --

18  A   That --

19  Q   -- is that correct?

20  A   That's correct.

21  Q   But on March 5th, those new directors were not -- had not

22  yet been appointed, correct?

23  A   That -- that's correct.

24  Q   Okay.  Moving on to some of the discussion about the

25  Toyota technology, I also appreciate the analogy.  Would it

1  have been possible to -- let me back up.

2          In January of 2021, after VTI had been formed, did

3  Stream need court approval from a court to use assets that

4  didn't involve the omnibus agreement?

5  A    It would not have needed court approval, no.

6  Q    Okay.  So what was stopping Stream at that point from

7  executing and papering up the sales and distribution agreement

8  with the manufacturer that wants to partner up on the -- I

9  believe stitching and tiling technology?

10  A    Well, as I answered that same question in my deposition,

11  it's patently clear.  Stream was blocked from raising any

12  money, starting in September, somewhere around the 15th, by the

13  status quo order.

14          That was in place for three months until the

15  preliminary injunction came out on December 8th.

16          And on -- subsequent to December 8th, we took a good

17  look and said, okay, how can we move forward?  We're not

18  allowed to use the Cadillac technology, we've been talking

19  about exploring these other options, but it's going to require

20  some cash, and as part of -- one of the transfers that did

21  happen, according to the omnibus agreement, was that we had to

22  empty all our bank accounts and give all of the available cash

23  to SeeCubic, Inc.

24          So here you have the company that has prospects, but

25  its bank accounts have been drained, it's in no position to

1  execute an agreement to go forward, and you've got $18 million

2  worth of unsecured debt on the books and creditors who are

3  going to be screaming at you "How am I going to get my money?"

4  So we may have been able to reorganize and generate small

5  amounts of revenue, but we'd have been buried under $18 million

6  worth of debt, and we would have collapsed, and any investor

7  who looked at the situation would say that's just completely

8  untenable.

9  Q    Okay.  So the investors, in your opinion, find it more

10 attractive that Stream has been placed in a bankruptcy

11 proceeding, in a Chapter 11 proceeding?

12 A    Well, they do because it gives us some breathing room to

13 reorganize the debtor, and potentially move forward with these

14 other possible products.  And most importantly, it gives the

15 debtor access to tools that are unique to the Bankruptcy Code

16 to pursue not only rejection of executory contracts, but the

17 possibility of voiding those contracts if it can prosecute

18 successfully a fraudulent conveyance claim, fraudulent

19 transfer.

20        So I'm not saying that we're going to succeed in

21 those things, but there are possibilities that are open to the

22 debtor and any potential investor who sees, "Gee, could you do

23 Toyotas and Rolls-Royces, both?"  Okay, one may be a longshot,

24 it may not be possible, but while possibility exists, you know,

25 there are, you know, endless possibilities.

1  Q    Okay.  So just to go back to my initial question, there
2  was nothing necessarily stopping Stream from executing and
3  finalizing these agreements for the relationships for the non-
4  Ultra-D technology in January of 2021, correct?
5  A    There were financial impediments because any agreement
6  requires that Stream is going to be able to fill its
7  commitments.  And when you don't have the money to pay any
8  employees, even if it's only know-how that has to be
9  contributed, there was no way that Stream could, in good
10 conscience, enter into an agreement with anybody when it
11 doesn't know how it's going to possibly fulfill those because
12 we didn't see a possibility to bring in the necessary funding,
13 even on a minimal level given the huge amount of debt, and so
14 that's what really stopped us.

15      Was there anything practical?  No, we could have
16 entered into those agreements and really pursued those things,
17 and had we had some available cash to do that had we not been
18 battling -- nobody's talked about the pandemic, and the fact
19 that this is a glasses-free 3D technology that you have to see
20 with your own eyes.  And so for a year, we had to sit on our
21 hands and tell people it's great, and hope that they can trust
22 us because you've got no way to show people.  And that was a
23 significant impact to our business.
24 Q    Okay.

25      MS. SIERRA:  Those are all my questions, Your Honor.

Robertson - Cross/Aaronson                230

1          THE COURT:  Okay; thank you very much.

2          All right, who's next in the examination of Mr.

3   Robertson?  Mr. McMichael, are you going to be asking any

4   questions of Mr. Robertson?

5          MR. McMICHAEL:  My partner, Ms. Aaronson, is covering

6   Mr. Robertson.

7          THE COURT:  Okay.

8          MS. AARONSON:  I didn't know if the committee had any

9   questions, though.

10         MR. SAMIS:  Nothing here, Your Honor.

11         THE COURT:  I figured the committee will chime in if

12  they have questions, so that's why I haven't been asking.

13         MS. AARONSON:  Okay; thank you.

14         THE COURT:  Okay.

15         MS. AARONSON:  Can you hear me all right?  I can turn

16  it up if --

17         THE COURT:  Go ahead.

18         MS. AARONSON:  okay.

19                      CROSS-EXAMINATION

20  BY MS. AARONSON:

21  Q    Mr. Robertson, how are you doing this afternoon?

22  A    I'm good, Ms. Aaronson; how are you?

23  Q    Good.  I'm going to go over a few things to clear up a

24  little bit of testimony that you gave earlier.

25         When you were asked by SeeCubic's counsel about your

1  involvement in finance, and you indicated that you are not

2  involved in the financing or the efforts to obtain DIP

3  financing, who is -- whose area is financing for Stream?

4  A    For Stream, it's primarily Mathu Rajan working with Suby

5  Joseph, who was the former VP of Finance, and Dan Rink, who is

6  primarily business affairs, documents, in-house legal.  So the

7  three of them generally have worked together on the preparation

8  of the documents based on negotiations that Mr. Rajan takes the

9  lead on.

10 Q    Okay.  And another line of questioning was regarding the

11 IQH3D and the agreements in principle for the tiling and the 2D

12 products.  And you were asked whether the debtor has -- whether

13 you, on behalf of the debtor, had direct contact with

14 customers, and you indicated you had not.

15      Is the relationship with the debtor between the

16 debtor and customers or between the debtor and IQH3D?

17 A    The relationship at the moment is between the debtor and

18 IQH3D.  But as I mentioned, part of the negotiated arrangement

19 with IQH is that there were four or five -- it might be five

20 individuals that would be brought into the debtor as employees.

21 So eventually, that sales agreement with those customers would

22 become internal rather than, you know, an arm's length

23 arrangement.

24      And I shouldn't even say "eventually," that was part

25 of the discussion, is that those deals would come in, and we

1  would then engage with those customers directly.  But that

2  required Stream to be able to, you know, expand its staff,

3  which we haven't been able to do.

4  Q    So -- but currently, those customers are customers of

5  IQH3D, not customers of Stream, or potential.

6  A    Yeah, I would -- I'd say potential customers because I

7  can't speak for whether they have existing arrangements or not,

8  but that's correct.  They are the customers of IQH3D, not of

9  the debtor.

10 Q    And there's been some discussion, both testimony of Mr.

11 Rajan and you, in connection with the assets relating to the 2D

12 and multi D platforms, and those assets being post petition

13 assets.

14        Is the bonding equipment related to those products or

15 used in those products?

16 A    Well, the bonding equipment -- as Mr. Rajan said in his

17 testimony, the bonding equipment's very versatile.  So it's

18 important to know that that equipment was developed by a

19 Japanese manufacturer who supplies bonding needs for customers

20 all over the world for all kinds of things, that's why we went

21 to them.  Because the in-house solution that was developed by

22 our team was not effective; the yield rate was poor; we had a

23 very failed experiment where we were unable to even produce 100

24 units based on the technology proposed by the Dutch R&D team.

25        And so Mr. Rajan went to Japan, he found a

Robertson - Cross/Aaronson                    233

1  manufacturer of equipment that is used for bonding in a variety

2  of applications.  and then that equipment, we said we have some

3  unique requirements for Ultra-D, can you make a modification

4  module so that it can do more than just the basics for somebody

5  else, and it can do more of what we need, and the answer was,

6  yes.

7          So in that equipment, there is one module that is --

8  has some alignment that's one of those Ultra-D components that

9  Mr. Rajan referred to, right, of those 12 to 15 components, one

10 of them is special alignment.

11          But you can pull that module out, and that machine is

12 just a bonding machine.  It can do a variety of things for a

13 variety of things for a variety of products, so we could use it

14 for two-view, we could use it for multi-view if, in fact, it's

15 determined that that equipment still remains the property of

16 Stream TV and has not, in some way, been transferred.

17 Q    So that -- in addition to the potential contracts that are

18 queued up for, you know, in the event the debtor is able to

19 proceed in bankruptcy, that is tangible property that the

20 debtor had prepetition that was -- that is available for those

21 two lines of business.

22 A    Yes, correct.

23 Q    All right.

24 A    And I will --

25 Q    To the --

Robertson - Cross/Aaronson                234

1  A    And I would point out, if I may, that our strategic

2  partner that has expressed interest, and we've negotiated terms

3  on a cooperative bonding agreement, there's the opportunity to

4  provide just bonding services to other companies for other

5  products that don't even involve Stream TV or VTI.  So there's

6  a potential service arrangement where that equipment, when it's

7  not being used to manufacture our products, we could rent that

8  equipment out for other products.

9  Q    And presently, where is that bonding equipment?

10 A    That's in Suzhou, China.

11 Q    And is it in a debtor facility?

12 A    It is in a third party warehouse facility landlord

13 warehouse.

14 Q    Okay.  But SeeCubic isn't in possession of that equipment,

15 as far as you know.

16 A    As far as I know, they are not.

17         MS. AARONSON:  I have nothing further, Your Honor.

18         THE COURT:  Okay; thank you, Ms. Aaronson.

19         Mr. Stemerman?

20         MR. STEMERMAN:  Yes; thank you, Your Honor.

21         THE COURT:  Does your client wish to -- go ahead.

22         MR. STEMERMAN:  Just a few questions.

23                    CROSS-EXAMINATION

24 BY MR. STEMERMAN:

25 Q    Mr. Robertson, you said earlier about the board members of

Robertson - Cross/Stemerman                    235

1  VTI, I just had a couple of questions about them.

2            To your knowledge, does Sofia Gadusi have any

3  relationship with Stream TV?

4  A    To my knowledge, it's none whatsoever.  She's a

5  representative appointed by Mr. McCarthy.

6  Q    Same question as to Mr. McCarthy, does Mr. McCarthy have

7  any relationship with Stream TV?

8  A    None that I'm aware of, no.

9  Q    How about Glenn Hasen?

10  A    Glenn has some familiarity with Stream TV from previous

11  years.  He's been acting a little bit as an unofficial advisor,

12  but he has had no official relationship with Stream TV, but

13  it's his familiarity with the overall industry, and with our

14  venture -- with the debtor's previous venture that made him a

15  good choice.

16  Q    Besides familiarity, does Mr. Hasen have any current

17  relationship with Stream?

18  A    No.

19  Q    How about Tracy Rees?

20  A    No.

21  Q    And Cliff Morton?

22  A    No.

23            MR. STEMERMAN:  Thank you; no further questions.

24            THE COURT:  Did you say no further questions?

25            MR. STEMERMAN:  I did, Your Honor.

1          THE COURT:  Okay; thank you.

2          Mr. Larkin, I asked a few question of Mr. Robertson

3    before I tendered the witness for, I guess, what would be

4    considered redirect, although I'm not sure who's tendering the

5    witness either, VTI or the debtor, so perhaps I can get clarity

6    with the next witness.  But did you have any follow-up redirect

7    based on the substance of my questioning?

8          MR. LARKIN:  Nothing further from us, Your Honor;

9    thank you.

10          THE COURT:  Okay.  Mr. Robertson, thank you so much

11    for your time and attention today.  You can consider yourself

12    released from our virtual witness box today.

13          MR. ROBERTSON:  Great; thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. LARKIN:  Your Honor, I believe our next witness -

16    - I laid out the order of witnesses earlier today.  We have the

17    Dutch law expert scheduled to testify next because of the time

18    difference over in the Netherlands.

19          My colleague, Jason Liberi, will be calling the

20    debtor's Dutch law expert, if you will, on cross, and then she

21    will be followed by SeeCubic's Dutch law expert who the debtors

22    and VTI will, I guess, cross, and then we'll do redirect.  And

23    then we'll have Mr. Stastney either today or tomorrow, as time

24    permits.

25          THE COURT:  Okay.  So we think we can get through the

1 two experts today?

2          MR. LARKIN:  I think Mr. Liberi is prepared to do a

3 very direct cross, no pun intended, at least on our side, I

4 think that's right.  I'm not sure what the debtors --

5          THE COURT:  Okay.

6          MR. LARKIN:  -- are prepared to do.

7          THE COURT:  Okay.  Well, we'll just take one witness

8 at a time then.  Okay, Ms. Rumora, how do you pronounce your

9 last name, is it Scheltema?

10          MS. Rumora-Scheltema:  Well, technically it's

11 Scheltema, but Scheltema will do just fine.

12          THE COURT:  Well, I apologize because I'll probably

13 mispronounce it.  So welcome to these proceedings, and please

14 I'll swear you in before I tender you to Mr. Liberi for your

15 cross-examination.

16                 BARBARA RUMORA-SCHELTEMA, SWORN

17          THE COURT:  Okay.  Can you please state your name for

18 the record, and spell your last name.

19          THE WITNESS:  It's Barbara Rumora-Scheltema.  And my

20 last name is spelled R U M O R A hyphen S C H E L T E M A.

21          THE COURT:  Okay; thank you very much.

22          And, Mr. Liberi, when you're ready.

23          MR. LIBERI:  Thank you, Your Honor.

24                        CROSS-EXAMINATION

25 BY MR. LIBERI:

1  Q    Good afternoon, Ms. Rumora; Jason Liberi at Skadden Arps

2  for SeeCubic.  We previously met at your deposition; it's good

3  to see you again.

4        I want to get right into it, Ms. Rumora.  You have

5  never been qualified or accepted as an expert in a United

6  States legal proceeding, correct?

7  A    That's correct.

8  Q    I'd like to look at Mr. Dumoulin's expert report.

9        MR. LIBERI:  Mr. Frank, that's SeeCubic trial Exhibit

10  282, and specifically Exhibit A to that report.

11  Q    Exhibit A to Mr. Dumoulin's report is a corporate

12  organizational chart created by Stream and signed by Mathu

13  Rajan.

14        Ms. Rumora, you're familiar with this organizational

15  chart, correct?

16  A    Yes, I am.

17  Q    I want you to focus on a couple of things for us.  First,

18  TechnoVative Media, Inc. USA, and second the three Netherlands

19  entities a bit further down in the organizational chart in the

20  structure, do you see them there?

21  A    Yes.

22  Q    Okay.  Those three entities, the Netherlands entities,

23  Ultra-D Cooperatief U.A., Stream TV International B.V., and

24  SeeCubic B.V., can we agree for purposes of the testimony today

25  that we'll refer to those collectively as the Dutch entities?

1  A    Yes.

2  Q    Now the expert report that you submitted doesn't contain a

3  summary or statement of legal opinion, so I want to be sure

4  that we all understand what opinions you are offering and not

5  offering here today.

6        As I understand it, you have been told to assume that

7  there is a dispute with respect to the ownership of

8  TechnoVative Media, Inc., and that whoever owns TechnoVative

9  Media, Inc. is the ultimate shareholder of the Dutch entity,

10 correct?

11 A    That is correct.

12 Q    And your opinion in this report, based on that assumption,

13 as I understand it, is that in the event of such a dispute with

14 respect to the ultimate shareholder of a Dutch entity, a

15 director that has been dismissed from a Dutch entity may be

16 able to challenge his or her dismissal in the Dutch courts, is

17 that correct?

18 A    That is correct.

19 Q    But sitting here today with respect to this case, you are

20 not aware of any such challenge in the Dutch courts with

21 respect to the appointment or dismissal of any directors at the

22 Dutch entity, correct?

23 A    I'm not aware of any such action.

24 Q    And your other opinion offered in this report, as I

25 understand it, its that a Dutch court considering a legal

1  question with respect to the appointment or dismissal of a

2  director at a Dutch entity would not automatically accept and

3  recognize a United States court decision, but rather would

4  engage in its own analysis to assess whether, and to what

5  extent, to recognize that U.S. court decision, is that correct?

6  A    That is correct.

7  Q    And that is the extent of the opinions you are offering in

8  this report and this case, correct?

9  A    Yes.

10  Q    Okay.  Now let's talk a little bit about opinions that

11  you're not offering in this report or this case.  You are not

12  offering any opinion on U.S. law, correct?

13  A    Yes, correct.

14  Q    You are not offering any opinion with respect to the

15  Delaware Chancery Court's December 8, 2020 opinion or order,

16  correct?

17  A    That's correct.

18  Q    You are not offering any opinion with respect to the

19  omnibus agreement at issue in this case, correct?

20  A    Correct.

21  Q    You are not offering any opinion with respect to who owns

22  TechnoVative Media, Inc., correct?

23  A    That's correct.

24  Q    You are not offering any opinion with respect to who,

25  therefore, is the ultimate shareholder of the Dutch entity,

1  correct?

2  A    Yes.

3  Q    Let's look at Paragraph 38 of your report, if we can, Ms.

4  Rumora.

5            MR. LIBERI:   Mr. Frank, that's SeeCubic trial Exhibit

6  238, Paragraph 38.

7  BY MR. LIBERI:

8  Q    Ms. Rumora, in Paragraph 38, you state, quote, "My

9  understanding is that there is a dispute as to who is the

10 ultimate shareholder of the Dutch entities, resulting in

11 uncertainty as to who can validly represent the members of

12 Coop."  End quote.

13           When you refer there to "Coop," you're referring to

14 Ultra-D Cooperatief U.A., correct?

15 A    That is correct.

16 Q    And you are not offering an opinion as to who can validly

17 represent the members of the Coop, correct?

18 A    Yes.

19 Q    And you are not offering an opinion on who are currently

20 the valid directors at any of the Dutch entities, correct?

21 A    That is correct, yes.

22 Q    Let's go to Paragraph 7 of your expert report, if we can,

23 Ms. Rumora.  In Paragraph 7, with respect to the Dutch

24 entities, you discuss the concept of control of a Dutch entity,

25 and you state the control, quote, "boils down to the question

1  who can lawfully represent these entities towards third

2  parties.  For example, when entering into agreements, buying or

3  selling assets, etc.," end quote.

4          This concept of control discussed in your report is

5  not from Dutch case law, or statutes, or precedent, but rather

6  is your own formulation of the concept of control for purposes

7  of this report, correct?

8  A    Well, as you can see in the first line of that paragraph,

9  that is, indeed, how I define control for the purpose of this

10  opinion.

11          And I should add that control is not a concept that

12  is defined under Dutch law.

13  Q    Okay.  So it is your own formulation of the concept for

14  the purposes of the report.

15  A    That's right, yes.

16  Q    And you have never before provided expert testimony or

17  opinion with respect to this formulation of the concept of

18  control, correct?

19  A    That's right.

20  Q    And in your formulation of the concept of control of a

21  Dutch entity, it is the directors of the Dutch entity that

22  exercise control, correct?

23  A    Yes.

24  Q    Okay.

25  A    And if I may add, the reason for doing so, among other

Rumora-Scheltema - Cross/Liberi                243

1  things, is that as I explain in my report, the issue here is

2  who can dispose over the assets of the Dutch company.  And a

3  shareholder cannot do that, but a director can, and that's why

4  I defined it in that manner.

5  Q    Okay; understood.  Ms. Rumora, for my next question here,

6  I want you to make two assumptions for purposes of my question:

7  First, I want you to assume that my client, SeeCubic, Inc. in

8  the United States, is the owner of TechnoVative Media, Inc.

9  and, therefore, the ultimate shareholder of the Dutch entity.

10        Second, I want you to assume that Mathu Rajan is a

11  director of the Dutch entities.

12        Do you understand what I'm asking you to assume?

13  A    Yes, I do.

14  Q    Now in that scenario, based on those assumptions, Stream

15  TV Networks, Inc., the debtor in this case, does not have any

16  control over the Dutch entities, correct?

17  A    That's -- that's how I understand it, yes.

18  Q    And in that same scenario, VTI does not have any control

19  over the Dutch entity, correct?

20  A    Under those assumptions, that's correct, yes.

21  Q    And that's because Mr. Rajan would be acting in his

22  personal capacity as the director exercising your formulation

23  of control at the Dutch entity, correct?

24  A    That is right, yes.

25  Q    And in that role as director, he would have a duty to act

1  in the best interest of the Dutch entity itself and its

2  stakeholders, correct?

3  A    Yes, and stakeholders as defined under Dutch law.

4  Q    Let's go to Paragraph 12 of your report.  In Paragraph 12,

5  you state that, quote, "In order to obtain an enforceable title

6  in the Netherlands, the plaintiffs under the order would be

7  required to initiate new adversarial proceedings against the

8  defendants in a Dutch court."  And I want to be clear, your

9  reference here to enforceable title in this paragraph relates

10  only to the recognition of a U.S. court order in the

11  Netherlands, correct?

12  A    Yes, I should probably apologize to the Court because this

13  is a translation issue.  I literally translated the Dutch term,

14  which is executory ala titel (phonetic), the better term would

15  probably be an enforceable decision.

16  Q    Understood.  So to be clear, your reference to enforceable

17  title in this paragraph has nothing to do with a title to

18  assets or ownership rights in assets or property of any kind,

19  correct?

20  A    No, it's a decision, a judgment.

21  Q    And you are not opining or suggesting here that if there

22  were a change in the ultimate shareholder of the Dutch

23  entities, that that would require the commencement of some

24  Dutch court proceeding, or other steps, to effectuate the

25  change of the ultimate shareholder with respect to its direct

1  and indirect ownership of the Dutch entity, correct?

2  A    That is correct, yes.

3  Q    Okay.  Let's go to Paragraph 19, if we can.  Ms. Rumora,

4  in Paragraph 19 of your report, you discuss how a director who

5  was previously dismissed from a Dutch entity, like Mr. Rajan

6  was previously dismissed by the Dutch entities here, might

7  challenge the validity of that dismissal in a Dutch court

8  proceeding, correct?

9  A    Yes.

10  Q    But sitting here today, you are not aware of any challenge

11  pending in a Dutch court by Mr. Rajan of this dismissal as a

12  director of the Dutch entities, correct?

13  A    At this moment, no, I'm not aware of any.

14  Q    Let's go to Paragraphs 32 through 35 of your report, if we

15  can.  In Paragraphs 32 through 35 of your report, Ms. Rumora,

16  you acknowledge that the Dutch Trade Register currently

17  reflects for each of the Dutch entities that Mathu Rajan was

18  dismissed as a director of those entities in December of 2020,

19  correct?

20  A    Yes, although that doesn't have any effect on the validity

21  of that dismissal.

22  Q    And for each of the Dutch entities, the Dutch Trade

23  Register currently reflects that Shad Stastney and Hans Zuidema

24  are the directors of those entities, correct?

25  A    That is correct, although I will (indiscernible).

1  Q    You -- sitting here right now, you are not aware of any

2  pending Dutch court proceeding challenging Mr. Rajan's

3  dismissal as a director or the appointments of Mr. Stastney and

4  Mr. Zuidema as directors, correct?

5  A    That is correct.

6  Q    Let's go to Paragraph 37, if we can.  In Paragraph 37 of

7  your report, you state that you have not seen the corporate

8  documents effectuating the dismissal of Mr. Rajan and the

9  appointments of Mr. Stastney and Mr. Zuidema as directors of

10  the Dutch entities.

11        In fact, VTI and its lawyers had those documents

12  before you issued your report, but the documents had not yet

13  been provided to you, correct?

14  A    That is correct.

15  Q    Sitting here today, you have now reviewed those documents,

16  correct?

17  A    Yes.

18  Q    And other than the fact that those documents describe Mr.

19  Rajan's dismissal as a dismissal for cause, which you thought

20  was odd, otherwise, those documents are largely in the form and

21  with the content that you would expect in connection with these

22  appointments and dismissals of directors, correct?

23  A    That is correct.

24  Q    Let's go to Paragraph 40, if we can.  In Paragraph 40 of

25  your report, Ms. Rumora, you state, quote, "To the extent that

1  the members of the Coop were not properly represented, it is,

2  therefore, my view that as a director, that as a matter of

3  Dutch law, Mr. Mathu Rajan is the sole lawful director of both

4  Coop, as well as the B.V.s," do you see that?

5  A    Yes, I do.

6  Q    Okay.  And as I understand it -- and we'll cover it now --

7  the phrase "to the extent that" is sort of carrying a lot of

8  the weight here in this paragraph that is a hypothetical, so to

9  be clear, you are not offering an opinion with respect to who

10  are the proper representatives of the Coop, correct?

11  A    That is correct.

12  Q    And you are not offering an opinion that Mathu Rajan is

13  the sole lawful director of the Coop and the B.V.s, correct?

14  A    That is correct.

15          MR. LIBERI:  I think that's all that I have for now,

16  Your Honor, reserving, as I need it.

17          THE COURT:  Okay; thank you, Mr. Liberi.

18          Ms. Sierra, do you have any questions for this

19  witness?

20          MS. SIERRA:  Rosa Sierra for the U.S. Trustee; I

21  don't have any questions for this witness.

22          THE COURT:  Okay; all right.

23          Mr. Stemerman, or Mr. Weis, Mr. McMichael, who is

24  going to take the first turn?

25          MR. STEMERMAN:  Your Honor, this is Jonathan

1    Stemerman, I will take the first turn.

2                    CROSS-EXAMINATION

3    BY MR. STEMERMAN:

4    Q    Ms. Rumora, Mr. Liberi asked you about certain meeting

5    minutes that were not provided to you prior to you writing your

6    report.  Do you recall the circumstances regarding those

7    meeting minutes and them being provided to you eventually?

8    A    Not exactly, no.

9    Q    Okay.  Do you recall when VTI's counsel received those

10   documents?

11   A    Well, my understanding is that that was very shortly

12   before my opinion was rendered.

13   Q    Thank you.  And when you were testifying earlier, you

14   mentioned regarding the listing of Board members in the Trade

15   Register, you said that it did not affect the validity of the

16   appointment.  Could you expand on that a little bit, please?

17   A    Registration of the directors or dismissal of directors in

18   the Trade Registry is not a constitutive element for a director

19   to be validly appointed.  So whether or not a director is

20   validly appointed depends on whether the proper procedure has

21   been followed and whether the proper person has taken that

22   decision, or persons have taken that decision.  But it doesn't

23   depend on whether or not he is registered in the Trade

24   Registry.

25            So while third parties in good faith may rely on

1  information in the Trade Registry, it's not conclusive.

2  Q    Thank you.  And earlier you were also asked about

3  fiduciary duties that Mathu Rajan would have as a director of

4  any of the Dutch entities.  Would the same be true with respect

5  to Mr. Stastney and Mr. Zuidema?  Do they also have fiduciary

6  duties to the Dutch entities?

7  A    Yes, a director under Dutch law has the duty to act in the

8  interest of the company and its stakeholders.  And those

9  stakeholders are defined in quite a broad sense, they're not

10  limited to shareholders, but they also include customers,

11  suppliers, creditors, employees, and anybody else that the

12  company deals with.

13        So it's really irrelevant who is the director, they

14  will always have to take into account those interests.

15  Q    And who do those fiduciary duties apply to for the

16  directors of the Dutch entities?

17  A    Well, like I said all of the stakeholders.  So that would

18  include normally the first stakeholders that you think of as a

19  director of a Dutch company would be the creditors of the

20  company, the employees of the company, and other parties that

21  the company does business with.  And, of course, the

22  shareholder is also an important stakeholder, but it's not the

23  most important one.

24  Q    And if Stream TV was the owner of the TechnoVative Media

25  stock, would the directors of the Dutch entities ultimately owe

1  fiduciary duties to Stream TV?

2  A    Well, yes, along with those other stakeholders I

3  mentioned, yes.

4  Q    You were also asked earlier about Mr. Rajan being able to

5  institute a proceeding to challenge his removal of a director,

6  is that correct?

7  A    Yes.

8  Q    Do you know whether Mr. Rajan still has the ability to

9  initiate such a proceeding under Dutch law?

10 A    Yes, he does.

11 Q    And do you know how long he has to make such an

12 application, initiate a proceeding?

13 A    Well, there's -- there's two concepts that play a role

14 here:  He can ask the court to declare that his dismissal was

15 void or that it was voidable.  The main difference being that a

16 voidable decision is one where procedures haven't been properly

17 followed.  A void decision is one where, for example, I would

18 have taken the decision as a shareholder when I'm not a

19 shareholder.

20         The main difference for the purpose of answering your

21 question is that asking the Court to declare that a decision is

22 void does not expire because the decision -- a void decision is

23 considered void ab initio, so from the start, it's never been

24 void.

25         A voidable decision can be voided, and there is a

Rumora-Scheltema - Cross/Weis                    251

1  statute of limitations of one year after the party who

2  challenges the decision becomes aware of the decision.

3  Q    Thank you.  And I believe you also testified that a U.S.

4  court order would not necessarily be enforceable under Dutch

5  law.

6  A    That is correct, yes.

7  Q    And if a U.S. court opinion -- or court order, I'm sorry,

8  enjoined Mr. Rajan from asserting that he was a board member of

9  any of the Dutch entities, you are not rendering any opinion

10 about whether or not that order would be enforceable in the

11 United States, are you?

12 A    No, I'm not.

13 Q    Okay.

14        MR. STEMERMAN:  Thank you; no further questions.

15                    CROSS-EXAMINATION

16 BY MR. WEIS:

17 Q    Good afternoon, Ms. Rumora.  Martin Weis, I'm here on

18 behalf of Stream TV.

19        Very brief, Mr. Liberi asked you a hypothetical about

20 control over the entity, depending on if SeeCubic was the

21 ultimate owner of the -- the ultimate shareholder of the debtor

22 companies, do you recall that hypothetical?

23 A    Yes.

24 Q    Okay.  I'd like to change it slightly for you, and see

25 what you think about it.  What if Stream was the ultimate owner

Rumora-Scheltema - Cross/Weis                    252

1  and shareholder of the debtor entity, assumption number one.

2           Assumption number two is that Mr. Stastney and Mr.

3  Zuidema are the directors of the Dutch entity.

4           Is it true that SeeCubic would not have any control

5  under those circumstances?

6  A    Yes.  I'm sorry, yes, that's true.

7  Q    Thank you.

8           MR. WEIS:  I have nothing further, Your Honor.

9           THE COURT:  Okay; thank you very much.

10           Ms. Rumora-Scheltema, thank you so much for your time

11  and attention.  You can consider yourself released from our

12  virtual witness box today.

13           MS. RUMORA-SCHELTEMA:  Thank you.

14           THE COURT:  Have a good night.

15           MS. RUMORA-SCHELTEMA:  Thanks.

16           MR. LARKIN:  Your Honor, just one quick housekeeping

17  matter before we turn to the next witness.  I believe Mr.

18  Dumoulin, our Dutch law expert, is in the waiting room, the

19  virtual -- the virtual waiting room for the virtual witness

20  box.  And if it would be possible to admit him -- ask the Court

21  staff to admit him, that would be helpful.

22           THE COURT:  I am not seeing him in our waiting room;

23  are you sure?

24           MR. LARKIN:  Yeah, he has been trying to get in, and

25  -- would it -- should we take a five-minute -- maybe a five-

Dumoulin - Cross/Aaronson                    253

1 minute break here just to see if we can get him in?  I

2 apologize, Your Honor.

3          THE COURT:  That's okay.  Let's take a five-minute

4 break, we'll come back at 4:20 and we'll see if he is ready for

5 us.

6          MR. LARKIN:  All right; thanks a lot.

7          THE COURT:  Thank you.

8               (Recess 4:15 p.m./Reconvene 4:21 p.m.)

9          THE COURT:  Okay.  Mr. Larkin, are you ready to

10 continue?

11          MR. LARKIN:  I am.  And, thank you, Your Honor, I

12 appreciate your indulgence.  Mr. Dumoulin was able to get in.

13 I would like to introduce my colleague, Marley Brumme, who will

14 be doing the cross-examination.  Or, I'm sorry, redirect.

15          MS. BRUMME:  Hi; good afternoon.

16          THE COURT:  Mr. Dumoulin, thank you for joining us.

17 I'm going to swear you in, and then I'll tender you.

18                    SVEN DUMOULIN, SWORN

19          THE COURT:  Can you please state your name, and spell

20 your last name for the record?

21          THE WITNESS:  Yes.  My name is Sven Dumoulin, and my

22 last name is spelled D U M O U L I N.

23          THE COURT:  Okay; thank you very much.

24          Okay, so I will tender you for cross-examination.

25 Ms. Aaronson, are you handling this in this instance?

Dumoulin - Cross/Aaronson                    254

1              MS. AARONSON:  Yes, I am, Your Honor; thank you.

2              THE COURT:  Okay.

3                          CROSS-EXAMINATION

4    BY MS. AARONSON:

5    Q    Good afternoon, Professor Dumoulin; I believe we met

6    during your deposition last week.  So I believe you testified

7    at your deposition that this is the first time that you've

8    served as an expert for trial, and that your deposition was the

9    first time you had been deposed, is that correct?

10   A    That is correct.

11   Q    Okay.  And in this matter, you were retained as an expert

12   on Dutch law by SeeCubic or its counsel?

13   A    Yes, that's correct.

14   Q    Before you were asked to serve as an expert for this

15   trial, your firm, De Brauw Blackstone and Westbroek, were they

16   retained by SeeCubic or by Skadden in this matter?

17   A    Yes.

18   Q    And approximately when did that occur?

19   A    I do not know that other than from the documents that I

20   have seen, which are the exhibits to my report and the Rumora

21   report, and what I saw in one of the exhibits of the Rumora

22   report was that that was about August of last year because in a

23   letter sent, I think by someone in my firm at the beginning of

24   August -- of August, 2020, I think, it was stated there that

25   they had been retained recently.

Dumoulin - Cross/Aaronson                    255

1  Q    Okay.  And do you know what the purpose of that retention

2  was?

3  A    No, not specifically, no.

4  Q    Do you know what work was performed on behalf of SeeCubic?

5  A    Not other than what I read in the file.

6  Q    And what did you read in the file?

7  A    Well, for instance, the letter that I mentioned, I think

8  there were -- letters were sent in relation to certain

9  appointments that had been made or that had allegedly been

10 made, so that type of work.

11 Q    And that would be appointments to the board of the Dutch

12 entities?

13 A    Yes.

14 Q    Okay.  And did those letters also include demands alleging

15 that SeeCubic owned the TechnoVative stock?

16 A    Yes.

17 Q    Okay; all right.  I'd like to start with some preliminary

18 questions about your report itself.  On Page 2 under the title,

19 "Assignment," you don't need to look at it, but if you have it

20 in front of you, that would be fine.

21       You list some information that forms the background

22 of your opinion in Paragraphs 6 through 10.  Where did the

23 background information come from?

24 A    I received that from both the members of my firm, who were

25 representing SeeCubic, and from Skadden Arps.

Dumoulin - Cross/Aaronson                256

1  Q    Okay.  And are those assumptions that you were asked to

2  make in connection with your report?

3  A    Those assumptions are set out in the report primarily, I

4  think, in Paragraph 7.

5  Q    Okay.  And did you perform any independent research or

6  other investigation to determine whether those assumptions are

7  true?

8  A    No.

9  Q    Okay.  So the basis of your report is limited to the

10  assumptions provided to you by your firm and by SeeCubic.

11  A    Yes, but I'm also -- my report is also based on certain

12  documents which have been exhibited to that, for instance

13  minutes of meetings --

14  Q    Right.

15  A    -- and invitations to attend meetings.

16  Q    Okay.  But you didn't -- you didn't undertake a personal

17  examination of U.S. law or any validity of any of the

18  assumptions.

19  A    No, I didn't.

20  Q    Okay; thank you.  Okay.  And in your report, you've

21  attached an organization structure chart, correct?

22  A    Yes.

23  Q    Okay.  And the structure chart shows the U.S. entity,

24  TechnoVative Media, as the indirect parent of Ultra-D

25  Cooperatief, Stream TV International B.V., and SeeCubic B.V.,

Dumoulin - Cross/Aaronson                    257

1  which you refer to in your report as the Dutch entities

2  collectively, correct?

3  A    Correct.

4  Q    Okay.  And you've assumed that that organization structure

5  is accurate, and you haven't done your own research on that,

6  correct?

7  A    That is -- that's correct.

8  Q    Okay.  And at the bottom of Page 2 in 7C, you indicate

9  that SeeCubic -- and your understanding is that the SeeCubic

10 U.S. entity is different from SeeCubic B.V. that's one of the

11 Dutch entities, correct?

12 A    Correct.

13 Q    Okay.  So at the bottom of Page 2, you indicate that

14 SeeCubic U.S. acquired all of the shares of TechnoVative, do

15 you see that?

16 A    I do.

17 Q    All right.  And that's an assumption you were asked to

18 make; you don't know whether that's true or not.

19 A    That's an assumption.

20 Q    Okay.  And to determine the accuracy of that assumption,

21 is that a matter of Dutch law or U.S. law?

22 A    Insofar as I can see, that's a matter of U.S. law.

23 Q    Okay.  And then you don't know the requirements under U.S.

24 law to transfer stock of a U.S. company from one stockholder to

25 another, correct?

Dumoulin - Cross/Aaronson                    258

1  A    Correct.

2  Q    You're not an expert on U.S. securities laws.

3  A    Correct.

4  Q    Okay; all right.  So the next paragraph, top of Page 3 in

5  7D, you indicate that through the acquisition by SeeCubic U.S.

6  of all the shares in TechnoVative, SeeCubic indirectly acquired

7  shares in technology holdings and media holdings, and this is

8  also something you assumed, correct?

9  A    Correct.

10 Q    All right.  And the -- to determine the truth of that

11 assumption, is that a matter of U.S. law or Dutch law?

12 A    I think it's a matter of U.S. law.

13 Q    Okay; all right.  And then in Paragraph 7E, you indicate

14 that Mr. Stastney is authorized to represent technology

15 holdings and media holdings.  Again, they're the U.S.

16 subsidiary of TechnoVative Media.  This is also something that

17 you assumed, and you haven't independently researched that,

18 correct?

19 A    Correct.

20 Q    Okay.  And would that -- would Mr. Stastney's control over

21 the U.S. subsidiary of TechnoVative, is that a matter of U.S.

22 law or Dutch law?

23 A    Are you referring to the fact that he's authorized to

24 represent these entities?

25 Q    Yeah, authorized to represent the U.S. subsidiaries of

1  TechnoVative Media.

2  A    Yes, that's a matter of U.S. law insofar as I understand.

3  Q    Okay; all right.  And so consistent with what you've just

4  testified in Paragraph 4 -- Page 4, Paragraph 11, you provide

5  that Dutch law does not affect whether the ownership of

6  TechnoVative stock was validly transferred to SeeCubic.  But if

7  it was transferred, according to U.S. law, then Dutch law would

8  -- then SeeCubic would be recognized under Dutch law as the

9  indirect owner, correct?

10 A    Correct.

11 Q    Okay.  So your report doesn't address the application of

12 Dutch law in the event that TechnoVative stock was not

13 transferred in accordance with U.S. law, correct?

14 A    That's correct.

15 Q    Okay.  And you would agree that the ultimate ownership of

16 the Dutch entities is determined by the ownership of their

17 parent company, which is an issue of U.S. law.

18 A    That's correct.

19 Q    Okay.  Just a couple more questions, not related to the

20 stock in TechnoVative.  But is a Netherlands court order

21 necessary if someone wanted to enforce an order of a U.S. State

22 Court, Delaware Chancery Court order in the Netherlands?

23 A    Yes, that's correct.

24 Q    Okay.  And finally, if a director of a Dutch company is

25 suspended or removed from the board of directors of that Dutch

Dumoulin - Cross/Aaronson                          260

1  entity, does Dutch law provide an opportunity for that director

2  to contest or challenge the removal?

3  A    That depends on the -- on whether there is anything wrong

4  or incorrect with that decision.

5  Q    Right, but to make that determination the dismissed

6  director would have the ability to bring a challenge.

7  A    Yes.

8  Q    Okay.  And do you know how long that period runs?

9  A    That runs, in case a decision is voidable, 12 months.

10 Q    And what if it's void?

11 A    If it's void, then it's void, which means that it doesn't

12 need to be contested in court for it to be invalid.

13 Q    Okay.

14         MS. AARONSON:  Nothing further, Your Honor.

15         THE COURT:  Okay.  Mr. Stemerman, did you want to ask

16 any questions of this witness?

17         MR. STEMERMAN:  No questions from VTI, Your Honor.

18         THE COURT:  Okay.  Ms. Sierra, did you have any

19 questions for this witness?

20         MS. SIERRA:  No questions from the U.S. Trustee.

21         THE COURT:  Okay.  Then I will tender him for

22 redirect.

23         MS. BRUMME:  No questions from SeeCubic.

24         THE COURT:  Okay.  I guess we're all getting ready to

25 conclude for today.

1          So, Mr. Dumoulin, thank you so much for your time and

2    attention to this matter, and staying on the line into the late

3    hours of your night.  I appreciate your testimony and your

4    expert opinion today, you are released from our virtual witness

5    box.

6          MR. DUMOULIN:  Thank you very much.

7          THE COURT:  Thank you.

8          Okay.  So I don't think it makes any sense to call

9    the next witness.  I think I'm a little tired, and we've been

10   going at it all day, so -- and I don't think it makes sense to

11   put the next witness on the stand and sequester him --

12   virtually sequester him all evening.

13         So let's just resume tomorrow with the final witness

14   and closing arguments.  I have you returning at 3 o'clock, so

15   is that sufficient enough time to complete our final witness

16   and present closing arguments?  Mr. Larkin, what do you think?

17   You're on mute, though.

18         MR. LARKIN:  I -- I think -- I know we started the

19   day with an agreement on the chess clock.  I think particularly

20   the first witness went a little longer on cross than I would

21   have anticipated.  It's not a criticism, I know everyone's

22   doing their best here in the virtual world, and I do think it

23   would be helpful for Your Honor to hear closings from both

24   sides on this, and have an opportunity for both sides to

25   present their witnesses.

1            I think we have a little short of an hour left of our
2   allotted time on the chess clock.  I don't know how much time
3   my friends on the other side are going to spend with Mr.
4   Stastney.  I anticipate we'll have -- we could have potentially
5   an hour of redirect, it really just depends on what they elicit
6   on cross.
7            And then I would anticipate, you know, 15 to 20
8   minutes of closing.  So if we have any -- if Your Honor has
9   anymore time tomorrow other than those two hours, maybe three
10  hours might be enough time for us to finish tomorrow; I think
11  that'd be good.
12           THE COURT:  Okay.  Mr. Weis, Mr. McMichael, what do
13  you think?  Is three hours enough for concluding these
14  proceedings --
15           MR. McMICHAEL:  I think --
16           THE COURT:  -- tomorrow if I were to be able to start
17  at 2 o'clock?
18           MR. McMICHAEL:  I think we can get it done by 5, Your
19  Honor, I concur with Mr. Larkin's view on that.
20           MR. WEIS:  To be --
21           THE COURT:  Okay.
22           MR. WEIS:  And to be clear --
23           THE COURT:  Well, then -- I'm sorry, Mr. Weis, go
24  ahead.
25           MR. WEIS:  My apologies, Your Honor.  But to be

1  clear, we are sticking with the chess clock format.

2          THE COURT:  Right; I understand that.  But with

3  closings -- was the closing built into the chess clock format?

4          MR. WEIS:  It was, Your Honor.

5          MR. LARKIN:  It was, Your Honor, but -- and I think -

6  - you know, I'm only asking for -- I think it's an additional

7  15 to 20 minutes if we're going to allot three hours tomorrow,

8  I -- you know, as I said, it's -- I think it would be helpful

9  to Your Honor.

10          THE COURT:  Well, I think it would be helpful.  But

11  more importantly, I acknowledge that I took up some time with

12  my questioning, and I don't know how much that amounted to, but

13  I think it was probably at least 15 minutes that I took away

14  from the parties today.  So to the extent that someone's

15  attributing that to one side or the other, I don't think that's

16  appropriate, okay?

17          MR. WEIS:  No, we're not.

18          THE COURT:  So -- okay.

19          MS. AARONSON:  Just so you know, Your Honor --

20          THE COURT:  All right.  Well, let's do that --

21          MS. AARONSON:  We --

22          THE COURT:  Oh, I'm sorry, Ms. Aaronson?

23          MS. AARONSON:  Oh, that's okay.  I've been working

24  with someone at Skadden on the clocks, we've been keeping good

25  track of everybody's time, and we did not attribute your

1  questioning to any party.  It was free time, so --

2              THE COURT:  Okay.  Okay; great.

3          All right, well, let's just do this because I really

4  don't want to go over 5 o'clock.  So let's just start at 2

5  o'clock tomorrow, just for the sake of everybody, and I'll make

6  no position on the extra time.  And hopefully, we'll be able to

7  complete with plenty of time before 5 tomorrow based on the

8  chess clock.

9          So with that, let's adjourn today's hearing, and I

10  will plan to see you all at 2 o'clock, all right?  And I think

11  that you can continue to use the same registration link for

12  Zoom so you don't need to re-register, if my understanding is

13  correct.

14          Okay?  So I look forward to seeing you all at 2 p.m.,

15  and we'll consider the hearing adjourned.  Everyone have a good

16  night; take care.

17              THE COURT:  Thank you, Your Honor.

18              MULTIPLE SPEAKERS:  Thank you.

19          (Whereby the hearing concludes at 4:36 p.m.)

20

21

22

23

24

25

1      **CERTIFICATION**

2          We certify that the foregoing is a correct transcript from

3      the electronic sound recording of the proceedings in the above-

4      entitled matter to the best of my knowledge and ability.

5

6      */s/ Dipti Patel*

7      DIPTI PATEL, CET

8

9      */s/ Dana Kelly*

10     DANA KELLY, CET

11

12     */s/ Karen Watson*

13     KAREN WATSON, CET

14

15     */s/ Beth Reid-Grigsby*

16     BETH REID-GRIGSBY, CET

17

18     */s/ Karen Hartmann*                    May 12, 2021

19     KAREN HARTMANN, CET

20     **RELIABLE**

21

22

23

24

25

# EXHIBIT 15

VTI Stock Purchase Agreement 210506

## AMENDED STOCK PURCHASE AGREEMENT

An amended agreement ("**Agreement**"), dated as of May 6, 2021 (the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong    (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

**WHEREAS**, the Company is an entity  formed pursuant to the laws of the State of Nevada USA as a Nevada corporation, and

**WHEREAS,** The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  Class A Common Stock ("**Shares**") having a par value $0.00001 per share to be issued to Investor as a part of this Agreement; and

**WHEREAS**, Class B Voting Stock has been issued to the Company's founder or his wholly-owned entity, such Class B Voting Stock enjoys 10:1 voting rights, pursuant to the Amended and Restated Certificate of Incorporation, and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor; and

**WHEREAS**, the Parties have had several other agreements and modifications executed between themselves  prior to the  Effective Date  (the "**Prior Agreements**") and two of the  Prior Agreements were  Stock Purchase Agreements dated as of  Feb 10, 2021 and May 3, 2021 (the "**Prior Stock Purchase Agreements**").

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

## TERMS

1)      The Prior Stock Purchase Agreementis are hereby amended in their entirety and replaced by this Agreement.

2)      Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of One Hundred and Eighty Million US Dollars ($ 180,000,000) (the "**Investment Amount**") and an optional Accelerated Investment of up to One Hundred and Twenty Million US Dollars (US $120,000,000) for a total of Three Hundred Million US Dollars (US $300,000,000).

3)      The Investment Amount is split into three (3) tranches of Sixty Million US Dollars (US $60,000,000) each a ("**Tranche**") with the first Tranche invested on or before May 24, 2021; the

VTI Stock Purchase Agreement 210506

second Tranche invested on or before May 31, 2022; and the third Tranche invested on or before May 31, 2023 (each a "**Closing**" and together the "**Closings**"). Each Tranche, when combined with each other Tranche, shall be referred to as the "**Tranches**." Each Closing has a 7 business-day cure period in case the funds are not received by the Company by the date of the Closing.

4)      The Investor retains an option for 60 days from the first Closing ("**Accelerated Period**") to accelerate the investments from the second and third Closings to occur within the Accelerated Period ("**Accelerated Investment**"). The second and third Closings will remain an option for the Investor even in the event of an Accelerated Investment.

5)      The price per Share at the first Closing is to be $1.40 per Share and the for each subsequent Closing is a twenty-five percent (25%) discount to the last transacted price per Share for the Company at the time of Closing.

6)      The validity of the Agreement is not subject to the execution of the first Closing, but binding and irrevocable upon execution of this Agreement.

7)      The Investor shall pay to the Company in immediately available funds a payment equal to the Investment amount for each Closing to the Company's bank account ("**Payment**") by executing the exercise form reflected at Exhibit A hereto.

8)      The purchase and sale of the Shares of each Tranche shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares of each Tranche will be the date of receipt of funds from each Closing in the designated bank account per **Exhibit B hereto.**

9)      Use of Proceeds. In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.

## REPRESENTATIONS AND WARRANTIES

10)     Representations and Warranties of the Company. The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a.      Organization. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b.      Capitalization. The Company currently has two classes of outstanding stock. There is Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock are stated in the Amended and Restated Certificate of Incorporation and as otherwise provided by the Nevada General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will be fully

VTI Stock Purchase Agreement 210506

paid and non-assessable. The fully diluted capitalization table of the Company will be provided prior to each Closing.

      c.    Authorization. All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

      d.    Valid Issuance of Shares. The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

      e.    Governmental or Other Consents and Filings. Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

      f.    Litigation. There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

      g.  Intellectual Property. Except as set forth in the Disclosure Schedule:

      i.    The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property") in all material respects necessary for its business as currently conducted.

      ii.    The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

      iii.    The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility

VTI Stock Purchase Agreement 210506

exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

iv.    All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

h.    Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

i.    The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investor acknowledged that it has made its investment based solely on its own due diligence.

j.    No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

11)    Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

a.    Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

b.    Purchase Entirely for Own Account. Investor confirms that the Shares are being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of

Page 4 of 20

VTI Stock Purchase Agreement 210506

selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

c.     Securities Laws.  The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares.  The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction.  The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons.  The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

d.     Disqualification.  Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

e.     Acknowledgment.  Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in this Agreement.  The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence.  Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto.    Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its own independent investigation and verification

## MISCELLANEOUS

12)     Miscellaneous.

a.     Successors and Assigns.  This Agreement may not be assigned by the Investor without the express written consent of the Parties.  The provisions hereof shall inure to the

Page 5 of 20



VTI Stock Purchase Agreement 210506

benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

     b.    <u>Expenses</u>. Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

     c.    <u>Confidentiality</u>. Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

     d.    <u>Placement Agents</u>. Such placement agents as the Company may disclose to the Investor. Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

     e.    <u>Governing Law</u>. This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of Nevada USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada USA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

     f.    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

     g.    <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

     h.    <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

     i.    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

VTI Stock Purchase Agreement 210506

    j.    <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

    k.    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

    l.    <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

    m.    <u>Dispute Resolution; Waiver of Jury Trial</u>.  The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL

VTI Stock Purchase Agreement 210506

NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n.      Publicity.  The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended:

(i)  Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C)  Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(1) Association with an entity regulated by such commission, authority, agency, or officer;

(2) Engaging in the business of securities, insurance or banking; or

VTI Stock Purchase Agreement 210506

(3) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

Page 9 of 20

VTI Stock Purchase Agreement 210506

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |
| Litigation | The Company does not believe at this time that any claims are material to the Company's business or ongoing operations. |
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

Page 10 of 20

VTI Stock Purchase Agreement 210506

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

Page 11 of 20

VTI Stock Purchase Agreement 210506

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or the sharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**

VTI Stock Purchase Agreement 210506

### Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

VTI Stock Purchase Agreement 210506

SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**

Visual Technology Innovations, Inc.

By: _Mathu Rajan_

Name:    Mathu Rajan
Title:    President
Address:    1105 William Penn Drive
Philadelphia, PA 19020

**INVESTOR**

Burlington Resources Asia Limited

By: _____

Name:    Timothy McCarthy
Title:    CEO
Address:    Old St. James's Vicarage,
Maxwell Road,
London SW6 2HR, UK

Page 14 of 20

VTI Stock Purchase Agreement 210506

## ACCREDITED INVESTOR CERTIFICATION

**For Individual Investors Only**
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

Initial _____    I certify that I have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

Initial _____    I certify that I have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

**For Non-Individual Investors**
**(all Non-Individual Investors must *INITIAL* where appropriate):**

Initial _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

Initial _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

Initial _____    The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

Initial _____    The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

Initial _____    The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

Initial _____    The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

Initial _____    The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

Initial _____    The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

Initial _____    The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Initial _____    The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

Initial _____    The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1] For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

Page 15 of 20

VTI Stock Purchase Agreement 210506

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth: _____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth: _____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:
_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

*mr* *TM*

VTI Stock Purchase Agreement 210506

## Section B – Entity Investor Information

Investor Name(s):  Burlington Resources Asia Limited

Authorized Individual executing Profile or Trustee:  Timothy McCarthy

Social Security Numbers / Federal I.D. Number:  _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust)  _____

Type of Business:  Investment Holding Company

Street Address:  20th Floor, 88 Gloucester Road, Wanchai, Hong Kong

City, State & Zip Code:  _____

Phone: _____+44 7768943655   Fax: _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / Outside Broker/Dealer:  Knight-Davis Associates LLP

VTI Stock Purchase Agreement 210506

## EXHIBIT A

### FORM OF EXERCISE FOR TRANCHE _____, CLOSING _____

**TO: VISUAL TECHNOLOGY INNOVATIONS, INC.**

**ATTENTION: LEGAL**

**(1)**    The undersigned hereby elects to purchase _____ Shares of Visual Technology Innovations, Inc. (the "**Company**") in the name of the Investor at a price of US $_____ per Share for a total value of US $_____ pursuant to the terms of the attached Agreement, and tenders herewith Payment in full, together with all applicable transfer taxes, if any.

**(2)**    The undersigned represents that (i) the aforesaid Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such Shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the Shares issuable upon exercise of this Warrant have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid Shares may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the Shares for the number of years prescribed by Rule 144, that among the conditions for use of the Rule is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid Shares unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel satisfactory to the Company, stating that such registration is not required.

_____    _____
(Date)    (Signature)

                                             _____
                                             (Print name)

Page 18 of 20

VTI Stock Purchase Agreement 210506

EXHIBIT B

**Bank Wire Instructions for Payment to Company**

| | |
|---|---|
| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: 8571165235<br>Routing/ABA Number :121000248 |
| International Wire | Account: 8571165235<br>SWIFT: WFBIUS6S |

VTI Stock Purchase Agreement 210506

**Checklist for complete documentation**

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |

Page 20 of 20

**EXHIBIT 16**

Leah A. Martin, Esq.
Nevada Bar No. 7982
Kevin Hejmanowski, Esq.
Nevada Bar No. 10612
LEAH MARTIN LAW
601 South Rancho Drive, Suite C-26
Las Vegas, Nevada 89106
Telephone: (702) 420-2733
Facsimile: (702) 330-3235
lmartin@leahmartinlv.com
khejmanowski@leahmartinlv.com

Raja Rajan (*Pro Hac Vice Admission Pending*)
Pennsylvania Bar No. 58849
RAJAN LAW GROUP
2009 Chestnut Street
Philadelphia, Pennsylvania 19103

*Attorneys for Plaintiff Visual
Technology Innovations, Inc.*

# UNITED STATES DISTRICT COURT

# DISTRICT FOR NEVADA

| | |
|---|---|
| VISUAL TECHNOLOGY INNOVATIONS, INC.<br><br>Plaintiff,<br>v.<br><br>BURLINGTON RESOURCES ASIA LIMITED<br>and<br>TIMOTHY MCCARTHY<br><br>Defendants | Civil Action<br><br>Case No. 2:24-cv-00728<br><br>**VERIFIED COMPLAINT** |

Plaintiff Visual Technology Innovations, Inc. ("**VTI**") complains against Defendants as follows:

/ / / /

**PARTIES**

1.  Plaintiff VTI is a for-profit Nevada corporation with headquarters in Bensalem, PA.

2.  Defendant Burlington Resources Asia Limited ("**Burlington**") has a business address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong, S.A.R.

3.  Defendant Timothy McCarthy ("**McCarthy**") had an address at Old Vicarage, Maxwell Road, London, United Kingdom, SW62HR.

4.  At all times relevant hereto, McCarthy was the Chief Executive Officer and principal owner of Burlington.

**JURISDICTION AND VENUE**

5.  Plaintiff VTI is incorporated in Nevada.

6.  Defendant Burlington is a foreign entity and Defendant McCarthy is a resident of a foreign country.

7.  Plaintiff and Defendants executed contract(s) that specify Las Vegas, Nevada is the exclusive location of disputes.

8.  This Court has subject matter jurisdiction over this matter as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity between a Nevada entity and the Defendants. 28 U.S.C. § 1332(a)(2).

**BACKGROUND**

9.  In February of 2021, an individual named Timothy McCarthy indicated that he would invest in VTI.

10. McCarthy wanted to be a "white knight" to rescue VTI with his investment monies, which he planned to come through his company Burlington.

11. The Chief Executive Officer ("**CEO**") of VTI is Mathu Rajan.

12. Mathu Rajan also founded another company earlier than VTI called Stream TV Networks, Inc. ("**Stream TV**").

13. Mathu Rajan worked for over ten (10) years as the CEO of Stream TV to develop new technology in the area of 3D viewing.

14. The 3D technology of Stream TV could be used for TVs, tablets, and cell phones to view 3D images in video without viewing glasses.

15. In May of 2020, a group of investors in Stream TV looted the technology and all assets of Stream TV in May of 2020 claiming ownership under a private contract that was enacted by minority board members without shareholder approval.

16. That group of investors also took from Stream TV many employees and many trade names and attempted to make Stream TV an empty shell so it could not compete with them in the future.

17. That group of investors also walked away from millions of dollars of trade debt and started a new company with the technology/assets of Stream TV.

18. A Delaware Trial Court upheld that transfer of ownership of the technology/assets of Stream TV, but that ruling was overturned by the Delaware Supreme Court.

19. The Delaware Supreme Court found the private contract used to transfer the technology/assets was invalid as it violated Delaware state corporate laws requiring shareholder approval for such extraordinary transfers.

20. In early 2021, when McCarthy entered the picture, Mathu Rajan and Stream TV had not yet appealed the lower court ruling but were convinced that the Delaware Trial Court was in error in upholding the private contract that took away everything from Stream TV.

21. McCarthy convinced Mathu Rajan and VTI that he could help in the appeal with his money such that VTI and Mathu Rajan could regain the 3D technology/assets that were illegally taken from Stream TV.

22. On February 10, 2021, McCarthy, through Burlington, signed an investment term sheet that outlined his intended investment. That term sheet is attached hereto as **Exhibit A**.

23. On the same date, McCarthy, through Burlington, also signed an agreement called an Investor Rights Agreement ("**IR**"). That agreement is attached hereto as **Exhibit B**.

24. Typically, IR type contracts are signed contemporaneous with the actual closing of investment monies and not before since they usually provide for investor/shareholder rights at actual investment.

25. However, McCarthy wanted control over VTI even before he executed definitive documents for his investment.

26. Eleven (11) days later, on February 21, 2021, McCarthy signed a document called the "Stock Purchase Agreement." ("**Stock Purchase**"). That agreement is attached hereto as **Exhibit C**.

27. The Stock Purchase agreement promised investment of thirty million dollars (USD $30,000,000) in VTI.

28. Then on May 3rd and 6th McCarthy, through Burlington, signed amendments increasing the amount of promised investments to three hundred million dollars

($300,000,000). The May 6th amendment is called "**$300m Amendment**" and attached hereto as **Exhibit D**.

29. Just four (4) days later, on May 10th, 2021, McCarthy, through Burlington, signed another amendment increasing the amount of promised investment in VTI to five hundred million dollars (USD $500,000,000). The May 10th amendment is called "**$500m Amendment**" and attached hereto as **Exhibit E**.

30. McCarthy was the consummate salesman through the whole process of promising investments.

31. McCarthy charmed VTI representatives and agents, opposing counsel in the Stream TV litigation and even the United States Bankruptcy Court in legal proceedings.

32. Mathu Rajan had caused Stream TV to file for restructuring help in the United States Bankruptcy Court and counted on McCarthy/Burlington and their promised money into VTI as part of the restructuring plan for Stream TV.

33. McCarthy used his charm to induce VTI to wait for his investment monies to close and increased investment amounts to induce patience.

34. As demonstrated below, McCarthy even displayed a bank statement showing he had the funds to invest.

35. On or about May 10,2021, McCarthy testified in United States Bankruptcy Court about his investment and displayed no hesitancy to invest.

36. In fact, he enthusiastically testified that his money was not contingent or conditional and that he had completed all due diligence for the deal.

37. He provided an affidavit to the United States Bankruptcy Court that $120 million of his investment promise was a commitment and more money as an option.

38. At that time only Exhibit D was executed.

39. Later that day, Exhibit E was enacted and increased the investment amount to USD $500 million dollars and had no contingency or option.

**COUNT I**
**(VTI v. Burlington and McCarthy)**
**(BREACH OF CONTRACTS)**

40. All the averments above are incorporated herein by reference.

41. Burlington made promises of investments in contracts as displayed in the Exhibits (A-E).

42. All of those contracts were properly formed and agreed.

43. VTI fulfilled all of the obligations in those contracts.

44. Burlington, through McCarthy, materially breached those contract promises.

45. At all times relevant hereto, Burlington was McCarthy's personal investment vehicle.

46. McCarthy should not enjoy corporate veil protections as a result of Burlington.

47. McCarthy used Burlington to commit fraud against VTI and all its representatives.

48. McCarthy failed to observe corporate formalities at Burlington.

49. Burlington was undercapitalized in relation to the fraudulent promises made to VTI.

50. Upon information and belief, McCarthy commingled his personal funds with Burlington funds as Burlington was owned by McCarthy and was his personal corporate vehicle.

51. Burlington through McCarthy engaged in fraudulent behavior.

52. Burlington failed to follow corporate formalities.

53. Burlington is and was merely a facade or a tool for McCarthy to conduct his activities without assuming any personal liability.

54. McCarthy caused harm to VTI and others that counted and relied on VTI and Stream TV succeeding through the promises of McCarthy.

55. In addition to the monies that VTI lost in terms of the investment promises, VTI also took investments from others who counted on McCarthy's investment to invest.

**WHEREFORE,** Plaintiff asks for judgment in its favor against Defendants, jointly and severally, for USD $500,000,000.00 or an amount proven at trial, interests and costs, and any other relief deemed appropriate by the Court.

**COUNT II**
**(VTI v. McCarthy)**
**(FRAUD)**

56. All the averments above are incorporated herein by reference.

57. At all times relevant hereto, Burlington was McCarthy's personal vehicle.

58. The fraud was not only in the inducement but also ongoing fraud to allow McCarthy to assert his power at VTI even before investments from Burlington were made in VTI.

59. McCarthy provided his alleged qualification to rescue Mathu Rajan and VTI with an email of his prior alleged accomplishments. That email is attached hereto as **Exhibit F**.

60. That email, Exhibit F, reveals McCarthy bragging about his alleged prior deals and his closeness with famous people like Sir Richard Branson.

61. McCarthy, through Burlington, promised that thirty million dollars (USD $30,000,000) would be invested, then they changed the investment amount to USD $300,000,00 and then yet again to USD $500,000,000.

62. The increasing amounts of the promised investment amounts were made through the ongoing fraud/misrepresentations of McCarthy.

63. Though his investment was promised and not yet closed, McCarthy wanted to ensure his intended ownership in VTI was allocated for him; he revealed his greed and anxiousness.

64. He (McCarthy) caused VTI to obtain another investor before him in order to close on his monies through Burlington.

65. Some of the examples of the fraud and falsity by McCarthy are:

    a.  Inducement of the investment promises;

    b.  Displaying to VTI and its representatives that he had much successful business experience and was very wealthy;

    c.  The showing of bank statements to convince VTI and others of his financial wherewithal.

    d.  Seeking his ownership allocation even before his investment;

    e.  Convincing many people at VTI he had a strong network of potential investors that he could employ for VTI;

    f.  Seeking board membership for himself and his colleague in VTI even before his monies in VTI were closed upon; and

    g.  Convincing VTI that it could use the tools allowed in the Bankruptcy Court process to regain the assets of Stream TV with his money.

66. McCarthy knew that he was committing those falsities, yet he persisted.

67. McCarthy provided a document in a Zoom call which purportedly was a bank statement of Burlington that showed a balance of $103,018,461.95; McCarthy used that bank statement to induce VTI and other investors that he had the financial wherewithal to invest as promised. That bank statement is attached hereto as **Exhibit G**.

68. McCarthy caused another company called Knights Asia Limited, which allegedly held his money, to  convince investors to invest in VTI because he had liquid cash to invest immediately.  That document is attached hereto as **Exhibit H**.

69. McCarthy convinced VTI through fraud to appoint him and his colleague to the board of directors of VTI even before his/Burlington's investment closed.

70. The colleague of McCarthy that he added to VTI board of directors may have been unqualified and in a personal relationship with McCarthy.

71. McCarthy became extensively involved with VTI in nearly all aspects.

72. McCarthy had numerous calls with VTI personnel to convince them of his sincerity.

73. It is evident that McCarthy never intended to invest in VTI and only strung it along through fraud.

74. VTI was fooled by the fraud of McCarthy to much detriment.

75. VTI's reliance on the misrepresentation of McCarthy was justifiable.

76. VTI had other investors and VTI counted on McCarthy/Burlington to remain viable as an entity for benefit of all shareholders.

77. VTI has been sued by other investors angry with the information about investment by McCarthy that they claim induced them to invest in VTI.

78. McCarthy conduct was outrageous and intentional where punitive or exemplary damages may be awarded.

/ / / /

**WHEREFORE,** Plaintiff asks for judgment in its favor against Defendants for the amount proven at trial for compensatory damages, an award of punitive damages, an award of interests and costs, and any other relief deemed appropriate by the Court.

Dated this 27th day of March 2024.

LEAH MARTIN LAW

/s Kevin Hejmanowski, Esq.
Leah Martin, Esq.
Kevin Hejmanowski, Esq.
601 South Rancho Drive, Suite C-26
Las Vegas, Nevada 89106
*Attorneys for Visual Technology Innovations, Inc.*

## IN THE UNITED STATES DISTRICT COURT FOR NEVADA

VISUAL TECHNOLOGY                )
INNOVATIONS, INC.                )
                                 )
        Plaintiff,       )    Civil Action
        v.               )
                                 )    Case No.
BURLINGTON RESOURCES ASIA LIMITED)
                                 )    **VERIFIED COMPLAINT**
and                              )
                                 )
TIMOTHY MCCARTHY                 )
                                 )
        Defendants        )
                                 )

## VERIFICATION

I, Mathu Rajan, hereby declare and affirm that the facts recited in the foregoing Complaint are true and correct, to the best of my knowledge, under penalty of perjury.

_[signature]_

_____      Date: March __, 2024

Mathu Rajan, Chief Executive Officer and Founder of Plaintiff

# Exhibit A
## -Burlington Term Sheet-

VTI-TS(30) 210210-Common

## TERM SHEET

### Proposed Private Placement Investment inConvertible Debt

The following is a summary of the principal terms with respect to a proposed investment inClass A Common Shares of Visual Technology Innovations, Inc. as an offering to accredited investors. This is a non-binding Term Sheet setting for a summary of the proposed terms of the transaction and is intended solely as a basis for further discussion and is not intended to be, and does not constitute, a legally binding obligation of any party. A legally binding obligation will be established only pursuant to mutually acceptable definitive written agreements executed by the parties. In the event of any inconsistency between this summary and such definitive written agreements, the definitive agreements will govern.

| | |
|---|---|
| **Issuer:** | Visual Technology Innovations, Inc., a Nevada, USA Corporation(the "**Company**"). |
| **Purchaser:** | The purchaserBurlington Resources Asia Limited("**Purchaser**") is an accredited investor and has a principal place of business at 20[th]Floor, 88 Gloucester Road, Wanchai, Hong Kong. Purchaser and the Company may together be referred to as the "**Parties**" and individually as "**Party**." |
| **Amount:** | Purchaser will invest a total of thirtymillion US dollars (US $30,000,000) ("**Investment**") in the Securitystarting on or before February10, 2021("**Execution**") through the Term. |
| **Proof of Funds:** | The Purchaser will deliver to the Company a satisfactory form of proof demonstrating the availability of the Investment amount. |
| **Closings:** | The Purchaser elects to exercise the option to purchase one million US dollars (US $1,000,000) in the Security immediately upon Execution. The funds would be made available in thirty (30) calendar days from Execution ("**Initial Closing**").The Company will present to the Purchaser a selection of business opportunities ("**Presentation**") needing additional funds ("**Amount**") at various times during the Term, which has to be closed within twenty (20) calendar days from the Presentation. The form of the Presentation will be included in the closing documents. Each Presentation will constitute a "**Closing**" and will be considered a part of the Investment. Upon the absence of a Closing, the Investment balance will be reduced by the Amount. Each Closing, including the Initial Closing may be together referred to as "**Closings**". All Closings should be completed within the earlier of eighteen (18) months from Execution or Exit ("**Term**"). |
| **Exit:** | The earlier of (i) closing of an access to the public markets; (ii) merger or acquisition when there is a change of control |
| **Security:** | Class A Common Shares of the Company (the "**Security**"). |
| **Price:** | The price of the Security will be $1.40 per share. |
| **Signing Bonus:** | The Purchaser will be issued 987,839 shares of the Security upon execution of the closing documents to be issued pursuant to the acceptance of this Term Sheet. |
| **Contingent Bonus:** | In the situation that the Purchaser has not exercised any option to invest beyond the Initial Closing, the Purchaser will be issued an additional 1,141,230 shares of the Security upon at the end of the Term. |
| **Board Seat:** | The Purchaser will be awarded one (1) board seat on the Company's Board of Directors as soon as the total value of the Closings is more than five million US dollars (US $5,000,000). If Purchaser has made Closings to a total value of fifteen |

VTI-TS(30) 210210-Common

| | |
|---|---|
| | million US Dollars ( US$ 15,000,000)the Purchaser may have three (3) board seats on the Company's Board of Directors in which there are a maximum of six (6) Directors. |
| Placement Agents: | Such placement agents as the Company may disclose to the Purchaser. Such placement agents shall be compensated on such terms as the Company may agree to in its discretion. |
| Use of Proceeds: | The Company will use the proceeds, net of applicable placement agent fees, for any lawful general business purpose related to the Company. |
| Confidentiality: | Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Term Sheet or the agreements contemplated herein, discussions or negotiations relating to this Term Sheet or the agreements contemplated herein, the performance of its obligations under the agreements contemplated herein or the ownership of the shares purchased under such agreements. |
| Expenses: | Each party to this transaction shall bear its own expenses, including but not limited to legal fees. |

Accepted and agreed to, this ___ day of February,2021, by each of the Parties set forth below:

Company: Visual Technology Innovations, Inc.

By: _Mathu Rajan_

Name: Mathu Rajan

Title: President

Date: **February 10, 2021**

Purchaser: Burlington Resources Asia Limited

By: _[signature]_

Name: Timothy McCarthy

Title: CEO

Date: 10 02 21

# Exhibit B
## -Burlington Investor Rights Agreement-

VTI Investor Rights Agreement 210210

## INVESTOR RIGHTS AGREEMENT

An agreement (this "**Agreement**"), dated as of February 10, 2021(the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "Company") and Burlington Resources Asia Limited, with an address at 20<sup>th</sup>Floor, 88 Gloucester Road, Wanchai, Hong Kong  (the "**Investor**"), with the Company and the Investor together referred to as the "Parties."

**WHEREAS,**The Company desires to issue and sell to the Investor Class A Common Shares ("**Shares**") issued by the Company; and

**WHEREAS,**the Investor desires to purchase the Shares on the terms and conditions set forth in that certain Purchase Agreement by and between Company and Investor as of the date hereof ("**Purchase Agreement**"); and

**WHEREAS,** Company and Investor desire to specify other rights and obligations of both parties with respect to the transactions set forth in the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual promises and covenants hereinafter set forth and for other good and valuable consideration, and intending to be legally bound hereby, the parties hereto agree as follows:

1. Election of Board Members. Upon consummation of the Purchase Agreement for a total of a minimum of five million US dollars (US $5,000,000), the Investorwill be entitled to nominate and elect one duly qualified member to the Board of the Company.If the Investor invests fifteen million US dollars (US $ 15,000,000), the Investor will be entitled to elect up to three duly qualified members to the Board of the Company in which such Board has a maximum of six (6) members. It is currently contemplated that the Board would meet monthly and meetings will be held electronically until further notice.

2. Information Rights. For so long as the Investor owns at least 5% of the Company'sSharesbut before the earlier of (i) closing of an access to the public markets; (ii) merger or acquisition when there is a change of control, the Company shall furnish the Investor:

    a. within 90 days after the end of each fiscal year of the Company but as soon as practicable (x) a balance sheet as of the end of such year, (y) statements of income and of cash flows for such year, and (z) a statement of changes in members' equity as of the end of such year, all such financial statements may be unaudited. The Company will make reasonable and normally accepted arrangements to provide for audited financials thereafter.

    b. within 45 days after the end of each of the first three (3) quarters of each fiscal year of the Company but as soon as practicable, internallyprepared unaudited statements of income and of cash flows for such fiscal quarter, and an unaudited balance sheet as of the end of such fiscal quarter, (except that such financial statements may (x) be subject to normal year-end audit adjustments and (y) not contain all notes thereto that may be required in accordance with GAAP);

c. within 30 days of the start of each new fiscal year but as soon as practicable, a business plan for the new fiscal year, which business plan shall include a budget with underlying assumptions together with updated three-year strategic plans, and promptly after preparation, any revisions to the forecasts contained therein.

3. Inspection Rights. The Company shall permit the Investor, upon 10 days' prior notice to the Company, to visit and inspect the properties of the Company, to examine its corporate and financial records and to discuss its affairs, finances, and accounts with its executive officers, provided that no such inspection shall disrupt or impede the operations of the Company. In exercising its rights of inspection hereunder, the Investor agrees to maintain the confidentiality of all financial and other confidential information of the Company disclosed to it.

4. Miscellaneous.

a. Governing Law and Sole Choice of Jurisdiction. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Nevada, USA without giving effect to the principles of conflict of laws. The Federal and state courts of Las Vegas, NV shall have exclusive jurisdiction over any matters pertaining to this Agreement. Each of the parties (i) irrevocably consents to the jurisdiction and venue of any Federal and state courts of Las Vegas, NV, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than any court set forth herein.

b. Amendment and Waiver. Any provision of this Agreement may be amended, and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only upon the written consent of the Company and the Investor.

c. Entire Agreement. This Agreement constitutes the entire agreement between the parties relative to the specific subject matter hereof. Any previous or contemporaneous agreement or understanding, whether written or oral, among the parties relative to the specific subject matter hereof is superseded by this Agreement.

d. Notices. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by confirmed email, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) the next business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent, as applicable, to the Company or the Investor at the address or facsimile number set forth on the signature page hereof or at such other address as the Company or the Investor may designate by 10 days' advance written notice to the other.

e. Severability. In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity,

VTI Investor Rights Agreement 210210

illegality, or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

f. Counterparts. This Agreement may be executed in two or more counterparts (including facsimile counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

g. Successors and Assigns. The provisions hereof shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto.

h. Titles and Subtitles. The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

i. Termination. Except as provided in this Agreement, the Company's obligations, and the rights of the Investor under this Agreement shall continue in full force and effect through the earlier of the following dates, on which date such rights and obligations shall terminate in their entirety the earlier of: (a) 18 months after the Effective Date;(b) the date of closing of the sale of securities of the Company in a firm commitment underwritten public offering pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") or (c) the date of closing of a sale, lease, or other disposition of all or substantially all of the Company's assets or the Company's merger with or into or consolidation with any other corporation or other entity, or any other corporate reorganization, in which the holders of the Company's outstanding voting securities immediately prior to such transaction own, immediately after such transaction, securities representing less than a majority of the voting power of the corporation or other entity surviving or resulting from such transaction; provided, however, the covenants set forth in paragraph 2 shall terminate and be of no force or effect when the Company first becomes subject to the periodic reporting requirements of the Securities Exchange Act of 1934, as amended, if such date is earlier than the closing of the sale of securities pursuant to a registration statement filed by the Company under the Securities Act.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _Mathu Rajan_
Name:    Mathu Rajan
Title:    President
Address:  1105 William Penn Dr
          Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia
Limited

By: _____
Name:    Timothy McCarthy
Title:    CEO
Address:  Old St. James's Vicarage
          Maxwell Road,
          London SW6 2HR

Exhibit C
-Burlington Investment Subscription Agreement of February 21, 2021-

VTI Stock Purchase Agreement 210210

## STOCK PURCHASE AGREEMENT

An agreement (this "**Agreement**"), dated as of February 10, 2021 (the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

**WHEREAS**, the Company is an entity  formed pursuant to the laws of the State of Nevada USA as a Nevada corporation, and

**WHEREAS,** The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  a class of common stock ("**Common Stock**") having a par value $0.00001 per share which is anticipated will be nullified and replaced on a one-for-one basis with shares of Class A Common Stock by an Amended and Restated Certificate of Incorporation which may soon be filed by the Company with the State of Nevada, such Class A Common Stock  is anticipated to be issued to Investor as a part of this Agreement; and

**WHEREAS**, it is anticipated that a new class of voting only (no economic rights) stock to be known as Class B Voting Stock would be issued to the Company's founder or his wholly-owned entity prior to the issuance of the Class A Common Stock to Investor, such Class B Voting Stock anticipated to have 10:1 voting rights, pursuant to that same Amended and Restated Certificate of Incorporation referenced above , and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor.

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

## TERMS

1)      Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Thirty Million US Dollars ($ 30,000,000) (the "**Purchase Price**") at a price per share of $1.40 per Share

2)      The Investor will deliver to the Company a satisfactory form of proof demonstrating the ready availability of the Purchase Price under the Investor's authority ("**Proof of Funds**").

3)      The Investor will invest one million US dollars (US $1,000,000) in the Shares immediately upon Execution. The funds would be made available in thirty (30) calendar days from Effective Date ("**Initial Closing**").

VTI Stock Purchase Agreement 210210

4)     The Company will present to the Investor a selection of business opportunities ("**Presentation**") with the required amount to fund the opportunity ("**Amount**") at various times during the Term, which has to be closed within twenty (20) business days.The form of the Presentation is shown in **Exhibit A**.

5)     The Initial Closing and each Presentationwill constitute a "**Closing**" and will be considered a part of the Purchase Price. Upon the absence of a Closing, the balance of the Purchase Price available to the Investor that is not yet invested will be reduced by the Amount. Each Closing may be together referred to as "**Closings**".

6)     All Closings should be completed within the earlier of (i) eighteen (18) months from the Effective Date; or (ii) closing of an access to the public markets; or (iii) merger or acquisition when there is a change of control ("**Term**").

7)     The Investor shall pay to the Company in immediately available funds a payment equal to the Amount in each Closing to the Company's bank account ("**Payment**"). The Company's bank wiring instructions are reflected at **Exhibit B**hereto.

8)     In addition, the Company will issue to the Investor 987,839 Shares of the Company immediately on the Effective Date ("**Signing Bonus**").

9)     The Investor will be issued an additional 1,141,230 Shares of the Company if there has not been any further Closings during the Term after the Initial Closing ("**Contingent Bonus**").

10)     The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares will be the date of receipt of funds from each Closing in the designated bank account per Exhibit A.

11)     Use of Proceeds. In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.

## REPRESENTATIONS AND WARRANTIES

12)     Representations and Warranties of the Company. The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a.     Organization. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b.     Capitalization. The Company currently has one class of Common Stock. It is

VTI Stock Purchase Agreement 210210

contemplated in the future that the Company will have two classes of outstanding stock. There will be Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock will be as stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Nevada General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will be fully paid and non-assessable. The fully diluted capitalization of the Company as of close of business January 25, 2020 comprises of 4,349,050 Shares; 5,275,100 warrants that are exercisable into Shares; and 3,500,000 stock options that are exercisable into Shares amounting to a fully diluted total of 13,124,150 Shares.

      c.      Authorization. All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

      d.      Valid Issuance of Shares. The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

      e.      Governmental or Other Consents and Filings. Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

      f.      Litigation. There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

      g.  Intellectual Property. Except as set forth in the Disclosure Schedule:

      i.      The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property")

in all material respects necessary for its business as currently conducted.

      ii.     The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

      iii.     The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

      iv.     All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

      h.     Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

      i.     The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investoracknowledged that it has made its investment based solely on its own due diligence.

      j.     No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

13)     Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

      a.     Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding

obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

      b.      Purchase Entirely for Own Account. Investor confirms that the Sharesare being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

      c.      Securities Laws. The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction. The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons. The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

      d.      Disqualification. Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

      e.      Acknowledgment. Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement. The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment inherent based solely on its own due diligence.Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto. Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its

VTI Stock Purchase Agreement 210210

own independent investigation and verification

## MISCELLANEOUS

14) Miscellaneous.

a. <u>Successors and Assigns</u>. This Agreement may not be assigned by the Investor without the express written consent of the Parties. The provisions hereof shall inure to the benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

b. <u>Expenses</u>. Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

c. <u>Confidentiality</u>. Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

d. <u>Placement Agents</u>. Such placement agents as the Company may disclose to the Investor. Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

e. <u>Governing Law</u>. This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of NevadaUSA without giving effect to any choice or conflict of law provision or rule (whether of the State of NevadaUSA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

f. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

g. <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

h. <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to

VTI Stock Purchase Agreement 210210

the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

i.  Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

j.  Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

k.  Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

l.  Entire Agreement. This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

m.  Dispute Resolution; Waiver of Jury Trial. The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR

VTI Stock Purchase Agreement 210210

THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n.    Publicity.  The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state

performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(1) Association with an entity regulated by such commission, authority, agency, or officer;

(2) Engaging in the business of securities, insurance or banking; or

(3) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

VTI Stock Purchase Agreement 210210

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

VTI Stock Purchase Agreement 210210

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |

Governmental or Other Consents and Filings

No exceptions

Litigation                    The Company does not believe at this time that any claims are material to the Company's business or ongoing operations.

| | |
|---|---|
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

VTI Stock Purchase Agreement 210210

## PRIVACY AND CONSENT
### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data,as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

VTI Stock Purchase Agreement 210210

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or thesharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**

VTI Stock Purchase Agreement 210210

### Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

VTI Stock Purchase Agreement 210210

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _Mathu Rajan_

Name:    Mathu Rajan
Title:    President
Address:  1105 William Penn Dr
         Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia Limited

By: _____

Name:    Timothy McCarthy
Title:    CEO
Address:  Old St. James's Vicarage,
         Maxwell Road,
         London SW6 2HR, UK

VTI Stock Purchase Agreement 210210

## ACCREDITED INVESTOR CERTIFICATION

### For Individual Investors Only
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

Initial _____    I certify thatI have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

Initial _____    I certify thatI have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

### For Non-Individual Investors
**(all Non-Individual Investors must *INITIAL* where appropriate):**

Initial _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

Initial _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

Initial _____    The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

Initial _____    The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

Initial _____    The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

Initial _____    The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

Initial _____    The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

Initial _____    The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

Initial _____    The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Initial _____    The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

Initial _____    The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1]For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

VTI Stock Purchase Agreement 210210

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth: _____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth: _____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:
_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Stock Purchase Agreement 210210

### Section B – Entity Investor Information

Investor Name(s): Burlington Resources Asia Limited

Authorized Individual executing Profile or Trustee: Timothy McCarthy

Social Security Numbers / Federal I.D. Number: _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust) _____

Type of Business: Investment Holding Company

Street Address: 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong

City, State & Zip Code: _____

Phone: _____+44 7768943655    Fax: _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / Outside Broker/Dealer: Knight-Davis Associates LLP

VTI Stock Purchase Agreement 210210

# EXHIBIT A

Form of Presentation

1. Presentation of the opportunity
2. Cost of the opportunity
3. Subscription agreement for Shares with date of wire

# EXHIBIT B

## Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |

## Bank Wire Instructions for Payment to Company

| | |
|---|---|
| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: ███ 5235<br>Routing/ABA Number: 121000248 |

VTI Stock Purchase Agreement 210210

| International Wire | Account:        5235 |
| | SWIFT: WFBIUS6S |

# Exhibit D
## -$300m Amendment-

VTI Stock Purchase Agreement 210506

## AMENDED STOCK PURCHASE AGREEMENT

An amended agreement ("**Agreement**"), dated as of  May 6, 2021 (the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong   (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

**WHEREAS**, the Company is an entity  formed pursuant to the laws of the State of Nevada USA as a Nevada corporation, and

**WHEREAS,** The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  Class A Common Stock ("**Shares**") having a par value $0.00001 per share to be issued to Investor as a part of this Agreement; and

**WHEREAS**, Class B Voting Stock has been issued to the Company's founder or his wholly-owned entity, such Class B Voting Stock enjoys 10:1 voting rights, pursuant to the Amended and Restated Certificate of Incorporation, and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor; and

**WHEREAS**, the Parties have had several other agreements and modifications executed between themselves prior to the Effective Date (the "**Prior Agreements**") and two of the Prior Agreements were  Stock Purchase Agreements dated as of Feb 10, 2021 and May 3, 2021 (the "**Prior Stock Purchase Agreements**").

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.


## TERMS

1)      The Prior Stock Purchase Agreementis are hereby amended in their entirety and replaced by this Agreement.

2)      Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of One Hundred and Eighty Million US Dollars ($ 180,000,000) (the "**Investment Amount**") and an optional Accelerated Investment of up to One Hundred and Twenty Million US Dollars (US $120,000,000) for a total of Three Hundred Million US Dollars (US $300,000,000).

3)      The Investment Amount is split into three (3) tranches of Sixty Million US Dollars (US $60,000,000) each a ("**Tranche**") with the first Tranche invested on or before May 24, 2021; the

VTI Stock Purchase Agreement 210506

second Tranche invested on or before May 31, 2022; and the third Tranche invested on or before May 31, 2023 (each a "**Closing**" and together the "**Closings**"). Each Tranche, when combined with each other Tranche, shall be referred to as the "**Tranches**." Each Closing has a 7 business-day cure period in case the funds are not received by the Company by the date of the Closing.

4) The Investor retains an option for 60 days from the first Closing ("**Accelerated Period**") to accelerate the investments from the second and third Closings to occur within the Accelerated Period ("**Accelerated Investment**"). The second and third Closings will remain an option for the Investor even in the event of an Accelerated Investment.

5) The price per Share at the first Closing is to be $1.40 per Share and the for each subsequent Closing is a twenty-five percent (25%) discount to the last transacted price per Share for the Company at the time of Closing.

6) The validity of the Agreement is not subject to the execution of the first Closing, but binding and irrevocable upon execution of this Agreement.

7) The Investor shall pay to the Company in immediately available funds a payment equal to the Investment amount for each Closing to the Company's bank account ("**Payment**") by executing the exercise form reflected at Exhibit A hereto.

8) The purchase and sale of the Shares of each Tranche shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares of each Tranche will be the date of receipt of funds from each Closing in the designated bank account per **Exhibit B hereto.**

9) Use of Proceeds. In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.

## REPRESENTATIONS AND WARRANTIES

10) Representations and Warranties of the Company. The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a. Organization. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b. Capitalization. The Company currently has two classes of outstanding stock. There is Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock are stated in the Amended and Restated Certificate of Incorporation and as otherwise provided by the Nevada General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will be fully

VTI Stock Purchase Agreement 210506

paid and non-assessable. The fully diluted capitalization table of the Company will be provided prior to each Closing.

c. Authorization. All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

d. Valid Issuance of Shares. The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

e. Governmental or Other Consents and Filings. Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

f. Litigation. There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

g. Intellectual Property. Except as set forth in the Disclosure Schedule:

i. The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property") in all material respects necessary for its business as currently conducted.

ii. The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

iii. The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility

VTI Stock Purchase Agreement 210506

exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

iv. All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

h. Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

i. The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investor acknowledged that it has made its investment based solely on its own due diligence.

j. No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

11) Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

a. Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

b. Purchase Entirely for Own Account. Investor confirms that the Shares are being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of

VTI Stock Purchase Agreement 210506

selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

     c.    Securities Laws. The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction. The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons. The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

     d.    Disqualification. Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

     e.    Acknowledgment. Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in this Agreement. The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence. Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto. Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its own independent investigation and verification

## MISCELLANEOUS

12)    Miscellaneous.

     a.    Successors and Assigns. This Agreement may not be assigned by the Investor without the express written consent of the Parties. The provisions hereof shall inure to the

VTI Stock Purchase Agreement 210506

benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

b.     <u>Expenses</u>. Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

c.     <u>Confidentiality</u>. Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

d.     <u>Placement Agents</u>. Such placement agents as the Company may disclose to the Investor. Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

e.     <u>Governing Law</u>. This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of Nevada USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada USA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

f.     <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

g.     <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

h.     <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

i.     <u>Amendments and Waivers</u>. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

VTI Stock Purchase Agreement 210506

    j.      Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

    k.      Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

    l.      Entire Agreement. This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

    m.      Dispute Resolution; Waiver of Jury Trial. The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL

VTI Stock Purchase Agreement 210506

NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n. Publicity. The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(1) Association with an entity regulated by such commission, authority, agency, or officer;

(2) Engaging in the business of securities, insurance or banking; or

VTI Stock Purchase Agreement 210506

(3) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

VTI Stock Purchase Agreement 210506

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |
| Litigation | The Company does not believe at this time that any claims are material to the Company's business or ongoing operations. |
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

Page 10 of 20

VTI Stock Purchase Agreement 210506

## PRIVACY AND CONSENT
### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

Page 11 of 20

VTI Stock Purchase Agreement 210506

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or the sharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**

VTI Stock Purchase Agreement 210506

**Form of Consent**

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

Page 13 of 20

*MR  TM*

VTI Stock Purchase Agreement 210506

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**

Visual Technology Innovations, Inc.

By: _Mathu Rajan_

Name:   Mathu Rajan
Title:    President
Address:  1105 William Penn Drive
           Philadelphia, PA 19020

**INVESTOR**

Burlington Resources Asia Limited

By: 

Name:   Timothy McCarthy
Title:    CEO
Address:  Old St. James's Vicarage,
           Maxwell Road,
           London SW6 2HR, UK

VTI Stock Purchase Agreement 210506

## ACCREDITED INVESTOR CERTIFICATION

**For Individual Investors Only**
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

**Initial** _____    I certify that I have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

**Initial** _____    I certify that I have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

**For Non-Individual Investors**
**(all Non-Individual Investors must *INITIAL* where appropriate):**

**Initial** _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

**Initial** _____    The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

**Initial** _____    The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

**Initial** _____    The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

**Initial** _____    The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

**Initial** _____    The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

**Initial** _____    The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

**Initial** _____    The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

**Initial** _____    The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

**Initial** _____    The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

**Initial** _____    The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1] For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

VTI Stock Purchase Agreement 210506

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth:_____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth:_____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:

_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

Page 16 of 20

VTI Stock Purchase Agreement 210506

## **Section B – Entity Investor Information**

Investor Name(s):  Burlington Resources Asia Limited

Authorized Individual executing Profile or Trustee:  Timothy McCarthy

Social Security Numbers / Federal I.D. Number: _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust) _____

Type of Business:  Investment Holding Company

Street Address:  20th Floor, 88 Gloucester Road, Wanchai, Hong Kong

City, State & Zip Code: _____

Phone: _____+44 7768943655    Fax: _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / Outside Broker/Dealer:  Knight-Davis Associates LLP

VTI Stock Purchase Agreement 210506

## EXHIBIT A

### FORM OF EXERCISE FOR TRANCHE _____, CLOSING _____

**TO: VISUAL TECHNOLOGY INNOVATIONS, Inc.**

ATTENTION: LEGAL

**(1)** The undersigned hereby elects to purchase _____ Shares of Visual Technology Innovations, Inc. (the "**Company**") in the name of the Investor at a price of US $_____ per Share for a total value of US $_____ pursuant to the terms of the attached Agreement, and tenders herewith Payment in full, together with all applicable transfer taxes, if any.

**(2)** The undersigned represents that (i) the aforesaid Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such Shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the Shares issuable upon exercise of this Warrant have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid Shares may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the Shares for the number of years prescribed by Rule 144, that among the conditions for use of the Rule is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid Shares unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel satisfactory to the Company, stating that such registration is not required.

_____        _____
(Date)                                          (Signature)

                                                _____
                                                (Print name)

Page 18 of 20

VTI Stock Purchase Agreement 210506

**EXHIBIT B**

## Bank Wire Instructions for Payment to Company

| | |
|---|---|
| Bank | Wells Fargo Bank NA |
| | 420 Montgomery |
| | San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc. |
| | 1105 William Penn Drive |
| | Bensalem, PA 19020 |
| Domestic Wire | Account: ███ 5235 |
| | Routing/ABA Number :121000248 |
| International Wire | Account: ███ 5235 |
| | SWIFT: WFBIUS6S |

VTI Stock Purchase Agreement 210506

## Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |

# Exhibit E
## -$500m Amendment-

BRAL-VTI Amendment to Stock Purchase Agreement 210506

## AMENDMENT

THIS AMENDMENT ("**Amendment**"), dated as of May 10, 2021 is between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong (the "**Investor**") and amends the Stock Purchase Agreement executed on or about May 6, 2021 ("**Agreement**"). All capitalized terms not herein defined shall have the meaning ascribed to them in the Agreement. The Company and the Investor together referred to as the "**Parties**."

## W I T N E S S E T H

**WHEREAS**, the Company and the Investor wish to amend the Agreement

**NOW THEREFORE**, the Parties hereto, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby agree to amend the Agreement as follows:

1)      Unless otherwise specified herein, each term used herein that is defined in the Agreement, shall have the meaning assigned to such term in the Agreement.

2)      Section 2 of the Agreement is amended in its entirety and will henceforth read as follows:

> Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Five Hundred Million US Dollars (US$ 500,000,000) (the "**Investment Amount**").

3)      Section 3 of the Agreement is amended in its entirety and will henceforth read as follows:

> a.  The Investment Amount is split into five (5) separate tranches ("**Tranche**"). The first Tranche for an amount of Sixty Million US Dollars (US $60,000,000) invested on or before May 24, 2021; the next four (4) Tranches of One Hundred and Ten Million US Dollars (US $110,000,000) each invested a month from the prior Tranche (each a "**Closing**" and together the "**Closings**"). Each Tranche, when combined with each other Tranche, shall be referred to as the "**Tranches**." Each Closing has a 7 business-day cure period in case the funds are not received by the Company by the date of the Closing.

4)      Section 4 of the Agreement is voided.

5)      Except as expressly amended by this Amendment, the provisions of the Agreement, shall remain in full force and effect.

## SIGNATURE PAGE FOLLOWS

BRAL-VTI Amendment to Stock Purchase Agreement 210506

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed on the date first written above.

**COMPANY**

Visual Technology Innovations, Inc.

By: _Mathu Rajan_

Name:     Mathu Rajan
Title:      President
Address:  1105 William Penn Drive
             Philadelphia, PA 19020

**INVESTOR**

Burlington Resources Asia Limited

By: _____

Name:     Timothy McCarthy
Title:      CEO
Address:  Old St. James's Vicarage,
             Maxwell Road,
             London SW6 2HR, UK

# Exhibit F
## -Email of McCarthy Prior Accomplishments-

From: Timothy McCarthy <tim@burlingtonresources-asia.com>
Date: Feb 13, 2021, 4:14 AM -0500
To: Mathu Rajan <mathu.rajan@vti-global.com>
Subject: Timothy McCarthy CV


Mathu,


I raised and invested 500 m $ in Sweta Estates Private Ltd. in 2008. It is one of the premier residential developers in Delhi and has built upscale residences in Gurgaon, a satellite city SW of New Delhi. Sweta operates under the brand Central Park which has a reputation for luxury and aspirational living for the upper echelons of Indian society and expats. I served on the Board of Sweta reporting to the Group CEO AMARJIT BAKSHI.

I invested and raised 750 m $ in Bangkok Land a major property developer in Bangkok, Thailand which enabled it to complete an integrated community with retail, hospitality and commercial and entertainment complexes in Muang Thong Thani, a northern suburb of Bangkok. In addition Bangkok Land owns IMPACT which consists of arenas, exhibition halls and one of the largest convention centres in Asia. It is a landmark property in Thailand and hosts all key events in the country. I worked closely with the Group Chairman recently deceased Anant Kanjanapas.


I invested US $ 75 million with a consortium in Richard Branson's record producing company V2 which he established after the sale of Virgin Records to Thorn EMI. I was on the board of V2.

I also invested I. and served on the Board of Richard Branson's companies that were involved in Cosmetics and a rival to Bodyshop and Virgin Jeans.

In my business career I have worked with Sovereign Funds, Hedge Funds, Captains of Industry, Political Leaders and a range of HNW and Family Offices with a special focus on Asia.

Best regards,


Tim McCarthy

CEO
Burlington Resources Asia Limited

# Exhibit G
## -Burlington Bank Statement-

**DBS**

**Account Details**

| Account Number : | - USD | Account Name : | BURLINGTON RESOURCES ASIA LIMITED - USD |
| --- | --- | --- | --- |

**Product Type :** FOREIGN CCY SAVINGS ACCOUNT

| Opening Balance : | 103,032,089.05 | 04-Feb-2021 | Earmark Amount : | 0.00 |
| --- | --- | --- | --- | --- |
| Ledger Balance : | 103,018,435.47 | 24-Feb-2021 | Overdraft Limit : | 0.00 |
| Available Balance : | 103,018,435.47 | 24-Feb-2021 | | |

| Date | Value Date | Transaction Details | Debit | Credit | Running Balance |
| --- | --- | --- | --- | --- | --- |
| 06-Feb-2021 | 06-Feb-2021 | TRANSFER REMITTANCE 08070N0263042 Mgt Fee Jan UNION ALPHA C.P.A Mgt Fee Jan UETR Ref b9327e7b-3ed9-4b0e-b5a4-12deea0ae88a | 13,627.10 | | 103,018,461.95 |
| 06-Feb-2021 | 06-Feb-2021 | TRANSFER REMITTANCE CHARGES 08070N0263042 Mgt Fee Jan UNION ALPHA C.P.A Mgt Fee Jan UETR Ref b9327e7b-3ed9-4b0e-b5a4-12deea0ae88a | 7.07 | | 103,018,454.88 |
| 07-Feb-2021 | 07-Feb-2021 | TRANSFER BK CHG 0I0263042 | 19.41 | | 103,018,435.47 |

| | Total Debit Count : | 3 | Total Debit Amount : | 13,653.58 |
| --- | --- | --- | --- | --- |
| | Total Credit Count : | 0 | Total Credit Amount : | 0.00 |

Transactions performed on a non-working day will be posted on the next working day.
If date requested is a non business day, please select the next business day to view your transactions.

**END OF REPORT**

# Exhibit H

## -Knight Asia Comfort Letter-



# KNIGHT ASIA LIMITED

10B, Shun Ho Tower, 24-30 Ice House Street, Central, Hong Kong
Tel: (852) 2509 9000    Fax: (852) 2509 3718

STRICTLY PRIVATE AND CONFIDENTIAL

18 February 2020

Visual Technology Innovations, Inc., ("VTI")
1105 William Penn Drive,
Philadelphia, PA 19020
USA.

Attention : Mathu Rajun, President

Dear Sir,

We confirm that we are ready, willing and able upon the express instructions of our client Burlington Resources FZE ( a wholly owned subsidiary of Burlington Resources Asia Limited) to make a payment of  US$ 30  million from our bank DBS, Singapore to purchase certain shares in VTI subject to the terms and conditions in the Stock Purchase Agreement of 10 February 2021.

Please take note that in issuing this letter, we do not assume any obligation to notify you or inform you  of any developments subsequent to this date that might render the contents above untrue or inaccurate in whole or in part at such later time.

This letter may be verified and authenticated at our offices.

Yours faithfully,

Mr. Jeremy King, Director

KNIGHT ASIA GROUP