IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK L. BUNCE, *Plaintiff*, | : <br> : <br> : |
| v. | : CIVIL ACTION <br> : NO. 23-1740 |
| VISUAL TECHNOLOGY INNOVATIONS, INC., and MATHU RAJAN, *Defendants*. | : <br> : <br> : <br> : |

### MEMORANDUM

This litigation has been a long one. What should have been a simple breach of contract and fraud case has spiraled into a years-long controversy involving discovery disputes, bankruptcies, and sanctions. This particular opinion goes to the heart of this case: the claims. For the reasons below, Plaintiff Mark L. Bunce and Defendants Visual Technology Innovations, Inc. ("VTI") and Mathu G. Rajan's motions for summary judgment are both granted in part and denied in part.

### I. BACKGROUND

The Court need not recite this case's entire procedural history. For purposes of this opinion, both parties last year filed motions of summary judgment on Plaintiff's breach of contract, unjust enrichment, and fraudulent inducement claims. One day before this Court was to hold a hearing on the motions, both Defendants filed suggestions of bankruptcy. ECF No. 128. Consequently, the case was stayed against Defendants and the Court did not hear argument on the motions for summary judgment. ECF No. 142. Upon learning that the Defendants' bankruptcy proceedings had concluded, the Court entered an order lifting the stay. ECF No. 165. On August 27, 2025, a hearing was finally held for argument on the motions for summary judgment.

1

Despite the long history of this case, the facts underlying it are straightforward. Plaintiff alleged that Defendants induced Plaintiff to loan $1,050,000 to Mr. Rajan's company, Visual Technology Innovations, Inc. ("VTI"). On February 17, 2021, Glen Davis, an undisputed agent of VTI, sent Plaintiff an Investor Presentation of VTI. ECF No. 108-19 [hereinafter Investor Presentation]; ECF No. 108-4 ¶ 20; Hearing Transcript at 50-51. The Investor Presentation conveyed that Plaintiff's contribution would be a precursor investment "to finance the purchase orders, fulfillment and shipping of current orders of 5,000 off Glasses Free 3-D 8" Tablets and 5 off 250" large exterior signage screens . . . plus the ever present expensive lawyers." Investor Presentation at 46. After which, an institutional investor was to invest $30 million to enable the acquisition of "a company in the sector." *Id.* The company to be acquired was Stream TV Networks, Inc., of which Mr. Rajan was owner and CEO. Stream TV had filed for Chapter 11 bankruptcy in both Delaware and Pennsylvania. *In re Stream TV Networks, Inc.*, Case No. 21-10433, U.S. Bankr. Ct. for Dist. of Del.; *see In re Stream TV Networks, Inc.*, BR 23-10763 (MDC), 2024 WL 87639. The ultimate goal was to take VTI public via a reverse merger with Stream TV. Investor Presentation at 34.

To loan the $1,050,000 amount, Plaintiff and VTI executed Convertible Notes on February 25, March 8, and May 4 of 2021. ECF Nos. 108-5, 108-8, 108-11. Respectively, Plaintiff wired $150,000 to VTI on February 25, 2021, $850,000 on March 8, 2021, and $50,000 on May 4, 2021. ECF No. 108-7. Plaintiff loaned this money in consideration of his right to convert his loans into shares in VTI at a favorable set price if VTI went public. The parties amended the March 8, 2021 Convertible Note on April 5, 2021, and amended the February 25, 2021 Convertible Note on November 23, 2021. ECF Nos. 108-9, 108-12 [hereinafter Amendment to Note]. If both the merger and public offering did not occur, then the Amendment to Note's repayment schedule for

the $1,050,000 would kick in. Amendment to Note at 2. The Amendment to Note stated that if VTI missed any of the payment dates, it would have a five-day cure period to get back on schedule or else the whole of the remaining debt would be due immediately. *Id*. VTI did not go public by the date of the first repayment deadline. After the first repayment deadline came and went, Plaintiff demanded that VTI repay the $1,050,000 amount. ECF No. 108-13. VTI never did.

Recently, Defendants obtained new counsel. New counsel for Defendants have attempted to usher in new evidence. ECF No. 171. For instance, counsel wants this Court to consider the declaration of Charles M. Robertson almost a year after Defendants first filed their motion for summary judgment. Not only is Defendants' new evidence untimely, but it is also improper. Mr. Robertson was never disclosed in the Rule 26 initial disclosures. Defendants cannot now introduce testimony of witnesses, who were never initially disclosed, for the purpose of creating a dispute of fact with their own previous discovery responses. Thus, the Court will not entertain Defendants' new submissions, and the facts as stated above are the applicable facts.

## II. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is warranted "if the movant shows there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The nonmovant can defeat summary judgment by alleging "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A factual dispute is genuine if evidence in the record would permit a reasonable jury to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome. *Id*. The nonmovant must show more than a "mere scintilla of evidence" to defeat summary judgment. *Id*. at 252. For each particular motion, this

Court views the facts in light most favorable to the nonmovant and draws reasonable inferences for the nonmovant. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022). Credibility determinations and weighing of the evidence are matters reserved to the jury. *Anderson*, 447 U.S. at 255.

### B. FEDERAL RULE OF CIVIL PROCEDURE 37

Rule 37(b)(2)(A) permits a district court to impose sanctions on a party for failure to comply with a discovery order. This Court may:

> (i) direct that designated facts shall be taken as established in favor of the prevailing party;
> (ii) prohibit the disobedient party from supporting or opposing designated claims or defenses or from introducing designated matters in evidence;
> (iii) strike pleadings in whole or in part;
> (iv) stay further proceedings until the order is obeyed;
> (v) dismiss the action or proceeding in whole or in part;
> (vi) render a default judgment against the disobedient party; or
> (vii) treat the failure to obey the order as a contempt of court.

FED. R. CIV. P. 37(b)(2)(A)(i)-(vii).

## III. DISCUSSION

Both parties have moved for summary judgment on Plaintiff's breach of contract, unjust enrichment, and fraudulent inducement claims. For breach of contract, Plaintiff's motion is granted, and Defendants' motion is denied. For unjust enrichment, Plaintiff's motion is denied, and Defendants' motion is granted in part. For fraudulent inducement, Plaintiff's motion is granted, and Defendants' motion is denied.

### A. BREACH OF CONTRACT

A federal court sitting in diversity applies state substantive law and federal procedural law. *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). This Court will uphold the Nevada choice of law provision in the Amendment to Note because VTI was organized under Nevada law. *Cottman Transmission Sys., Inc. v. Melody*, 869 F. Supp. 1180, 1184 (E.D. Pa. 1994). Nevada and

4

Pennsylvania's elements for breach of contract do not materially differ. *Compare Contreras v. Am. Family Mut. Ins. Co.*, 135 F. Supp. 3d 1208, 1224 (D. Nev. 2015) *with Hanna v. Lincoln Fin. Grp.*, 498 F. Supp. 3d 669, 684 (E.D. Pa. 2020). Both parties concur that Nevada law applies. ECF No. 108-2 at 15 [hereinafter Pl.'s Mot. for Summ. J.]; ECF No. 107-1 at 8 [hereinafter Def.s' Mot. for Summ. J.].

To establish a breach of contract claim, a party must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach. *Richardson v. Jones*, 1 Nev. 405, 408-09 (1865). There are numerous contracts at play here, but the relevant contract for this claim is the latest contract: the November 23, 2021 Amendment to Note, which amended the maturity date of the notes and provided a repayment schedule. *See* Amendment to Note. Contrary to VTI's argument that this amendment lacked consideration, the Amendment to Note permitted Plaintiff to convert 7,000,000 optional warrants for shares in VTI at a favorable rate, in consideration for VTI's right to repay its loans to Plaintiff in installments if needed. Therefore, the Court finds sufficient consideration and recognizes the November 23, 2021 Amendment to Note as a valid contract. *Cain v. Price*, 134 Nev. 193, 195 (2018) ("where a party's promise, offered as consideration, differs from that which it already promised, there is sufficient consideration to support the subsequent agreement.").

It is indisputable that VTI breached the Amendment to Note. Quite revealing, new counsel for VTI did not advance an argument at the August 27, 2025 hearing against Plaintiff's breach of contract claim. Hearing Transcript at 43-44. VTI never paid back the first installment of the loan by December 23, 2021 or within five days after. Plaintiff counsel noted at the August 27, 2025 hearing that VTI recently and unilaterally wired $30,000 to Plaintiff's overseas account. Hearing Transcript at 13. But such fact is only relevant for damages, not for breach. VTI's $30,000

payment in 2025 does not remedy the $1,050,000 principal amount it was to pay in 2021 per the terms of the Amendment to Note. Due to VTI's breach, Plaintiff has suffered $1,020,000 in compensatory damages, the principal amount that VTI has not repaid.

As required by Nevada law, Plaintiff shall also receive mandatory prejudgment interest. *See Schoepe v. Pac. Silver Corp.*, 111 Nev. 563, 567 (1995) (under N.R.S. 99.040 "interest is recoverable as a matter of right upon money due from contracts"); *see also Nippo Corp./Int'l Bridge Corp. v. AMEC Earth & Envtl., Inc.*, 2013 WL 1311094, at *64 (E.D. Pa. Apr. 1, 2013) (applying Nevada Law). As declared in the order accompanying this opinion, Plaintiff shall submit to the Court an accounting of a prejudgment interest award.

### B. RULE 37 SANCTIONS

Prior to ruling on the remaining two counts—unjust enrichment and fraudulent inducement—the Court will decide two issues that impact the claims' outcomes. The first issue is whether this Court will impose Rule 37(b)(2)(A) sanctions on Defendants for failure to obey a discovery order.

The list of available Rule 37(b)(2)(A) sanctions is not exhaustive, and imposing sanctions is "generally entrusted to the discretion of the district court."[1] *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 580 (3d Cir. 2018). However, "Rule 37(b)(2)(A) is not equivalent to carte blanche; it limits courts' discretion in two ways: First, any sanction must be just; second, the sanction must be specifically related to the particular claim which was at issue in the order to provide discovery." *Id.* (internal quotations omitted). "[U]nproduced discovery [must] be sufficiently material to the administration of due process to support a presumption that the failure to produce constituted an admission by the offending party that its asserted claim or defense lacked merit." *Id.* at 581; *see*

---

[1] In addition, a court must order the disobedient party to pay reasonable expenses, including attorneys' fees, caused by the failure to comply. FED. R. CIV. P. 37(b)(2)(C). This Court has already done so. ECF No. 155.

6

*also Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) (a court must "ensure that the sanction is tailored to address the harm identified.")

On August 13, 2024, this Court granted in part Plaintiff's motion to compel certain discovery and ordered Defendants to explain "how VTI used and spent the $1,050,000 that plaintiff provided to VTI, or, in the alternative, [explain] how VTI used and spent all of its money, identifying all dates, recipients, amounts and documentation as to each transfer or transaction involving any portion of such funds." ECF No. 87. On January 8, 2025, this Court sanctioned then-attorney for Defendants, Attorney Raja Rajan, for failing to comply with the discovery order. ECF No. 130. At that time, a stay was placed on the case given the Defendants' bankruptcies. Since that time, the stay has been lifted but Defendants have still not complied with the discovery order. The spreadsheet that Attorney Rajan shared with Plaintiff ostensibly contains all VTI's transactions, but it still does not provide the underlying documentation of the transactions as required by the order. New defense counsel do not contest that Defendants did not comply with the discovery order. Hearing Transcript at 38-39.

As punishment for Defendants continued non-compliance with the order, Plaintiff requested sanctions under Rule 37(b)(2)(A)(i); specifically, that Mr. Rajan be deemed to have (i) "personally controlled the money that Mr. Bunce loaned to VTI," (ii) "used that money for his own personal benefit and to the detriment of VTI," and (iii) "used that money for purposes that contradicted the presentations that Mr. Rajan and his agents made to Mr. Bunce to induce him to loan the money." Hearing Transcript at 8. Essentially, Plaintiff requested that VTI be deemed the alter ego of Mr. Rajan, that Mr. Rajan was unjustly enriched, and that he fraudulently induced Mr. Bunce. In the event this Court denies Plaintiff's motion for summary judgment on the unjust enrichment and fraudulent inducement claims, Plaintiff requested that this Court impose sanctions

7

under Rule 37(b)(2)(A)(ii) and bar Defendants "from putting up any evidence to rebut" Plaintiff's claims. Hearing Transcript at 57-58. Defense counsel requested a lesser sanction that a negative inference be submitted to the jury that VTI used Mr. Bunce's "funds for purposes other than the business purposes agreed to." Hearing Transcript at 45. Defendants argued that inferring that Mr. Rajan used Mr. Bunce's funds "for his personal purposes is one removed." *Id.* They reasoned that the non-disclosed discovery materials were records of VTI, not Mr. Rajan, and so the negative inference should be against VTI only. *Id.*

If the Court were to award Plaintiff's preferred sanctions under Rule 37(b)(2)(A)(i), that would equate to Plaintiff's preferred disposition of the claims. The Court is not willing to impose such severe sanctions without stronger evidence of Mr. Rajan's personal fault in violating the Court's discovery order. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). Rather, the Court imposes the lesser sanction under Rule 37(b)(2)(A)(ii) on Defendants for their failure to comply with the discovery order. *Victaulic Co. v. HiTHERM*, LLC, No. CV 21-5077, 2024 WL 1364258, at *5 (E.D. Pa. Mar. 28, 2024) (finding the lesser sanction of Rule 37(b)(2)(A)(ii) to be more appropriate than Rule 37(b)(2)(A)(i), under the circumstances). Specifically, Defendants are prohibited from introducing evidence opposing Plaintiff's unjust enrichment and fraudulent inducement claims.

### C. ALTER EGO

The second threshold issue this Court must decide before ruling on the unjust enrichment and fraudulent inducement claims is whether VTI was an alter ego of Mr. Rajan.

There is no actual conflict between Pennsylvania and Nevada law on these claims. *Compare Mortimer v. McCool*, 667 Pa. 134, 148 (2021) *with LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904 (2000); *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). Plaintiff

briefed his arguments under Nevada law, without any objections from Defendants, so this Court applies Nevada law. Pl.'s Mot. for Summ. J. at 21.

The elements of finding an alter ego are: "(1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice." *LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904 (2000). The following factors may indicate an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities. *Id*. The elements of an alter ego must be established by a preponderance of the evidence. *Id*. "There is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 602 (1987). Here, the undisputed facts conclude that Mr. Rajan was indeed the alter ego of VTI.

### i. Mr. Rajan was VTI's Majority Shareholder and Sole Officer.

Mr. Rajan's control over VTI is demonstrated by his officer positions and ownership stake in VTI. Mr. Rajan was VTI's sole officer. He was its President, Treasurer, Secretary, as well as its majority shareholder. *Id*. ¶¶ 4-5; ECF No. 108-15; *LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 904-05 (2000) ("ownership of corporate shares is a strong factor favoring unity of ownership and interest"). Thus, Mr. Rajan's structural control over VTI weighs in favor of finding alter ego status. *LFC Mktg.*, 116 Nev. At 904-05 (a defendant, who considered himself to be "president and CEO" and the "primary owner" of a company, was the alter ego of the company).

### ii. VTI's Other Directors do not Shield Mr. Rajan from Alter Ego Status.

Although VTI had other directors besides Mr. Rajan, the timing of their appointment cancels out this fact as favorable for Mr. Rajan. For background, Mr. Rajan was VTI's sole director as of January 6, 2021. Three other directors—Tracy Rees, Glenn Hasen, and Cliff Morton—were all appointed on April 7, 2021. Their end dates as directors are undocumented. Two other directors—Timothy McCarthy and Sofia Kheddouci—served as directors from April 28, 2021, to October 28, 2021. Defs. Interrog. Resp. ¶ 6. The only actions these directors took were to appoint other directors and to approve a debtor-in-possession financing term sheet so VTI could loan money to Stream TV. *Id.* ¶ 7; ECF No. 108-18; ECF No. 108-20. But before any other directors were appointed to the VTI board, VTI loaned $300,000 of Plaintiff's funds, against their agreement,[2] to Stream TV on March 24, 2021. At that time, Mr. Rajan was VTI's sole director. Therefore, VTI's subsequent appointment of five directors does not rehabilitate a finding against alter ego status, especially when Mr. Rajan—who was VTI's sole director, officer, and majority shareholder at the time of Plaintiff's $300,000 loan—subsequently loaned these funds to Stream TV, a company Mr. Rajan founded and was CEO.

### iii. VTI had no Parent or Subsidiary Companies.

Although not sufficient on its own, VTI's lack of parent or subsidiary companies may indicate that VTI was being used as a mere instrumentality of Mr. Rajan. Defs. Interrog. Resp. ¶¶ 1-2. Where a more complex corporate structure may have provided checks and balances on any one person controlling VTI's finances and operations, a simple and unlayered structure may permit an easier pathway to personal control and breakdown of corporate formalities. Thus, the lack of

---

[2]   *See* discussion *infra* Section III.E.

parent or subsidiary relationships may reinforce the inference that VTI was not operating as its own entity, but merely as an alter ego of Mr. Rajan.

### iv. VTI had no Employees and Substantially Underdelivered on Sales.

Moreover, there were no employees of VTI,[3] and VTI never used accounting services. Defs. Interrog. Resp. ¶¶ 3, 12. This suggests that VTI lacked the operational independence expected of a company that planned to sell 3-D tablets and screens in order to finance VTI's prospects to go public. Those prospects are called into doubt as VTI only sold five tablets for $5,999.13. *Id.* ¶ 14. The lack of internal personnel bolsters a finding that VTI was ill-equipped to manage its own affairs or maintain its stated goal to sell tablets and screens to finance its transition to a public entity. VTI's low sales is evidence that VTI instead existed to further Mr. Rajan's personal interest to fund Stream TV's bankruptcy proceedings, an entity of which Mr. Rajan was the founder, shareholder, and CEO.

Plaintiff also claimed that commingling is a factor weighing in favor of finding VTI to be Mr. Rajan's alter ego. However, VTI commingled Plaintiff's funds with other investor money. Pl.'s Mot. for Summ. J. at 22. Commingling investor funds is not the same as commingling company funds with personal funds. In any event, the Court finds that the above undisputed facts establish VTI as Mr. Rajan's alter ego. *Carson Meadows Inc. v. Pease*, 91 Nev. 187, 191 (1975). Honoring VTI's superficial separateness from Mr. Rajan would promote injustice by barring Plaintiff from proceeding with his unjust enrichment and fraudulent inducement claims for actions Mr. Rajan committed through VTI.

---

[3] Defense counsel tried to argue otherwise on a technicality; specifically, that the interrogatory question was phrased in the present tense. Hearing Transcript at 44. Counsel argued that at the time that VTI answered the interrogatory, January 2024, Mr. Rajan was the only officer, but the relevant time would have been three years earlier at the time of the alleged misconduct. *Id.* Once again, the Court is not convinced by Defense counsel's attempts to clean up past discovery. The interrogatory states "Please identify all employees of Visual Technology Innovations, Inc. by name, position, date of hire, *end date of employment (if any)*, annual salary or hourly wage[,]" clearly indicating that the question did not have a temporal qualification. Defs. Interrog. Resp. ¶ 3 (emphasis added).

### D. UNJUST ENRICHMENT

To recover on an unjust enrichment claim, a plaintiff must demonstrate that a benefit was conferred on the defendant by the plaintiff, the defendant appreciated the benefit, and the defendant's acceptance and retention of the benefit occurred under such circumstances that it would be inequitable for the defendant to retain it without payment." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir.2010); *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 113 Nev. 747, 755 (1997).

Plaintiff's unjust enrichment claim is bifurcated. Plaintiff argued (i) that VTI, as Mr. Rajan's alter ego, improperly loaned $300,000 of Plaintiff's funds to Stream TV for its bankruptcy proceedings for the purpose of keeping Mr. Rajan in control of Stream TV; and (ii) that Mr. Rajan used the remaining $720,000[4] of the $1,020,000 for his personal benefit.[5] The Court addresses each argument in turn.

#### i. The $300,000 Loan did not Unjustly Enrich Mr. Rajan.

On March 24, 2021, VTI loaned $300,000 of Plaintiff's funds to Stream TV in its bankruptcy proceedings. ECF No. 108-16. Defense counsel did not contest this fact at the August 27, 2025 hearing. Hearing Transcript at 46. Plaintiff argued that Mr. Rajan, using VTI as his alter ego, improperly used Plaintiff's loan to pay Stream TV's bankruptcy lawyers for the ultimate goal of Mr. Rajan maintaining control over Stream TV. Pl.'s Mot. for Summ. J. at 22.

Defense counsel argued there was no personal benefit to Mr. Rajan. Hearing Transcript at 50. The VTI loan to Stream TV during its bankruptcy was allegedly an attempt to control Stream

---

[4] As noted above, Plaintiff received $30,000 from Defendants, bringing the total amount due down to $1,020,000.
[5] In Plaintiff's briefing, he phrased his unjust enrichment claim as an alternative to his breach-of-contract claim. Pl.'s Mot. for Summ. J. at 20. But at the August 27, 2025 hearing, counsel clarified that the unjust enrichment claim does not depend on the breach-of-contract claim. Hearing Transcript at 33.

12

TV by obtaining Stream TV's stocks, not its assets. *Id*. at 48. However, that plan was denied by the bankruptcy court, and VTI never became the parent company of Stream TV via a stock purchase. *Id*. at 49. So, Defendants argued, there ultimately was no personal benefit to Mr. Rajan because he never regained control of Stream TV. *See In re Stream TV Networks, Inc.*, BR 23-10763, 2024 WL 87639, at * 36 (Bankr. E.D. Pa. Jan. 5, 2024); *see* Docs. 89-14 - 89-16.

The pertinent disagreement between both parties is whether an *attempt* to enrich is sufficient in an unjust enrichment claim. The Court finds that it is not. The Court has already found VTI to be Mr. Rajan's alter ego, so it is concluded that VTI's $300,000 loan of Plaintiff's funds to Stream TV was done on Mr. Rajan's behalf. But although Mr. Rajan attempted to enrich himself by maintaining control over Stream TV during its bankruptcy, he did not actually receive that benefit in the end. The gravamen of an unjust enrichment claim is the retention of an unearned, undeserved benefit. If the attempt to enrich did not result in a benefit, whether intended or not, then no benefit was actually retained.

For example, in *In re Wolf*, the plaintiff deposited a check into an the defendant's bank account, even though the check pertained to a transaction between the plaintiff and the defendant's corporation. 573 B.R. 179, 186 (E.D. Pa. 2017), *aff'd*, 739 F. App'x 165 (3d Cir. 2018). The plaintiff never received a car, as promised in the contract between the plaintiff and the defendant's corporation. *Id*. The plaintiff sued the individual defendant for unjust enrichment, but the court found that the individual defendant was not enriched because he used the plaintiff's payment to pay corporate debts. Therefore, the individual defendant was not himself enriched. *Id.* Similarly here, Mr. Rajan never received a personal benefit. He attempted to and failed, which is not sufficient for an unjust enrichment claim. Therefore, Plaintiff's motion for summary judgment

with respect to the unjust enrichment claim for the $300,000 loan to Stream TV is denied, and Defendants' motion is granted on this limited issue.

### ii. Defendants May Not Introduce Evidence Opposing Plaintiff's Unjust Enrichment Claim on the Remaining $720,000.

Because Defendants did not produce necessary information in discovery, the unjust enrichment claim on the remaining $720,000 loan proceeds to trial with the sanction that Defendants may not introduce evidence opposing this claim. Plaintiff sought discovery of VTI's use of his loan for the very purpose of establishing the evidence underlying his unjust enrichment claim. However, in defiance of this Court's order, Defendants still did not disclose this information, thereby depriving Plaintiff of the opportunity to establish his unjust enrichment claim with evidence on a motion for summary judgment. As noted above, *supra* Section III.B, Plaintiff requested sanctions under Rule 37(b)(2)(A)(i), but this Court opted instead to impose sanctions under Rule 37(b)(2)(A)(ii). Accordingly, both Plaintiff and Defendants' motions for summary judgment on the unjust enrichment claim—specifically regarding the remaining $720,000 of Plaintiff's loan for which there is no evidence of how it was used—are denied. However, this claim may proceed to trial, subject to the sanction imposed on Defendants: they are precluded from introducing evidence to oppose Plaintiff's unjust enrichment claim as it relates to the remaining $720,000.

### E. FRAUDULENT INDUCEMENT

Last, Mr. Rajan is found to have fraudulently induced Plaintiff into making the loan. Fraud in the inducement alleges that one party misrepresented another party to induce a contractual agreement. *Ruggiero v. Nocenti*, 556 F. Supp. 3d 512, 527 (E.D. Pa. 2021). Plaintiff must establish, by clear and convincing evidence: "(1) a representation; (2) which is material to the

transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Id.* Nevada law does not materially differ. *See J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 290 (2004).

Here, VTI's Investor Presentation is sufficient to establish a fraudulent inducement claim. On February 17, 2021, Glen Davis—an agent of VTI and Mr. Rajan[6]—sent Plaintiff an Investor Presentation of VTI. Investor Presentation. At the time that this email was sent, Mr. Rajan was the only director and officer of VTI. Defs. Interrog. Resp. ¶ 6. Defendants do not dispute the Investor Presentation's authenticity. ECF No. 108-4 ¶ 4.

The Investor Presentation contained numerous, discrete misrepresentations. These misrepresentations are (i) VTI had a "Management team with High-Tech Experience," (iii) Tracey Rees was President of VTI, (iv) Bud Robertson was Executive VP of VTI, (v) Cliff Morton was VP, Engineering for VTI, (vi) VTI had a "Technical & Sales Team" consisting of four people, (vii) VTI had an "[e]xisting [r]elationship[ ]" and "strategic partnership with the world's biggest panel manufacturer," BOE, (viii) VTI had "[e]stablished R&D subsidiary with 20+ person engineering team and on-site 3D bonding capability and "[e]stablished subsidiaries in China for manufacturing & sales." Investor Presentation at 16-17, 19, 25; Defs. Interrog. Resp. ¶¶ 1-3, 10.

In addition to these discrete misrepresentations, Mr. Rajan also misrepresented the purpose of Plaintiff's loan. In Plaintiff's declaration, he declares that Mr. Davis contacted him to convey that VTI was raising money to purchase Stream TV's patents and assets. ECF No. 108-22 ¶ 13.

---

[6]   It is undisputed that Mr. Davis was an agent of VTI. ECF No. 108-4 ¶ 20; Hearing Transcript at 50-51. The Court has already determined VTI to be the alter ego of Mr. Rajan, *see supra* Section III.C. Consequently, conduct by Mr. Davis is imputed to VTI, and conduct by VTI is imputed to Mr. Rajan.

15

Even if we do not take Plaintiff's word as truth on the motions for summary judgment, the Investor Presentation itself stated that Plaintiff's contribution is a precursor investment "to finance the purchase orders, fulfillment and shipping of current orders of 5,000 off Glasses Free 3-D 8" Tablets and 5 off 250" large exterior signage screens . . . plus the ever present expensive lawyers." Investor Presentation at 46. After which, an institutional investor was to invest $30 million to enable the acquisition of "a company in the sector," namely, Stream TV. *Id.* As the Court sees it, the debate here revolves around the meaning of "plus the ever present expensive lawyers." The bullet point structure of the deal summary does not permit an interpretation that the phrase "plus the ever present expensive lawyers" included VTI making payments to Stream TV in its bankruptcy proceedings. A reasonable reading of the unambiguous language, which comports with Plaintiff's argument, was that his investment would be used to sell tablets and screens, which shall include lawyer costs to make those sales. Therefore, Mr. Rajan, who was the only VTI officer and director at the time of loaning Stream TV $300,000, was using VTI to funnel money into Stream TVs bankruptcy proceedings—in contradiction of VTI's representations to Plaintiff.

Thus, Mr. Rajan fraudulently induced Plaintiff through the Investor Presentation. The misrepresentations were material because the Investor Presentation falsely conveyed that VTI had experienced officers, experienced employees, and valuable market relationships. Moreover, it conveyed that Plaintiff's loan would be used to support the sale of product to trigger further investments to acquire Stream TV and go public. At the time the Investor Presentation was sent to Plaintiff, Mr. Rajan was the only director, only officer, and majority shareholder, and made such misrepresentations in the Investor Presentation with knowledge of their falsity with the intent of misleading Plaintiff to loan $1,050,000. Mr. Rajan then used Plaintiff's funds, in contradiction of

the stated purposes set out in the Investor Presentation, to loan $300,000 to Stream TV in its bankruptcy proceedings.

Plaintiff justifiably relied on this Investor Presentation because he had dealt with Mr. Davis concerning other investments.[7] ECF No. 108-22 ¶ 12. Plaintiff knew that Stream TV had $150 million in investments and developed valuable intellectual property. *Id.* ¶ 14. Defendants represented that Plaintiff's loan would enable VTI product sales to eventually purchase Stream TV's valuable assets through bankruptcy and take VTI public. Investor Presentation at 46-47. Defendants even gave Plaintiff the option to convert his loan into shares in VTI if it became publicly traded. As a result of Mr. Rajan's fraudulent inducement, Plaintiff loaned $1,050,000 he would not have otherwise loaned and was injured. To determine damages for this claim, this Court will hold an evidentiary hearing.

## IV. CONCLUSION

Based on the foregoing, Plaintiff's motion on the breach of contract and fraudulent inducement claims is granted. Plaintiff's motion on the unjust enrichment is denied, and Defendants' motion on the unjust enrichment claim is granted in part.

---

[7] Defendants claimed there can be no justifiable reliance because of a no-reliance contractual provision in the Convertible Note Agreement, stating:

> "Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its own independent investigation and verification."

ECF No. 1-7 at 6; Hearing Transcript at 52. This was a clause in the Convertible Loan Agreement, which this Court has already declared inapplicable to this case given that Mr. Bunce never opted to convert his loans into shares. ECF No. 28 at 7-8.

BY THE COURT:

_____
**HON. KAI N. SCOTT**
**United States District Court Judge**